IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Assiniboine & Sioux Tribes of the Fort Peck Indian Reservation v. Norton, et al. | : : : | Civil Action No. 02-0035 (JR) |
| Standing Rock Sioux Tribe v. Norton, et al. | : : | Civil Action No. 02-0040 (JR) |
| Three Affiliated Tribes of the Fort Berthold Reservation v. Norton, et al. | : : : | Civil Action No. 02-0253 (JR) |
| Shoshone-Bannock Tribes of The Fort Hall Reservation v. Norton, et al. | : : : | Civil Action No. 02-0254 (JR) |
| Chippewa Cree Tribe of the Rocky Boy's Reservation v. Norton, et al. | : : : | Civil Action No. 02-0276 (JR) |
| Yankton Sioux Tribe v. Norton, et al. | : : | Civil Action No. 03-1603 (JR) |
| Osage Tribe of Indians of Oklahoma v. USA, et al. | : : | Civil Action No. 04-0283 (JR) |
| Crow Creek Sioux Tribe v. Kempthorne, et al. | : : | Civil Action No. 04-0900 (JR) |
| Omaha Tribe of Nebraska v. Kempthorne, et al. | : : | Civil Action No. 04-0901 (JR) |
| Oglala Sioux Tribe v. Kempthorne, et al. | : : | Civil Action No. 04-1126 (JR) |
| The Confederated Tribes of the Colville Reservation v. Norton, et al. | : : : | Civil Action No. 05-2471 (JR) |
| Wyandot Nation of Kansas v. Kempthorne, et al. | : : | Civil Action No. 05-2491 (JR) |
| Rosebud Sioux Tribe v. Kempthorne, et al. | : : | Civil Action No. 05-2492 (JR) |

| | | |
|---|---|---|
| Winnebago Tribe of Nebraska | : | |
| v. Kempthorne, et al. | : | Civil Action No. 05-2493 (JR) |
| | | |
| Lower Brule Sioux Tribe v. | : | |
| Kempthorne, et al. | : | Civil Action No. 05-2495 (JR) |
| | | |
| Prairie Band of Potawatomi | : | |
| Nation v. Kempthorne, et al. | : | Civil Action  No. 05-2496 (JR) |
| | | |
| Te-Moak Tribe of Western | : | |
| Shoshone Indians v. | : | Civil Action No. 05-2500 (JR) |
| Norton, et al. | : | |
| | | |
| Cheyenne River Sioux Tribe v. | : | |
| Kempthorne, et al. | : | Civil Action No. 06-1897 (JR) |
| | | |
| Stillaguamish Tribe of | : | |
| Indians v. Kempthorne, et al. | : | Civil Action No. 06-1898 (JR) |
| | | |
| Iowa Tribe of Kansas and | : | |
| Nebraska v. Kempthorne, et al. | : | Civil Action No. 06-1899 (JR) |
| | | |
| Confederated Tribes of the | : | |
| Goshute Reservation v. | : | Civil Action No. 06-1902 (JR) |
| Kempthorne, et al. | : | |
| | | |
| Muskogee (Creek) Nation of | : | |
| Oklahoma v. Kempthorne, et al. | : | Civil Action No. 06-2161 (JR) |
| | | |
| Eastern Shawnee Tribe of | : | |
| Oklahoma v. Kempthorne, et al. | : | Civil Action No. 06-2162 (JR) |
| | | |
| Northwestern Band of Shoshone | : | |
| v. Kempthorne, et al. | : | Civil Action No. 06-2163 (JR) |
| | | |
| Red Cliff Bank of Lake | : | |
| Superior Indians v. | : | Civil Action No. 06-2164 (JR) |
| Kempthorne, et al. | : | |
| | | |
| Pechanga Band of Luiseno | : | |
| Mission Indians v. | : | Civil Action No. 06-2206 (JR) |
| Kempthorne, et al. | : | |
| | | |
| Colorado River Indian Tribes | : | |
| v. Kempthorne, et al. | : | Civil Action No. 06-2212 (JR) |

Tohono O'Odham Nation v.                :
Kempthorne, et al.                      :      Civil Action No. 06-2236 (JR)

Nez Perce Tribe, et al. v.              :
Kempthorne, et al.                      :      Civil Action No. 06-2239 (JR)

Passamaquoddy Tribe of                  :
Maine v. Kempthorne, et al.             :      Civil Action No. 06-2240 (JR)

Salt River Pima-Maricopa                :
Indian Community v.                     :      Civil Action No. 06-2241 (JR)
Kempthorne, et al.                      :

Coer D'Alene Tribe v.                   :
Kempthorne, et al.                      :      Civil Action No. 06-2242 (JR)

Ak-Chin Indian Community v.             :
Kempthorne, et al.                      :      Civil Action No. 06-2245 (JR)

Sokaogon Chippewa Community             :
v. Kempthorne, et al.                   :      Civil Action No. 06-2247 (JR)

Gila River Indian Community             :
v. Kempthorne, et al.                   :      Civil Action No. 06-2249 (JR)

Northern Cheyenne Tribe of              :
Indians v. Kempthorne, et al.           :      Civil Action No. 06-2250 (JR)

Haudenosaunee:  The Onondaga            :
Nation v. Kempthorne, et al.            :      Civil Action No. 06-2254 (JR)

## **PLAINTIFFS' JOINT MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR REMAND AND STAY OF LITIGATION**

# TABLE OF CONTENTS

**Page(s)**

TABLE OF CONTENTS ..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. iv

I.  THE TRUST OBLIGATIONS OF THE UNITED STATES AND TRUSTEE-DELEGATES. ............................................................................................................. 3

    A.  Trustee-Delegates Owe Plaintiff-Beneficiaries Fiduciary Duties. .......................... 3

    B.  Trustee-Delegates Hold Assets in Trust for Plaintiff-Beneficiaries. ...................... 5

II. HISTORY OF TRUST MISMANAGEMENT, DELAY, AND FAILURE TO ACCOUNT. ............................................................................................................... 7

    A.  Trust Fund Management Problems Date Back To The Nineteenth Century. ......... 7

    B.  Indian Claims Commission Proves to be a Failure. ............................................... 9

    C.  Interior Fails to Take Corrective Measures in Response to Intense Criticism of Its Accounting and Trust Management. ................................................................... 12

        1.  Interior Fails to Take Promised Corrective Action in Response to the 1982 GAO Report. ...................................................................................... 13

        2.  BIA Breaks Its Promise to Reconcile Its Systems Within Six Months of Critical 1983 OIG Report. ....................................................................... 14

        3.  BIA Fails to Take Corrective Measures in Response to Critical Price Waterhouse Recommendations. .............................................................. 15

        4.  Interior Breaks Its Promise to Implement Arthur Andersen's Recommendations Within One Year. ....................................................... 16

    D.  Interior's Attempt to Outsource Tribal Trust Accounting Fails. .......................... 17

    E.  Congressional Measures Are Met with Further Delay. ........................................ 18

    F.  Congress Passes the 1994 Trust Reform Act in Response to Trustee-Delegates' Intransigence. ....................................................................................................... 20

III. THE ARTHUR ANDERSEN REPORTS WERE DEFICIENT AND DID NOT CONSTITUTE AN ADEQUATE ACCOUNTING. ................................................... 22

    A.  Trustee-Delegates Prepare a Woefully Inadequate Accounting "Plan." ............. 22

    B.  Trustee-Delegates Improperly Sought Acknowledgements from Tribes Attesting to the Accuracy of the Arthur Andersen Reports. .................................................. 25

    C.  The Arthur Andersen Reports Were Not a Full and Complete Accounting. ........ 27

IV. ONGOING DELAY AND FAILURE TO ACCOUNT. ............................................. 28

    A.  Interior Fails to Rectify Errors Revealed by the Arthur Andersen Reports. ......... 29

B.     Interior Still Has No Plan to Repair Deficiencies in the Trust Management System............................................................................................................ 29

C.     Trustee-Delegates Invited Lawsuits by Refusing to Extend the Date on Which Tribes Would Be Deemed to have Received their Reconciliation Reports. ......... 33

V.     PLAINTIFF-BENEFICIARIES' CLAIMS. .................................................... 35

SUMMARY OF ARGUMENT ........................................................................... 37

ARGUMENT .................................................................................................... 39

VI.    THE PRINCIPLES OF ADMINISTRATIVE LAW TRUSTEE-DELEGATES INVOKE TO SUPPORT FURTHER DELAY HAVE NO APPLICATION HERE BECAUSE PLAINTIFF-BENEFICIARIES' PRINCIPAL CAUSE OF ACTION SEEKS TO ENFORCE EQUITABLE TRUST DUTIES THAT ARE NOT ROOTED IN THE APA. ................................................................................................... 39

A.     Plaintiff-Beneficiaries' Principal Cause Of Action Is A Breach of Trust Claim That Is Not In Any Way Controlled By The Review Provisions Of The APA. .... 41

B.     The Administrative Law Doctrines Invoked By Trustee-Delegates Do Not Apply To A Trust Case. .............................................................................................. 46

VII.   TRUSTEE-DELEGATES' REMAND REQUEST MISCONCEIVES THE ROLE AND AUTHORITY OF THE COURT AND WOULD PREEMPT PROMPT JUDICIAL RESOLUTION OF LONG-NEGLECTED TRUST DUTIES BY ARROGATING THOSE DECISIONS TO THE AGENCY. ...................................................... 49

A.     Either Trustee-Delegates Concede, Or The Court Must Decide, Threshold Issues Of Duty, Breach, And Scope Of Duty To Account. ........................................... 51

B.     Trustee-Delegates Should Not Be Permitted To Delay These Proceedings An Additional Six Months In Order To Fashion An Accounting Plan That Is Decades Late. .................................................................................................................. 54

C.     Even if Trustee-Delegates were to Prepare A Historical Accounting Plan, Discovery Should Proceed Apace........................................................................ 57

VIII.  EVEN ON THE GOVERNMENT'S OWN TERMS, THE DOCTRINE OF PRIMARY JURISDICTION AND GENERAL PRINCIPLES OF ADMINISTRATIVE LAW DO NOT SUPPORT A REMAND.......................................................................... 60

A.     The Swimmer Declaration Is Entitled To No Consideration................................ 60

B.     The Court Should Not Remand The Case To Interior Based Upon The Doctrine of Primary Jurisdiction. ......................................................................................... 61

1.     Trustee-Delegates fundamentally misunderstand the nature of primary jurisdiction. ............................................................................................. 63

2.     Primary jurisdiction is inapplicable where there is a history of decades of delay...................................................................................................... 66

3.     Enforcement of trust duties is within the conventional experience of courts and does not require special agency expertise. ......................................... 67

4.      There will be no "inconsistent" outcome if this Court exercises its authority to enforce Trustee-Delegates' trust duties. ................................ 71

C.      The General "Principles Of Administrative Law" Trustee-Delegates Cite Do Not Support A Voluntary Remand. ........................................................................... 72

1.      Trustee-Delegates misunderstand the purpose of a voluntary remand. .... 73

2.      No intervening event justifies a voluntary remand. ................................. 73

3.      There are no substantial or legitimate grounds for a remand to reconsider Trustee-Delegates' prior action. ............................................................... 75

CONCLUSION .................................................................................................................. 77

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allnet Commc'ns Serv., Inc. v. Nat'l Exch. Carrier Ass'n, Inc.*,
965 F.2d 1118 (D.C. Cir. 1992) ................................................................. 61, 63, 71

*Am. Ass'n of Cruise Passengers v. Cunard Line, Ltd.*,
31 F.3d 1184 (D.C. Cir. 1994) ................................................................. 62, 69

*American Indians Residing on Maricopa-Ak Chin Reservation v. United States*,
667 F.2d 980 (Ct. Cl. 1981) ................................................................. 11, 71

*Assiniboine & Sioux Tribes of Fort Peck Indian Reservation v. Board of Oil & Gas Conservation*,
792 F.2d 782 (9th Cir. 1986) ................................................................. 42

*Beckett v. Air Line Pilots Ass'n*,
995 F.2d 280 (D.C. Cir. 1993) ................................................................. 45

*Blackfeet and Gros Ventre Tribes v. United States*,
32 Ind. Cl. Comm. 65 (1973) ................................................................. 10, 11, 63, 71

*Caterpillar Inc. v. Williams*,
482 U.S. 386 (1987) ................................................................. 43

*Chamber of Commerce of the U.S. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) ................................................................. 42

*Cherokee Nation v. Georgia*,
30 U.S. (5 Pet.) 1 (1831) ................................................................. 7

*Chippewa Cree Tribe v. United States*,
69 Fed. Cl. 639 (2006) ................................................................. 35

*Clark v. Library of Congress*,
750 F.2d 89 (D.C. Cir. 1984) ................................................................. 42

*Cobell v. Babbitt*,
30 F. Supp. 2d 24 (D.D.C. 1998) ................................................................. 42

*Cobell v. Babbitt*,
91 F. Supp. 2d 1 (D.D.C. 1999),
*aff'd*, 240 F.3d 1081 (D.C. Cir. 2001) ................................................................. 7, 8, 9

*Cobell v. Norton*,
226 F.R.D. 67 (D.D.C. 2005) ................................................................. 58

*Cobell v. Norton*,
240 F.3d 1081 (D.C. Cir. 2001) ................................................................. passim

*Cobell v. Norton*,
283 F. Supp. 2d 66 (D.D.C. 2003) ................................................................. 54

*Cobell v. Norton*,
   391 F.3d 251 (D.C. Cir. 2004) .......................................................................... 58

*Cobell v. Norton*,
   455 F.3d 301 (D.C. Cir. 2006) .......................................................................... 53

*Colo. River Water Conservation Dist. v. United States*,
   424 U.S. 800 (1976) ......................................................................................... 62

*Crawford v. La Boucherie Bernard Ltd.*,
   815 F.2d 117 (D.C. Cir. 1987) .......................................................................... 47

*Ethyl Corp. v. Browner*,
   989 F.2d 522 (D.C. Cir. 1993) .......................................................................... 73

*Firestone Tire & Rubber Co. v. Bruch*,
   489 U.S. 101 (1989) .................................................................................. 53, 68

*First Fiduciary Corp. v. Office of Comm'r of Banks*,
   684 N.E.2d 1 (Mass. App. Ct. 1997) ................................................................ 68

*Ford Motor Co. v. NLRB*,
   305 U.S. 364 (1939) .................................................................................. 49, 66

*Fort Still Apache v. United States*,
   28 Ind. Cl. Comm. 433 (1972) ................................................................... 10, 71

*Grupo Mexicano de Desarollo, S.A. v. Alliance Bond Fund, Inc.*,
   527 U.S. 308 (1999) ......................................................................................... 67

*Hubbard v. EPA*,
   949 F.2d 453 (D.C. Cir. 1991) .......................................................................... 42

*Jicarilla Apache Tribe v. Supron Energy Corp.*,
   728 F.2d 1555 (10th Cir. 1984) .................................................................. 47, 62

*Lower Sioux Indian Community v. United States*,
   30 Ind. Cl. Comm. 463 (1973) ............................................................. 10, 11, 71

*Manchester Band of Pomo Indians v. United States*,
   363 F. Supp. 1238 (N.D. Calif. 1973) .............................................................. 43

*Marbury v. Madison*,
   5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803) ........................................................ 54

*Mescalero Apache Tribe v. United States*,
   23 Ind. Cl. Comm. 181 (1970) .......................................................................... 11

*Nader v. Allegheny Airlines, Inc.*,
   426 U.S. 290 (1976) ............................................................................... 62, 64, 69

*Navajo Tribe of Indians v. New Mexico*,
   809 F.2d 1455 (10th Cir. 1987) ........................................................................ 10

*Navajo v. United States*,
   31 Ind. Cl. Comm. 40 (1973) ..................................................................... 10, 71

v

*Nevada v. United States*,
    463 U.S. 110 (1983)..................................................................................... 46

*NLRB v. Amax Coal Co., Div. of Amax, Inc.*,
    453 U.S. 322 (1981)............................................................................... 4, 46

*Osage Nation v. United States*,
    57 Fed. Cl. 392 (Fed. Cl. 2003) ................................................................ 52

*Presidential Gardens Assocs. v. United States*,
    175 F.3d 132 (2d Cir. 1999) ...................................................................... 41

*Red Lake Band of Chippewa Indians v. Barlow*,
    834 F.2d 1393 (8th Cir. 1987) ............................................... 45, 51, 65, 66

*Red Lake Band of Chippewa Indians v. Barlow*,
    846 F.2d 474 (8th Cir. 1988) ............................................................. passim

*Reiman v. Smith*,
    12 F.3d 222 (D.C. Cir. 1993) ..................................................................... 62

*Reiter v. Cooper*,
    507 U.S. 258 (1993).................................................................................... 63

*Ricci v. Chicago Mercantile Exch.*,
    409 U.S. 289 (1973).................................................................................... 67

*Rohr Indus., Inc. v. Washington Metro. Area Transit Auth.*,
    720 F.2d 1319 (D.C. Cir. 1983) ........................................................... 66, 67

*Schnapper v. Foley*,
    667 F.2d 102 (D.C. Cir. 1981) ................................................................... 42

*Sea-Land Serv., Inc. v. Alaska R.R.*,
    659 F.2d 243 (D.C. Cir. 1981) ................................................................... 42

*Seminole Nation v. United States*,
    316 U.S. 286 (1942).................................................................................... 45

*Shoshone Indian Tribe v. United States*,
    364 F.3d 1339 (Fed. Cir. 2004) ................................................................. 34

*Sioux Tribe of the Rosebud Reservation v. United States*,
    35 Ind. Cl. Comm. 123 (1974) ................................................................... 11

*Sioux Tribe v. United States*,
    12 Ind. Cl. Comm. 541 (1963) ................................................................... 10

*SKF USA, Inc. v. United States*,
    254 F.3d 1022 (Fed. Cir. 2001) ..................................................... 72, 73, 75

*Total Telecomms. Servs., Inc. v. Am. Tel. & Tel. Co.*,
    919 F. Supp. 472 (D.D.C. 1996).................................................................. 66

*Trudeau v. Federal Trade Comm'n*,
    456 F.3d 178 (D.C. Cir. 2006) ................................................................... 42

*United Am., Inc. v. N.B.C.-U.S.A. Hous., Inc. Twenty Seven*,
400 F. Supp. 2d 59 (D.D.C. 2005) .......................................................... 41

*United States v. Bessemer & Lake Erie R.R. Co.*,
717 F.2d 593 (D.C. Cir. 1983) .............................................................. 61

*United States v. McDonnell Douglas Corp.*,
751 F.2d 220 (8th Cir. 1984) ............................................................... 62

*United States v. Mitchell*,
463 U.S. 206 (1983) ................................................................... passim

*United States v. Philadelphia Nat'l Bank*,
374 U.S. 321 (1963) ........................................................................ 48

*United States v. W. Pac. R.R. Co.*,
352 U.S. 59 (1956) ......................................................... 48, 61, 63, 64

*United States v. White Mountain Apache Tribe*,
537 U.S. 465 (2003) ....................................................... 3, 4, 44, 46

*Vill. of Brookfield v. Pentis*,
101 F.2d 516 (7th Cir. 1939) ........................................... 43, 48, 68

*Webster v. Reproductive Health Servs.*,
429 U.S. 490 (1989) ........................................................................ 43

**Statutes**

25 U.S.C. § 152 ............................................................................... 6

25 U.S.C. § 155 ............................................................................... 6

25 U.S.C. § 155b ............................................................................. 6

25 U.S.C. § 177 ............................................................................... 6

25 U.S.C. § 2101, *et seq.* .............................................................. 6

25 U.S.C. § 311 ............................................................................... 6

25 U.S.C. § 312 ............................................................................... 6

25 U.S.C. § 318a ............................................................................. 6

25 U.S.C. § 319 ............................................................................... 6

25 U.S.C. § 321 ............................................................................... 6

25 U.S.C. § 396 ............................................................................... 6

25 U.S.C. § 397 ............................................................................... 6

25 U.S.C. § 398, *et seq.* ................................................................ 6

25 U.S.C. § 399 ............................................................................... 6

25 U.S.C. § 4011(a) ........................................................................ 21

25 U.S.C. § 4041(3) ........................................................................ 20

25 U.S.C. § 4042 ............................................................................ 20

25 U.S.C. § 4044 ............................................................................................ 21, 23, 33, 55

25 U.S.C. § 70a (1978) ............................................................................................. 10

25 U.S.C. §§ 323-28 ................................................................................................... 6

25 U.S.C. §§ 396a-396g ............................................................................................. 6

25 U.S.C. §§ 415-416j ............................................................................................... 6

28 U.S.C. § 1331 ................................................................................................. 40, 41

28 U.S.C. § 1361 ...................................................................................................... 40

28 U.S.C. § 1362 ...................................................................................................... 40

30 U.S.C. § 1701, *et seq.* ............................................................................................ 6

5 U.S.C. § 701, *et seq.* .............................................................................................. 39

5 U.S.C. § 702 ...................................................................................................... 41, 42

5 U.S.C. § 706 ................................................................................................. 39, 40, 46

**Other Authorities**

A. Dobie, *Handbook of Jurisdiction and Procedure* 660 (1928) ................................ 68

Act of December 22, 1987 Pub. L. 100-202, 101 Stat. 1329-214, 1329-229 (1987) ...................... 18

Act of July 1987, Pub. L. 100-71, 101 Stat. 391 (1987) ............................................ 18, 55

Act of October 23, 1989, Pub. L. 101-121, 103 Stat. 701, 714 (1989) ........................... 18

Act of September 1988, Pub. L. 100-446, 102 Stat. 1774, 1794 (1988) ......................... 18

G.T. Bogert, *Trusts* § 141 (6th ed. 1987) ............................................................. 19, 59

Louis L. Jaffe, *Primary Jurisdiction,*
    77 HARV. L. REV. 1037 (1964) ...................................................................... 63

Pub. L. No. 103-412 .................................................................................................. 20

Pub. L. No. 107-153, 116 Stat. 79 (2002) .................................................................. 33

Pub. L. No. 108-447, 118 St. 2809 (2004) ................................................................. 34

Pub. L. No. 109-158, 119 Stat. 2954 (2005) .............................................................. 33

*Restatement (Second) of Trusts* § 173 (1959) ..................................................... 50, 59

*Restatement (Second) of Trusts* § 199 ..................................................................... 45

William F. Fratcher, 3 *Scott on Trusts* § 199 (4th ed. 1988) ................................. 43, 68

**Rules**

Fed. R. Civ. P. 26(a)(1)(E)(i) .................................................................................... 58

Fed. R. Evid. 26(a) ................................................................................................ 5, 61

Fed. R. Evid. 602 ...................................................................................................... 60

Fed. R. Evid. 801(d)(1)(B) ........................................................................................ 60

Fed. R. Evid. 801(d)(2) .................................................................................................... 5

Fed. R. Evid. 803(8) ......................................................................................................... 5

Fed. R. Evid. Rule 26(f) .................................................................................................. 58

Local Rule 16.3(b)(1) ...................................................................................................... 58

**Regulations**

25 C.F.R. pt. 162 .............................................................................................................. 6

25 C.F.R. pt. 166 .............................................................................................................. 6

25 C.F.R. pts. 150-51 ....................................................................................................... 6

**INTRODUCTION**

Trustee-Delegates seek an order from this Court formally remanding the case to the Department of the Interior to permit them to prepare a plan to provide a complete, accurate, and adequate accounting, and a stay of the litigation while they develop that plan. Their requests for a remand and for a stay to put the lawsuit entirely on hold for six months are utterly without merit.

First, because this is a trust case rather than (as Trustee-Delegates strain to transform it) a routine administrative-law case, their arguments relying on administrative law doctrines of primary jurisdiction and "voluntary remand" have no place here. At bottom, it is for this Court sitting in equity, not for Trustee-Delegates themselves, to determine the nature and scope of Trustee-Delegates' fiduciary duties under the trust. Accordingly, the motion for a remand should be denied out-of-hand.

Second, Trustee-Delegates do not dispute that they have a duty to account; nor do they argue that they have not breached that duty. Indeed, their remand motion is premised, as it must be, on the admission that they have not yet discharged this fundamental fiduciary obligation. But even if Trustee-Delegates' motion did not make these concessions, Plaintiff-Beneficiaries are entitled to a ruling on Trustee-Delegates' duty to account, the scope of that duty, and their breach of that duty. Either they have performed a complete and accurate accounting for each tribe, or they have not. These are threshold issues, which this Court should address in the first instance.

Third, there is no reason to stay proceedings in this Court while Trustee-Delegates prepare a plan. To the contrary, any plan for an accounting must be developed under Court supervision and while the litigation process continues. As set forth in Parts II, III, and IV, *infra,* there is a manifest history of decades of unconscionable delay in discharging fundamental

fiduciary duties in the administration of tribal trust funds and other assets. Indeed, in light of Trustee-Delegates' egregious and continuing breaches of their fiduciary duties, the idea that they now be given another half-year to do what they should already have long ago completed is nothing short of shameless and amounts to an abject confession that they have not provided, and even today cannot provide, the requisite accounting. This history demonstrates beyond peradventure the need for this Court's ongoing supervision of all aspects of Trustee-Delegates' preparation of the required tribal accountings – including preparation of any plans to conduct the accountings to the extent this Court deems such plans advisable.

Fourth, the motion to remand covers 37 different cases involving at least 49 different tribes. These cases share some important commonalities – not least of which is that the United States, for as long as it has held the tribes' trust funds and other trust assets, has mismanaged them and wholly failed to account. But in important ways, these tribes also have particularized claims and circumstances which will not be addressed by Trustee-Delegates' generalized accounting plan. Some have judgment funds, others do not. Some have substantial mineral interests, timber resources, or both, others do not. Some have substantial leasing of their lands for farming, grazing, and other business purposes, others do not. Some have lands that number in the millions of acres, others have trust lands that are counted in the hundreds of acres. Some have trust funds and assets that have been controlled by Trustee-Delegates for almost two centuries; others have been federally recognized only in recent decades.

For these and other reasons discussed below, Trustee-Delegates' motion for remand and stay should be denied. However, although the parties fundamentally disagree on the remand motion, there is one respect in which Plaintiff-Beneficiaries do agree with Trustee-Delegates: the need for them forthwith to begin to formulate an accounting plan for each tribal plaintiff. It

is time – it is long past time – for them to do this.  Of course, there is no reason why Trustee-Delegates could not have begun this effort even before they filed their motion or while it is pending before the Court.  Furthermore, no order of the Court is required to enable them to proceed to develop a plan.  Thus, we assume that Trustee-Delegates will proceed with that proposal to formulate a plan and submit it to the Court within six months; their failure to do so would be a further and continued breach of their fiduciary obligations and additional contemporaneous evidence of their failure to comply with their trust duties.

In the meantime, because there is no justification whatsoever to stall any further, these cases should proceed.  In light of Trustee-Delegates' extraordinary record of recalcitrance and complete failure to *even commence* fulfilling basic fiduciary duties – among them the accounting duty – this Court should deny Trustee-Delegates' motion to remand and permit the normal litigation to go forward.[1]

## STATEMENT OF FACTS

I.     **THE TRUST OBLIGATIONS OF THE UNITED STATES AND TRUSTEE-DELEGATES.**

A.     **Trustee-Delegates Owe Plaintiff-Beneficiaries Fiduciary Duties.**

Because the United States holds Plaintiff-Beneficiaries' tribal lands and other assets in trust, it has assumed the fiduciary obligations of a trustee with respect to the management and administration of these trust assets.  *See United States v. White Mountain Apache Tribe*, 537 U.S.

---

[1] This Memorandum is intended to be a "principal brief" pursuant to paragraph 1 of this Court's August 23, 2007 Order ("Order").  That said, neither the Osage Tribe of Indians of Oklahoma nor the Gila River Indian Community join this brief.  The following plaintiff tribes, while they concur largely with this principal brief wish to make clear that they have some modest differences in view or approach, which they may or may not articulate in briefs filed subsequent hereto:  Assiniboine & Sioux Tribes of the Fort Peck Indian Reservation, Standing Rock Sioux Tribe, and Shoshone-Bannock Tribes of The Fort Hall Reservation.

All other tribes (*i.e.,* tribes not listed *supra*), do adopt this principal brief, however, pursuant to paragraph 2 of the Order, reserve the right to submit a supplemental memorandum by October 22, 2007, containing information and arguments specific to a plaintiff tribe.

465, 475-76 (2003); *United States v. Mitchell* ("*Mitchell II*"), 463 U.S. 206, 225 (1983).   The longstanding trust relationship between the United States and Plaintiff-Beneficiaries, and the United States' resulting fiduciary duties, are rooted in and derived from numerous statutes, regulations, and executive orders.   *See*, *e.g*., *White Mountain Apache Tribe*, 537 U.S. at 474; *Mitchell II*, 463 U.S. 224-26; *Cobell v. Norton* ("*Cobell VI*"), 240 F.3d 1081, 1098-99 (D.C. Cir. 2001).   The laws giving rise to the United States' fiduciary duties provide the "general contours" of those obligations, but the specific details are filled in through reference to general trust law and "defined in traditional equitable terms."   *Cobell VI*, 240 F.3d at 1099.   Thus, the failure of statutes to specify the precise nature of the fiduciary obligation or to enumerate the trustee's duties does not absolve the government of its responsibilities.   *Cobell VI*, 240 F.3d at 1099.   Rather, courts "must infer that Congress intended to impose on trustees traditional fiduciary duties unless Congress has unequivocally expressed an intent to the contrary."   *NLRB v. Amax Coal Co., Div. of Amax, Inc.*, 453 U.S. 322, 330 (1981) (*quoted in Cobell VI*, 240 F.3d at 1099) (adopting this generally applicable rule into the Indian trust context).[2]

These fiduciary duties include, among many others, the duty to perform a complete, accurate, and adequate historical accounting of all trust property (funds and non-monetary assets). Such an accounting must provide sufficient information to enable Plaintiff-Beneficiaries "readily to ascertain whether the trust has been faithfully carried out."   *Cobell VI*, 240 F.3d at 1103 (internal quotation omitted).   Despite their longstanding fiduciary responsibilities, Trustee-Delegates have failed, from the inception of the trust until the present, to provide Plaintiff-Beneficiaries with the

---

[2] Defendants Dirk Kempthorne, Secretary of the Interior, Ross O. Swimmer, Special Trustee, Office of the Special Trustee for American Indians, and Henry Paulson, Secretary of Treasury, are "the designated trustee-delegates" for tribal trust assets. Thus, "[e]ach Secretary, or his designates, has specific fiduciary responsibilities that must be fulfilled lest the United States breach its fiduciary obligations."   *Cobell VI*, 240 F.3d at 1089.

type of accounting they seek here – a complete, accurate and adequate accounting of all of their trust assets.

## B.    Trustee-Delegates Hold Assets in Trust for Plaintiff-Beneficiaries.

The United States has long held substantial assets, including funds and non-monetary assets, in trust for American Indian tribes.  In 1820, the Federal Government adopted the policy of holding tribal funds in trust.[3]  The trust funds are comprised principally of the proceeds from the sale and leasing of trust lands and other assets, as well as judgment funds.  Judgment funds are derived from settlements and judgments entered by federal courts on various claims against the United States.  *See, e.g.*, Compl. ¶ 14 *filed in Salt River Pima-Maricopa Indian Community*, No. 06-CV-02241 (D.D.C. Dec. 29, 2006) ("Salt River Complaint").  Trust funds, which are proceeds from the leasing and sale of trust lands and resources on such lands, receive their trust character as proceeds of trust property (and not because they are placed in a trust account).  *Id.* ¶ 2.  The funds involved are substantial.  By the government's own – almost assuredly undervalued – estimates, as provided by government contractor Arthur Andersen LLP, the United States handled substantially more than $ 100 billion in transactions for Indian tribes between fiscal years 1973 and 1992.[4]  As

_____

[3] Letter to Treaty Commission, October 18, 1820, reprinted in "American State Papers, Indian Affairs," vol. 2 at 233, cited in Committee on Government Operations, "Misplaced Trust:  The Bureau of Indian Affairs' Mismanagement of the Indian Trust Fund" at 6 (April 22, 1992) (hereinafter "Misplaced Trust") included in an accompanying Appendix (Exh. 1) (*see* Exh. A attached hereto).  Plaintiff-Beneficiaries are producing complete copies of all referenced materials.  These materials are not hearsay because they constitute Trustee-Delegates' admissions and/or fall under the exception to hearsay for public records and reports.  *See* Fed. R. Evid. 801(d)(2) and 803(8).  Plaintiff-Beneficiaries presume that Trustee-Delegates will not be raising objections with regard to authentication inasmuch as these documents are well-known to Trustee-Delegates and Trustee-Delegates' refusal to even make the most rudimentary disclosures required by Rule 26(a) left Plaintiff-Beneficiaries with no choice but to obtain these materials from third-parties.  If Trustee-Delegates object on the grounds of authenticity, however, Plaintiff-Beneficiaries should be given the opportunity to serve Requests for Admission on Trustee-Delegates regarding the authenticity of all such materials.

[4] The information that is the basis for this estimate and other information related to the failed reconciliation is chronicled in the 1996 U.S. General Accounting Office, *Report to the Committee on Indian Affairs*, U.S. Senate "Financial Management: BIA's Tribal Trust Fund Account Reconciliation Results,"

trustee, the United States has undertaken to manage, invest, and distribute these funds for the benefit of Plaintiff-Beneficiaries.  *Id.* ¶14.

Trust assets are not limited to tribal trust funds; a key component of these tribal assets is tribal lands and associated resources.  Title to the land constituting Plaintiff-Beneficiaries' reservations are held by the United States in trust for the tribes' benefit.  *Id.* ¶ 13.  Through numerous statutes and regulations, the United States maintains comprehensive control over these trust lands and resources.  *See, e.g.*, Indian Nonintercourse Act, 25 U.S.C. § 177; Indian Long-Term Leasing Act, 25 U.S.C. § 396; Indian Mineral Leasing Act of 1938, 25 U.S.C. §§ 396a-396g; Federal Oil & Gas Royalty Management Act, 30 U.S.C. §§ 1701, *et seq.*; Indian Mineral Development Act of 1982, 25 U.S.C. §§ 2101, *et seq.*; 25 U.S.C. § 152; 25 U.S.C. §§ 155, 155b; 25 U.S.C. §§ 311, 312, 318a, 319, 321, 323-28; 25 U.S.C. § 397; 25 U.S.C. §§ 398, *et seq.*; 25 U.S.C. § 399; 25 U.S.C. §§ 415-416j; 25 C.F.R. pts. 150-51; 25 C.F.R. pt. 162; 25 C.F.R. pt. 166.[5]  Over the years, substantial portions of these lands have been leased to third parties and to the government for rights-of-way, business uses, farming, grazing, housing, and other purposes.  Other natural resources are also held in trust for Plaintiff-Beneficiaries and are managed for the tribes' benefit, including, among other resources, oil, natural gas, timber, coal, and various minerals.

---

GAO/AIMD 96-93 (May 1996), which is discussed *infra* at p. 22.  Other information regarding this effort is contained in Section III, A.

[5] Trustee-Delegates make a feeble argument  that these statutes grant a "great deal" of "tribal autonomy" over the management of their trust assets.  Def. Mem. 18.  That obscures the big picture.  By any standards, any amount of tribal authority over trust assets pales in comparison to the enormous control asserted unilaterally by the government for centuries over every aspect of Indian trust matters, which largely continues to this day.

## II.     HISTORY OF TRUST MISMANAGEMENT, DELAY, AND FAILURE TO ACCOUNT.

The impropriety of Trustee-Delegates' request for a six-month "time out" to prepare an historical tribal accounting plan can be fully appreciated only in light of the government's long history of gross mismanagement of trust assets and failure to carry out its most basic and fundamental trust duty – the duty to account – for decade after decade.  Over the years, although Trustee-Delegates have made numerous promises to fulfill their fiduciary accounting obligations, these promises have been repeatedly followed by periods of undue delay and then additional stated commitments to completing the accountings that have proved empty and culminated in woefully inadequate attempts by Trustee-Delegates to discharge their accounting duties.

### A.     Trust Fund Management Problems Date Back To The Nineteenth Century.

As Chief Justice Marshall noted in 1831, the United States-Indian relationship is "perhaps unlike that of any other two people in existence" and "marked by peculiar and cardinal distinctions which exist nowhere else."  *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 2 (1831).  In the early 1800s, the United States pursued the policy of "removal" – *i.e.*, the relocation of tribal communities from their homelands in the East and Midwest to remote locations in the newly acquired Louisiana Purchase territory.  *See Cobell v. Babbitt*, 91 F. Supp. 2d 1, 6 (D.D.C. 1999) ("*Cobell V*"), *aff'd*, 240 F.3d 1081 (D.C. Cir. 2001).[6]  In 1824, the Bureau of Indian Affairs (BIA) was created, in large part, to implement that removal policy.  *Id.*[7]  In concluding that Trustee-Delegates had breached their duty to account to individual Indian beneficiaries by failing even to have developed plans for retaining vital IIM trust records or for obtaining missing records from third-parties, this Court observed that "[i]t would be difficult to

---

[6] This and other findings made in *Cobell V* were derived from evidence presented during the six-week long "Phase I" trial in 1999.

[7] BIA was originally named the "Office of Indian Affairs" and was placed in the United States Department of War.

find a more historically mismanaged federal program . . . ." *Id*. at 6. The Court found this "far more inexcusable than garden-variety trust mismanagement of a typical donative trust" because "the beneficiaries of this trust did not voluntarily choose to have their lands taken from them: they did not willingly relinquish pervasive control of their money to the United States. The United States imposed this trust on the Indian people." *Id*.

For the majority of the Nineteenth Century, the Federal Government entered into a series of treaties and agreements identifying the lands owned by the tribes. Treaties, the first means by which trust funds were held by the United States for the benefit of Indian tribes, were "frequently violated or amended to reduce Indian holdings and to open more land to non-Indian settlers." *Cobell V*, 91 F. Supp. 2d at 7. Moreover, the Government's reservation policy deprived Indians of their traditional economy and forced them to be dependent upon the Government for food and other goods. By the 1870's, the Federal Government had successfully placed Native Americans in what this Court has termed "a state of coerced dependency." *Id*.

Few of the trust management problems that plague Trustee-Delegates to this day are new. Indeed, in 1828 – just four years after BIA's creation – H.R. Schoolcraft described the Bureau's financial management as follows: "The derangements in the fiscal affairs of the Indian department are in the extreme. One would think that appropriations had been handled with a pitchfork . . . . There is a screw loose in the public machinery somewhere."[8] In 1915, in a commissioned study on the state of Indian trust fund management, Congress described the Bureau as fraught with "fraud, corruption, and institutional incompetence almost beyond the possibility of comprehension."[9] In 1992, a three-year congressional investigation of BIA's trust

---

[8] H.R. Schoolcraft, personal memoirs, at 319, quoted in Misplaced Trust at 9.
[9] "Report to the Joint Commission of the Congress of the United States, 63rd Congress, Third Session to Investigate Indian Affairs Relative to Business and Accounting Methods Employed in the Administration of the Office of Indian Affairs" (1915), at 2 (Exh. 2) (hereinafter "1915 Report").

fund mismanagement arrived at the same conclusion as Schoolcraft had reached one hundred and sixty-four years earlier:

> Schoolcraft's assessment of the BIA's financial management still rings true. BIA's administration of the Indian trust fund continues to make the accounts look as though they had been handled with a pitchfork. Undoubtedly, there is a screw loose in the public machinery at the Bureau. ***Indeed, while mismanagement of the Indian trust fund has been reported for more than a century, there is no evidence that either the Bureau or the Department of Interior has undertaken any sustained or comprehensive effort to resolve glaring deficiencies.***"

*Misplaced Trust* at 9 (emphasis added).

Fifteen years later, very little has actually changed – despite countless promises of improvement, numerous plans for reform, and a congressionally imposed deadline for producing the accounting of tribal trust assets that Trustee-Delegates failed to meet more than eleven years ago. Indeed, as their remand motion makes clear, Trustee-Delegates *have not even begun* the process of developing a plan to accomplish *what they were supposed to have completed by May 31, 1996* per congressional mandate, and their motion offers no excuse for the blatant failure even to have put in place plans for the retention of vital trust records necessary for the accounting and for obtaining such missing records from third-parties – obligations that Congress reaffirmed in 1994.[10] Rather, Trustee-Delegates' evident strategy appears to be – once again – to do or say whatever it takes to avoid accountability for this centuries-long mismanagement of Plaintiff-Beneficiaries' trust funds and other assets.

### B.    Indian Claims Commission Proves to be a Failure.

Seeking to obtain an accounting of tribal assets from the United States historically has been a difficult and frustrating process, dating back more than half a century to the days of the Indian

---

[10] The statutorily-imposed requirements for such plans are addressed in detail in the Court's opinion in *Cobell V*. *See* 91 F. Supp. 2d at 5 *et seq.* ("The Secretary of the Interior's Duty to Establish Written Plans for Gathering of Missing Information; Document Retention; Business and Computer Systems Architecture; and Staffing of Trust Management Functions").

Claims Commission ("ICC") and beyond. Until the passage of the Indian Claims Commission Act (the "ICCA") in the mid-1940's, tribes could not litigate claims against the United States without specific congressional permission. *See Navajo Tribe of Indians v. New Mexico*, 809 F.2d 1455, 1460 (10th Cir. 1987) (discussing the history of the ICCA). The ICCA established the ICC with jurisdiction to hear certain claims by an Indian tribe against the United States that accrued on or before August 13, 1946. 25 U.S.C. § 70a (1978). The Commission heard claims until it was terminated on September 30, 1978.

Despite the purpose of the Commission to adjudicate Indian claims, accounting actions before the ICC more often than not left tribes without a full, fair and adequate accounting. The ICC employed the following ineffective procedural process for accounting claims, which is strikingly similar to what Trustee-Delegates propose here. When a tribe initiated a claim, the burden was first on the United States to produce a proper accounting report. *See Blackfeet and Gros Ventre Tribes v. United States*, 32 Ind. Cl. Comm. 65 (1973). Tribes that wished to contest the report then filed exceptions to the accounting. *See Sioux Tribe v. United States*, 12 Ind. Cl. Comm. 541, 547 (1963). If there was a dispute between the parties, the matter would proceed to a hearing on the disputed transaction, at which the petitioner had the burden of proving a breach of trust. *Id.*

Furthermore, these ineffective results occurred only after years – even decades – of protracted litigation. *See, e.g.*, *Lower Sioux Indian Community v. United States*, 30 Ind. Cl. Comm. 463 (1973) (9 years); *Navajo v. United States*, 31 Ind. Cl. Comm. 40 (1973) (21 years); *Fort Still Apache v. United States*, 28 Ind. Cl. Comm. 433 (1972) (21 years). These delays were caused, in part, by the government's inability to comply with orders to produce adequate accounting reports in timely manner. *See Blackfeet*, 32 Ind. Cl. Comm. at 146 (commenting that if the "Government's failure to comply with our orders in accounting cases were deliberately adopted as a defense

tactic it would indeed be an effective one.")   This was compounded by the fact that the government's initial accounting reports – prepared after the plaintiff filed a claim and without the Commission's prior guidance – fell well-below traditional standards of accounting to such an extent the tribes were unable to obtain sufficient evidence to support their claims.  *See, e.g.*, *Lower Sioux Indian Community in Minnesota v. United States*, 35 Ind. Cl. Comm. 123 (1975); *Sioux Tribe of the Rosebud Reservation v. United States*, 35 Ind. Cl. Comm. 123 (1974); *Mescalero Apache Tribe v. United States*, 23 Ind. Cl. Comm. 181, 182 (1970) (The report "does not give sufficient details concerning either receipts or disbursements.  All the categories are gross.").  The government's intransigence ultimately prompted the ICC to throw-up its hands and conclude "despite our best efforts and even though the life of the [ICC] has been extended until 1977, we will not be able to finish our task without increased cooperation from the executive branch." *Blackfeet*, 32 Ind. Cl. Comm. at 148.

Thus, the accounting cases generally concluded only with the Commission finding that after decades of proceedings, the government had failed to provide an adequate accounting.  For example, in *American Indians Residing on Maricopa-Ak Chin Reservation v. United States*, 667 F.2d 980, 983 (Ct. Cl. 1981), the Court found that the government had completely "fail[ed] to discharge its accounting responsibilities" and did not render the "type of accounting that it should have made." 667 F.2d at 1004.  The Court identified one root of the problem: "Defendant's failure to render a proper accounting is not due solely to intransigence.  There has been a failure to keep adequate records." *Id.* at 1005.  The Court – with the limited authority under the ICCA – nonetheless failed to order the government to comply with its duties, and instead concluded that "[i]f needed records do not now exist, they will not be found in further rooting through the archives." *Id.* at 1004.

C.    **Interior Fails to Take Corrective Measures in Response to Intense Criticism of Its Accounting and Trust Management.**

Despite documented massive mismanagement at the Interior Department regarding Indian trust assets, no improvement ever transpired.  Every few years another report issued condemning the accounting deficiencies and severe mismanagement at all levels and stages of the trust management process.  The BIA took the brunt of the criticism, but the Mineral Management Service, Bureau of Land Management and U.S. Geological Survey faired little better.  *See, e.g.,* Special Committee on Investigations of the Select Committee on Indian Affairs, United States Senate, "Final Report and Legislative Recommendations" S. Rep. No. 101-216 (November 1989) (Exh. 3) (finding at the Mineral Management Service "fraud, corruption and mismanagement"); Committee on Government Operations, "Indian Oil and Gas Royalty Payments:  Problems Persist" (1985) H. Rep. No. 99-214 at 4 (Exh. 4) (noting that "[a]s far back as 1959, the U.S. General Accounting Office (GAO) reported a number of serious deficiencies in Interior's royalty accounting activities.  In 1981, fully twenty-two years later, GAO reported that the same financial management problems existed."); Statement of Pam Redfield, Hrg. Before the Select Committee on Indian Affairs, U.S. Senate (February 27, 1981) at 3 (Exh. 5) ("GAO studies and Energy Committee inquires suggest that there are major and continuing problems with the U.S. Geological Survey's management and accounting systems which have led to the loss of millions of dollars in royalties every year.  This is due to the agency's incompetence in carrying out its duties."); U.S. General Accounting Office, *Oil and Gas Royalty Collections – Serious Financial Management Problems Need Congressional Attention*, Audit Rep. No. FGMSD-79-24 (April 13, 1979) at i (Exh. 6) (finding "serious deficiencies in the way Geological Survey maintains lease account records.").  Interior responded with a string of broken promises to remedy obvious and well-documented deficiencies in its accounting and management systems.  Below we discuss a small sampling of the reports from GAO, Inspector

General and private firms outlining these deficiencies and Interior's recalcitrance in addressing them.

### 1. Interior Fails to Take Promised Corrective Action in Response to the 1982 GAO Report.

In a 1982 report, the U.S. General Accounting Office ("GAO") concluded that serious "[d]esign and operating deficiencies in the [BIA's] accounting and finance system [had] caused the Bureau to lose accountability for hundreds of millions of dollars of grant, contract and trust funds," and exposed "opportunities for improper use of funds and other resources." *See* U.S. General Accounting Office, *Major Improvements Needed in the Bureau of Indian Affairs' Accounting System*, Audit Rep. No. GAO/AFMD-82-71, at (i) (Sept. 8, 1982) (Exh. 7). The GAO found that trust accounts had not been reconciled with the agency's general ledger to ensure correct account balances and that controls over receipts and disbursements were inadequate. *Id.* In light of these shortcomings, the GAO faulted Bureau managers for continuing to operate the accounting system without correcting known system deficiencies that had been "repeatedly brought to their attention by GAO internal auditors, and special study groups." *Id.* As a consequence, key trust fund accounting records were "out-of-balance millions of dollars," and managers were not receiving reliable information from their accounting system and therefore could not "properly discharge their fiduciary responsibility as trustee for the trust funds." *Id.* at (ii), 28.

In its response to the report, Interior *agreed* with the GAO's recommendations, represented that improving the Bureau's financial management was "one of its top priorities," and "pledged corrective action." *Id.* at (v). The Department of the Treasury ("Treasury") also agreed with the report's findings and recommendations. The GAO optimistically concluded that if "the Interior Department and the Treasury Department follow through on their promised actions, the long-standing accounting system and financial management problems at the Bureau of Indian Affairs

13

should be corrected." *Id.* More than a year later, however, the Bureau still had not improved its accounting systems.

### 2.    BIA Breaks Its Promise to Reconcile Its Systems Within Six Months of Critical 1983 OIG Report.

In 1983, Interior's Office of the Inspector General ("OIG") issued a critical report highlighting the BIA's poor controls over accounting for tribal trust funds. *See* U.S. Dep't of the Interior, Office of the Inspector General, *Accounting Controls Over Tribal Trust Funds*, Audit Rep. No. C-IA-BIA-24-83 (Sept. 1983) (Exh. 8). The OIG found that "errors occur at every organization level involved with tribal trust funds." *Id.* at 4. "As a rule, BIA does not reconcile its systems. But when it does and identifies mistakes, it has no sound procedures for making complete determinations and processing corrections." *Id.* Although the OIG noted that Treasury "provides BIA with the only external check on the accuracy of BIA's trust fund accounting," BIA had neither kept up with its monthly reconciliations with Treasury nor made the necessary changes when it did a complete reconciliation. *Id.* at 10.

The OIG recommended to the Assistant Secretary of Indian Affairs that BIA (1) "[r]econcile the various systems involved in tribal trust fund accounting and make the necessary adjustments to its records" in order to provide a "fresh starting point for improving its overall management of trust funds," and "(2) revise its accounting systems and procedures," including a "monthly reconciliation to assure that the system kept in balance and that errors and omissions are promptly identified and corrected." *Id.* at 18-19. Once again, in its response to the draft report, BIA "agreed in principle" with the report's finding and recommendations and represented that the Bureau would "complete its reconciliation of the various systems" by a date *6 months* after the report date. *Id.* (Transmittal Memo). The government did not fulfill its promise then and, ironically, nearly twenty-five years

later is still requesting a remand for 6 more months to develop a plan to do so and to purportedly finally address these decades old reports. *See* Def. Mem. 17.

### 3. BIA Fails to Take Corrective Measures in Response to Critical Price Waterhouse Recommendations.

Also in 1983, the independent accounting firm Price Waterhouse was hired to perform a review of Indian trust fund investment management. Price Waterhouse made a number of recommendations, but more than eighteen months later, BIA was struggling to implement them, "losing valuable time in addressing its accounting needs." *See* Bureau of Indian Affairs, *Review of Responses to the April, 1985 "Request for Information" Regarding the Possible Contracting of the Bureau of Indian Affairs Investment, Cash Management, and Accounting Programs and Summary of Recommendations* (Dec. 2, 1985) at 17 (Exh. 9). Further, almost three years after the study, many of the Price Waterhouse recommendations were still under active consideration. Oman Financial Services, Inc. for First Nations Financial Project, "Price-Waterhouse In-Depth Review of Indian Trust Funds for the Bureau of Indian Affairs, U.S. Dep't of the Interior: Summary, Issues, and Comments" (June 1986) (Exh. 10) ("PW believes that *there appear to be significant deficiencies in BIA's current [1986] account system* which impair the Bureau's ability to meet its financial reporting and control responsibilities." *Id.* at 30 (emphasis in original)). Shortly thereafter, summing up BIA's repeated failure to take action, then-Assistant Secretary for Indian Affairs Ross O. Swimmer testified in Congress before the Select Committee on Indian Affairs that there were still "material weaknesses in the trust accounting system"; in particular, he noted that the BIA's "corrective measures" to date in response to the GAO, OIG, and Price Waterhouse reports had been "spotty" and that "immediate action was necessary to prevent further deterioration." Prepared Statement of Ross O. Swimmer, Assistant Secretary for Indian Affairs, U.S. Dep't of the

Interior, at the Hearing before the Select Committee on Indian Affairs, U.S. Senate, on the Status of the Indian Trust Fund, 99th Cong., 2d Sess., at 31, 34 (Sept. 23, 1986) (Exh. 11).

### 4. Interior Breaks Its Promise to Implement Arthur Andersen's Recommendations Within One Year.

Arthur Andersen & Co.'s experience with the Bureau's stonewalling was similar. The BIA first contracted with Arthur Andersen in 1988, 1989, and 1990 to perform financial statement audits for the BIA's tribal trust funds. These were the first known financial statement audits by independent public accountants of Indian trust funds. *See, e.g.*, Arthur Andersen & Co., *Trust Funds Managed by the U.S. Dep't of the Interior, Bureau of Indian Affairs, Report on Compliance and Report on Internal Controls as of Sept. 30, 1988* (March 1989) (Exh. 12).

The Arthur Andersen audits confirmed the general unreliability of trust records and material weaknesses of the BIA's internal controls as well as violations of applicable laws and regulations. *Id.* Arthur Andersen made multiple specific recommendations to correct Interior's Indian trust fund accounting and management. And in response to the first of these audits, the BIA once again stated emphatically that "we accept your findings and recommendations from a trust accounting perspective, and we intend to initiate action immediately to accomplish as many of your recommendations as possible *prior to the end of the current fiscal year*." Letter from Jim R. Parris, Chief, Branch of Trust Fund Accounting, U.S. Dep't of the Interior, Bureau of Indian Affairs to Arthur Andersen & Co. (June 7, 1989), reprinted in Arthur Andersen & Co., *Trust Funds Managed by the U.S. Dep't of the Interior, Bureau of Indian Affairs, Report on Compliance and Report on Internal Controls as of Sept. 30, 1988* (March 1989) at (ix) (emphasis added). **Three years later**, the BIA was still "in the process of implementing Arthur Andersen's recommendations." Statement of James Laborde, Partner, Arthur Andersen & Co., U.S. Senate Select Committee on Indian

Affairs, Hearing on Indian Fund Management, 102d Cong., 2d Sess., at 107 (Aug. 12, 1992) (Exh. 13). In fact, even today, these basic recommendations have yet to be implemented.

### D.     Interior's Attempt to Outsource Tribal Trust Accounting Fails.

After years of failing to live up to its repeated promises to comply with its fiduciary duty to account, Interior sought to outsource its problems. Between 1987 and 1989, seizing upon one of the Price Waterhouse recommendations, the Bureau spent "enormous amounts of time, energy and taxpayer money attempting – inappropriately and unsuccessfully – to transfer the Indian trust fund financial management to the private sector." *Misplaced Trust* at 17. Then-Assistant Secretary for Indian Affairs Ross Swimmer had a "strong belief … that privatization of financial management was the answer to most of the Bureau's longstanding trust fund problems." *Id.* at 17-18.

Two failed attempts were made to contract with a commercial bank for its services in managing BIA's trust funds, first with Mellon Bank of Pittsburgh, PA and then with Security Pacific National Bank of Los Angeles. *Id.* at 18, 29. The Mellon contract failed after concerns were raised about the Bureau's authority to delegate to a third party governmental functions such as collection, disbursement, and investment without statutory authorization. *Id.* Next, the contracted-for system with Security Pacific was "never delivered or developed" and the Bureau failed ever to demand that the contractor perform. *Id.* The Bureau "wasted nearly $1 million of taxpayers' money pursuing the Security Pacific National Bank contract for financial services" before it finally terminated the contract shortly before Congress began a series of oversight hearings into its accounting practices. *Id.* at 33-34.

The final result was a further waste of time and taxpayer dollars that drew strong criticism from Congress. The Committee on Government Operations later described the attempt as a "privatization fiasco" and concluded that an "equal share of the blame for this continuing disaster"

had to be "laid at the feet of the Bureau and specifically the Bureau's top officials." *Id.* at 3, 34. According to the Committee, the Bureau's headquarters "did not have a sufficient grasp or understanding of the agency's own needs prior to the advertisement and award of the Security Pacific contract." *Id.* at 34.

E.    **Congressional Measures Are Met with Further Delay.**

Fed up with Trustee-Delegates' intransigence, in 1987, Congress took legislative action to require Trustee-Delegates to fulfill their pre-existing duty to account.  In the wake of the criticisms lodged by the GAO, the OIG, Comptroller General and various accounting firms, as well as Congress itself, Congress initiated a subcommittee investigation into the Bureau's mismanagement of Indian trust funds.  In 1987, Congress prohibited Interior from transferring any funds to any third party management and reaffirmed that tribal trust funds must be "audited and reconciled, and the tribe … [be] provided with an accounting of such funds …."  Act of July 1987, Pub. L. 100-71, 101 Stat. 391, 416 (1987).

Because Interior once again failed to audit and reconcile the tribal accounts, even after congressional action, similar provisions were adopted in the appropriation acts for the next two fiscal years.  *See* Act of December 22, 1987 Pub. L. 100-202, 101 Stat. 1329-214, 1329-229 (1987); Act of September 1988, Pub. L. 100-446, 102 Stat. 1774, 1794 (1988).  Congress expanded the provision in the 1990 fiscal year appropriations act to require not only that all funds be "audited and reconciled to the earliest possible date" but also that the results of the reconciliation be certified by an independent party "as the most complete reconciliation of such funds possible."  *See* Act of October 23, 1989, Pub. L. 101-121, 103 Stat. 701, 714 (1989).  Thus, Interior continued to fail to fulfill its fiduciary duty to account in the face of these congressional mandates.

Accordingly, in 1989, Congress launched a subcommittee investigation into the mismanagement of Indian trust funds. The effort was led by Congressman Mike Synar of Oklahoma who noted during one hearing:

> The BIA will promise us anything to get out of a jam, but then never follow through. … When will the BIA start taking this stuff as legitimate criticism and seriously do something? It seems like you're unconcerned about judgments from the courts; you ignore congressional directives; and you treat those people to whom you owe a special fiduciary responsibility, very frankly, with contempt.

U.S. House of Reps., Comm. on Gov't Operations, Subcommittee on Environment, Energy, and Natural Resources, Hearings on the Continuing Failure to Adequately Manage the Indian Trust Fund, 101st Cong., 2d Sess., at 44 (Apr. 24, 1990) (Exh. 14).

After four oversight hearings, the Select Committee on Government Operations issued a scathing report entitled "Misplaced Trust: The Bureau of Indian Affairs' Mismanagement of the Indian Trust Fund." The Committee was particularly critical of the Bureau's responses to investment losses, noting that BIA's response was "simple indifference." *Id.* at 37. The BIA took the position that it was not obligated to inform trust fund beneficiaries of losses and that it was not obligated to reimburse beneficiaries for losses when BIA was at fault. *Id.* The Committee found these positions to be "nothing short of disgraceful," constituting "a serious misconception of the duties of the Federal Government." *Id.; see also* G.T. Bogert, *Trusts* § 141 at 494 (6th ed. 1987) ("The trustee is under a duty to furnish the beneficiary on demand all information regarding the trust and its execution which may be useful to the beneficiary in protecting its rights, and to give to the beneficiary facts which the trustee knows or ought to know would be important to the beneficiary.") The report further noted that the Bureau was "chronically behind schedule – even on self-imposed deadlines" -- and concluded that "there is no assurance that the Bureau actually desires

to, or will, make any substantial advancement toward rectifying the basic financial management failures brought to their attention." *Misplaced Trust* at 5.

### F. Congress Passes the 1994 Trust Reform Act in Response to Trustee-Delegates' Intransigence.

In order to "help rectify the government's longstanding failure" to fulfill its trust obligations, in 1994, Congress passed the American Indian Trust Fund Management Reform Act of October 25, 1994 (the "1994 Act"), Pub. L. No. 103-412, 25 U.S.C. §§ 4042, *et seq.*; *see Cobell VI*, 240 F.3d at 1096. On the eve of the Act's passage, Representative Thomas (R-Wyo) summed up the need for the legislation:

> All we have seen is a continuation of the BIA's one unchallenged specialty: inertia. We have seen the pattern repeated over and over. The Department and BIA promise to act, fail to, we are forced to introduce legislation to deal with the issue, and then when passage of the legislation seems imminent they come to us and ask for more time, quote, "because we're working on the problem, really we are," unquote, or they offer their own, watered-down, legislative proposal in the hope of heading ours off.

U.S. House of Representatives, Committee on Natural Resources, Subcommittee on Native American Affairs, Hearing on BIA Management of Indian Trust Funds, 103d Cong., 2d Sess., 67 (Aug. 11, 1994) (Exh. 15). The Act thus was a response to Trustee-Delegates' unconscionable delay in discharging existing duties.

Among other things, the 1994 Act created the Office of the Special Trustee for American Indians ("OST"). 25 U.S.C. § 4042. Congress expressly states in the Act that one of its purposes in creating this office was to "provide for more effective management of, and accountability for the proper discharge of, the Secretary's trust responsibilities to Indian tribes and individual Indians," and to "ensure the implementation of all reforms necessary for the proper discharge of the Secretary's trust responsibilities …." 25 U.S.C. § 4041(3).

The 1994 Act also served to recognize, reaffirm, and codify the United States' preexisting fiduciary duties to tribes. *Cobell VI*, 240 F.3d at 1090, 1100 ("The Indian Trust Fund Management Reform Act reaffirmed and clarified preexisting duties; it did not create them . . . [or] define and limit the extent of [Trustee-Delegates'] obligations.")  Among the duties enumerated in the 1994 Act, section 102 reaffirmed that tribal trust beneficiaries are owed a full and adequate accounting that must include, but is not limited to "all funds held in trust by the United States for the benefit of an Indian tribe … which are deposited or invested pursuant to the Act of June 24, 1938." 25 U.S.C. § 4011(a); *see Cobell VI*, 240 F.3d at 1102 (the 1994 Act "reaffirms the government's preexisting fiduciary duty to perform a complete historical accounting").

In an attempt to bring Interior into partial compliance with its preexisting duty to account, at least with respect to tribal funds,[11] the Congress directed that the Secretary reconcile all tribal trust accounts as of September 30, 1995. 25 U.S.C. § 4044.  It also set a date certain of May 31, 1996 by which Interior was required to report to Congress attesting that it had provided each tribe with "as full and complete accounting as possible of the account holder's funds to the earliest possible date." *Id.*  Trustee-delegates have not provided the accounting required by law and reaffirmed in the 1994 Act for any tribe.  As discussed in greater detail in the next section, instead of discharging their accounting duty, Interior hired Arthur Andersen to prepare "agreed upon procedures reports" that are so grossly inadequate that not even Trustee-Delegates are willing to aver that they discharge their accounting duty.

---

[11] An equitable accounting is a full accounting and thus includes tribal assets as well.  Trustee-Delegates have never attempted a comprehensive accounting of all assets, including non-monetary assets, held in trust for tribes.

III.    **THE ARTHUR ANDERSEN REPORTS WERE DEFICIENT AND DID NOT CONSTITUTE AN ADEQUATE ACCOUNTING.**

A.    **Trustee-Delegates Prepare a Woefully Inadequate Accounting "Plan."**

In May 1991, in response to the requirement in Interior's fiscal year 1990 appropriations act that it provide a complete reconciliation and accounting for all tribal trust funds and independent certification of such a reconciliation and accounting, Interior again contracted with Arthur Andersen. Prior to this effort, "the accounts – some of which were 50 to 100 years old – had never been reconciled." *See* U.S. General Accounting Office, *Report to the Committee on Indian Affairs*, U.S. Senate "Financial Management: BIA's Tribal Trust Fund Account Reconciliation Results," at 1, GAO/AIMD 96-93 (May 1996) ("May 1996 GAO Report") (Exh. 16).

Although "BIA spent over 5 years and about $21 million in a massive effort to locate supporting documentation and reconcile trust fund accounts, tribal accounts could not be fully reconciled or audited due to missing records and the lack of an audit trail in BIA's systems." *Id.* Because of the missing records, rather than use generally accepted accounting principles, the Bureau "determined that its contractor should use alternative procedures" developed by the Trustee-Delegates themselves "to verify tribal account balances where insufficient documents were available to reconstruct the accounting or where more efficient approaches were identified." *Id.* at 2-3.

Moreover, Trustee-Delegates limited the scope of the Arthur Andersen reports to fiscal years 1973-1992 (and to a significantly shorter time period than that for the limited examination undertaken of tribes' investment transactions). Trustee-Delegates imposed this artificial limitation despite the fact that many tribes' assets and funds had been held in trust for more than a century, the accounting duty requires as a matter of law that all funds regardless of when

produced be accounted for, and Congress had expressly directed the reconciliation to be "to the earliest possible date." 25 U.S.C. § 4044.

Arthur Andersen found a myriad of problems with the tribal trust accounts.  A total of $2.4 billion in noninvestment transactions – 16% of all such transactions for the 20-year period in question – were found to be "unreconciliable," meaning that *no documentation at all* could be located to corroborate the Bureau's ledger entries.  This is particularly astonishing considering that virtually any documentation, however remotely tied to a transaction, was considered sufficient to verify the transaction.[12]  As then-Special Trustee Paul Homan later told Congress: "[T]hese records should not be missing and would not be missing had the Federal Government followed conventional trust record keeping practices followed by the private sector."  U.S. House of Representatives, Committee on Resources, Hearing Before the Task Force on Indian Trust Fund Management at 7 (June 18, 1996) (Exh. 17).

In addition, only 10.7 percent of the leases originally identified for testing could be "verified."[13]  *Id.* at 4-5; *accord* Statement of Linda M. Calbom, Director, Civil Audits, Accounting and Information Mgmt. Div., U.S. General Accounting Office to the Honorable John McCain, Chairman, Committee on Indian Affairs, U.S. Senate, B-272352 GAO/AIMD-96-125R, Indian Trust Fund Testimony (Qs&As) (June 24, 1996) (Exh. 18).  Moreover, as the GAO later noted, the reconciliation could not possibly be complete: because "BIA does not know the universe of transactions or leases, it does not know the total amount of receipts and disbursements that should have been recorded."  May 1996 GAO Report at 12.  Thus, as Special Trustee Homan later explained:  "This stems from the Federal Government's lack of an ability accurately to trace a

---

[12] For example, the Arthur Andersen Reports relied on leases to verify disbursements.  If a disbursement occurred, the Arthur Andersen would consider a lease – perhaps entered into years before – as somehow sufficient evidence that the correct beneficiary received the correct disbursement in the correct amount.

[13] Again, for Arthur Andersen, "verification" is a relative term.

collection to a source lease on a contract.  That in turn results from the fact that ***the Bureau of
Indian Affairs does not maintain the master lease file, nor does it maintain a consolidated
accounts receivable billing system*** . . . ."  June 18, 1996 Hearing at 7 (emphasis added).  Simply
put, Trustee-Delegates had (and have) no idea what they have not accounted for.

A recitation of the *admitted* limitations to the "reconciliation" is indicative of the processes'
extraordinary shortcomings.  Dozens of changes were made to Interior's "plan" during the course of
the reconciliation – not to improve the report, but because the widespread destruction of trust
records made anything more near impossible.  As GAO made clear, "not all of the reconciliation
procedures specified in BIA's reconciliation contract were performed" and still others "could not be
completed due to missing records [and] the lack of an audit trail through BIA's systems …. "  May
1996 GAO Report at 5.  Further, Trustee-Delegates did not reconcile their subsidiary system to the
general ledger and could not complete the reconciliation of the Finance System (general ledger)
transactions to Treasury records."  *Id.*  In addition, the "Bureau was not able to determine the total
amount of receipts and disbursement that should have been recorded and had no reconciliation
procedure to address the completeness of the accounting records."  *Id.* at 4-5.

Because the reconciliation was so dramatically inadequate, the results were never
certified as Congress had directed.  The fiscal year 1990 appropriations act required a separate,
independent certification that the accounts had been certified and audited to the earliest possible
date.  The express purpose of this mandate was "to obtain independent assurance of the accuracy
and reliability of the reconciled balances" – something Trustee-Delegates simply could not
provide then or now.  *Id*. at 7.

Conveniently, the certification contract that Interior issued in September 1993 required
nothing of the sort.  Instead, it merely directed that the certification contractor (Coopers &

24

Lybrand) take steps to confirm that the reconciliation effort had been performed in accordance with the terms of the Arthur Andersen project's terms – terms that were fashioned by the BIA and do not come close of meeting the strict requirements of trust law. Moreover, when the certification contractor advised in October 1995 that it would take an additional 6 months and another $1.2 million to complete its certification work, the effort was summarily terminated. *See* May 1996 GAO Report.

The "status letter" issued by Coopers & Lybrand on November 30, 1995 disclosed that in the course of performing its certification work, numerous errors and inaccuracies (including "methodological concerns") in the Arthur Andersen project had been revealed. *Id*. at 8. Yet, the certification effort was abandoned without making any further attempt to obtain the "independent assurance" that Congress had mandated six years earlier. Here too, Trustee-Delegates fell far short of doing what the law required.

**B.     Trustee-Delegates Improperly Sought Acknowledgements from Tribes Attesting to the Accuracy of the Arthur Andersen Reports.**

In a desperate attempt to appear to comply with its legal obligations, including those re-affirmed in the 1994 Act, in January 1996 Trustee-Delegates provided to each tribe a "report package" on the results gathered from the incomplete reconciliation procedures performed by Arthur Andersen for fiscal years 1973 through 1992. The report also included the Bureau's own purported "reconciliations" for fiscal years 1993 through 1995, and a transmittal letter describing the information provided and BIA's plans to meet with tribes to discuss the reconciliation results. *Id*. According to the BIA's Office of Trust Fund Management, which was responsible for carrying out the reconciliation and certification effort, a reconciliation report package was issued to each of 269 tribes in January 1996. *Id.* at 6.

The most critical aspect of the reports was what they did *not* include.  Despite specific and express guidance from the GAO prior to the distribution of the reports to disclose the limitations of the reports, Interior "did not disclose in the report package to tribes the procedures specified in the reconciliation contract which were not performed or could not be completed."  May 1996 GAO Report at 6.  Nor did the reports disclose the reasons for these exclusions.  *Id.*  Further, for the procedures that were performed, Interior "did not fully disclose scope limitations or changes in methodologies, such as accounts and time periods that were not covered and alternative source documents used."  *Id.*; *see also* Statement of Linda M. Calbom, Director, Civil Audits, Accounting and Information Management Division, U.S. General Accounting Office, Testimony Before the U.S. Senate, Committee on Indian Affairs, *Financial Management: Interior's Efforts to Reconcile Indian Trust Fund Accounts and Implement Management Improvements*, GAO/T-AIMD-96-104, at 1 (June 11, 1996) (Exh. 19) (in the 1996 reports "the limitations of the reconciliation were not evident").

Despite the reports' deficiencies and omissions and the tribes' lack of full information, Interior asked the tribes to approve an acknowledgment that the reports were "as full and complete accountings as possible."  *See* Acknowledgment form appended to Letter from Paul M. Homan, Special Trustee for American Indians and Hilda A. Manuel, Deputy Commissioner of Indian Affairs, Office of the Secretary, U.S. Dep't of the Interior to Tribal Leaders (Jan. 8, 1996) (Exh. 20).  Trustee-Delegates brazenly acknowledge in their memorandum and the Declaration of Ross O. Swimmer that "tribes were asked to attest to the accuracy of their account balances." Declaration of Ross O. Swimmer, ¶ 8; *see also* Def. Mem. at 9.

The GAO outlined additional criticisms of the "reconciliation" and Trustee-Delegates' approach in its May 1996 Report to the Senate Committee on Indian Affairs.  According to the

GAO, "in order for the tribes and the Congress to understand the reconciliation results and determine whether the reconciliation represents as full and complete an accounting as possible, it was important that BIA explain the limitations in reconciliation scope and procedures, including procedures that were not performed or completed." May 1996 GAO Report at 12. The GAO identified several "significant reconciliation limitations and changes in procedures and methodologies" that it believed it was incumbent on Interior to disclose. *Id.* at 13. Specifically, GAO thought it critical that Trustee-Delegates reveal to tribes the "lack of a known universe of transactions and leases" that on numerous occasions Trustee-Delegates had issued "papers to approve changes in reconciliation scope and procedures" because otherwise the contractor could not complete the project and the numerous "reconciliation procedures that could not be completed or were not performed." *Id.*

### C. The Arthur Andersen Reports Were Not a Full and Complete Accounting.

It is not only the GAO that has criticized the Arthur Andersen Reports as insufficient to satisfy the requirement of a full and complete accounting. Indeed, Interior itself has repeatedly and consistently acknowledged that the Arthur Andersen Reports were not even audits in accordance with generally accepted principles – let alone adequate accountings.

In testimony before Congress in October 1996, Special Trustee Paul Homan conceded, as he had to, many of the deficiencies identified by the GAO and concluded that "the undeniably poor quality of the trust management systems and the condition of the historical records effectively prevent the Federal Government from providing an accurate and timely accounting to the American Indian trust beneficiaries." *See* Testimony of Paul Homan, Special Trustee, before the Task Force on Indian Trust Fund Management 7 (June 18, 1996) (*See* Exh. 17). Since then, Interior has repeated this concession many times. *See, e.g.*, U.S. Dep't of the Interior,

Recommendation of the Secretary of the Interior for Settlement of Disputed Tribal Trust Fund Accounts, at 9 (Nov. 1997) (Exh. 21) (acknowledging the Arthur Andersen Reports were a "less than complete accounting of the state of the Tribal trust funds"); BIA's Proposed Legislative Options in Response to Tribal Trust Fund Reconciliation Project Results, at 12 (Dec. 1996) (Exh. 22) ("Despite five years of effort and the expenditure of $21 million, the [AA] Project provides a less than complete accounting of the state of the Tribal trust funds."); U.S. Dep't of the Interior, Office of the Assistant Secretary – Indian Affairs, News Release, *Fact Sheet on Indian Tribal Trust Funds*, at 2 (Nov. 18, 1997) (Exh. 23) ("[T]he poor condition of the records and systems did not allow the federal government to conduct a complete audit or provide the level of assurance to account holders that was expected."); U.S. Dep't of the Interior, Office of the Special Trustee for American Indians, Strategic Plan to Implement the Reforms Required by the American Indian Trust Fund Management Reform Act of 1994 at Part 8 (Addendum One, Condition of the U.S. Government's Trust Management Systems – Special Trustee's Assessment), at 5 (Apr. 1997) (Exh. 24) (The AA Basic Reconciliation effort "disclosed the types of problems [i.e., missing records] which prevent a full accounting of tribal trust funds."). In short, it is undisputed that the Arthur Andersen Reports are not an accounting and do not come close to discharging Trustee-Delegates' fundamental obligation to account.

## IV.    ONGOING DELAY AND FAILURE TO ACCOUNT.

After the Arthur Andersen Reports issued in 1996, Interior did nothing in furtherance of discharging its responsibility to render a full and complete accounting of tribal funds and has never attempted any sort of accounting of non-monetary tribal assets it holds in trust – let alone the comprehensive one required by law.  Furthermore, Interior has proposed, then discarded, a number of "plans" to repair deficiencies in the trust management system.  To date, however, no

comprehensive plan to repair trust mismanagement problems at Interior has ever been adopted and implemented and mismanagement continues unabated.

### A.    Interior Fails to Rectify Errors Revealed by the Arthur Andersen Reports.

More than eleven years after failing to meet the congressionally imposed deadline for completing the reconciliation of tribal accounts, Trustee-Delegates have taken ***no*** meaningful steps to rectify their continuing breach of this most fundamental trust duty. Even as to "known errors" disclosed in the Arthur Andersen Reports issued in January 1996, tribes have not yet been reimbursed – notwithstanding assurances given ten years ago that the government was prepared to "credit Tribes' accounts in the amount of those known errors due Tribes on a net basis . . . whether or not a Tribe accept[ed] the government's settlement offer for any other claims . . . ." *See* U.S. Dep't of the Interior, Office of the Assistant Secretary – Indian Affairs, News Release, *Fact Sheet on Indian Tribal Trust Funds*, at 3 (Nov. 18, 1997). Nor have Trustee-Delegates committed to making the substantial adjustment of tribal trust balances clearly warranted in light of the $2.4 billion in unreconciled transactions which they readily concede (not to mention literally tens of billions dollars worth of other transactions with woefully insufficient documentation to verify them). This is especially hard to fathom since defendants concede the lack of verification "indicates that the poor condition of the records and systems will not allow the federal government to conduct a complete audit or provide the level of assurance to account holders that was expected." *Id*. at 2. Trustee-Delegates have simply not performed what has been mandated.

### B.    Interior Still Has No Plan to Repair Deficiencies in the Trust Management System.

Despite the directive from the GAO "for Interior to develop a comprehensive plan to guide trust fund management improvements across Interior agencies," since issuing the Arthur Andersen

Reports, Interior has done little more than propose and discard a number of "plans" to repair obvious deficiencies. June 11, 1996 Statement of Linda M. Calbom, Director, Civil Audits, Accounting and Information Management Division, U.S. General Accounting Office, Testimony before the U.S. Senate Committee on Indian Affairs, GAO/T-AIMD-96-104, at 11 and 14. As a result, Interior still lacks a department-wide strategic plan to correct trust fund management problems. *Id.* at 14.

The 1994 Act also required the Special Trustee to develop a comprehensive Strategic Plan to cover all phases of the trust fund business cycle including accounting and investment. To date, however, no comprehensive plan to repair trust mismanagement problems at Interior has ever been implemented. *See*, *e.g.*, Letter from Linda M. Calbom, Director, Civil Audits, Accounting and Information Management Division, U.S. General Accounting Office, to the Honorable Ben Nighthorse Campbell, Chairman, Committee on Indian Affairs, U.S. Senate, B-280598, GAO/AIMD-98-241R, Interior's Trust Improvement Project (July 21, 1998) (1997) (Exh. 25) (strategic plan was never adopted because of disagreements at Interior); U.S. House of Reps., Comm. on Resources, Oversight Hearing on Indian Trust Fund Accounts, 107th Cong., 2d Sess., at 13 and 15 (Feb. 6, 2002) (Exh. 26) ("High Level Implementation Plan" first developed in 1998, revised and updated in 2000, and still being reworked in 2002, was also discarded).

Moreover, as the GAO continues to remind Congress, after decades of critical review of its deficient accounting and management practices, presently there are still widespread deficiencies in the system and unwarranted delay in correcting them. *See* Statement of Robin M. Nazzaro, Director, Natural Resources and Environment, U.S. Government Accountability Office, Testimony Before the U.S. House of Reps., Committee on Natural Resources, "Department of the Interior: Major Management Challenges," GAO-07-502T, at 9 (Feb. 16, 2007) (Exh. 27) ("GAO has

reported on management weaknesses in Indian programs for a number of years. … [Interior] is still in the process of implementing key trust fund reforms, and several concerns exist about the completion of these reforms."); Letter from Robert E. Martin, Director, Financial Management and Assurance, U.S. Government Accountability Office to the Honorable Byron L. Dorgan, Chairman, Committee on Indian Affairs, U.S. Senate, Re:  Office of Special Trustee for American Indians: Financial Statement Audit Recommendations and the Audit Follow-up Process, GAO-07-295R (Jan. 19, 2007) (Exh. 28) (recommendations to address material weaknesses in Indian trust fund financial statement audits remain unaddressed).

In July of 2002, the Secretary of Interior established the "Office of Historical Trust Accounting" (OHTA), purportedly to enhance Trustee-Delegates' capacity to discharge its trust responsibilities. *See* Motion to Remand at 13-15.  But OHTA has done little in actuality, except attempt to devise ways to limit the accounting defendants must provide.  While defendants claim that OHTA is working on tribal accountings, there has been no independent assessment that has validated their claims in this regard.  What is a matter of well-established record is that Trustee-Delegates have a track-record of promising heaven and earth regarding what they are doing or will do, but when their actions are independently assessed, they prove to fall well short of their promises.

In short, Trustee-Delegates have not remedied their broken trust management or commenced legitimate steps to discharge their accounting duty.  Instead, they have established the Tribal Trust Fund Settlement Project ("TTFS") through the InterTribal Trust Monitoring Association – a tribal organization funded exclusively by the Department of Interior.  The stated purpose of the TTFS is to find an acceptable *alternative* to conducting actual accountings.  Even as to this task, however, there has been no agreement as to an appropriate methodology and

numerous plaintiff tribes familiar with Trustee-Delegates' inequitable approach to such "settlement" processes have rejected the TTFS out-of-hand.

In another attempt to avoid having to fulfill their fiduciary obligation to provide a full and accurate accounting, in 2006, Trustee- Delegates circulated regulations purporting to "set forth the rules and procedures . . . to provide tribes with the account statements required by law." *See* Letter from James E. Cason, Associate Deputy Secretary of the Interior, to tribal leaders (July 7, 2006), enclosing "New Part 112 – Tribal Trust Fund Accounting and Appeals" (hereinafter "July 7, 2006 Letter") (Exh. 29). These draft regulations, however, are clearly nothing more than a unilateral attempt to restrict tribes' rights to obtain a full and adequate accounting and appropriate, timely judicial review. Among other things, the regulations purport to limit tribes' ability to file all civil actions, create a mandatory and arduous administrative process for reconciliation of trust accounts and adopt and recognize ***as dispositive*** the admittedly deeply flawed Arthur Andersen Reports. *See* July 7, 2006 Letter (Subpart A- General Provisions: Purposes and Definitions; 112.308). Because the draft regulations are so harsh and fundamentally inequitable, they were widely rejected by tribes, even ITMA. *See*, *e.g*., InterTribal Monitoring Association on Indian Trust Funds, "Analysis: DOI Proposed Regulations 'Part 112 – Trust Funds and Accounting Appeals,'" September 7, 2006 at 16-17 ("ITMA should exercise every effort to oppose the draft Part 112 Regulations and to ensure that they are not finalized and implemented. The regulations are intended to force every tribe into an administrative track whereby tribal trust fund claims, including resource mismanagement claims . . . would be disposed of in a very narrow fashion and based almost entirely on the flawed Anderson [sic] Reports."); Letter from Mary Zuni-Chalan, ITMA Executive Director, to Michelle Singer, Office of the Associate Deputy Secretary of Interior (August 31, 2006) at 1

("**ITMA therefore requests that the Department withdraw the draft Part 112 regulations.**") (emphasis in original); Letter from Rebecca A. Miles, Chairman, Tribal Executive Committee Nez Perce Tribe to Michelle F. Singer (August 30, 2006) at 12 ("Part 112 . . . appears to be designed primarily to limit the Department's exposure to monetary damages resulting from its mismanagement of the tribal trust accounts and to supersede statutory remedies available to Tribes for that mismanagement.") (collectively, Exh. 29).

      C.      **Trustee-Delegates Invited Lawsuits by Refusing to Extend the Date on Which Tribes Would Be Deemed to have Received their Reconciliation Reports.**

While Trustee-Delegates have engaged in further delay, Congress has been left to deal with the consequences of Trustee-Delegates' continuing failure to provide the reconciliation of trust accounts required by law. In 2002, Congress extended the date that tribes would be deemed to have received their Arthur Andersen reconciliation reports. *See* An Act to Encourage the Negotiated Settlement of Tribal Claims, Pub. L. No. 107-153, 116 Stat. 79 (2002) (codified at 25 U.S.C. § 4044). The stated purpose of the bill was to "encourage settlement negotiations with the United States."

In 2005, Congress considered extending the date on which tribes would be deemed to have received their reconciliation reports by six additional years. The Administration, however, opposed any further extensions, arguing that "[s]ound public policy calls for the filing of claims with reasonable promptness." Letter from William E. Moschella, Assistant Attorney General to John McCain, Committee on Indian Affairs, Chairman (Dec. 13, 2005) (Exh. 30). Faced with the certainty that anything more extensive would be vetoed by the President, Congress enacted only a one-year extension of the law. S*ee* An Act to Amend Public Law 107-153 to Modify a Certain Date, Pub. L. No. 109-158, 119 Stat. 2954 (2005). As a consequence, a number of the 37 equitable accounting actions pending before the Court in this consolidated proceeding were filed

prior to December 31, 2006 to avoid having to address a statute of limitations assertion that, however frivolous, might otherwise be raised if they had elected to wait any longer for Trustee-Delegates to fulfill their fiduciary obligations. [14]

So too, in an effort to minimize the impact of Trustee-Delegates' continuing failure to account on the rights of tribal trust beneficiaries to identify and/or present monetary claims for mismanagement in the Court of Federal Claims, Congress has defined the time when certain Indian trust claims "first accrue[]" in a series of appropriation acts beginning 1990 and continuing to the present.  The relevant provision of each such Appropriations Act provides:

> [N]otwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim, including any claim in litigation pending on the date of the enactment of the Act, concerning losses to or mismanagement of trust funds, until *the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss*.

Consolidated Appropriations Acts of 2005, Pub. L. No. 108-447, 118 St. 2809, 3061-62 (2004) (emphasis added).

Thus, "[b]y the plain language of the [Appropriations] Act[s], Congress has expressly waived its sovereign immunity and deferred the accrual of the Tribes' cause of action until an accounting is provided." *Shoshone Indian Tribe v. United States,* 364 F.3d 1339, 1346 (Fed. Cir. 2004).  Nevertheless, the government has repeatedly taken the position in litigation before the Court of Federal Claims that tribes' claims for breach of trust are time-barred despite Trustee-Delegates' failure to have furnished the accounting required by law.  *See, e.g.*, *id.* at 1347 ("Unlike the Government, we see no ambiguity in the language used by Congress.  The clear intent of the Act is that the statute of limitations will not begin to run on a tribe's claims until an

---

[14] It is remarkable that Trustee-Delegates point to the number of cases they are defending as a reason to stay these actions.  Trustee-Delegates opposed any further extensions and thus have nobody to blame but themselves for the current state of affairs.

accounting is completed . . . .  This is simple logic – how can a beneficiary be aware of any claims unless and until an accounting has been rendered?"); *Chippewa Cree Tribe v. United States*, 69 Fed. Cl. 639, 664 (2006) (rejecting the government's limitations argument on grounds that:  "The Appropriations Acts expressly referred to the furnishing of 'an accounting' which the Federal Circuit in turn emphasized must be 'completed' before the statute of limitations would begin to run.  None of the reports provided by defendant appears to satisfy this requirement.") (internal citation omitted).

It is remarkable that a trustee would seek to take such tactical advantages of its long-standing failures as a fiduciary.  But as the seminal *Misplaced Trust* report concluded fifteen years ago:

> The real losers . . . are the Tribes and the individual Indian accountholders.  These accountholders are being misrepresented by the Federal Government.  Yet victims of this nonfeasance have had no recourse except to the very agency that is responsible for their predicament.

*Misplaced Trust* at 56.

## V.    PLAINTIFF-BENEFICIARIES' CLAIMS.

Beginning in 2002, in light of Interior's failure ever to provide a full and complete accounting of tribal assets, held in trust, Plaintiff-Beneficiaries filed suit in the District Court against Trustee-Delegates.   These are actions by trust beneficiaries against their trustee. Therefore, Plaintiff-Beneficiaries have invoked the equitable jurisdiction of this Court to request a complete, accurate, and adequate accounting of *all* property held in trust by Trustee-Delegates for Plaintiff-Beneficiaries' benefit, as well as to require compliance with Trustee-Delegates' other fiduciary duties as trustee of tribal funds, lands, and other assets.  *See* Salt River District Ct. Compl. ¶ 1.; Compl. ¶ 1 *filed in Tohono O'odham Nation*, Case No. 1:06-CV-02236-JR (D.D.C. on December 28, 2006); Compl. ¶ 1 *filed in Ak-Chin Indian Community*, No. 06-CV-

02245 (D.D.C. Dec. 29, 2006); Compl. ¶ 1 *filed in Passamaquoddy Tribe of Maine*, Case No. 1:06-cv-02240-JR (D.D.C. December 29, 2006).

In Count One of the District Court Complaints, Plaintiff-Beneficiaries request a declaration (1) that Trustee-Delegates owe a fiduciary duty to provide a complete and accurate accounting of all funds and assets, and (2) that Trustee-Delegates are in violation of their duty. (*See*, *e.g.*, *id.* at ¶¶ 33-39; Prayer ¶¶ 1-4.)  In Count Two of the District Court Complaints, Plaintiff-Beneficiaries request injunctive relief directing Trustee-Delegates to provide such an accounting and to comply with their other fiduciary duties as determined by that Court.  (*See*, *e.g.*, *id.* at ¶¶ 41-44; Prayer ¶ 5.)  Finally, the accounting may well reveal that other equitable relief is appropriate to compel Trustee-Delegates to comply with their trust obligations in the present or in the future.  (*See*, *e.g.*, *id.* at ¶¶ 43-44; Prayer ¶¶ 5-6.)[15]

In response to Plaintiff-Beneficiaries' suits, Trustee-Delegates now seek another six-month delay in order to prepare a "plan," which they, not surprisingly, assure the Court is the first step on the path to an historical accounting.  As before, Trustee-Delegates are generous with the promise of compliance but awfully stingy with fulfilling their promises.  On this record of unconscionable intransigence, a remand is plainly unjustified.  The record here is crystal clear – until mandated by Court order, Trustee-Delegates will perform nothing and do nothing.  Plaintiff-Beneficiaries respectfully submit enough is enough; this Court, sitting in equity, should act now to vindicate Plaintiff-Beneficiaries' rights.

---

[15] Some Plaintiff-Beneficiaries also filed Complaints for money damages in the United States Court of Federal Claims to redress specific breaches of statutory, regulatory, and fiduciary duties in the management of Plaintiff-Beneficiaries' trust funds and non-monetary trust assets.  These duties, as the Supreme Court has recognized, are "money-mandating" and their breach may be remedied by an award of money damages in the Court of Federal Claims.  *See Mitchell II*, 463 U.S. at 228.

## SUMMARY OF ARGUMENT

In their Motion to Remand, Trustee-Delegates' seek to import doctrines of administrative law into the trust context in order to wrest from this Court its authority and responsibility to enforce the terms of a trust and to replace it with the deferential "agency-first" approach familiar to administrative law. That argument is fundamentally unsound and indeed completely out of place here.

1. To begin with, this is a trust case. Trustee-Delegates therefore offer a fatally flawed understanding of this case. They interpret Plaintiff-Beneficiaries' claims as ones for routine review of agency action under the Administrative Procedure Act ("APA"). Plaintiff-Beneficiaries are the masters of their Complaints, however, and have expressly pled their principal claim as an action to enforce federal statutory trust responsibilities, both express and implied, against Trustee-Delegates. That claim thus involves the inherent equitable powers of this Court to enforce the trust created by federal statute and Plaintiff-Beneficiaries in no way rely upon the APA to provide the cause of action. Therefore, invocation of the doctrines of primary jurisdiction and voluntary remand, which grow out of administrative law principles, simply have no application here.

This is the principal and dispositive ground for rejecting Trustee-Delegates' request for a remand. Accordingly, the Court need go no further in denying their motion. But in fact there are a number of additional reasons why the remand motion is meritless.

2. Even if *arguendo* the Complaints are viewed to present claims that arise in part from the APA, a remand still would be inappropriate because it would transfer to the agency the core equitable power to enforce trusts that has long been the province of the courts and would prevent prompt judicial resolution of Plaintiff-Beneficiaries' claims. Threshold issues of duty to

account, the scope of the duty, and its breach are squarely within the traditional role and responsibility of the Court. Plaintiff-Beneficiaries are of the view that Trustee-Delegates have conceded these threshold issues, but, if they dispute these admissions in any way, this Court should decide them forthwith. In addition, the Court should refuse to countenance another six-month delay of Trustee-Delegates' accounting obligations in light of their persistent, decades-long failure to provide Plaintiff-Beneficiaries with the full and complete accounting required by law. Thus, there is no basis for either the remand or the stay of discovery Trustee-Delegates seek.

3.      Finally, the doctrines Trustee-Delegates offer in support of their remand motion fail on their own terms. First, the doctrine of primary jurisdiction applies when a federal court with jurisdiction over a plaintiff's cause of action remands some subpart of that claim to the agency that has administrative authority delegated by Congress to resolve that issue. It has no application where, as here, the issues the agency seeks to address are not subparts of the plaintiff's cause of action and are not entrusted to the decisional authority of the agency. The trust duties to be enforced here – in contrast to such issues as ratemaking and fair and reasonable tariffs where primary jurisdiction is applicable – are plainly not within the jurisdiction or competence of the agency to decide under some regulatory scheme established by Congress but rather are squarely within the Court's traditional equitable powers to enforce trust and protect the *cestui*.

Second, the "voluntary remand" line of cases Trustee-Delegates cite is also inapt. It applies where the agency reports that will take some action on remand that will either obviate the need for judicial review or fundamentally change the nature of the issues before the Court to

decide.  Trustee-Delegates' request for a remand to formulate a plan for an accounting does not satisfy either of these criteria.

## ARGUMENT

**VI.    THE PRINCIPLES OF ADMINISTRATIVE LAW TRUSTEE-DELEGATES INVOKE TO SUPPORT FURTHER DELAY HAVE NO APPLICATION HERE BECAUSE PLAINTIFF-BENEFICIARIES' PRINCIPAL CAUSE OF ACTION SEEKS TO ENFORCE EQUITABLE TRUST DUTIES THAT ARE NOT ROOTED IN THE APA.**

There is a critical, but unstated, predicate underlying both of Trustee-Delegates' arguments that this Court should delay Plaintiff-Beneficiaries' claims for an equitable accounting once again and remand to the agency.   The government presumes that this is an administrative law case for review of agency action (or inaction) and that Plaintiff-Beneficiaries' causes of action are based upon the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*  Therefore, they assume that the familiar administrative law framework and standards of judicial review of agency action, map directly onto this case.  *See, e.g.,* Def. Memo. at 2 ("[A]s Interior has not yet set forth its programmatic historical trust accounting plan to guide all tribal trust accountings, the appropriate record for judicial review is presently incomplete."); *id.* at 33 ("The administrative record for historical tribal trust accountings for these plaintiffs has not yet been fully developed. Hence the Court cannot fully assess the reasonableness of Interior's decisions on these accounting claims until and unless Interior has the opportunity to articulate the bases of its decisions.").

This is patently incorrect.  Although Plaintiff-Beneficiaries have alleged an ***alternative*** and ***secondary*** right of action under § 706 of the APA based upon unreasonable delay in providing an accounting, Plaintiff-Beneficiaries' primary and independent cause of action is that of a trust beneficiary seeking to enforce the trust terms and duties against a trustee.  As alleged in

Plaintiff-Beneficiaries' Complaints, this cause of action is rooted in various treaties and statutes that give rise to a trust relationship between the United States and Plaintiff-Beneficiaries and invokes this Court's inherent equitable authority to enforce the terms of that trust. (*See, e.g.*, Salt River Complaint ¶¶ 9, 16.)[16] It is not grounded in the APA.[17]

If Trustee-Delegates dispute Plaintiff-Beneficiaries' trust claim, it was incumbent upon them to do so directly in their remand motion. Since they have not done so, the principles of administrative law they invoke here (both primary jurisdiction and voluntary remand) have no application to this equitable trust action. If, on the other hand, Trustee-Delegates do dispute whether Plaintiff-Beneficiaries have alleged a pure trust claim – even though they nowhere address this question in their remand motion – then Plaintiff-Beneficiaries believe this is a crucial threshold issue that the Court must decide before it accepts Trustee-Delegates' invitation to proceed as if this case were the traditional and routine administrative law case. In the absence of any challenge in their motion to Plaintiff-Beneficiaries' claim that this cause of action sounds in trust and in no way implicates the substantive or procedural standards of the APA, no issue is properly before the Court, and the allegations of the Complaint must be accepted. Therefore, Plaintiff-Beneficiaries do not endeavor to brief in full their response to any such challenge. Nonetheless, Plaintiff-Beneficiaries will outline the principal reasons why this case is a trust case

---

[16] Salt River Complaint ¶ 9 (This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1362, as the Community is a federally recognized Indian tribe and its claims arise under the Constitution and laws of the United States, including, but not limited to, the numerous statutes and regulations giving rise to the trust relationship between the United States and the Community. This Court also has jurisdiction over this action under 28 U.S.C. § 1361 and 5 U.S.C. § 706, as this is an action to compel federal officials to perform a duty owed to the Community; ¶16 ("The longstanding trust relationship between the United States and the Community and the United States' resulting fiduciary duties are rooted in and derived from numerous statutes and regulations.") (citations omitted).

[17]Plaintiff-Beneficiaries' Complaints are explicit in that their primary right of action is a trust claim, sounding in equity, and they do not invoke the APA for any purpose other than a waiver of sovereign immunity. Plaintiff-Beneficiaries have relied upon § 706 of the APA only as a secondary and separate basis for the action.

lying in equity, and not an administrative law case, in order to place Trustee-Delegates' request and Plaintiff-Beneficiaries' opposition in the proper context.

**A.    Plaintiff-Beneficiaries' Principal Cause Of Action Is A Breach of Trust Claim That Is Not In Any Way Controlled By The Review Provisions Of The APA.**

As set forth in the Complaints, Plaintiff-Beneficiaries' principal claim is not framed as an appeal of administrative action that depends upon the APA for its cause of action, but rather an equitable action to enforce federal statutory trust responsibilities, both express and implied, against Trustee-Delegates.  *See id.*   When bringing an action against the United States or its officials, three requirements must be satisfied: there must be (1) subject matter jurisdiction; (2) a waiver of sovereign immunity; and (3) a cause of action.  *See United Am., Inc. v. N.B.C.-U.S.A. Hous., Inc. Twenty Seven*, 400 F. Supp. 2d 59, 61 (D.D.C. 2005) (citing *Presidential Gardens Assocs. v. United States*, 175 F.3d 132, 139 (2d Cir. 1999)).

First, this Court has jurisdiction over Plaintiff-Beneficiaries' trust claim pursuant to the general federal question statute, 28 U.S.C. § 1331, because their claims – which are rooted in numerous treaties, statutes and regulations that establish the trust relationship between the United States and Plaintiff-Beneficiaries – arise under the laws of the United States.  (*See, e.g.*, Salt River Complaint ¶¶ 9, 16.)

Second, § 702 of the APA, 5 U.S.C. § 702, provides the waiver of sovereign immunity. (*See, e.g.*, Salt River Complaint ¶ 10.)  Section 702 waives sovereign immunity for an action (like this one) against a federal official seeking relief "other than money damages."  *See* 5 U.S.C. § 702.  Critically, although the waiver of immunity is housed in the APA, it is well-settled that the immunity waiver is ***not*** limited to APA claims.  As the D.C. Circuit has made clear, the "APA's waiver of sovereign immunity ***applies to any suit whether under the APA or not***."

41

*Chamber of Commerce of the U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (emphasis added); *see also Schnapper v. Foley*, 667 F.2d 102, 107 (D.C. Cir. 1981) ("The legislative history of this provision could not be more lucid.  It states that this language was intended 'to eliminate the defense of sovereign immunity with respect to any action in a court of the United States seeking relief other than money damages and based on the assertion of unlawful official action by a Federal officer ….'" (citation and quotation marks omitted)); *Cobell v. Norton* ("*Cobell VI*"), 240 F.3d 1081, 195-96 (D.C. Cir. 2001); *Hubbard v. EPA*, 949 F.2d 453, 466 (D.C. Cir. 1991); *Clark v. Library of Congress*, 750 F.2d 89, 102 (D.C. Cir. 1984); *Sea-Land Serv., Inc. v. Alaska R.R.*, 659 F.2d 243, 244 (D.C. Cir. 1981); *Assiniboine & Sioux Tribes of Fort Peck Indian Reservation v. Board of Oil & Gas Conservation*, 792 F.2d 782, 793 (9th Cir. 1986), *Cobell v. Babbitt* ("*Cobell I*"), 30 F. Supp. 2d 24, 31 (D.D.C. 1998).

Indeed, just last year the D.C. Circuit reaffirmed this principle without qualification, noting that the Court has "previously, and repeatedly, rejected" the argument that § 702's waiver is restricted to actions arising under the APA.  *Trudeau v. Federal Trade Comm'n*, 456 F.3d 178, 186 (D.C. Cir. 2006) (holding that § 702 waived sovereign immunity for plaintiff's First Amendment claim against the Federal Trade Commission).  The Court summarized at some length the legislative history confirming this reading.  *See, e.g.*, *id.* ("The Judiciary Committees of both Houses, in their reports on the 1976 amendment, identified as the measure's clear purpose 'elimina(tion of) the sovereign immunity' defense in *all* equitable actions for specific relief against a Federal agency or officer acting in an official capacity.'" (citation omitted)).  Therefore, the fact that Plaintiff-Beneficiaries invoke § 702's **waiver of sovereign immunity** for

equitable claims against federal officials in no way means that its ***cause of action*** is provided by the APA or that Plaintiff-Beneficiaries seek review of agency action under the APA.[18]

Third, Plaintiff-Beneficiaries' principal cause of action embodies a trust claim. It is for Plaintiff-Beneficiaries, not Trustee-Delegates, to state the cause of action for which they seek relief. *See Webster v. Reproductive Health Servs.*, 429 U.S. 490, 512 (1989) ("Plaintiffs are masters of their complaints ....") (citing *Caterpillar Inc. v. Williams*, 482 U.S. 386, 398-99 (1987)). As set forth in the Complaints, Plaintiff-Beneficiaries' principal claim is framed not as an appeal of agency action under the APA, but as an action in equity for judicial enforcement of the fiduciary duties of a trustee that arise from the trust relationship between Plaintiff-Beneficiaries and Trustee-Delegates established by federal law. (*See, e.g.*, Salt River Compl. ¶¶ 9, 16.) It is axiomatic that "[a] court of equity, having jurisdiction over the administration of trusts, will give to the beneficiaries of a trust such remedies as are necessary for the protection of their interests ...." William F. Fratcher, 3 *Scott on Trusts* § 199, at 203-04 (4th ed. 1988). Accordingly, this Court has the authority and responsibility to enforce trust duties using its inherent equitable power to ensure protection of the beneficiary. *See, e.g.*, *Vill. of Brookfield v. Pentis*, 101 F.2d 516, 520-21 (7th Cir. 1939) ("Courts of equity have original inherent jurisdiction to decree and enforce trusts and to do whatever is necessary to preserve them from destruction."); *Manchester Band of Pomo Indians v. United States*, 363 F. Supp. 1238, 1242 (N.D. Calif. 1973) (District Court finding that it has "jurisdiction over actions to compel the responsible officers of the United States to perform [their trust] duties in the event they have not done so.").

---

[18] One of the principal cases relied upon in Trustee-Delegates' brief also stands for this proposition. *See Red Lake Band of Chippewa Indians v. Barlow* ("*Red Lake Band II*"), 846 F.2d 474, 476 (8th Cir. 1988) ("Contrary to the Secretary's second argument, the waiver of sovereign immunity contained in section 702 is not dependent on application of the procedures and review standards of the APA. It is dependent on the suit against the government being one for non-monetary relief.").

This cause of action is derived from various statutes and regulations that establish the trust relationship between the United States and Plaintiff-Beneficiaries. In *United States v. Mitchell* ("*Mitchell II*"), 463 U.S. 206 (1983), the Supreme Court recognized a substantive right to enforce trust duties when federal statutes and regulations establish a trust relationship between the government and Indian tribes. In *Mitchell II*, the plaintiffs sought money damages for mismanagement of timber lands held in trust. In determining whether the federal government could be held liable, the *Mitchell II* Court held that certain statutes and regulations gave the federal government "full responsibility to manage Indian resources and land for the benefit of the Indians." *Id.* at 224. The Court concluded that a

> fiduciary relationship necessarily arises when the Government assumes such elaborate control over … property belonging to Indians. All of the necessary elements of a common-law trust are present: a trustee (the United States), a beneficiary [the tribe or allottees], and a trust corpus (Indian timber, lands, and funds).

*Id.* at 206. The Supreme Court further concluded that a cause of action to obtain traditionally available remedies for the violation of the rights of the beneficiaries – in that case, money damages – was inherent in and "naturally follows" from the creation of the trust. *Id.* at 226; *see also White Mountain Apache Tribe*, 537 U.S. at 472 (reaffirming *Mitchell II*).

Here, as in *Mitchell II*, the United States holds in trust the tribal lands and assets of Plaintiff-Beneficiaries and has assumed the fiduciary obligations of a trustee. (*See, e.g.*, Salt River Compl. ¶ 15.) As set forth in the Complaints, the long-standing trust relationship between Plaintiff-Beneficiaries and Trustee-Delegates is rooted in and derived from numerous treaties, statutes and regulations. (*See, e.g.*, *id.* ¶ 16 (citing a long list of examples).) These treaties, statutes and regulations give the United States control over and responsibility for tribal assets and resources, and therefore obligate the United States to the full range of fiduciary obligations. It

"naturally follows" from the establishment of this trust relationship that an ordinary right of action seeking equitable relief commonly available to beneficiaries is available to Plaintiff-Beneficiaries here. *See Cobell VI*, 240 F.3d at 1101 ("While *Mitchell II* involved a claim for damages, nothing in that decision or other Indian cases would imply that appellants are not entitled to declaratory or injunctive relief. Such remedies are the traditional ones for violations of trust duties."); *Seminole Nation v. United States*, 316 U.S. 286, 297 (1942) ("[The government] has charged itself with moral obligations of the highest responsibility and trust. Its conduct . . . should therefore be judged by the most exacting fiduciary standards."); *Beckett v. Air Line Pilots Ass'n*, 995 F.2d 280, 286 (D.C. Cir. 1993) ("Just as an intended third party beneficiary may sue to enforce a contract, it is equally fundamental that the beneficiary of a trust may maintain a suit to compel the trustee to perform his duties as trustee or to redress a breach of trust.") (*citing Restatement (Second) of Trusts* § 199)).

Indeed, in *Red Lake Band of Chippewa Indians v. Barlow* ("*Red Lake Band I*"), 834 F.2d 1393 (8th Cir. 1987), the predecessor to one of the principal cases cited in the government's brief in support of its primary jurisdiction argument, the Eighth Circuit approved of a trust claim based upon exactly the same right of action identified here. In reliance upon *Mitchell II*, the Eighth Circuit identified a trust relationship between the federal government and Red Lake Band and held that the district court had equitable authority to order funds transferred from one account to another if necessary to comply with the federal government's trust obligations. *Id.* at 1398.

Once a fiduciary relationship is established by statute, the government's fiduciary duties follow as a matter of law. These duties "are largely defined in traditional equitable terms" and may be filled in by reference to general trust law. *Cobell VI*, 240 F.3d at 1099. Since the trust relationship is established by statute, courts "must infer that Congress intended to impose on

45

trustees traditional fiduciary duties unless Congress has unequivocally expressed an intent to the contrary." *Id.* (quoting *Amax Coal Co.*, 453 U.S. at 330); *see also Nevada v. United States*, 463 U.S. 110, 142 (1983) ("[W]here only a relationship between the Government and the tribe is involved, the law respecting obligations between a trustee and a beneficiary in private litigation will in many, if not all, respects adequately describe the duty of the United States."); *White Mountain Apache*, 537 U.S. at 475 ("While it is true that the … Act does not …expressly subject the Government to duties of management and conservation, the fact that the property occupied by the United States is expressly subject to a trust supports a fair inference that an obligation to preserve the property improvements was incumbent on the United States as trustee. … [E]lementary trust law, after all, confirms the commonsense assumption that a fiduciary actually administering trust property may allow it to fall into ruin.").

In sum, Plaintiff-Beneficiaries' principal cause of action is a trust claim – arising "naturally" as in *Mitchell II* from the statutes that established the trust – the Court's authority in equity to enforce Trustee-Delegates' trust duties.  Although the APA provides the necessary waiver of sovereign immunity, this is a trust case and, thus, the right of action does not depend in any way on the APA.  While the Complaints filed in this Court also make reference to § 706 of the APA as an ***alternative*** and legally distinct basis for relief, this does not transform into an APA case the trust enforcement claim brought by Plaintiff-Beneficiaries pursuant to the statutes that establish this trust.

## B.    The Administrative Law Doctrines Invoked By Trustee-Delegates Do Not Apply To A Trust Case.

Given that Plaintiff-Beneficiaries' primary cause of action is a trust claim and not an administrative law claim, Trustee-Delegates' attempt to shoehorn this case into the APA mold and to invoke classic administrative law doctrines is entirely out of place.  It makes little sense to

remand a trust action that seeks to enforce, among other obligations, a long-neglected accounting duty to the very trustee that has ignored that duty for decades.

Even after decades of delay in providing an historical accounting, Trustee-Delegates seek a remand to Interior so that Interior "can present a written plan detailing its policies and process for completion of historical tribal accountings." (Def's Memo. at 30; Swimmer Decl. ¶¶ 20-26.) Indeed, they propose merely to present to the Court their **plan** for how they intend to comply with those duties. Such a request is simply laughable in light of the history of recalcitrance and amounts to an attempt to avoid well-established trust obligations by invoking the familiar analytical framework and unique principles of administrative law. *See Cobell VI*, 240 F.3d at 1099 (quoting *Jicarilla Apache Tribe v. Supron Energy Corp.*, 728 F.2d 1555, 1567 (10th Cir. 1984) (the Secretary "'cannot escape his role as trustee by donning the mantle of administrator' to claim that courts must defer to his expertise and delegated authority").

Trustee-Delegates appeal to the doctrines of primary jurisdiction and "voluntary remand" to support their remand request. Trustee-Delegates cite only run-of-the-mill administrative law cases in furtherance of their position that they, rather than the Court, should decide what is required for them to comply with their fiduciary duties. In a trust action, however, it is the court sitting in equity that determines the scope of any fiduciary duties and that imposes appropriate remedies necessary to correct breaches of trust. *See Crawford v. La Boucherie Bernard Ltd.*, 815 F.2d 117, 120 (D.C. Cir. 1987) ("Trust law contemplates the use of broad and flexible equitable remedies as means for dealing with breaches of fiduciary duty, and it imposes the obligation **upon the courts** to use the remedy that is most advantageous to the participants and that will most closely effectuate the purposes of the trust.") (emphasis added; citations omitted).

Therefore, administrative law cases decided in contexts where the agency is customarily afforded broad discretion and deference are not applicable in a trust case.

The primary jurisdiction doctrine is particularly out of place in a case where the agency is acting, not in its capacity as administrator, regulator, or promulgator, but as trustee. As the Supreme Court has explained, the "doctrine of primary jurisdiction … is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63 (1956). Therefore, the doctrine "comes into play whenever enforcement of the claim requires the resolution of issues which, ***under a regulatory scheme, have been placed within the special competence of an administrative body***." *Id.* at 64 (emphasis added). It is the protection of the integrity of this regulatory scheme that undergirds the doctrine. *See United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 353 (1963) (primary jurisdiction "requires judicial abstention in cases where protection of the integrity of a regulatory scheme dictates preliminary resort to the agency"). A trustee, however, is not entitled to deference in its interpretation of its own trust duties.[19] Nor does a trustee have an institutional role in a regulatory scheme that must be protected from judicial intrusion. Rather, it has long been the unique role and special responsibility of the courts to enforce the trust relationship. *See, e.g.*, *Village of Brookfield*, 101 F.2d at 520-21 ("Courts of equity have original inherent jurisdiction to decree and enforce trusts and to do whatever is necessary to preserve them from destruction.").

Similarly, the "voluntary remand" cases cited by Trustee-Delegates have no application here. (*See* Def. Memo. at 28.) These cases hold that a court may remand to an agency upon the agency's request so that the agency may reconsider or change its position and thereby avoid

---

[19] Nor is this a circumstance when traditional administrative law deference can find application. *See, e.g., Cobell VI*, 240 F.3d at 1100 ("*Chevron* deference is not applicable in this case.").

altogether or at least materially alter the issue before the court.  *See Ford Motor Co. v. NLRB*,

305 U.S. 364, 375 (1939) ("There is nothing … in the principles governing judicial review of

administrative action, which precludes the court from giving an administrative body an

opportunity to meet objections to its order by correcting irregularities in procedure, or supplying

deficiencies in its record, or making additional findings…, or supplying findings validly made in

the place of those attacked as invalid.").  That principle makes eminent sense in the

circumstances in which it has been applied but makes no sense here.  Nothing in the requested

remand would circumvent or affect the trust issues the Court will need to decide.  Moreover,

Trustee-Delegates do not propose to change their prior positions and in fact have never rendered

an action that could be the premise of a voluntary remand; they simply allege that they want to

get around to doing what they should have been doing, and should have completed.  In short, it

would be silly for a court, the enforcer of a trust, to remand a trust action to a trustee so that it

could decide what to do to comply with its own trust duties, especially in light of such

demonstrated recalcitrance.

In sum, the unstated predicate of Trustee-Delegates' position is that this is an APA case.

As a consequence, they have invoked principles of administrative law that simply do not apply to

claims against them as trustees.

## VII.   TRUSTEE-DELEGATES' REMAND REQUEST MISCONCEIVES THE ROLE AND AUTHORITY OF THE COURT AND WOULD PREEMPT PROMPT JUDICIAL RESOLUTION OF LONG-NEGLECTED TRUST DUTIES BY ARROGATING THOSE DECISIONS TO THE AGENCY.

Trustee-Delegates' invocation of the doctrines of primary jurisdiction and "voluntary

remand" is misplaced and shows the lengths to which they will go in search of a legal theory to

support their desperate request for a remand.  But even assuming *arguendo* that this Court has

any discretion to remand this case to the Department of the Interior, whether under trust law or

administrative law, such a remand would be unwarranted and improper here.[20]  First, Trustee-Delegates' either concede they have failed to date to comply with their trust obligations, or their request for a remand at this time is premature because it fails to address important threshold questions of law (*e.g.*, duty, breach, and scope of the accounting), and this would mean that Trustee-Delegates, rather than this Court, would define their own trust duties.  Trustee-Delegates are certainly welcome – indeed obligated – to begin finally to comply with their fiduciary obligations to provide Plaintiff-Beneficiaries with a full and complete accounting of their trust assets, but it is unacceptable to postpone, or defer to the agency, a decision on these critical threshold questions in the meantime.  Second, Trustee-Delegates' request for a six-month time-out from this litigation is one more attempt to delay what now amounts to decades of intransigence in completing the accounting that is required of Trustee-Delegates by law.  Third, even in the event of a remand, the Court should not stay the litigation but rather should permit Plaintiff-Beneficiaries to begin discovery in the interim to collect information about the basic integrity of Plaintiff-Beneficiaries' trust data as well as to compel production of records that Trustee-Delegates have a fiduciary duty to provide to Plaintiff-Beneficiaries under the trust. *Restatement (Second) of Trusts* § 173 (1959) (Duty to Furnish Information) ("The trustee is under a duty to the beneficiary to give him upon his request at reasonable times complete and accurate information as to the nature and amount of the trust property, and to permit him or a person duly authorized by him to inspect the subject matter of the trust and the accounts and vouchers and other documents relating to the trust.").

---

[20] In addition, for the reasons discussed in Section III, *infra*, even on the government's own terms, the doctrines of primary jurisdiction and "voluntary remand" do not support a remand.

**A.     Either Trustee-Delegates Concede, Or The Court Must Decide, Threshold Issues Of Duty, Breach, And Scope Of Duty To Account.**

In requesting a remand in order to set forth a plan for a historical accounting, Trustee-Delegates implicitly concede (1) that they have a fiduciary duty to provide an historical accounting to Plaintiff-Beneficiaries and (2) that they have failed adequately to discharge that duty to date and therefore are in breach of trust. Indeed, they concede they have not taken even the first step toward providing an historical accounting – setting forth a plan to complete the accounting. (*See* Def. Memo. at 22 ("The first step in providing a full and complete accounting is the preparation of a historical accounting plan detailing how the accountings should take place."); *id.* at 30 ("Plaintiffs have brought claims requesting historical accountings of their tribal trust accounts and other assets. … Interior proposes to provide plaintiffs with a major step towards historical tribal accountings, that is, a plan[21] setting forth the scope of such historical tribal accountings.").)

If, however, Trustee-Delegates attempt to take the position that they have not conceded these threshold issues in their entirety, then the Court must decide them before the litigation proceeds. This is exactly what was done in *Cobell* and the predecessor to *Red Lake Band II* (upon which Trustee-Delegates heavily rely). *See Cobell*, 91 F. Supp. 2d 1 (declaring duties and breach); *Red Lake Band I*, 846 F.2d at 1398 (deciding trust relationship and duty).

This Court must also decide issues related to the scope of Trustee-Delegates' duty to account. It would be an enormous waste of resources and time for Trustee-Delegates to develop a plan for an historical accounting based upon their own assumptions about the scope of their accounting duty before the Court resolves relevant disputes between the parties. For example,

---

[21] In light of Trustee-Delegates' penchant to **plan** to comply with their trust duties, but never actually doing so, it is hard to take their current commitment seriously. They have never kept their promises before, why should the Court believe them now?

Trustee-Delegates contend that "each tribe has a potentially different starting date for the historical accounting of each of its accounts." (*See* Swimmer Decl. ¶ 24.) Further, Trustee-Delegates allege that any duty to account does not predate August 13, 1946 because any claims that existed on or before that date are barred by the ICCA. *See* Salt River Answer, Affirmative Defenses ¶ 2. *Compare Osage Nation v. United States*, 57 Fed. Cl. 392, 398 (Fed. Cl. 2003) (rejecting out of hand the argument that all tribal trust fund mismanagement claims against the United States that accrued before August 13, 1946 are barred). It makes perfect sense, and is far more efficient, for this Court to determine the scope of the accounting before Trustee-Delegates set forth provide that accounting. It is also appropriate for the Court to declare that the Arthur Andersen Reports did not provide Plaintiff-Beneficiaries with a full and complete accounting as required by law for all of its assets for even a single year.

There may also be other issues related to the scope of Trustee-Delegates' duty to account that must be resolved. *See, e.g.*, *Cobell VI*, 240 F.3d at 1102 (deciding issues related to scope of accounting duty including whether it predated 1994 Act and whether IIM trust beneficiaries were entitled to a complete historical accounting of *all* funds held in trust). Other scope issues the Court should consider include which assets are to be included in the accounting, whether direct pay transactions will be accounted for, whether cadastral surveys must be conducted as a starting point to ensure the accuracy of ownership data, or whether Trustee-Delegates must take immediate steps to obtain relevant third-party records in view of their clearly deficient and unreliable record keeping (as evidenced by the failed Arthur Andersen reconciliation project).

It appears that Trustee-Delegates have skipped over these threshold issues regarding their duty to account because they believe they are entitled to define that duty themselves. (*See* Swimmer Declaration ¶ 20 ("I am committed to ensuring that Interior provides tribes with

historical accountings in accordance with *its* understanding and interpretation of applicable law." (emphasis added); *id*. ¶ 22 ("Interior intends to prepare an accounting plan and accompanying record that fully articulates *its* understanding and interpretation of its various tribal accounting duties under law." (emphasis added)); Def. Memo. at 35 ("The remand process presents a superior alternative as a remand will permit Interior first to offer an administrative interpretation of its accounting obligations.").)

That is simply and fundamentally wrong as a matter of law.  It is not up to Trustee-Delegates to decide what the scope of their fiduciary duties are or whether they have breached those duties.  *See, e.g.*, *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 112 (1989) ("The extent of the duties … of a trustee is determined by the rules of law that are applicable to the situation, and not the rules that the trustee or his attorney believes to be applicable, and by the terms of the trust as the court may interpret them, and not as they may be interpreted by the trustee himself or by his attorney.").  Interior may have some discretion in the first instance to decide *how* to comply with its trust duties once the court decides that it has breached certain duties.  *See* Def. Memo. at 25-26, 33; *Cobell v. Norton* ("*Cobell XVIII*")¸ 455 F.3d 301, 305 (D.C. Cir. 2006) ("While a court might certainly act to prevent or remedy a trustee's wrongful intermingling of trust accounts, this does not imply that the normal remedy would be an order specifying *how* the trustee should program its computers to avoid intermingling, as opposed to, for example, barring the use of a program that had caused forbidden intermingling or was clearly likely to do so.").  The D.C. Circuit has explicitly rejected, however, the government's argument that it, rather than the district court, may define the "*nature and scope* "of that accounting.  *See Cobell VI*, 240 F.3d at 1102-1104; *see also Cobell v. Norton ("Cobell X")*, 283 F. Supp. 2d 66, 144 (D.D.C. 2003), *aff'd in part, vacated and remanded on other grounds*, *Cobell v. Norton*

("*Cobell XIII*"), 392 F.2d 461 (D.C. Cir. 2004). ("[I]t is 'emphatically the province and duty of the judicial department to say what the law is.'" (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803))).

Of course, nothing precludes Trustee-Delegates from finally setting forth a plan for an historical accounting. Indeed, this step is long overdue and should be completed forthwith. In the meantime, however, the Court should hold that Trustee-Delegates have conceded, or otherwise proceed to decide, any and all threshold issues like duty and breach and provide appropriate declaratory relief.

### B.    Trustee-Delegates Should Not Be Permitted To Delay These Proceedings An Additional Six Months In Order To Fashion An Accounting Plan That Is Decades Late.

Ironically, after decades of failing to provide Plaintiff-Beneficiaries with a complete historical accounting of their trust assets, and nearly eleven years after Congress specifically reaffirmed and restated the duty to reconcile all tribal trust assets in the 1994 Act, Trustee-Delegates now ask for six more months to "prepare and present an accounting plan that addresses the plaintiffs' requests for accountings of their trust funds and non-monetary trust assets." (Def. Memo. at 16.) Given Trustee-Delegates' history of delay and pattern of failed attempts to comply with their accounting obligations, this Court should not agree to halt litigation for an additional six-month "time out" during which Trustee-Delegates will merely lay out one more "plan" for what they believe will finally comply with their trust duties. The only product of the approach Trustee-Delegates advocate is more delay.

As described in greater detail in the Statement *supra*, Trustee-Delegates have a long history of abject delay and utter failure to fulfill their duty to account. In fact, Trustee-Delegates have ***never*** provided a full and complete historical accounting of assets held in trust for any tribe

54

since the inception of the trust more than a century ago.  In 1987 – two decades ago – when Congress recognized that the government had never provided an accounting to Indian tribes, it directed in a series of appropriation riders that Interior commence an accounting immediately in order to comply with its preexisting duty to account.  *See, e.g.*, Act of July 11, 1987, Pub. L. 100-71, 101 Stat. 391, 416 (1987).  Still nothing happened.  So Congress enacted a statute – the 1994 Trust Reform Act – restating and reaffirming Trustee-Delegates' accounting duty and mandating that Trustee-Delegates discharge their duty to account within two years and certify the results. *See, e.g.*, 25 U.S.C. § 4044.  Interior tried to rely upon the Arthur Andersen Reports, which were conducted pursuant to wholly compromised accounting standards established by the BIA, to discharge this duty.  Yet, "despite five years of effort and the expenditure of $21 million," the Arthur Andersen  Reports were widely rejected – even by Interior itself – as a "less than complete accounting of the state of the Tribal trust funds."   U.S. Dep't of the Interior, Recommendation of the Secretary of the Interior for Settlement of Disputed Tribal Trust Fund Accounts, at 9 (Nov. 1997); *see supra* III, A and C (detailing admissions of Trustee-Delegates that Arthur Andersen Reports are not full and complete accountings).   They also failed ever to certify the results of that accounting.  As detailed in the GAO's May 1996 report on the Arthur Andersen reconciliation reports, this accounting attempt was rife with shortcomings and did not even approach the requisite accounting required by traditional and universally applicable trust standards.  *See* May 1996 GAO Report.

Even though the Arthur Andersen Reports fell far short of what the law required, and notwithstanding the fiduciary relationship of trust with their trust beneficiaries, Trustee-Delegates tried to pass off this reconciliation attempt as discharging their duties to Plaintiff-Beneficiaries.  Interior sent Acknowledgement forms to tribal leaders that specifically asked

Indian tribes to agree that the Reports were "as full and complete accountings as possible." "Acknowledgment" form appended to Jan. 8, 1996 Letter from Paul M. Homan.   However, the form did not (to say the least) make "evident" the many limitations in reconciliation scope and methodology or the procedures specified under the original contracts that were not performed or completed.   *See* June 11, 1996 Statement of Linda M. Calbom at 4 (GAO/T-AIMD-96-104). Therefore, Trustee-Delegates failed to deal with the deficiencies in their own accounting attempt with the candor required of a trustee.   What is more, thirteen years later they have not completed the reconciliation required of them or corrected its deficiencies.   Only after being this litigation was filed did they propose to set forth a "comprehensive plan" to remedy these failures.

Trustee-Delegates defend their failure to prepare an historical accounting plan in the last five years (since the first Indian tribes starting filing suit in this and other United States District Courts to compel an accounting in 2002) on the grounds that they have been following the "Congressional policy to encourage settlement" by pursuing settlement negotiations with tribes on a case-by-case basis, only as each case "oblige[d] it to."   (Def. Memo. at 32 (citation omitted).)   This explanation for continued delay over these past five years (on top of prior recalcitrance), and the failure to ask for a remand to set out a plan until thirty-seven tribes had pending accounting claims against Trustee-Delegates is nothing short of audacious in light of the fact that the Administration opposed an amendment in December 2005 that would have allowed tribes additional time to present their concerns without the necessity of filing suit.   An amendment to P.L. 107-153 would have extended by six years the date on which an Indian tribe was deemed to have received its Tribal trust fund reconciliation report for purposes of the statute of limitations.   Under this bill, the deadline to file suit challenging these reports would have been extended from December 31, 2005 until December 31, 2011.   Interior opposed the amendment

on the ground that "[s]ound public policy calls for the filing of claims with reasonable promptness" and that "further delay … is not in the public interest." Dec. 13, 2005 Letter from William E. Moschella to John McCain at 1. In truth, Trustee-Delegates wanted to bar tribes from enforcing their rights,[22] but now that tribes have acted, defendants ask this Court to save them from their self-inflicted wounds. They cannot have it both ways.

In sum, given Trustee-Delegates' intransigence and repeated failures to comply with their fiduciary duty to account for Tribal trust assets, Trustee-Delegates' request for another six-month delay to fashion a mere plan to comply with their trust duties is not only unwarranted, but, candidly, is an outrage and a disgrace.

### C.    Even if Trustee-Delegates were to Prepare A Historical Accounting Plan, Discovery Should Proceed Apace.

As noted above, Plaintiff-Beneficiaries agree that (1) Trustee-Delegates should begin immediately to comply with their fiduciary duty to provide an accounting of all assets held in trust on Plaintiff-Beneficiaries' behalf, and (2) since they failed even to develop a plan to do so, Trustee-Delegates should fashion their plan forthwith and submit it to the Court. While that is underway, however, there is no reason that discovery should be halted for six more months, thereby further delaying Plaintiff-Beneficiaries' access to the trust records essential to prove their claims. (Indeed, by filing this motion, Trustee-Delegates have already achieved a delay of discovery of more than six months between the filing of the Joint Reports in Plaintiff-Beneficiaries' cases in early May of 2007 and the due date for Trustee-Delegates' reply to this opposition in November of this year).

---

[22] Plaintiff-Beneficiaries do not concede that enactment of these statutes were necessary to protect against statute of limitations defense since the Arthur Andersen Reports are not an adequate accounting and thus cannot commence the running of the limitations period.

Discovery is critical to Plaintiff-Beneficiaries' claims.  In this case, proof of their claims requires access to trust records in the exclusive possession of Trustee-Delegates. Plaintiff-Beneficiaries have a right to prepare their case and the only way they can do so is with access to their trust records.[23]

The trust documents relevant to this accounting action are numerous and varied.  Trustee-Delegates have in their possession account books, data, vouchers, receipts, working papers of its auditors including Arthur Andersen, records of past failed accounting plans, and many other records that may be relevant to Plaintiff-Beneficiaries' accounting claim.  Further, in their Answers to the Complaints, Trustee-Delegates repeatedly reference "financial and accounting data and documentation," "statements of account," and other "trust account information" they claim to have furnished to Plaintiff-Beneficiaries; indeed, although they hint that these items may discharge their fiduciary obligation to account, they wholly fail to explain how any of these documents satisfy that duty.  (*See, e.g.*, Salt River Answer ¶¶ 2, 3, 5, 21, 30, 34, 36, 37, 38.) Trustee-Delegates should be required to produce all documents that they contend fulfill their duty to provide an accounting.

Moreover, Plaintiff-Beneficiaries have demanded an accounting not only of their trust funds but also the underlying resources.  (*See, e.g.*, Salt River Compl. ¶ 1-2, 13.)  As with the trust funds, in many instances Trustee-Delegates hold all of the relevant information regarding

---

[23]  In some of Plaintiff-Beneficiaries' cases, Trustee-Delegates erroneously argued in the Rule 26(f) Joint Report that Plaintiff-Beneficiaries are not entitled to discovery in this case because these cases involve nothing more than the Court's "review of an administrative record."  *See* Fed. R. Civ. P. 26(a)(1)(E)(i) and Local Rule 16.3(b)(1).  As explained above, Trustee-Delegates fundamentally misconceive our case. Furthermore, Trustee-Delegates took a similar position in the *Cobell* trust accounting litigation and this Court rejected it as ill-founded.  *Cobell v. Norton*, 226 F.R.D. 67, 92 (D.D.C. 2005) (observing that "[D]efendants have never been successful in portraying this litigation as a typical case of judicial review of agency action."); *see also Cobell v. Norton* ("*Cobell XII*"), 391 F.3d 251, 257-58 (D.C. Cir. 2004) ("The narrower judicial powers appropriate under the APA do not apply [in this suit] … because the underlying lawsuit is both an Indian case and a trust case in which the trustees have egregiously breached their fiduciary duties.").

Plaintiff-Beneficiaries' trust assets as well.  For example, such trust records include records of rights-of-way and easements or other important information about Plaintiff-Beneficiaries' land, and records relating to non-mineral assets, proceeds collected, and accounts receivable.   Were discovery and the litigation to be stayed pending remand, Plaintiff-Beneficiaries would be denied access to all of these trust records, making it impossible for them to prepare their case in the interim.

### D.    Trustee-Delegates Should Be Ordered To Comply With Their Duty To Turn Over Material Information Regarding The Management And Administration Of The Trust.

Wholly apart from Plaintiff-Beneficiaries' right to obtain trust records pursuant to the normal rules of discovery, one of the claims certain Plaintiff-Beneficiaries have brought is to enforce the duty that Trustee-Delegates provide material information regarding the management and administration of their trust assets.  (*See*, *e.g*., Salt River Compl. Prayer ¶ 7.)  It is well-established that a trustee is "under a duty to the beneficiary to give him . . .  complete and accurate information . . . (to the Beneficiary, in text) as to the nature and amount of the trust property," and "the beneficiary is always entitled to such information as is reasonably necessary to enable him to enforce his rights under the trust or to prevent or redress a breach of trust." *Restatement (Second) of Trusts*, § 173 (1959); *see also* G.T. Bogert, *Trusts* § 141 at 494 (6th ed. 1987) ("The trustee is under a duty to furnish the beneficiary on demand all information regarding the trust and its execution which may be useful to the beneficiary in protecting its rights, and to give to the beneficiary facts which the trustee knows or ought to know would be important to the beneficiary.  There is justification to postpone by six more months Plaintiff-Beneficiaries' access to their own trust records, which thus far they have been barred from accessing, and which constitutes an independent and ongoing breach of trust.  Trustee-Delegates

should not be allowed to turn this Court, sitting in equity to enforce trust obligations, into an instrument of further delay by requesting a stay.

## VIII. EVEN ON THE GOVERNMENT'S OWN TERMS, THE DOCTRINE OF PRIMARY JURISDICTION AND GENERAL PRINCIPLES OF ADMINISTRATIVE LAW DO NOT SUPPORT A REMAND.

Even if the doctrines of primary jurisdiction and "voluntary remand" apply in this trust case, they do not support Trustee-Delegates' request remand here.

### A.    The Swimmer Declaration Is Entitled To No Consideration.

As an initial matter, in support of their remand motion, Trustee-Delegates rely upon and submit to the Court the declaration of Ross O. Swimmer ("Swimmer Declaration").  They rely upon this declaration to establish their alleged "expertise" and intentions to set out an historical accounting plan on remand.  However, the Swimmer Declaration is entitled to no consideration unless, at the least, Mr. Swimmer is made available for cross-examination, either by deposition or at a hearing in open court.  *See* Fed. R. Evid. 801(d)(1)(B).

A probing examination is particularly essential here because Mr. Swimmer appears to have no personal knowledge on which to rely for most of his averments.  *See* Fed. R. Evid. 602. He recounts, for example, what Interior claimed to be doing in the 1990s to advance the cause of trust management and to reconcile tribal accounts even though he had left Interior in early 1989 and was absent for the next 12 and one-half years living in Tulsa.  *Cobell* Trial 1.5 Tr. at June 25, 2003 P.M. (Swimmer) (12:9-13); (13:21-14:16) (Exh. 31).  Cross-examination of Mr. Swimmer also is necessary in light of his inconsistent testimony under oath in similar trust cases – namely the *Cobell* 1.5 trial which included admissions with respect to Interior's failures wholly at odds with Trustee-Delegates' claim that Interior has the expertise and experience necessary to resolve

trust issues.[24]  Lastly, from the outset of this case, Trustee-Delegates have taken the position that discovery is not appropriate and refused to make even the most rudimentary disclosures required by Federal Rule 26(a) on the ground that the case must be litigated on the basis of the supposed "administrative record" under the APA.  By going outside that record and submitting the lengthy and litigation-driven declaration of Mr. Swimmer –  a named defendant –  without making him available, Trustee-Delegates clearly are improperly trying to have their cake and eat it too.

> **B.    The Court Should Not Remand The Case To Interior Based Upon The Doctrine of Primary Jurisdiction.**

Despite its literal meaning, the doctrine of primary jurisdiction "does not speak to the jurisdictional power of the federal courts."  *United States v. Bessemer & Lake Erie R.R. Co.*, 717 F.2d 593, 599 (D.C. Cir. 1983).   Instead, it is a judge-made, prudential doctrine that is "concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties."  *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63 (1956) (citation omitted).  It is applicable when a claim is originally cognizable in the courts but "enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body."  *Id.* at 64.  In such a case, "the judicial process is suspended pending referral of such issues to the administrative body for its views."  *Id.*

The primary jurisdiction doctrine rests "both on a concern for uniform outcomes … and on the advantages of allowing an agency to apply its expert judgment."  *Allnet Commc'ns Serv., Inc. v. Nat'l Exch. Carrier Ass'n, Inc.*, 965 F.2d 1118, 1120 (D.C. Cir. 1992).   Although expertise in this context extends to "policy judgments needed to implement an agency's

---

[24] For, example Swimmer testified under oath that the Arthur Andersen Reports did not constitute a fair and accurate accounting.  *Cobell* Trial 1.5 at Tr. June 26, 2003 A.M. (Swimmer) (29: 11-15) and (31:16-24) (Exh. 32).

mandate," *id.*, the doctrine has typically been applied "particularly when the issue involves technical questions of fact uniquely within the expertise and experience of an agency." *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 304 (1976). By contrast, the doctrine does not apply to matters that are "within the conventional competence" or "work-a-day world of the district court." *Id.*; *Am. Ass'n of Cruise Passengers v. Cunard Line, Ltd.*, 31 F.3d 1184, 1187 (D.C. Cir. 1994).

In addition, it is well-settled that the doctrine "should be invoked sparingly, as it often results in 'added expense and delay.'" *Red Lake Band II*, 846 F.2d at 476 (quoting *United States v. McDonnell Douglas Corp.*, 751 F.2d 220, 224 (8th Cir. 1984)). Further, as the D.C. Circuit has recognized, the doctrine of primary jurisdiction must be applied in light of the fact that federal courts have a "virtually unflagging obligation ... to exercise the jurisdiction given them." *Am. Ass'n of Cruise Passengers v. Cunard Line, Ltd.*, 31 F.3d 1184, 1186 (D.C. Cir. 1994) (quoting *Reiman v. Smith*, 12 F.3d 222, 223 (D.C. Cir. 1993) (*quoting in turn Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976))).

Moreover, as noted above, *supra* at VI, the doctrine of primary jurisdiction has no place in a trust case. But even if *arguendo* the case is viewed as having some administrative law component, and thus administrative law principles are relevant at all, the clear nature and weight of the claims show that this is predominantly a trust case before a court sitting in equity to enforce the trust. *See Cobell VI*, 240 F.3d at 1099 (quoting *Jicarilla Apache Tribe v. Supron Energy Corp.*, 728 F.3d 1555, 1567 (10th Cir. 1984) (the Secretary "'cannot escape his role as trustee by donning the mantle of administrator' to claim that courts must defer to his expertise and delegated authority"). Therefore, the invocation of a doctrine that is "sparing[]" even in a

run-of-the-mill administrative case should be exceedingly rare (if applicable at all) in a trust case like this one.

For the reasons that follow, the Court should reject Trustee-Delegates' attempt to avoid or postpone the judiciary's "unflagging obligation" to exercise jurisdiction, which is all the greater where, as here, this Court is sitting in equity and enforcing a trust and the trustee has so long failed to comply with fundamental fiduciary obligations.

1.    **Trustee-Delegates fundamentally misunderstand the nature of primary jurisdiction.**

Trustee-Delegates have invoked the doctrine of primary jurisdiction outside its normal context.  Conceptually, primary jurisdiction comes into play when a federal court properly has jurisdiction over the plaintiff's cause of action but some ***subpart*** of that claim, or issue raised by that claim, can best be first addressed by an expert agency.  As the Supreme Court has explained, primary jurisdiction is "specifically applicable to claims properly cognizable in court that contain some ***issue*** within the special competence of an administrative agency."  *Reiter v. Cooper*, 507 U.S. 258, 268 (1993) (emphasis added) (citing *Western Pacific,* 352 U.S. at 63-640).  In such a case, the court may "enable a 'referral' to the agency [of that issue], staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling."  *Id.*; *W. Pac.*, 352 U.S. at 64 ("the judicial process is suspended pending referral of such issues to the administrative body for its views").

Primary jurisdiction is "primarily applicable to controversies concerning the so-called regulated industries."  Louis L. Jaffe, *Primary Jurisdiction*, 77 HARV. L. REV. 1037, 1040 (1964).  It is not surprising, therefore, that "courts have frequently invoked primary jurisdiction in cases involving tariff interpretations."  *See Allnet Commc'ns Serv., Inc. v. Nat'l Exch. Carrier Ass'n, Inc.*, 965 F.2d 1118, 1120 (D.C. Cir. 1992).  In such a case, it frequently happens that a

dispute is properly before the federal court but the agency charged with overseeing the regulated industry has special competence to decide the reasonableness of a rate that is in dispute. The court retains ultimate power to decide the overall dispute between the parties to the lawsuit, but suspends its proceedings so that the non-party agency charged with regulating the industry may issue a ruling to decide the questions that is both a subissue in the litigation and specifically within its realm of delegated administrative authority. *See, e.g.*, *W. Pac.*, 352 U.S. 59 (referring reasonableness of tariff charged by railroads to U.S. Army to the Interstate Commerce Commission); *Nader v. Allegheny Airlines*, 426 U.S. 290, 304 (1976) (referral to agency appropriate where action otherwise within the court's jurisdiction "raises a question of the validity of a … practice included in a tariff filed with an agency").

In this case, Trustee-Delegates do not seek remand of a subpart of Plaintiff-Beneficiaries' claims to an expert agency with administrative authority conferred by Congress over an issue entrusted to its special province or competence. Instead, they seek remand of the entire action to Interior so that it may exercise its purported "expertise" with respect to an array of loosely-defined "technical and intricate questions regarding the parsing and organization of Interior's accounting records." (Def. Memo. at 25.) In contrast to administrative rate-making or tariff-setting, Trustee-Delegates have no legal (let alone special and conclusive legal) authority over such issues and, especially in light of the historical record, no actual expertise. Rather, they simply act as a trustee, and there is no basis to displace the Court's role in favor of that of the agency.

Trustee-Delegates cite the Eighth Circuit's decision in *Red Lake Band of Chippewa Indians v. Barlow* ("*Red Lake Band II*"), 846 F.2d 474 (8th Cir. 1988), as an example of a claim for "accounting of trust funds [that was] remanded to Interior on [the] basis of primary

jurisdiction." (Def. Memo. at 22). The remand ordered in that case, however, was nothing like the remand sought here. Indeed, that decision finally supports our analysis that the Court should resolve controlling legal issues before the trustee-agency carries out the actual accounting.

In *Red Lake Band*, the Eighth Circuit directed that on remand the Department of the Interior (rather than the district court) should conduct an evidentiary hearing needed to determine the viability of the forest products business on the Red Lake Reservation. In doing so, the Court of Appeals invoked the doctrine of primary jurisdiction, "find[ing] force in the Secretary's assertion that a determination of the viability of a forest products business is a matter requiring technical expertise" and is "well-suited for administrative decisionmaking." *Id.* at 476. The issue was therefore remanded to Interior to make the necessary fact-finding, subject to the district court's retaining jurisdiction and monitoring the agency's progress "[t]o assure that the Secretary reaches a decision promptly." *Id.*

Significantly, however, although the Court of Appeals remanded a narrow factual issue to the agency, it had already addressed and resolved the legal questions giving rise to the need for the "viability" determination the evidentiary hearing was intended to provide. *See Red Lake Band I*, 834 F.2d at 1393. A year earlier, the Court of Appeals had reversed the district court's summary dismissal of the Band's accounting claim and remanded the case for further fact-finding related to plaintiff's request that the funds of a "sawmill account" administered by Interior be ordered to be transferred to another "general account" also administered by Interior for the Band's benefit. The Eighth Circuit held that the 1916 statute creating the "sawmill account" had "place[d] the federal government in a fiduciary relationship with the Band." *Id.* at 1398. Thus, in reliance upon *Mitchell II*, the Court held the "Secretary has a duty to manage the forest preserve and the funds generated by it in a way beneficial to the Band." *Id.* The Court

concluded that if upon remand the district court (later modified to be Interior) concluded that the sawmill could not be made economically viable, then the funds in the sawmill account must be transferred to the Band's general account in order for the federal government to "meet its trust obligations." *Id.* at 1399. Therefore, although the Eighth Circuit ultimately remanded a narrow factual issue regarding viability of a sawmill to the agency, the Court first decided issues related to trust duties and the scope of those duties. Just as in other primary jurisdiction cases, the remand was for the agency to decide only a small subpart of the Band's claims. *Red Lake Band II*, 846 F.2d at 476.

> **2.     Primary jurisdiction is inapplicable where there is a history of decades of delay.**

A district court "must also examine whether delay of its own proceedings [by invocation of the primary jurisdiction doctrine] will have any impact on the alleged harm sought to be presented to the trial court." *Rohr Indus., Inc. v. Washington Metro. Area Transit Auth.*, 720 F.2d 1319, 1327 (D.C. Cir. 1983). Because of its potential to result in "added expense and delay," the doctrine "should be invoked sparingly." *Red Lake Band II*, 846 F.2d at 476. Indeed, in many of the cases cited by Trustee-Delegates, the courts held as an important prerequisite to primary jurisdiction that the remand would not result in delay. *See, e.g., Ford Motor Co. v. NLRB*, 305 U.S. 364, 375 (1939) ("The application for remand in this instance was not…for any purpose that might be considered dilatory or vexatious."); *Red Lake Band of Chippewa Indians v. Barlow*, 846 F.2d 474, 476 (8th Cir. 1988) (allowing remand where "the more informal administrative decisionmaking process may be more expeditious"); *Total Telecomms. Servs., Inc. v. Am. Tel. & Tel. Co.*, 919 F. Supp. 472, 482 (D.D.C. 1996) (Holding that delay was not an issue because "[t]he present litigation has been on-going for only several months.").

By contrast, when courts conclude the agency seeking remand has a history of delay, remand is improper.  "[C]ourts must be wary of the possibility of rewarding the very impropriety alleged." *Rohr*, 720 F.2d at 1327.  "Rote deference to agency proceedings in such circumstances can force parties to unnecessarily travel roads 'equally long and expensive and available only to those with long purses …'" *Id.* at 1327 (quoting *Ricci v. Chicago Mercantile Exch.*, 409 U.S. 289, 321 (1973) (Douglas, J., dissenting)).  As detailed thoroughly above, Interior's primary strategy for handling its accounting obligations for more than a century has been recalcitrance and delay.  There is a long string of broken promises to produce an accounting plan  - let alone the accounting itself.  Trustee-Delegates have not fulfilled their obligations despite constant pressure from Congress to do so.  Therefore, granting the requested six-month time out to produce a "plan" would only result in further delay and reward Trustee-Delegates, century-long obduracy.

> **3.**     **Enforcement of trust duties is within the conventional experience of courts and does not require special agency expertise.**

Trustee-Delegates argue that primary jurisdiction is appropriately invoked here because there are "many technical and intricate questions regarding the parsing and organization of Interior's accounting records" that are "not within the conventional experience of courts."  (Def. Memo. at 25.)  Not only is that not a legally sufficient basis for primary jurisdiction, but it also is incorrect.

Enforcement of Trustee-Delegates' trust duties is well within the competence of the district court.  Indeed, federal district courts are courts of equity and have the traditional powers of a court of equity.  *See Grupo Mexicano de Desarollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318 (1999) ("[T]he equity jurisdiction of the federal courts is the jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the

Constitution and the enactment of the original Judiciary Act, 1789 (1 Stat. 73)." (citing A. Dobie, *Handbook of Jurisdiction and Procedure* 660 (1928))). Specifically, federal courts have significant and ample expertise in enforcing trusts. "[T]he particular substantive area of this case – the law of trusts – is one in which the judicial branch possesses special knowledge or expertise." *Cobell X*, 283 F. Supp. 2d at 135.

Courts are well-acquainted with the fiduciary duties owed by a trustee and it is their province to decide trust duties and related issues including issues about the scope of a trustee's duty to account. *See Firestone Tire & Rubber*, 489 U.S. at 112 ("The extent of the duties … of a trustee is determined by the rules of law that are applicable to the situation, and not the rules that the trustee or his attorney believes to be applicable, and by the terms of the trust as the court may interpret them, and not as they may be interpreted by the trustee himself or by his attorney."); *Vill. of Brookfield*, 101 F.2d at 520-21 ("Courts of equity have original inherent jurisdiction to decree and enforce trusts and to do whatever is necessary to preserve them from destruction.") (emphasis added); *First Fiduciary Corp. v. Office of Comm'r of Banks*, 684 N.E.2d 1, 2 n.2 (Mass. App. Ct. 1997) ("there is a long history of equitable supervision of trusts and trustees by the courts, which, at the behest of beneficiaries, routinely compel trustees to perform duties, enjoin breaches of trust, compel redress of breaches of trust, remove faithless trustees, and appoint receivers to administer trust property."); *Scott on Trusts* § 199, at 203-04 (4th ed. 1988) ("A court of equity, having jurisdiction over the administration of trusts, will give to the beneficiaries of a trust such remedies as are necessary for the protection of their interests). As noted above, Trustee-Delegates may have some discretion about *how* to complete an accounting, but they do not have any discretion or expertise to decide what the law requires an accounting to entail. *See supra* VII.

Certainly the role of this Court sitting in equity in a trust case need not and should not be circumvented or thwarted while Trustee-Delegates finally begin to take steps they should have taken long ago. This case plainly involves the application of concepts that are squarely "within the conventional competence" or "work-a-day world of the district court." *Nader*, 426 U.S. at 305; *Am. Ass'n of Cruise Passengers,* 31 F.3d at 1187.

Furthermore, Trustee-Delegates have revealed by their conduct that they lack the requisite expertise to be trusted to conduct an accounting on their own and without judicial guidance. The record demonstrates that they have consistently breached their fiduciary duties and "unconscionably delay[ed]" the discharge of their most fundamental trust obligations. *Cobell VI*, 240 F.3d at 1096.[25] Trustee-Delegates make their request for a remand against a backdrop of decades of documented malfeasance, intransigence, and unwillingness to fulfill their basic trust duties, or even to take the most rudimentary steps to do so. Independent reports and multiple independent auditors have identified a multitude of errors, omissions, and flawed accounting procedures and persistent foot-dragging in response to any effort to compel them to remedy these deficiencies. In fact, in the late 1980s, Interior, at the behest of then-Assistant Interior Secretary for Indian Affairs Ross Swimmer, urged that Interior outsource its trust responsibilities to others because of a history of demonstrated failure to carry out the government's trust duties. Even this was mismanaged and resulted in waste of upwards of $1 million in taxpayer dollars over five years, without any benefit whatsoever.

---

[25] *See also* Griffin & Associates P.C., "Report of Independent Public Accountants on Financial Statement" at 6 (May, 17 1996) (Exh. 33) (independent auditor noting "major inadequacies in the Trust Fund accounting systems, controls and records caused them to be unreliable"); Special Committee on Investigations of the Select Committee on Indian Affairs, United States Senate, "Final Report and Legislative Recommendations" (November 1989) ("[D]espite the federal government's longstanding obligation to protect Indian natural resources, they have been left unprotected, subject to, at best, benign neglect and, at worst, outright theft by unscrupulous private companies") (1915 Report at 2) (in a commission study on the state of Indian trust fund management, describing BIA as fraught with "fraud, corruption, and institutional incompetence almost beyond the possibility of comprehension").

As H.R. Schoolcraft said nearly two centuries ago and a committee of Congress reaffirmed in the *Misplaced Trust* report issued in 1992, Interior's administration of Indian trust funds

> continues to make the accounts look as though they had been handled with a pitchfork. Undoubtedly, there is a screw loose in the public machinery at the Bureau. Indeed, while mismanagement of the Indian trust fund has been reported for more than a century, there is no evidence that either the Bureau or the Department of Interior has undertaken any sustained or comprehensive effort to resolve glaring deficiencies.

*Misplaced Trust* at 9. Trustee-Delegates' expertise should be judged by their conduct rather than by their purported assurances and "commitments" to rectify the breaches that they have made these past twenty-five years.[26]  What the record indicates is that this is not the sort of "expertise" that warrants giving Trustee-Delegates yet another opportunity to prove their intransigence and incompetence.[27]

Nor do Trustee-Delegates credibly argue that the application of their expertise would in this case "simplify a complex fact pattern." (Def. Memo. at 25.) Boldly, but erroneously, they suggest that this "proposition is well established" in the trust accounting context because in the accounting claims filed before the Indian Claims Commission, the government was permitted to compile an accounting prior to judicial review. (*Id.*)

That is hardly a model to follow and assuredly not required by any principle of law applicable here. In the ICC accountings, in the case of a general contested accounting matter, it took anywhere between nine to thirty years before a final order was entered. *See, e.g.*, *Am. Indians Residing on Maricopa Ak-Chin Reservation v. United States*, 229 Ct. Cl. 167, 667 F.2d 980

---

[26] Indeed, Trustee-Delegates have stated time and again in their responsive pleadings that they do not even understand what the term "accounting" means. *See*, *e.g.*, Answer *filed in Salt River*, ¶ 3.

[27] Moreover, Trustee-Delegates' remand request apparently contemplates no role for the Department of the Treasury – notwithstanding the fact that Treasury has played a significant role in the administration of tribal trust funds. This glaring deficiency, too, supports rejection out-of-hand of defendants' request.

(1981) (30 years); *Lower Sioux Indian Cmty. v. United States*, 30 Ind. Cl. Comm. 463 (1973) (9 years); *Navajo v. United States*, 31 Ind. Cl. Comm. 40 (1973) (21 years); *Fort Still Apache v. United States*, 28 Ind. Cl. Comm. 433 (1972) (21 years).  The Commission itself expressed frustration with the government's intransigence, noting that if "the Government's failure to comply with our orders in accounting cases were deliberately adopted as a defense tactic it would indeed be an effective one." *Blackfeet & Gros Ventre Tribe*, 32 Ind. Cl. Comm. 65, 146 (1973).  And in many cases the government produced reports that were grossly inadequate to meet traditional standards of accounting or to meet the government's burden to produce sufficiently detailed reports.  *See id.* at 144 ("[T]he defendant's difficulties in presenting acceptable accounts are not, as has been stated, caused by any novel requirements of this Commission, but by failure of the accountants to follow long-standing case law"); *Maricopa Ak-Chin Reservation*, 229 Ct. Cl. 167, 667 F.2d at 1001 ("[I]nformation that [the government] did provide is incomplete, inconsistent, and insufficient to enable the Indians to ascertain whether defendant's obligations as a fiduciary have been faithfully discharged").  If anything, the ICC proceedings only highlight that it would be a grave mistake to defer to Trustee-Delegates' "expertise" in this area.

### 4.    There will be no "inconsistent" outcome if this Court exercises its authority to enforce Trustee-Delegates' trust duties.

The second keystone underlying the doctrine of primary jurisdiction is a concern for uniform outcomes.  Typically, this concern is directed toward avoiding multiple courts inconsistently resolving the same issues inconsistently when an agency (typically the industry regulator) could provide a uniform result.  *See Allnet Commc'ns Serv., Inc. v. Nat'l Exch. Carrier Ass'n*, 965 F.2d 1118, 1120 (D.C. Cir. 1992).  Trustee-Delegates do not raise that concern here.  (Def. Memo. at 27).  Instead, pointing to an asserted potential "conflict between the role of the court and the agency" (Def. Memo. at 27.), Trustee-Delegates contend that it

would "be error for the Court to specify [Interior's historical accounting and other obligations] before Interior has first articulated its view as to the proper scope of historical accountings for tribal trust funds and other assets." (*Id.* at 28.)

This is merely Trustee-Delegates' attempt to repackage their argument that they have discretion to define the scope of their accounting duty and what actions are legally required discharge that duty. Once again, as previously explained, it is the Court's province to define and enforce trust duties. Once the Court's proper role is recognized, there is no risk of inconsistency between the agency and the Court.

### C.    The General "Principles Of Administrative Law" Trustee-Delegates Cite Do Not Support A Voluntary Remand.

Trustee-Delegates rely upon various administrative law cases in support of their argument that the Court has discretion, at Interior's request, to grant a "voluntary remand" to the agency so that "Interior can present a written plan detailing its policies and process for the completion of historical tribal accountings." (Def. Memo. at 30). They cite to the grounds for granting a request for a voluntary remand set forth in *SKF USA, Inc. v. United States*, 254 F.3d 1022, 1028 (Fed. Cir. 2001). First, an "agency may seek a remand because of intervening events outside of the agency's control, for example, a new legal decision or the passage of new legislation." *Id.* at 1028. Second, even "in the absence of intervening events, the agency may request a remand … in order to reconsider its previous position." *Id.* While a "substantial and legitimate" request is appropriate, a request that is "frivolous or in bad faith" should be denied. *Id.*[28]

---

[28] Trustee-Delegates also cite a third ground for granting a request for a voluntary remand – the agency's belief "that its original decision was incorrect on the merits and wishes to change the result" – but they do not rely directly upon that ground. *Id.*

### 1.    Trustee-Delegates misunderstand the purpose of a voluntary remand.

Trustee-Delegates' invocation of the Court's authority to order a voluntary remand, like their attempt to rely upon the doctrine of primary jurisdiction, is fundamentally flawed. Each of the grounds identified in *SKF* for awarding a voluntary remand is premised upon a representation by the agency that it will take some action on remand that will either obviate the need for judicial review or fundamentally change the nature of the case the Court is being asked to decide. In those circumstances, it would be both inappropriate and wasteful for the court to proceed to decide the issue before remand. *See, e.g.*, *Ethyl Corp. v. Browner*, 989 F.2d 522, 524 (D.C. Cir. 1993) ("We commonly grant such motions, preferring to allow agencies to cure their own mistakes rather than wasting the courts' and the parties' resources reviewing a record that both sides acknowledge to be incorrect or incomplete.").

In this case, nothing Trustee-Delegates propose to accomplish on remand would obviate the need for judicial review or change fundamentally the trust issues before the Court. Here, Plaintiff-Beneficiaries do not seek review of agency action; they seek enforcement of Trustee-Delegates' trust duties. Irrespective of Trustee-Delegates' proposed accounting plan, the Court will still need to define their trust duties, the scope of their duty to account, the nature of their breach, and the nature of the accounting that will need to be performed. Indeed, if anything, it is the Court's rulings that, as a matter of logic and efficiency, must come first in order to guide Trustee-Delegates in formatting their historical accounting plan.

### 2.    No intervening event justifies a voluntary remand.

Trustee-Delegates identify two "intervening events" they contend justify a voluntary remand. Neither is the sort that warrants a voluntary remand. *See SKF USA*, 254 F.3d at 1028 (providing examples including "a new legal decision or the passage of new legislation").

First, since furnishing the Arthur Andersen reports, Interior claims it has updated its accounting knowledge as the result of accounting efforts in some of the early-filed tribal trust cases. (Def. Memo. at 35-36.) But at this juncture, this claim is nothing more than a mere supposition by an entity that has consistently over-promised and under-performed and thus cannot be believed now. Furthermore, nothing about this new information changes the nature of the Court's task: enforcement of Trustee-Delegates' trust duties. The fact that Trustee-Delegates have learned more information about how they might have completed an accounting for all of Plaintiff-Beneficiaries' trust assets had they decided to comply with their fiduciary duties years ago is not relevant as to whether this Court should enforce clear legal mandates. Indeed, if Trustee-Delegates are entitled to a remand merely because of additional learning from their ongoing evaluation of their historical accounting knowledge, then it would be impossible ever to bring suit to enforce their trust duties.

Second, Trustee-Delegates argue that the 1994 Act and its subsequent amendments extending the time to file suit for failure to account are intervening acts because they indicate Congress's preference for resolution of trust claims through settlement rather than litigation. Apparently, Trustee-Delegates mean to suggest that their (thus far unsuccessful) efforts to resolve disputes over their failed duty to account through negotiated settlement of tribal accounting claims excuses them complying with their well-settled trust obligations to account in the meantime. Now, in light of the dozens of tribal cases filed at the end of 2006, Trustee-Delegates view this as a change in circumstances that warrants a remand to develop their accounting plan. There has been no change in circumstances, however. Trustee-Delegates were obligated to fulfill their fiduciary duties as trustees between 1994 and 2006 and they are obligated to do so now. The fact that they are late in doing so does not warrant a stay of the very

litigation that is intended finally to compel compliance.  Furthermore, even if Congress could be said to have preferred settlement to litigation, a predicate fact we do not concede, Trustee-Delegates had and still have every reasonable opportunity to negotiate with Plaintiff-Beneficiaries.  Nothing is stopping them from resolving claims; but so too, nothing should prevent Tribes who so desire to adjudicate claims in federal court.

### 3.    There are no substantial or legitimate grounds for a remand to reconsider Trustee-Delegates' prior action.

Trustee-Delegates mistakenly suggest that a voluntary remand is always appropriate if there are "substantial and legitimate reasons for doing so."  (Def. Memo. at 30.)  Instead, the Federal Circuit stated in *SKF USA* that an agency may request a remand "*in order to reconsider its previous position*" if an agency's concern is "substantial and legitimate."  254 F.3d at 1029 (emphasis added).  Trustee-Delegates' arguments are simply out of place. They do not ask the Court for an opportunity to reconsider their duty to account, but instead argue that Interior, rather than the Court, initially – and perhaps ultimately and conclusively – define the applicable trust duties.  (*See* Def. Memo. at 30-34 (arguing that Congress has delegated to Interior the responsibility to account for tribal trust accounts, that Congress has expressed a preference for negotiated settlement of tribal trust accounting claims, and that it would benefit the Court to have a full administrative record prior to any adjudications on the merits)).  Not only do these concerns not meet the standard for voluntary remand, they fail on their own merits.  For reasons already discussed above in Section II, even if this Court had discretion simply to remand the case to the agency based upon "substantial and legitimate" reasons, there are compelling reasons not to assent to Trustee-Delegates' request, after decades of intransigence, to delay this action six more months.

Finally, Trustee-Delegates argue in favor of their request for a "voluntary remand" that Plaintiff-Beneficiaries will "not be prejudiced by a remand of the record considering the early stage of litigation at which this motion is filed." (Def. Memo. at 34.) This argument is the height of callous indifference by a trustee. The suggestion that Plaintiff-Beneficiaries will not be prejudiced by further delay blithely ignores the literally decades of Trustee-Delegates' unconscionable delay that Plaintiff-Beneficiaries have already suffered in their attempt to an obtain an accounting from their own trustees. This Court should reject Trustee-Delegates' most recent tactic in pursuit of its strategy of recalcitrance, inertia, and delay.

**CONCLUSION**

For the foregoing reasons, Plaintiff-Beneficiaries respectfully request that the Court deny

Trustee-Delegates' Motion for Remand and Stay of the Litigation.

Respectfully submitted this the 1st day of October, 2007.


/s/ Keith M. Harper
KEITH M. HARPER
D.C. Bar No. 451956
E-mail: kharper@kilpatrickstockton.com
G. WILLIAM AUSTIN
D.C. Bar No. 478417
E-mail: baustin@kilpatrickstockton.com

Kilpatrick Stockton LLP
607 14th Street, N.W.
Washington, D.C. 20005
Phone: (202) 508-5800

*Attorneys for Plaintiff*
Salt River Pima-Maricopa Indian Community
Ak-Chin Indian Community
Tohono O'odham Nation
Passamaquoddy Tribe of Maine

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Assiniboine & Sioux Tribes of the Fort Peck Indian Reservation v. Norton, et al. | : : : | Civil Action No. 02-0035 (JR) |
| Standing Rock Sioux Tribe v. Norton, et al. | : : | Civil Action No. 02-0040 (JR) |
| Three Affiliated Tribes of the Fort Berthold Reservation v. Norton, et al. | : : : | Civil Action No. 02-0253 (JR) |
| Shoshone-Bannock Tribes of The Fort Hall Reservation v. Norton, et al. | : : : | Civil Action No. 02-0254 (JR) |
| Chippewa Cree Tribe of the Rocky Boy's Reservation v. Norton, et al. | : : : | Civil Action No. 02-0276 (JR) |
| Yankton Sioux Tribe v. Norton, et al. | : : | Civil Action No. 03-1603 (JR) |
| Osage Tribe of Indians of Oklahoma v. USA, et al. | : : | Civil Action No. 04-0283 (JR) |
| Crow Creek Sioux Tribe v. Kempthorne, et al. | : : | Civil Action No. 04-0900 (JR) |
| Omaha Tribe of Nebraska v. Kempthorne, et al. | : : | Civil Action No. 04-0901 (JR) |
| Oglala Sioux Tribe v. Kempthorne, et al. | : : | Civil Action No. 04-1126 (JR) |
| The Confederated Tribes of the Colville Reservation v. Norton, et al. | : : : | Civil Action No. 05-2471 (JR) |
| Wyandot Nation of Kansas v. Kempthorne, et al. | : : | Civil Action No. 05-2491 (JR) |
| Rosebud Sioux Tribe v. Kempthorne, et al. | : : | Civil Action No. 05-2492 (JR) |

| | | |
|---|---|---|
| Winnebago Tribe of Nebraska | : | |
| v. Kempthorne, et al. | : | Civil Action No. 05-2493 (JR) |
| | | |
| Lower Brule Sioux Tribe v. | : | |
| Kempthorne, et al. | : | Civil Action No. 05-2495 (JR) |
| | | |
| Prairie Band of Potawatomi | : | |
| Nation v. Kempthorne, et al. | : | Civil Action  No. 05-2496 (JR) |
| | | |
| Te-Moak Tribe of Western | : | |
| Shoshone Indians v. | : | Civil Action No. 05-2500 (JR) |
| Norton, et al. | : | |
| | | |
| Cheyenne River Sioux Tribe v. | : | |
| Kempthorne, et al. | : | Civil Action No. 06-1897 (JR) |
| | | |
| Stillaguamish Tribe of | : | |
| Indians v. Kempthorne, et al. | : | Civil Action No. 06-1898 (JR) |
| | | |
| Iowa Tribe of Kansas and | : | |
| Nebraska v. Kempthorne, et al. | : | Civil Action No. 06-1899 (JR) |
| | | |
| Confederated Tribes of the | : | |
| Goshute Reservation v. | : | Civil Action No. 06-1902 (JR) |
| Kempthorne, et al. | : | |
| | | |
| Muskogee (Creek) Nation of | : | |
| Oklahoma v. Kempthorne, et al. | : | Civil Action No. 06-2161 (JR) |
| | | |
| Eastern Shawnee Tribe of | : | |
| Oklahoma v. Kempthorne, et al. | : | Civil Action No. 06-2162 (JR) |
| | | |
| Northwestern Band of Shoshone | : | |
| v. Kempthorne, et al. | : | Civil Action No. 06-2163 (JR) |
| | | |
| Red Cliff Bank of Lake | : | |
| Superior Indians v. | : | Civil Action No. 06-2164 (JR) |
| Kempthorne, et al. | : | |
| | | |
| Pechanga Band of Luiseno | : | |
| Mission Indians v. | : | Civil Action No. 06-2206 (JR) |
| Kempthorne, et al. | : | |
| | | |
| Colorado River Indian Tribes | : | |
| v. Kempthorne, et al. | : | Civil Action No. 06-2212 (JR) |

Tohono O'Odham Nation v.                :
Kempthorne, et al.                      :       Civil Action No. 06-2236 (JR)

Nez Perce Tribe, et al. v.              :
Kempthorne, et al.                      :       Civil Action No. 06-2239 (JR)

Passamaquoddy Tribe of                  :
Maine v. Kempthorne, et al.             :       Civil Action No. 06-2240 (JR)

Salt River Pima-Maricopa                :
Indian Community v.                     :       Civil Action No. 06-2241 (JR)
Kempthorne, et al.                      :

Coer D'Alene Tribe v.                   :
Kempthorne, et al.                      :       Civil Action No. 06-2242 (JR)

Ak-Chin Indian Community v.             :
Kempthorne, et al.                      :       Civil Action No. 06-2245 (JR)

Sokaogon Chippewa Community             :
v. Kempthorne, et al.                   :       Civil Action No. 06-2247 (JR)

Gila River Indian Community             :
v. Kempthorne, et al.                   :       Civil Action No. 06-2249 (JR)

Northern Cheyenne Tribe of              :
Indians v. Kempthorne, et al.           :       Civil Action No. 06-2250 (JR)

Haudenosaunee:  The Onondaga            :
Nation v. Kempthorne, et al.            :       Civil Action No. 06-2254 (JR)

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was electronically filed using the Court's ECF system

and that the below-listed counsel are ECF users and will be served via the ECF System:

John H. Martin, Esq.
United States Department of Justice
Environmental and Natural Resources Division
Natural Resources Section
1961 Stout Street, Eighth Floor
Denver, CO  80294

Kevin J. Larsen, Esq.
United States Department of Justice
Environmental and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C.  20044-0663

This 1st day of October, 2007.

/s/ Keith Harper
KEITH HARPER
D.C. Bar No. 451956
E-mail: kharper@kilpatrickstockton.com
G. WILLIAM AUSTIN
D.C. Bar No. 478417
E-mail: baustin@kilpatrickstockton.com

Kilpatrick Stockton LLP
607 14th Street, N.W.
Washington, D.C. 20005
Phone: (202) 508-5800

*Attorneys for Plaintiffs*
Salt River Pima-Maricopa Indian Community
Ak-Chin Indian Community
Tohono O'odham Nation
Passamaquoddy Tribe of Maine

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Assiniboine & Sioux Tribes of          :
the Fort Peck Indian                   :        Civil Action No. 02-0035 (JR)
Reservation v. Norton, et al.          :

Standing Rock Sioux Tribe v.           :
Norton, et al.                         :        Civil Action No. 02-0040 (JR)

Three Affiliated Tribes of             :
the Fort Berthold Reservation          :        Civil Action No. 02-0253 (JR)
v. Norton, et al.                      :

Shoshone-Bannock Tribes of             :
The Fort Hall Reservation v.           :        Civil Action No. 02-0254 (JR)
Norton, et al.                         :

Chippewa Cree Tribe of the             :
Rocky Boy's Reservation v.             :        Civil Action No. 02-0276 (JR)
Norton, et al.                         :

Yankton Sioux Tribe v.                 :
Norton, et al.                         :        Civil Action No. 03-1603 (JR)

Osage Tribe of Indians of              :
Oklahoma v. USA, et al.                :        Civil Action No. 04-0283 (JR)

Crow Creek Sioux Tribe v.              :
Kempthorne, et al.                     :        Civil Action No. 04-0900 (JR)

Omaha Tribe of Nebraska v.             :
Kempthorne, et al.                     :        Civil Action No. 04-0901 (JR)

Oglala Sioux Tribe v.                  :
Kempthorne, et al.                     :        Civil Action No. 04-1126 (JR)

The Confederated Tribes of             :
the Colville Reservation v.            :        Civil Action No. 05-2471 (JR)
Norton, et al.                         :

Wyandot Nation of Kansas v.            :
Kempthorne, et al.                     :        Civil Action No. 05-2491 (JR)

Rosebud Sioux Tribe v.                 :
Kempthorne, et al.                     :        Civil Action No. 05-2492 (JR)

| | | |
|---|---|---|
| Winnebago Tribe of Nebraska | : | |
| v. Kempthorne, et al. | : | Civil Action No. 05-2493 (JR) |
| | | |
| Lower Brule Sioux Tribe v. | : | |
| Kempthorne, et al. | : | Civil Action No. 05-2495 (JR) |
| | | |
| Prairie Band of Potawatomi | : | |
| Nation v. Kempthorne, et al. | : | Civil Action  No. 05-2496 (JR) |
| | | |
| Te-Moak Tribe of Western | : | |
| Shoshone Indians v. | : | Civil Action No. 05-2500 (JR) |
| Norton, et al. | : | |
| | | |
| Cheyenne River Sioux Tribe v. | : | |
| Kempthorne, et al. | : | Civil Action No. 06-1897 (JR) |
| | | |
| Stillaguamish Tribe of | : | |
| Indians v. Kempthorne, et al. | : | Civil Action No. 06-1898 (JR) |
| | | |
| Iowa Tribe of Kansas and | : | |
| Nebraska v. Kempthorne, et al. | : | Civil Action No. 06-1899 (JR) |
| | | |
| Confederated Tribes of the | : | |
| Goshute Reservation v. | : | Civil Action No. 06-1902 (JR) |
| Kempthorne, et al. | : | |
| | | |
| Muskogee (Creek) Nation of | : | |
| Oklahoma v. Kempthorne, et al. | : | Civil Action No. 06-2161 (JR) |
| | | |
| Eastern Shawnee Tribe of | : | |
| Oklahoma v. Kempthorne, et al. | : | Civil Action No. 06-2162 (JR) |
| | | |
| Northwestern Band of Shoshone | : | |
| v. Kempthorne, et al. | : | Civil Action No. 06-2163 (JR) |
| | | |
| Red Cliff Bank of Lake | : | |
| Superior Indians v. | : | Civil Action No. 06-2164 (JR) |
| Kempthorne, et al. | : | |
| | | |
| Pechanga Band of Luiseno | : | |
| Mission Indians v. | : | Civil Action No. 06-2206 (JR) |
| Kempthorne, et al. | : | |
| | | |
| Colorado River Indian Tribes | : | |
| v. Kempthorne, et al. | : | Civil Action No. 06-2212 (JR) |

| | | |
|---|---|---|
| Tohono O'Odham Nation v. | : | |
| Kempthorne, et al. | : | Civil Action No. 06-2236 (JR) |
| | | |
| Nez Perce Tribe, et al. v. | : | |
| Kempthorne, et al. | : | Civil Action No. 06-2239 (JR) |
| | | |
| Passamaquoddy Tribe of | : | |
| Maine v. Kempthorne, et al. | : | Civil Action No. 06-2240 (JR) |
| | | |
| Salt River Pima-Maricopa | : | |
| Indian Community v. | : | Civil Action No. 06-2241 (JR) |
| Kempthorne, et al. | : | |
| | | |
| Coer D'Alene Tribe v. | : | |
| Kempthorne, et al. | : | Civil Action No. 06-2242 (JR) |
| | | |
| Ak-Chin Indian Community v. | : | |
| Kempthorne, et al. | : | Civil Action No. 06-2245 (JR) |
| | | |
| Sokaogon Chippewa Community | : | |
| v. Kempthorne, et al. | : | Civil Action No. 06-2247 (JR) |
| | | |
| Gila River Indian Community | : | |
| v. Kempthorne, et al. | : | Civil Action No. 06-2249 (JR) |
| | | |
| Northern Cheyenne Tribe of | : | |
| Indians v. Kempthorne, et al. | : | Civil Action No. 06-2250 (JR) |
| | | |
| Haudenosaunee:  The Onondaga | : | |
| Nation v. Kempthorne, et al. | : | Civil Action No. 06-2254 (JR) |

## **NOTICE REGARDING BULKY EXHIBIT ATTACHMENT**

Exhibits 1 through 33, which are attachments to Plaintiffs' Joint Memorandum in Opposition to Defendants' Motion for Remand and Stay of Litigation, is in paper form only and is being maintained in the case file in the Clerk's Office.  These documents will be available for public viewing and copying between the hours of 9:00 a.m. to 4:00 p.m., Monday through Friday.

/s/ Keith Harper
KEITH HARPER
D.C. Bar No. 451956
E-mail: kharper@kilpatrickstockton.com
G. WILLIAM AUSTIN
D.C. Bar No. 478417
E-mail: baustin@kilpatrickstockton.com

Kilpatrick Stockton LLP
607 14th Street, N.W.
Washington, D.C. 20005
Phone: (202) 508-5800

*Attorneys for Plaintiff*
Salt River Pima-Maricopa Indian Community
Ak-Chin Indian Community
Tohono O'odham Nation
Passamaquoddy Tribe of Maine

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Assiniboine & Sioux Tribes of     :
the Fort Peck Indian     :     Civil Action No. 02-0035 (JR)
Reservation v. Norton, et al.     :

Standing Rock Sioux Tribe v.     :
Norton, et al.     :     Civil Action No. 02-0040 (JR)

Three Affiliated Tribes of     :
the Fort Berthold Reservation     :     Civil Action No. 02-0253 (JR)
v. Norton, et al.     :

Shoshone-Bannock Tribes of     :
The Fort Hall Reservation v.     :     Civil Action No. 02-0254 (JR)
Norton, et al.     :

Chippewa Cree Tribe of the     :
Rocky Boy's Reservation v.     :     Civil Action No. 02-0276 (JR)
Norton, et al.     :

Yankton Sioux Tribe v.     :
Norton, et al.     :     Civil Action No. 03-1603 (JR)

Osage Tribe of Indians of     :
Oklahoma v. USA, et al.     :     Civil Action No. 04-0283 (JR)

Crow Creek Sioux Tribe v.     :
Kempthorne, et al.     :     Civil Action No. 04-0900 (JR)

Omaha Tribe of Nebraska v.     :
Kempthorne, et al.     :     Civil Action No. 04-0901 (JR)

Oglala Sioux Tribe v.     :
Kempthorne, et al.     :     Civil Action No. 04-1126 (JR)

The Confederated Tribes of     :
the Colville Reservation v.     :     Civil Action No. 05-2471 (JR)
Norton, et al.     :

Wyandot Nation of Kansas v.     :
Kempthorne, et al.     :     Civil Action No. 05-2491 (JR)

Rosebud Sioux Tribe v.     :
Kempthorne, et al.     :     Civil Action No. 05-2492 (JR)

US2000 10342197.1

| | | |
|---|---|---|
| Winnebago Tribe of Nebraska<br>v. Kempthorne, et al. | :<br>: | Civil Action No. 05-2493 (JR) |
| Lower Brule Sioux Tribe v.<br>Kempthorne, et al. | :<br>: | Civil Action No. 05-2495 (JR) |
| Prairie Band of Potawatomi<br>Nation v. Kempthorne, et al. | :<br>: | Civil Action  No. 05-2496 (JR) |
| Te-Moak Tribe of Western<br>Shoshone Indians v.<br>Norton, et al. | :<br>:<br>: | Civil Action No. 05-2500 (JR) |
| Cheyenne River Sioux Tribe v.<br>Kempthorne, et al. | :<br>: | Civil Action No. 06-1897 (JR) |
| Stillaguamish Tribe of<br>Indians v. Kempthorne, et al. | :<br>: | Civil Action No. 06-1898 (JR) |
| Iowa Tribe of Kansas and<br>Nebraska v. Kempthorne, et al. | :<br>: | Civil Action No. 06-1899 (JR) |
| Confederated Tribes of the<br>Goshute Reservation v.<br>Kempthorne, et al. | :<br>:<br>: | Civil Action No. 06-1902 (JR) |
| Muskogee (Creek) Nation of<br>Oklahoma v. Kempthorne, et al. | :<br>: | Civil Action No. 06-2161 (JR) |
| Eastern Shawnee Tribe of<br>Oklahoma v. Kempthorne, et al. | :<br>: | Civil Action No. 06-2162 (JR) |
| Northwestern Band of Shoshone<br>v. Kempthorne, et al. | :<br>: | Civil Action No. 06-2163 (JR) |
| Red Cliff Bank of Lake<br>Superior Indians v.<br>Kempthorne, et al. | :<br>:<br>: | Civil Action No. 06-2164 (JR) |
| Pechanga Band of Luiseno<br>Mission Indians v.<br>Kempthorne, et al. | :<br>:<br>: | Civil Action No. 06-2206 (JR) |
| Colorado River Indian Tribes<br>v. Kempthorne, et al. | :<br>: | Civil Action No. 06-2212 (JR) |

US2000 10342197.1

Tohono O'Odham Nation v.                    :
Kempthorne, et al.                          :        Civil Action No. 06-2236 (JR)

Nez Perce Tribe, et al. v.                  :
Kempthorne, et al.                          :        Civil Action No. 06-2239 (JR)

Passamaquoddy Tribe of                      :
Maine v. Kempthorne, et al.                 :        Civil Action No. 06-2240 (JR)

Salt River Pima-Maricopa                    :
Indian Community v.                         :        Civil Action No. 06-2241 (JR)
Kempthorne, et al.                          :

Coer D'Alene Tribe v.                       :
Kempthorne, et al.                          :        Civil Action No. 06-2242 (JR)

Ak-Chin Indian Community v.                 :
Kempthorne, et al.                          :        Civil Action No. 06-2245 (JR)

Sokaogon Chippewa Community                 :
v. Kempthorne, et al.                       :        Civil Action No. 06-2247 (JR)

Gila River Indian Community                 :
v. Kempthorne, et al.                       :        Civil Action No. 06-2249 (JR)

Northern Cheyenne Tribe of                  :
Indians v. Kempthorne, et al.               :        Civil Action No. 06-2250 (JR)

Haudenosaunee:  The Onondaga                :
Nation v. Kempthorne, et al.                :        Civil Action No. 06-2254 (JR)

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was electronically filed using the Court's ECF system

and that the below-listed counsel are ECF users and will be served via the ECF System:

> John H. Martin, Esq.
> United States Department of Justice
> Environmental and Natural Resources Division
> Natural Resources Section
> 1961 Stout Street, Eighth Floor
> Denver, CO  80294

US2000 10342197.1

Kevin J. Larsen, Esq.
United States Department of Justice
Environmental and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C.  20044-0663


This 1st day of October, 2007.


/s/ Keith Harper
KEITH HARPER
D.C. Bar No. 451956
E-mail: kharper@kilpatrickstockton.com
G. WILLIAM AUSTIN
D.C. Bar No. 478417
E-mail: baustin@kilpatrickstockton.com

Kilpatrick Stockton LLP
607 14th Street, N.W.
Washington, D.C. 20005
Phone: (202) 508-5800

*Attorneys for Plaintiffs*
Salt River Pima-Maricopa Indian Community
Ak-Chin Indian Community
Tohono O'odham Nation
Passamaquoddy Tribe of Maine

8

US2000 10342197.1