IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SALT RIVER PIMA-MARICOPA, | ) | |
| INDIAN COMMUNITY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 06-CV-02241-JR |
| | ) | Judge James Robertson |
| DIRK KEMPTHORNE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
ENTRY OF TRUST RECORD PRESERVATION ORDER**

RONALD J. TENPAS
Assistant Attorney General

JOHN H. MARTIN
BRIAN M. COLLINS
ANTHONY P. HOANG
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C. 20044-0663
Tel: (202) 305-3022
Tel: (202) 305-0428
Fax: (202) 353-2021

Attorneys for Defendants

# TABLE OF CONTENTS

I.     INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    BACKGROUND  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.   ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

       A.    Plaintiff Has Failed to Demonstrate That it is Entitled to Discovery
             in This Case  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

       B.    Legal Standard  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

             1.    Plaintiff's proposed TRPO seeks injunctive relief, not simply
                   an evidence preservation order  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

             2.    To the extent the Court is willing to entertain Plaintiff's Motion
                   as a motion for a record preservation order, Plaintiff must
                   demonstrate, at the very least, that the order is necessary and
                   not unduly burdensome  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

       C.    Plaintiff Has Failed To Show That The Trust Record Preservation
             Order Is Necessary  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

             1.    Defendants have implemented numerous document
                   preservation protocols that provide far more protection
                   than Plaintiff's proposed order  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

                   a.    Document preservation protocols of the Department
                         of the Interior  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

                         (i)     Interior has already issued document preservation
                                 directives  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

                         (ii)    The Acting Deputy Solicitor's March 12, 2007
                                 Departmental Memorandum  . . . . . . . . . . . . . . . . . . . . . . . 16

                         (iii)   Interior policy memoranda regarding the
                                 movement of inactive records  . . . . . . . . . . . . . . . . . . . . . 17

                         (iv)    The Opening of the AIRR and Development
                                 of the Box Inventory Search System ("BISS")  . . . . . . . . 18

(v)    <u>Training</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

(vi)   <u>Additional actions</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

b.    Department of Treasury's document preservation
protocols . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

c.    National Archives and Records Administration. . . . . . . . . . . . . 22

2.    Plaintiff has failed to demonstrate that the current preservation
regime is inadequate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

3.    Plaintiff's proposed Order will not enhance the protections
already afforded to Indian trust records, and Defendants,
like any other litigants, are already subject to the potentially
severe sanctions provided by the Federal Rules of Civil
Procedure for spoliation of evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . 25

a.    Plaintiff's examples of document mismanagement
pre-date the document preservation protocols . . . . . . . . . . . . . 26

b.    Plaintiff relies upon examples arising from natural
phenomena that a document preservation order would
not prevent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

c.    Plaintiff's additional examples likewise do not support
its claims that there has been repeated destruction of
"irreplaceable Indian trust records," and that future
incidents  will not be avoided absent the imposition of
Plaintiff's proposed order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

D.    Plaintiff's Proposed Order Is Unduly Burdensome and Ineffective . . . . . . . . . 36

1.    Plaintiff's failure to distinguish between active and inactive
records will impair Interior's ability to carry out its trust
responsibilities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

2.    Movement restrictions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

3.    Plaintiff's proposed conference requirement is burdensome
and ineffective . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

4.    Plaintiff's "indisputable" test for identification of Trust Records
is both overbroad and ineffective . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

       5.     The certification requirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

E.     If The Court Deems A Preservation Order Necessary, Defendants
Request An Opportunity To Present An Order That Better Protects
Potentially Relevant Documents And Is Equally Binding On Both
Parties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

IV.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

## I.    INTRODUCTION

Defendants, through their undersigned counsel, submit this memorandum in opposition to Plaintiff's Motion for Entry of Trust Record Preservation Order (Dkt. # 31) and its accompanying Memorandum of Points and Authorities in Support of Plaintiff's Motion for Entry of Trust Record Preservation Order (the "Memorandum") (Dkt. # 32).[1/]

Plaintiff has not carried its burden to justify the entry of the onerous document preservation order Plaintiff has proposed, or indeed any such order. First, any discussion of a preservation order

---

[1/]As of the date of filing this Response, twenty-three plaintiff tribes have joined in the Motion for Trust Record Preservation Order that was filed in this case. Although four tribes filed independent motions, it does not appear that there are any substantive differences among them. For ease of reference Defendants intend this Response to oppose the Motion for Trust Record Preservation Order that was filed or adopted by Plaintiffs in each of the following twenty-three cases: *Ak-Chin Indian Community v. Kempthorne*, No. 06cv02245-JR; *Cheyenne River Sioux Tribe v. Kempthorne*, No. 06cv01897-JR; *Chippewa Cree Tribe of the Rocky Boy's Reservation v. Kempthorne*, No. 02cv00276-JR; *Confederated Tribes of the Goshute Reservation v. Kempthorne*, No. 06cv01902-JR; *Crow Creek Sioux Tribe v. Kempthorne*, No. 04cv00900-JR; *Eastern Shawnee Tribe of Oklahoma v. Kempthorne*, No. 06cv02162-JR; *Iowa Tribe of Kansas and Nebraska v. Kempthorne*, No. 06cv01899-JR; *Lower Brule Sioux Tribe v. Kempthorne*, No. 05cv02495-JR; *Muscogee (Creek) Nation of Oklahoma v. Kempthorne*, No. 06cv02161-JR; *Nez Perce Tribe, et al. v. Kempthorne*, No. 06cv02239-JR; *Northwestern Band of Shoshone Indians v. Kempthorne*, No. 06cv02163-JR; *Oglala Sioux Tribe v. Kempthorne*, No. 04cv01126-JR; *Omaha Tribe of Nebraska v. Kempthorne*, No. 04cv00901-JR; *Passamaquoddy Tribe of Maine v. Kempthorne*, No. 06cv02240-JR; *Prairie Band of Potawatomi Nation v. Kempthorne*, No. 05cv02496-JR; *Red Cliff Band of Lake Superior Indians v. Kempthorne*, No. 06cv02164-JR; *Rosebud Sioux Tribe v. Kempthorne*, No. 05cv02492-JR; *Salt River Pima-Maricopa Indian Community v. Kempthorne*, No. 06cv02241-JR; *Stillaguamish Tribe of Indians v. Kempthorne*, No. 06cv01898-JR; *Tohono O'Odham Nation v. Kempthorne*, No. 06cv02236-JR; *Winnebago Tribe of Nebraska v. Kempthorne*, No. 05cv02493-JR; *Wyandot Nation of Kansas v. Kempthorne*, No. 05cv02491-JR. In addition, while the plaintiff in *Yankton Sioux Tribe v. Kempthorne*, No. 03cv01603-JR has not formally joined or adopted the motion for trust preservation order, in the four independently filed motions the plaintiffs assert that Yankton Sioux Tribe is joining in the motion. *See, e.g.*, Memo in Support of Motion for RRO, *Salt River Pima-Maricopa Indian Community v. Kempthorne, et al.*, Case No. 06-CV-02241-JR (D.D.C.) (Dkt. No. 32), p. 3. In each of these cases, including *Yankton Sioux Tribe v. Kempthorne*, Defendants will file an appropriate motion to join in this Response.

is premature because Plaintiff has not established that it is entitled to any discovery in this case. Second, the proposed order is in essence an order to make Defendants comply with the law, without any finding that Defendants have violated the law, and is therefore improper.

Moreover, even if a document preservation order were potentially justifiable in this case, Plaintiff has not met the requirements to establish the entry of a document preservation order, which is in essence a request for a preliminary injunction and requires a showing of irreparable injury, among other requirements. Plaintiff argues that the applicable standard is the one that the Court of Federal Claims applied, in *Pueblo of Laguna v. United States,* 60 Fed. Cl. 133, 138 (2004). Even under Plaintiff's theory, however, to obtain a document preservation order, Plaintiff must show at the very least that the order is both necessary and not unduly burdensome. It has failed to meet either part of even that lesser test. Plaintiff has not demonstrated that relevant discoverable information relating to the claims in this case is in danger of loss or destruction absent a Court order. It therefore cannot establish that a document preservation order is necessary, as the governing standard requires. Although Plaintiff points to various incidents of damage to documents, many of those occurred over ten years ago, before the construction of the American Indian Records Repository ("AIRR") and the implementation of policies and procedures by Interior to move "inactive" trust records there for safekeeping and indexation in a state-of-the-art archival facility. Moreover, nearly all of Plaintiff's evidence of past destruction of documents focuses on severe weather events or damage due to mold and rodents, all of which are phenomena that a document preservation order is unlikely to prevent, because such events often occur in spite of the best efforts of the persons maintaining the records. In addition, Plaintiff has not made any particularized showing that any relevant, discoverable documents pertaining to itself or the other tribal litigants

listed in its papers (*see* Pl.'s Mem. at 3) have been destroyed in the past, or are at "significant risk" of being lost or destroyed in the future.        Plaintiff's Motion should be denied for the additional and independent reason that Plaintiff's proposed order does not meet the requirement that such an order be "effective, but not overbroad." *Laguna, supra,* 60 Fed. Cl. at 138. To the contrary, Plaintiff's proposed order is so overly-broad and unduly burdensome that it is likely to inhibit, rather than enhance, the measures already in place for safeguarding Indian trust records. It also impermissibly interferes with the DOI's operations and functions.

For both of these reasons – the fact that the proposed order is unnecessary and unduly burdensome – this Court should deny Plaintiff's motion. Should the Court nevertheless decide that a document preservation order is necessary, Defendants request an opportunity to present a more appropriate form of proposed document preservation order for the Court's consideration. Any such order should apply to the Plaintiff litigants, as well as to Defendants, because both parties in litigation have a common duty to preserve records. *See* Fed. R. Civ. P. 26; *United States v. Magnesium Corp. of Am.*, 2006 WL 2350155 at *4 (D. Utah 2006).

## II.    BACKGROUND

Plaintiff's proposed Order consists of broad definitions and burdensome procedural requirements. For example, Plaintiff's order defines "Trust Record" as "documents, data, or tangible things . . . that *embody, refer to, or relate to* the accounts or assets held in trust by Defendants or their agents for the Salt River Pima-Maricopa Indian Community." Pl's Proposed Trust Record Preservation Order at ¶ 1(a) ("TRPO") (Dkt. #31-2) (emphasis added). The TRPO would encompass both active and inactive records as defined by the Department of Interior. Ex. 22, ¶¶ 2-4.

The TRPO purports to include "any duplicates" among the materials that Defendants must

preserve.  Pl.'s TRPO ¶ 1 (a).

The TRPO further provides that "[u]nless it is indisputable that a record is not a [Specific Tribe's] Trust Record, Defendants must preserve it under this Order." *Id.* ¶ 1 (b).  Furthermore, "[i]f Defendants are uncertain whether any action concerning a [Specific Tribe's] Trust Record would constitute a failure to preserve that record, Defendants shall confer with Plaintiff regarding the proposed action." *Id.*

Plaintiff also urges the imposition of a requirement that Defendants ensure that all employees and agents "of Defendants, their departments, agencies, offices, divisions and contractors" who "ha[ve] custody" of Trust Records are advised of the terms of the TRPO by Defendants' counsel and review and execute an acknowledgment, to be "maintained by Defendants' attorney of record." TRPO ¶ 2 (b).

If a "destruction or loss of documents[2]" should occur, the TRPO requires "Defendants and their counsel" to notify the Court immediately, and also to "provide to the Court (I) a list of all those involved with the violation of this Order who handled the relevant Trust Records, and (ii) provide a copy of the signed acknowledgments for those individuals." *Id.* ¶ 2 ( c ).  The phrase "involved with the violation of this Order" is not defined and the term "handled" is not limited in time or otherwise defined.

The TRPO also purports to govern "movements or transfers" of Trust Records. *See* Pl.'s TRPO ¶ 4.  It requires twenty days' advance written notice of *any* movement of those records "from their present location to another location, including without limitation any transfers

---

[2]The TRPO does not make clear why here the term "documents" is used, instead of "Trust Records," the subject of the proposed order and the term used throughout the rest of the proposed order.

of records to the . . . AIRR."  It also imposes requirements that advance written notice include:

      1.    "a move plan or move plans;"

      2.    "an implementation schedule;"

      3.    "box inventories and descriptions of the records being moved;"

      4.    "the method of transportation;"

      5.    "the chain of custody;" and

      6.    "the signature of the official responsible for the move."

In addition to being unnecessary, particularly in light of *Laguna*'s conclusion that "necessity" should be analyzed in the context of a request for a document preservation order, Plaintiff's proposed order goes far beyond the requirements imposed by the Federal Rules of Civil Procedure and would be so burdensome as to interfere with day-to-day work of the agencies, including Interior's ongoing service to the tribes and other non-parties such as individual Indians.

Plaintiff seeks to impose these requirements, and others, on federal agencies with numerous sub-agencies and offices spread throughout the United States, including the Department of the Interior ("DOI" or "Interior").   As the accompanying exhibits, including the various Declarations , demonstrate, Plaintiff's proposed order would affect Interior offices and agencies that  provide a wide variety of services to tribes and individuals, spanning such subject matter areas as realty, forestry, natural resources, water rights, irrigation, power, and mineral leasing, among others; and which maintain, and use on a daily basis, documents that would be subject to Plaintiff's proposed order.[3]   *See, e.g.,* Decl. of William T. Walker ("Walker Decl."), Deputy Regional Director, Trust Services, for the Western Region for the BIA, which is located in Phoenix, Arizona.  Ex. 63, ¶¶ 1-2

5

(describing services provided by the Western Region to the Ak-Chin Indian Community, the Salt River Indian Community, the Tohono O'Odham Nation, the Confederated Tribes of the Goshute Reservation, and the Hualapai Tribe as well as forty-seven other tribes in the BIA's Western Region.) *See also* Decl. of Richard P. Fielitz, Jr., Chief of Staff for the Office of the Special Trustee for American Indians ("OST"), Ex. 22, which explains the various operations OST performs in carrying out the mandates of the American Indian Trust Fund Management Reform Act of 1994, and the DOI-wide policies to preserve Indian Trust Records.

A list of the declarants and the various offices they represent is set forth as part of the accompanying Index of Exhibits. These declarants, representing the Financial Management Service of the Department of the Treasury, and various Interior agencies such as the Bureau of Reclamation and United States Geological Service, and eleven out of the twelve Regional Offices of the BIA[4] and over twenty-four BIA agencies, describe the types of documents they have, use, and maintain, and the potential effects of Plaintiff's proposed Order on their respective operations, including BIA offices and agencies serving tribes from Alaska to Florida. Perhaps more importantly, they establish that the records at issue are already subject to stringent regimes and preservation efforts undertaken by the agencies themselves, and are not in jeopardy of loss or destruction, much less that "irreparable harm" to movants will ensue if this Court does not enter Plaintiff's proposed Order.

For example, the American Indian Records Repository ("AIRR") was established through a partnership between Interior and the National Archives and Records Administration ("NARA") for the very purpose (among others) of preserving the integrity of Indian records. Ex. 6, ¶ 7.

---

[4] The only Region not represented among the declarants is the Navajo Region of the BIA, which serves a single tribe, the Navajo Nation, which is not a movant here.

Inactive BIA and OST records and other federal agency Indian fiduciary records are stored at the AIRR, in compliance with NARA regulations and standards. *Id.*, ¶ 8. They are shipped to the AIRR for permanent storage according to stringent protocols already in place for the purpose of preserving and maintaining Indian records. *Id.,* ¶¶ 8 and 12-16. Plaintiff's proposed Order will do nothing to enhance the protections afforded to the documents, but rather will interfere with those protections. Further, the provisions of the proposed Order will impair the day-to-day functioning of the BIA and other Interior offices at issue, as well as Treasury and NARA.

## III.    ARGUMENT

### A.    Plaintiff Has Failed to Demonstrate That it is Entitled to Discovery in This Case.

As a threshold matter, any discussion of a trust record preservation order is premature because Plaintiff has failed to establish that it is entitled to any discovery in this case. As discussed more fully in Defendants' Motion to Dismiss filed June 16, 2008, Plaintiff's claims in this litigation are predicated on the Administrative Procedures Act ("APA"). *See* Def.'s Mot. to Dismiss, filed June 16, 2008 (Dkt. # 42 in case no. 1:06-cv-2241). If Plaintiff's claim for an accounting is brought under the generic APA cause of action, then the only discovery to which Plaintiff is entitled is discovery of the administrative record related to the agency action Plaintiff is challenging. *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971) (noting that a court must confine its review to the "full administrative record that was before the [agency] at the time [it] made [its] decision"); *Commercial Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 7 (D.C. Cir. 1998) (discovery not allowed in case of administrative record review). If Defendant's arguments as to how Plaintiff's claim exceeds this Court's limited jurisdiction are even partly correct, then Plaintiff's proposal for a trust record preservation order is fatally flawed because it would result in

the Court's exercise of jurisdiction already deemed unavailable in the related case of *Cobell v. Kempthorne*. *See Cobell XX*, 532 F. Supp. 2d 37, 103 (D.D.C. 2008) (stating that "the existence of APA jurisdiction cannot be taken for granted."); *see also id*. at 64 (recognizing that the Court's jurisdiction is more limited than that of an equity court over a negligent trustee). Plaintiff's proposal for a trust record preservation order, with its overly broad definition of "trust records" is also flawed because it contemplates preservation and discovery of materials related to issues that are beyond this Court's jurisdiction.

Plaintiff's motion should be denied for the additional and independent reason that insofar as Plaintiff's proposed Order would compel the preservation of documents relevant to the litigation, it is in essence an order to compel Defendants to comply with the law (with additional and unduly burdensome trappings, as explained below), without any finding that Defendants have violated the law.

An order to comply with the law, without a showing that the law has been violated, is the very sort of order vacated in *Cobell v. United States*, 392 F.3d 461, 475 (2004) ("*Cobell XIII*") (holding that "in the absence of specific findings of unreasonable delay in Interior's performance of its fiduciary duties, the court's order that the defendants implement the entire Comprehensive Plan, including the full To-Be Plan, amounts to an order to obey the law in managing the trusts" and therefore was unjustified.)

Administrative agencies are entitled to a presumption that "that they will act properly and according to law." *See, e.g.*, *Federal Communications Comm'n v. Schreiber*, 381 U.S. 279, 296 (1965). Even in a case involving private parties, "[t]o supplement every complaint with an order requiring compliance with the Rules of Civil Procedure would be a superfluous and wasteful

task, and would likely create no more incentive upon the parties than already exists." *Hester v. Bayer Corp.*, 206 F.R.D. 683, 685 (M.D. Ala. 2001); *see also Pepsi-Cola Bottling Co. of Olean v. Cargill, Inc.*, Civ. No. 3-94-784, 1995 WL 783610, at *3 (D. Minn. Oct. 20, 1995) ("To further embellish the grave importance of document preservation, through an administratively demanding mechanism, seems inordinate, at best.").

Defendants, like all litigants (including Plaintiff), already have obligations to preserve relevant evidence, and potentially are subject to sanctions for spoliation of such evidence. There has been no showing by Plaintiff here that Defendants should be, in effect, subject to "an injunction broadly to obey" the existing law and court rules governing their document preservation obligations. *Cobell XIII,* 392 F.3d at 475 (quoting *NLRB v. Express Pub. Co.*, 312 U.S. 426, 435-36 (1941)).

**B.**    **Legal Standard**

  ***1.***    ***Plaintiff's proposed TRPO seeks injunctive relief, not simply an evidence preservation order.***

For the reasons set forth above, Defendants do not concede that any document preservation order, particularly Plaintiff's proposed Order, is appropriate or justified in this case. If this Court nevertheless entertains Plaintiff's request, it should apply the standards applicable to a preliminary injunction, because to the extent that Plaintiff seeks to impose obligations on Defendants in addition to those that the Federal Rules of Civil Procedure impose on all litigants, with respect to the preservation of evidence relevant to claims within the Court's jurisdiction, the requested order amounts to a request for a preliminary injunction imposing affirmative requirements well beyond the obligation merely to preserve a status quo regarding records relevant to the litigation. Some examples of such provisions in Plaintiff's proposed Order include: the onerous meet and confer requirements (TRPO ¶ 6); requirements that custodians of records be "advised" of certain matters

9

by Defendants (TRPO ¶ 2(b)); that certifications be obtained and maintained (TRPO ¶ 2(b)); and requirements that Defendants give Plaintiff twenty days' advance written notice before moving records, including "a move plan or move plans;" "an implementation schedule;" "box inventories and descriptions of the records being moved;" "the method of transportation;" "the chain of custody;" and "the signature of the official responsible for the move." (TRPO ¶ 4)

As such, Plaintiff is entitled to the order it seeks only if meets the requirements for injunctive relief: (1) irreparable injury, (2) substantial likelihood of success on the merits with respect to the requested relief, (3) lack of injury to other interested parties, and (4) furtherance of the public interest. *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir.1998) (quoting *City Fed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir.1995)); *see also Madden v. Wyeth*, No. 3-03-CV-0167-R, 2003 WL 21443404, at *1 (N.D. Tex. Apr. 16, 2003); *Pepsi-Cola Bottling Co. of Olean v. Cargill, Inc.*, Civ. No. 3-94-784, 1995 WL 783610, at *3-*4 (D. Minn. Oct. 20, 1995); *Humble Oil & Refining Co. v. Harang*, 262 F. Supp. 39, 42-43 (E.D. La. 1966) (all requiring that the requirements for injunctive relief be met as prerequisites to a document preservation order). Plaintiff has not even attempted to meet the strict standards for issuing the type of injunctive relief sought by the TRPO, and, as a consequence, its Motion must be denied.

The Court of Federal Claims's decision in *Laguna* should not be read as supplying the appropriate standard for record preservation because it would establish an inappropriate framework for ascertaining the parties' compliance with their document preservation obligations. Plaintiff does not appear to allege, nor des it prove that the Defendants have violated their document preservation obligations in this case, thus it is in no position to seek sanctions for failure to preserve evidence. Rather, the order it seeks is apparently intended to have a prophylactic effect. Indeed the very

purpose of the order Plaintiff seeks would be to establish the basis for a future request for sanctions. *See Laguna*, 60 Fed. Cl. at 139 (purpose of order is to satisfy precondition for application of the spoliation doctrine or imposition of sanctions under RCFC 16(f) or 37(b)); *see also Landmark Legal Foundation v. E.P.A.*, 272 F.Supp. 2d 70 (D. D.C. 2003) (contempt sanctions imposed for violation of preservation order).

Setting up such an enforcement mechanism risks a conflict with caselaw of the D.C. Circuit however, insofar as it would substitute an overbroad and ambiguous preservation order, including multiple procedural requirements, for the parties' pre-existing document preservation obligation. One plain purpose of the proposed retention order would be to hold the Defendants to strict compliance with the various provisions of the order as a substitute for compliance with their pre-existing preservation duty. The D.C. Circuit has established however that "a sanction for failure to preserve evidence is appropriate only when a party has consciously disregarded its obligation to do so." *Shepherd v. American Broadcasting Companies,* 62 F.3d 1469, 1481 (D.C. Cir. 1995). In *Shepherd* the court of appeals described the particularized document by document inquiry required for establishing a violation of the document preservation obligation. *Id*. In the event questions should arise in this litigation over the existence or destruction of particular documents or data, Plaintiff's proposed order would inappropriately obscure analysis of the proper issues. Plaintiff, for example would substitute an overbroad definition of the documents that need be preserved, ignoring the rule that a party needs to preserve only those document that are potentially relevant and whose loss prejudices the opposing party. *Shepherd*, 62 F.3d at 1481. D.C. Circuit caselaw already prescribes the parties' document preservation duties and the test for ascertaining breach of those duties as well as the propriety of sanctions for any breach found. Plaintiff's proposed Order, based

on the inappropriate notion that affirmative judicial intervention is warranted to police compliance with a duty that has not been shown to have been breached, should be rejected.

   2.   *To the extent the Court is willing to entertain Plaintiff's Motion as a motion for a record preservation order, Plaintiff must demonstrate, at the very least, that the order is necessary and not unduly burdensome.*

Since Plaintiff's proposed Order seeks to impose obligations far beyond record retention, the preliminary injunction standard should govern Plaintiff's Motion. Assuming for the sake of argument that the *Laguna* standard is proper, as Plaintiff asserts, Plaintiff has failed to meet even that test. Defendants note that although the Court of Federal Claims concluded that it had authority to enter a document preservation order in that case,[5] it recognized at the same time that its authority should be used only with the utmost restraint. *See Laguna*, 60 Fed. C1. at 137 (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) ("Because of their very potency, inherent powers must be exercised with restraint and discretion"). Appropriate judicial restraint here compels the conclusion that no such order should issue. In any event, however, in deciding whether a document preservation order should issue in this case, this Court should apply a standard at least as stringent as the one enunciated by the Court of Federal Claims in *Laguna, supra.*

The Court of Federal Claims held that "one seeking a preservation order [must] demonstrate that it is necessary and not unduly burdensome." *Id*. at 138. To satisfy that two-prong test, a proponent first must show that "absent a court order, there is significant risk that relevant evidence will be lost or destroyed . . . ." *Id*. To meet the second element of the test, "the proponent must show

---

[5]In so finding, the Court of Federal Claims relied in large part on its view of the inherent powers of the Court to preserve material evidence and to take appropriate action to control and schedule discovery under RCFC 16. *See Laguna, supra*, 60 Fed. at 136-38.

that the particular steps to be adopted will be effective, but not overbroad . . . ." *Id.*[9]  Even applying this test, which Plaintiff urges the Court to adopt, Plaintiff's request for a document preservation order should fail.

### C.    Plaintiff Has Failed To Show That The Trust Record Preservation Order Is Necessary.

To show that a preservation order is "necessary," Plaintiff must demonstrate that "absent a court order" there is a "significant risk" that "relevant evidence will be lost or destroyed."  Plaintiff has not shown that those elements are present here.  Not only must Plaintiff demonstrate that there exists a significant risk that loss or damage to some documents may occur, but a significant risk that loss or destruction of evidence relevant to the particular cases in which the order is sought will occur absent a preservation order.  "Even under the two-factor approach [of *Laguna*], one element of demonstrating the necessity for an order is showing that the documents in jeopardy are in fact relevant." *Treppel v. Biovail Corp.*, 233 F.R.D. 363, 370-71 (S.D.N.Y. 2006).  Here, that requires Plaintiff to show that unless the Court enters Plaintiff's proposed order, the evidence relating to the particular tribes who seek the order will be at significant risk of loss or destruction.

### 1.    *Defendants have implemented numerous document preservation protocols that provide far more protection than Plaintiff's proposed order*

---

[9]The *Laguna* two-prong test has been followed by other federal courts with some variations. *See,* *Treppel v. Biovail Corp.*, 233 F.R.D. 363, 370-71 (S.D.N.Y. 2006); *Williams v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 144, 147 (D. Mass. 2005).  Another case, *Capricorn Power Co. v. Siemens Westinghouse Power Corp.*, 220 F.R.D. 429 (W.D. Pa. 2004) presents a three-factor analysis for entry of a record retention order. These factors include: (1) level of concern the court has for continuing existence and maintenance of integrity of evidence absent court order; (2) irreparable harm likely to result to the party seeking preservation of evidence; and (3) capability of a party to maintain evidence sought to be preserved, and the physical, spatial and financial burdens created by ordering preservation.  *See id.* at 433-34.  At least one court has noted however, that the distinction between these two tests is "more apparent than real." *Treppel,* 233 F.R.D. at 370-71 (S.D.N.Y. 2006).

### a.    Document preservation protocols
### of the Department of the Interior

The federal agencies having the preponderance of potentially-relevant documents, primarily the Department of the Interior ("DOI" or "Interior"), have in place a Department-wide policy affecting all Indian trust records.  That policy necessarily covers most or all records of interest here because Interior's definition of "Indian trust records" encompasses any potentially-discoverable records relating to the "claims and defenses in this case."  *See, e.g.*, Memorandum of Lawrence Jensen dated March 12, 2007, Ex. 6; and Fed. R. Civ. Pro. 26.

The steps Interior has taken to implement that policy include:  (1) sending preservation directives to agency personnel; (2) training agency personnel; (3) developing records movement protocols; (4) opening the AIRR and creating of the Box Inventory Search System ("BISS"); and (5) placing a policy emphasis on moving inactive records to the AIRR to protect trust records.

In its motions papers, Plaintiff repeatedly cites language from the 2004 decision of the Court of Federal Claims in *Laguna, supra,* to bolster its request for a record retention order here.  Yet when the Court of Federal Claims entered its orders in *Jicarilla* and *Laguna*, Interior was already in the process of developing a comprehensive records management program for Indian trust records in general to address the specific weaknesses that the Court perceived.   Ex. 11, Decl. of Ethel J. Abeita, June 21, 2007, ¶¶ 3-6.  Interior  has adopted an institutional records program with three main components:  (1) the centralization of all inactive records in an archival-quality records facility, the AIRR, for preservation and indexation (*Id*., ¶¶ 5-9); (2) the adoption of NARA-approved records retention schedules requiring the indefinite retention of Indian fiduciary trust records.  (*Id*., ¶ 16); and (3) extensive training of Interior personnel in records management and safeguarding trust

14

records, which has been underscored by the issuance of periodic directives to all Interior employees and contractors, as discussed below.

(i)    <u>Interior has already issued document preservation directives.</u>

Interior officials have sent preservation directives and periodic reminders to agency management and staff since at least, 1999.  *See* Ex. 29, Jaeger Decl., ¶ 10 (identifying various DOI document preservation orders dating back to 1999); *see also* Exs. 1-10 (various DOI policy statements and memoranda regarding record retention).  As another example, the duties, responsibilities, and obligations of Interior officials and employees to preserve Indian trust documents were set forth in a Departmental Memorandum dated March 20, 2002.  Ex. 1. Furthermore, on April 6, 2004, the Deputy Secretary of the Interior issued a memorandum to the heads of various components and subagencies of the Interior Department about the document preservation orders issued in the *Jicarilla* and *Laguna* case, in particular.[7]  Exhibit 2. That memorandum reaffirmed the existing duties, responsibilities, and obligations of Interior officials and employees as set forth in the March 2002 Departmental Memorandum.  Ex. 2 at 2.  That memorandum reinforced Interior's policy requiring the indefinite retention of all categories of Indian fiduciary trust records, regardless of the existence of any pending litigation.  That policy is detailed in the record retention schedules contained in 16 Bureau of Indian Affairs Manual.  *See* Ex. 22, Fielitz Decl., ¶¶ 2-4, 12-16.

Since the issuance of those memoranda by the Deputy Secretary, Interior has published periodic reminders containing instructions regarding certain preservation obligations.  *See, e.g.*, Exs.

---

[7]The April 6, 2004, memorandum focused on the *Jicarilla* and *Laguna* cases, but expressly emphasized the obligation to "preserv[e] ... tribal trust documents generally," citing the March 20, 2002, Departmental Memorandum.  Ex. 2, at 2.

15

3, 4, 5, copies of such publications that occurred on July 9, 2004, July 13, 2004, and October 26, 2006.

(ii)    The Acting Deputy Solicitor's March 12, 2007, Departmental Memorandum

On March 12, 2007, Lawrence J. Jensen, the Deputy Solicitor of DOI, issued a Departmental Memorandum (the "Jensen Memo") to the heads of various components and sub-agencies of Interior, reiterating Interior's policy regarding the preservation and retention of Indian trust-related documents and data. Ex. 6. Among other things, the memorandum identified, by name, the Tribes (including Plaintiff herein) or groups that had filed trust accounting and trust mismanagement cases against Defendants. *See id.* Using in that memorandum the same broad language that the Court of Federal Claims employed in the document preservation order in *Laguna*, and *Jicarilla*, *supra*, Interior mandated the preservation of "all documents, data, and tangible things in the possession, custody or control" of Interior employees, bureaus, and offices that may be relevant to the subject matter of the Tribal Trust cases.[9]  *Id.* at 2. The memorandum applied to all paper documents, electronically stored information, and other materials, such as maps, videos, calendars, and charts, and it also applied to materials stored at off-site storage facilities and Federal Records Centers

---

[9]The Office of the Solicitor defined "relevant information" as

> reflecting, referring or relating to (1) any asset, such as funds, land, minerals, forestry, sand and gravel, or other resources, that is, or at any time has been, held in trust by the United States or its agents for the Plaintiff; (2) policies, procedures, guidelines, or correspondence relating to any aspect of the management or administration of trust assets;
> (3) proceeds, interest, or income from trust assets; or disbursement, distribution, disposition or transfer of any trust assets; (4) reports, appraisals, reconciliations or evaluations of any trust assets; and (5) information that serves to identify, locate, or link any relevant information, such as file inventories, file folders and indices.

16

("FRCs"). *See id.* Further, the memorandum instructed Interior's employees about the obligations imposed by certain amendments to the Federal Rules of Civil Procedure to preserve electronically stored information, and directed the employees to comply with those obligations. *See id.* at 3.

(iii)    Interior policy memoranda regarding the movement of inactive records

The DOI defines certain records as "inactive," meaning "records no longer required to conduct business and therefore ready for final disposition." *See* Ex. 22, Decl. of Richard P. Fielitz, Jr., ¶ 4. Interior recognizes the critical importance of preserving inactive Indian trust records and, to accomplish that important goal, has collaborated with NARA to move those documents to the AIRR. *See* Ex. 7, Memorandum of Understanding Between the Department of the Interior and the National Archives and Records Administration, September 12, 2003 ("the DOI-NARA MOU"). As part of the process of transferring those inactive records to the AIRR, the documents are indexed and filed in an archive where the entrances and exits of researchers and employees alike are monitored and controlled. The documents are in a secure environment at the AIRR, as well as being protected from potential environmental harms such as natural catastrophe or changes in temperature and humidity. *See* Part III.C.1.(a)(iv), *infra*, describing the AIRR; see also Ex. 11, Decl. of Abeita, ¶¶ 5-8; Ex. 22, Decl. of Fielitz, ¶¶ 7-8 .

Interior's policy to move inactive records to the AIRR is manifest in several Interior records, three of which are included with this brief:  (1) Memorandum of James E. Cason, Associate Deputy Secretary, May 5, 2005, Ex. 8; (2) Memorandum of Ethel J. Abeita, Director, Office of Trust Records, March 22, 2006, Ex. 9; and (3) Memorandum of Chief Information Officer, Office of the Special Trustee for American Indians, February 1, 2007, Ex. 10. These memoranda underscore the importance of delivery of inactive records to the AIRR and set out the procedures for expeditiously

accomplishing that objective.

    (iv)    <u>The Opening of the AIRR and Development of the</u>
<u>Box Inventory Search System ("BISS")</u>

In collaboration with NARA, Interior has built a state-of-the-art underground document storage facility to consolidate in a single location all inactive federal Indian records. *See* Ex. 7, the DOI-NARA MOU. The facility was built in Lenexa, Kansas, and completed in 2004. Ex. 7; Ex. 11, Decl. of Abeita, ¶ 5. It is co-administered by the Office of Trust Records ("OTR") and NARA. The AIRR is a state-of-the-art facility built to archive standards and is equipped with controls to regulate humidity, temperature, particulate matter, and ultraviolet light. *See* Ex. 11, ¶¶ 5- 6. The AIRR provides secure access for research by individual Indians, tribes, and historians, with permission from Interior, and for Interior staff conducting historical accounting work. The AIRR has sufficient future capacity to hold all of Interior's American Indian records. *Id*. ¶ 6. Currently, the AIRR contains in excess of 150,000 boxes of inactive records. *See id.* at ¶ 9.

Plans for the movement of Indian trust documents are described in the June 20, 2007, Abeita Decl., Ex. 11, ¶¶ 9-14. As noted in detail there, the Chain of Custody plan, pickup, delivery, and verification of contents of boxes shipped are all carefully confirmed, both at the point of origin and at the point of delivery. *See id.* ¶¶ 9-14. Ultimately, upon arrival at the AIRR of boxes of inactive records, the contents are indexed using the BISS, as described below. The indexed contents are then archived at the AIRR.

Inactive Indian records stored at the AIRR are electronically indexed. Ex. 11, Abeita Decl., ¶ 11. If there are no file folders and the box is identified as coming from a trust program, a document level index is compiled for the entire box contents. Ex. 11, Abeita Decl., ¶ 12. Information as to where the records originated is printed on the outside of each box, and this

information is also entered into the BISS. *Id.*, ¶ 13.

(v)     Training

The Bureau of Indian Affairs ("BIA") also provides training to its personnel and to tribal records personnel with respect to the proper management of Indian trust records. Regional Records Liaisons ("RRLs") from the Office of Trust Records conduct training for BIA, tribal, and other personnel who handle or come into contact with records. (Fielitz Decl., Ex. 22, ¶¶ 9 and 17). OTR trains new employees as they are hired and provides advanced training to longer-term employees. Ex. 11, Abeita Decl., ¶ 18 and Ex. 2 to Abeita Decl. For example, in 2006, OTR held over 100 training events. Between 2004 and May 2007, over 2,000 people received records training. Ex. 11, Abeita Decl., ¶ 18. In addition to training by OTR, courses are also offered by the Office of Trust Training of the Office of the Special Trustee for American Indians. *See e.g.*, Pl.'s Ex. 17 (29th Interior Report at 23); Pl.'s Ex. 25 (23rd Interior Report at 7); Pl.'s Ex. 26 (28th Interior Report at 44). Courses offered under the Indian Fiduciary Trust Training Program include specialty courses ranging from "Trust Fundamentals" to "Trust Accounting." Additionally, there is a curriculum leading to a Certified Indian Fiduciary Trust Specialist certification.[9] *See id.* Records management training programs for Interior employees are further reported in the declarations of numerous Interior managers, including BIA managers (*see, e.g.,* Ex. 55 (Papago Agency) Ex. 17 (Salt River Agency)); and managers of other Interior sub-agencies, for example, the Bureau of Reclamation (mandatory records management training). *See also* Ex. 21, ¶ 7; and Exs. 10-49; 52-53; 55-57; 60; 63; and 66.

(vi)     Additional actions

---

[9]Data concerning the number of attendees for the various courses are also reported in the Quarterly Cobell Reports filed in this Court by the Department of the Interior, under the "Office of Trust Records" and "Indian Fiduciary Trust Training Program" sections.

In addition to all of the foregoing actions to ensure documents are preserved, Interior, and its agencies have taken further steps focused on movants' documents. Those efforts include circulation of the Jensen Memo by various means such as requiring each employee to read it, placing it on an internal distribution center, circulation of the Memo by email and discussion of preservation policies at regularly scheduled meetings. For example, in the Western Region of the BIA, the assigned Records Liaison attends each Monday morning Regional Director's and Branch Chiefs staff meeting and emphasizes records compliance policies. Ex. 63, ¶ 9. In addition, records management compliance is a performance standard for all 128 Regional Office employees in the Western Region. *Id.* Such training efforts and emphasis on records management efforts extend to non-BIA Interior agencies. *E.g.*, Ex. 24, ¶ 4. ("The [National Park Service], as a bureau of the Department of the Interior (DOI), requires all of its staff to complete the annual DOI records management training which, in part, addresses the importance of Indian trust records and the need to care for such records.").

Safe-keeping of active records is also emphasized. At the Winnebago Agency, for example, Indian records are maintained in locking "Lektrievers" (a type of computer controlled automated filing system) and maintained in a secured locked records room or other safe, controlled-access environments (Ex. 52, ¶¶ 3, 9 ). *See also,* Ex. 13, ¶¶ 2 and 6. (At the Cheyenne River Agency, records for certain "completed trust transactions" are kept in a locking cabinets in a vault secured by a combination lock; others are kept in fireproof locking file cabinets. Only the Realty Officer and Records Manager have access.) Similar measures are taken at certain other agencies. *E.g.,* Ex. 34, ¶ 2. (Filed are stored in fire-resistant cabinets or a fire-resistant vault, and the file room is locked every night, at the Mescalero Agency.) At the Eastern Regional office of the BIA, which serves the

20

Passamaquoddy Tribe (among others listed in the accompanying declaration), tribes' trust records are kept in locking steel file cabinets located within a designated fire-rated Trust Records Storage room.  Ex. 32, ¶ 2.

### b.    Department of Treasury's document preservation protocols

The bureaus of the Department of the Treasury most likely in possession of material potentially relevant to Plaintiff's claims are Treasury's Financial Management Service (FMS) and the Bureau of Public Debt ("BPD").  *See* Ex. 54, Decl. Lach Seward Tabs B-1through B-3 (describing role of FMS, BPD, and Departmental Offices); *see also Laguna*, 60 Fed.Cl. at 140 n.13 (noting that FMS and BPD, while not primarily charged with dealing with the tribe, retain financial information regarding the Pueblo in their general financial records).   These bureaus have implemented document retention policies and procedures for documents potentially relating to Tribal trust funds that – due to the overlap between the universe of potentially relevant materials in the tribal cases and the *Cobell* litigation– rely on a successful structure developed to comply with retention obligations in the latter.  *See generally* Ex. 54, Decl. Lach Seward.  The bureaus issue reminders regularly to their employees concerning these policies and procedures, and have placed the policies and procedures on the bureaus' Intranets.  *Id*. at Tabs A-K.  In addition to existing procedures for the retention of documents in paper format, both FMS and BPD have procedures in place to assure retention of electronic documents potentially relevant to Indian tribal trust funds. *See id.* at Tabs C-F.  In addition, Treasury's Departmental Offices has also instructed its employees to take steps to "preserve any potentially relevant documents," stressing that employees are to "retain and maintain those records associated with the tribal trust fund accounts, regardless of NARA approved disposition schedules . . . ." Ex. 54, Decl. Lach Seward, Tab C.   This directive

remains in full force and effect today.  *See id*. at Tab E, F.  *See also* Ex. 58, Decl. John Swales ¶ 6.

### c.    National Archives and Records Administration.

Pursuant to the Federal Records Act, the Archivist of the United States is responsible for the custody of all records transferred to NARA, and by statute is required to maintain adequate facilities for the housing of those records. 44 U.S.C. §§ 2108(a) and 2110.  *See also* Ex. 12, Declaration of Jason R. Baron ¶ 3.  The records in the custody of NARA include archival records, which are permanently retained by the United States government, and those records that are held in federal records centers.  *See* Ex. 12, Decl. Baron ¶¶ 3, 9; Ex.51 Decl. Gregory Pomicter ¶ 4.  Any archival records in the legal custody of NARA, including any archival records that are relevant to Plaintiff's case, are held on a permanent basis. Decl. Baron ¶ 4; Pomicter ¶ 4.  Archival records are subject to stringent environmental and security standards for the storage of permanent records.  *See* Ex. 59, Decl. Steven Tilley ¶ 4; *id*. at Tabs A & B; *see also* Decl. Gregory Pomicter ¶ 4.  Similarly federal records centers, which store temporary and permanent records that are legally owned and accessed by federal agencies, are also subject to the statutory requirement that they be housed in adequate facilities pursuant to the Federal Records Act.  *See* Decl. Pomicter ¶¶ 4-5; *see also* 36 C.F.R. Part 1228, Subpart K (establishing "Facility Standards for Records Storage Facilities").  With regard to Interior records in particular, one or more administrative "freezes" are in effect that prevent the destruction of any DOI records across all sixteen DOI records groups that comprise DOI records. Declaration Tilley ¶ 8; Pomicter ¶ 5.  A freeze was put in place as a result of the *Cobell* litigation in 2002, and other freezes on destruction are in effect apart from the *Cobell* litigation.  Decl. Pomicter ¶ 11.

In addition to its general record preservation actions related to archival materials and records

22

in federal centers, NARA has taken a number of steps to ensure the preservation of records specifically related to tribal trust litigation. The NARA Office of General Counsel has alerted key staff in NARA's Office of Records Services (covering NARA's headquarters holdings in the Washington D.C. area) and NARA's Office of Regional Records Services (covering NARA's regional holdings nationwide) of this pending litigation and the need for record preservation. Decl. Baron ¶¶ 4-6. Furthermore, NARA recently issued a nationwide electronic notice issued on May 16, 2008, which reminded heads of offices to continue to preserve records related to tribal trust matters, "regardless of whether a specific records retention order has been issued." Decl. Baron ¶ 5; *id*. at Tab A. That notice supplemented a prior NARA comprehensive nationwide notice that alerted staff to the existence of record retention orders in tribal trust litigation, notified NARA staff of "each person's duty to preserve relevant records and information across the board for *all* tribes currently pursuing tribal trust claims," whether a record retention order was in place or not, and listed all known tribal trust cases. Decl. Baron ¶ 6; *id*. at Tab B. That notice also stated that NARA staff "must take reasonable steps to preserve every document, all data or tangible thing in its possession, custody or control" concerning five categories of information corresponding to allegations of trust mismanagement. Decl. Baron ¶ 6; *id*. at Tab B. In addition, the notice specifically required NARA staff to preserve paper documents, electronic documents, including email and word processing documents, and voice mail. Decl. Baron ¶ 6. Notably, the notice cautioned NARA's employees that failure to comply with its provisions may lead to sanctions. *Id*. Tab B at 2. The notice also provided specific instructions for forwarding electronic documents to central email and voice mail repositories for continuous preservation during the pendency of tribal trust litigation. *Id*.

23

In addition, NARA has taken additional actions to preserve information and ensure compliance with its tribal trust record retention directives. NARA technical staff have established a set of disaster recovery backup tapes that contain any and all electronic mail and other documents that were residing in NARA's electronic system since September 4, 2007, which will be held indefinitely during the pendency of tribal trust litigation. *See* Ex. 12 Decl. Baron ¶ 7. NARA's Office of General Counsel continues to monitor efforts to comply with the requirement to preserve tribal trust records, including those of the Plaintiff and those who have joined in the instant motion, and will coordinate the efforts of various NARA components to monitor compliance with preserving document. *See* Decl. Baron ¶¶ 8-10.

> **2.    *Plaintiff has failed to demonstrate that the current preservation regime is inadequate.***

Ignoring the existing document preservation regime, Plaintiff attempts to show that a document preservation order is necessary in this case by collecting various instances of purported "failure[s] to prevent the destruction of critical Indian trust records." Pl's Mem. at 26. Upon closer examination, however, it becomes clear that Plaintiff's "evidence" consists of no more than cherry-picked quotes from reports that in some cases are too outdated to have any relevance to this litigation, especially when viewed against Defendants' extensive document preservation regime described above. In other instances, Plaintiff takes quotes out of context, giving the impression that the harm resulting from the supposed mismanagement was worse than it actually was. When put into the proper context, Plaintiff's evidence fails to show that any documents relating to the tribes that have joined in Plaintiff's Motion face a "significant risk" of destruction absent a document preservation order. *See Treppel, supra,* 233 F.R.D. at 371-72 (refusing to enter a document preservation order in part because plaintiff had not shown that any evidence had in fact been lost and

"the threat of future spoliation has been diminished by the steps Biovail ultimately took to preserve" the evidence at issue).  Defendants discuss each of the allegedly illustrative examples Plaintiff relies on, below.

> **3.    *Plaintiff's proposed Order will not enhance the protections already afforded to Indian trust records, and Defendants, like any other litigants, are already subject to the potentially severe sanctions provided by the Federal Rules of Civil Procedure for spoliation of evidence.***

Plaintiff has not demonstrated that "absent a Court order" a "significant risk" of loss or destruction of evidence relevant to its case (or the other tribal trust cases listed in its motions papers) now exists or will arise.  The protocols and physical protections described in above, already apply and will continue to apply for the protection of Indian trust records.

Plaintiff asserts that the threat of Court sanctions, pursuant to its proposed Order, will strengthen the existing protections afforded to the documents at issue.  That argument lacks force, and fails to address the question of necessity, for unless a document preservation order is necessary, and the only means to accomplish preservation, a court should not issue the order.  Defendants, just as any other litigants before this Court, are already potentially subject to sanctions, potentially including adverse inferences as provided by law and the applicable federal rules, if there is spoliation of relevant evidence or a sanctionable failure to produce relevant discoverable evidence. Plaintiff fails to demonstrate how the threat of sanctions under Plaintiff's proposed Order will make the documents any safer or eliminate any chance of human error by federal agency employees, contractors, or Tribal personnel.  In other words, remedies already exist for the harm Plaintiff says it wishes to prevent.

> **a.    Plaintiff's examples of document mismanagement pre-date the document preservation protocols.**

Plaintiff relies on a number of allegations of document mismanagement that are so outdated that they do not have any bearing on whether a record preservation order is necessary in this case. As noted above, in response to the *Cobell* litigation and lawsuits filed by numerous tribes, Interior and Treasury have implemented a wide array of document preservation procedures and protocols. When placed in that context, many of Plaintiff's examples of document mismanagement described in reports from 1990 and 1993 are irrelevant to the issue of whether trust records relevant to this litigation are in jeopardy of destruction fifteen or more years later.

Moreover, as noted above, Interior has undertaken wide-ranging document maintenance efforts in the face of tribal trust litigation, the most visible of which is the construction of the AIRR, an archival-quality underground document storage facility which was completed in 2004. The AIRR serves as a temperature-controlled, fire-proof, humidity-controlled data repository to provide a central and protected location for all at-risk trust records. *See Cobell v. Kempthorne*, 532 F. Supp. 2d 37, (D.D.C. 2008) ("*Cobell XX*") (noting that "the AIRR is a state of the art, climate-controlled, organized, and sizable facility suitable to the storage and research obligations of the Interior Department.") Since the completion of the AIRR, Interior has taken unprecedented steps to preserve and protect potentially relevant trust records from damage or destruction by transferring inactive trust records to the AIRR from their repositories in a multitude of offices across the nation.

The first two "illustrative examples" Plaintiff cites in its attempt to show that a document preservation order is necessary here were drawn from a NARA Report from 1990 and a Federal Systems and Integration Management Center ("FEDSIM") Report from 1993. Pl's Mem. at 14-15. Those reports, issued eighteen and fifteen years ago, respectively, contained criticisms of the document records management program as it existed then, but in view of everything that Interior has

26

done to reform document management practices, those out-dated reports do not accurately describe the current state of Interior's document preservation efforts. Indeed, it was in response to the types of criticisms in those early reports that Defendants undertook a massive overhaul of document management practices, which culminated in the construction of the AIRR. That, coupled with litigation-related document preservation mandates from senior officials of the DOI and NARA, has addressed the concerns expressed in the early inter-governmental reports upon which Plaintiff relies.

Plaintiff's third "illustrative example" is no more persuasive. It relies on Special Master reports that also fail to demonstrate any current jeopardy to Plaintiff's trust records. On pages 15-17 of its memo, Plaintiff relies upon Special Master reports from Alan Balaran in October and November 1999, which criticized the storage conditions at numerous local agency offices. Pl's Mem. at 15-17. Interior has addressed those issues by constructing the AIRR and removing inactive trust records to that facility. Records are constantly being indexed and transported to the AIRR under strict chain-of-custody procedures.[10] Ex. 11, Abeita Decl.; *see also, e.g.,* Ex. 17, Carolin Decl., ¶ 8 (Salt River agency has transported 227 cubic feet of records to the AIRR without incident); Ex. 22, Fielitz Decl., ¶ 16 (describing the document transfer protocols for the AIRR); Ex. 31, Joseph Decl. ¶ 4.

Two other examples on which Plaintiff relies are drawn from reports that contain criticisms of acts and omissions that occurred nearly a decade ago, or more. In making much of 162 boxes

---

[10]Perhaps even more importantly, Special Master Balaran has been disqualified by the United States Court of Appeals for the D.C. Circuit for his bias against the Government, and the Court of Appeals suppressed several of his reports for that reason. Specifically, in *In re Kempthorne*, the D.C. Circuit ordered that several of Mr. Balaran's reports be "stricken from the district court's records and be given no legal effect." *In re Kempthorne*, 449 F.3d 1265, 1272 (D.C. Cir. 2006) (internal citations and quotations omitted).

of documents that were destroyed in 1999, and an alleged delay of "months" in reporting that incident to the *Cobell* court, Plaintiff implies that the boxes at issue must have contained relevant discoverable trust records.  Plaintiff's own exhibits reveal, however, that the 162 boxes to which it refers constituted a portion of 407 boxes stored together, and that a subsequent "page-by-page search" of the undamaged 245 boxes that were stored with the destroyed boxes revealed only "*two boxes* worth of files which *referred to* any one of the five named [*Cobell*] plaintiffs, Individual Indian Monies ("IIM"), *or any Native American tribe*, agency *or individual*."  Ex. 12 to Pl's Mem. at 2 (emphasis added).[11]  Plaintiff also points to an incident twelve years ago, regarding one box of documents that apparently was "mislaid" when transferred to the Bureau of Public Debt in 1996. *Id.*  Yet the report cited by Plaintiff does not state that this box contained records relevant to the *Cobell* (or other Indian trust) litigation, or materials that would have been irreplaceable if lost. *See id.*  Most importantly,  the fact that the incidents took place nearly a decade ago shows that they do not amount to evidence of "significant risk" to any relevant discoverable trust records at issue in this case.   Indeed, the primary concern expressed in the 1999 report was the length of time it took for the *Cobell* defendants to inform the Court of the incidents of potential destruction.

In summary, none of these allegedly-illustrative incidents of document mismanagement satisfy Plaintiff's burden to show that "there is a significant risk that relevant evidence will be lost or destroyed." *See, e.g., Treppel, supra,* 233 F.R.D. at 371-72.   The other examples Plaintiff cites likewise fail to provide an adequate foundation for the order it seeks.

> **b.    Plaintiff relies upon examples arising from natural phenomena**

---

[11]Notably, these are additional reports from Special Master Balaran, whose bias renders his reports of little if any evidentiary value. *In re Kempthorne*, 449 F.3d 1265, 1272 (D.C. Cir. 2006).

**that a document preservation order would not prevent.**

Three of the incidents that Plaintiff relies upon to bolster its claim that a document preservation order is appropriate here concern roof leaks, extreme weather, or construction accidents. Pl's Mem. at 20-22. Plaintiff failed to show how a document preservation order would have prevented or guaranteed against such accidents or other unforeseeable events.

In discussing an incident reported in early 2004, which arose from a leak in the roof of an Office of Trust Records ("OTR") storage warehouse (Pl's Mem. at 20), Plaintiff quoted selectively from numerous Interior reports stating that "140 of the [350 affected] boxes contained records where portions of the record are illegible or unclear." *Id.* Plaintiff fails to point out, however, the important facts that the incident occurred before the AIRR was constructed, and that the report on which Plaintiff relies also stated that Interior's contractor "estimated that less than 1% of the total pages assessed for this project are completely illegible." Ex. 13 to Pl.'s Mem. at 30. The record shows that Interior enlisted the aid of NARA specialists to assist in the remediation efforts, and ultimately remediated all but six boxes of the original 350. Ex. 16 to Pl.'s Mem. at 23. For those six boxes, Interior contracted with additional conservator specialists to remediate the remaining damage. Pl.'s Mem. at 23; Ex. 17 to Pl.'s Mem. at 15-16.

Plaintiff asserted that the 29th Interior Report in the *Cobell* case "impl[ied] that the remaining contaminated boxes had been repaired but conspicuously fail[ed] to confirm that the project was completed." Pl.'s Mem. at 21. Contrary to that assertion, the same report states that "it was subsequently decided by OTR that the contents of all six boxes would undergo repair/conservation, *which was completed* in this reporting period." Ex. 17 to Pl.'s Mem. at 15-16 (emphasis added).

Moreover, this instance of eventually-remediated damage occurred in February 2004, before

29

the AIRR became operational. The AIRR was designed, in part, to protect Indian records from precisely this type of harm (a leaky roof), and Interior has been working diligently to transfer inactive trust records to that state-of-the-art facility, and does not constitute evidence of any intransigence on the part of Interior. Instead, it is an example of the great lengths to which Interior has gone to prevent the loss of trust records, and to remediate any damage that has occurred.

Similarly, Plaintiff points to water damage in a Financial Management Service ("FMS") office in Maryland, which occurred as a result of unusually heavy rainfall. Pl.'s Mem. at 21. Plaintiff also cites what it characterizes as a water-main break near the Washington National Records Center. Pl.'s Mem. at 21-22. These incidents are inapposite to the question whether a document preservation order in this case is "necessary," as *Laguna* requires.[12] Indeed, they have no bearing on whether a document preservation order is necessary, because they epitomize the type of extraordinary incident that cannot be guaranteed against, even if Plaintiff's proposed document preservation order were

_____

[12]Similarly, the final incident Plaintiff describes as support for its requested order (Pl.'s Mem. at 26) is an April 2008 incident of mold and water damage affecting eleven boxes of documents relating to the Navajo Nation at the BIA Regional Office in Window Rock, AZ. (*See* Defendant's Response To The Court's Order of April 16, 2008, Regarding [the] Department of the Interior's Discovery of Document Damage, including the related declarations and other exhibits. Filed in *Navajo Nation v. United States*, Case No. 06-945L in the Court of Federal Claims on May 8, 2008. (Dkt. #50)) (the "May 8, 2008 *Navajo* CFC Report") As Ethel Abeita, Director of the Office of Trust Records at the Office of the Special Trustee for American Indians states in her declaration concerning that matter, the damaged documents will be remediated, and the documents have been moved from the location where the mold appears to have accrued. Abeita Decl., Exh. 1 to May 8, 2008 *Navajo* CFC Report, ¶¶ 5-10.) Again, these types of incidents relating to climate, temperature, and humidity are precisely the reason Interior has implemented policies and procedures to move inactive trust records to the AIRR as expeditiously as possible. Most importantly, Plaintiff's proposed Order would not prevent the types of incidents Plaintiff complains of, and, as Defendants explain below, the normal rules governing discovery as to all litigants provide ample incentives to preserve relevant documents.

adopted wholesale.[13]  Furthermore, Plaintiff admitted, citing a report filed with this Court, that the

damage was "remediate[d] fully."  (*See* Plaintiff's Mem. at 22, in which Plaintiff complains that the

full remediation of documents damaged by the water-main break took a year.)

                    **c.**      **Plaintiff's additional examples likewise do not support its claims that there has been repeated destruction of "irreplaceable Indian trust records," and that future incidents will not be avoided absent the imposition of Plaintiff's proposed order.**

Plaintiff points also to a 2006 report by the Department of Treasury containing the statement

that "37 boxes of potential trust records were not located in an inventory of the Federal Reserve Bank

of St. Louis."  Pl.'s Mem. at 22.  This matter has already been reported to the *Cobell* Court, and, more

importantly, the check processing information is irrelevant or unnecessary to Plaintiffs' request for

full and complete historical accountings in these case.   *See* Ex. 33, Decl. Helm Kurtz ¶¶ 3, 4, 7, 8,

11.

Plaintiff also describes a September 2005 incident involving a NARA employee's random

destruction of various records located in the National Archives.  This too, does nothing to advance

Plaintiff's argument that a document preservation order is necessary here.  The incident involved

apparently random acts by an employee who later resigned and no longer has access to the

documents.[14]  A document preservation order does not meet the *Laguna* test of necessity, because

---

[13]In fact, as will be discussed in more detail below, Plaintiff's order would prevent even the emergency relocation of these documents for twenty days while Defendant "provide[s] Plaintiff with notice of such document movement at least twenty days in advance of the movement."  Pl.'s Proposed Order at ¶ 4.

[14]The matter is described in a September 28, 2005 letter from Jason R. Baron, Director of Litigation for NARA, to Dennis Gingold, attorney of record for Plaintiff in Cobell.  *See* Exs. 26 and 26a to Defendant's Opposition to Plaintiff's Motion for Entry of Record Retention Order, filed in *Navajo Nation v. United States*, Case No. 06-945L in the Court of Federal Claims on

it is not likely to deter such acts of apparent malice by a disgruntled worker. It is arguable that a disgruntled employee might think twice about engaging in such action if he had signed Plaintiff's proposed acknowledgment, but, as discussed below, the burden of imposing that provision on every employee, contractor, and agent of Defendants outweighs any potential benefit to the parties. Furthermore, it seems just as likely that a disgruntled employee who is inclined randomly to attempt disposal of various file contents, as in the September 2005 incident at NARA, might be even more tempted to do so if he thought such actions would cause legal difficulties or Court sanctions for his employer.

Plaintiff also points to a May 2006 incident in which employees at the BIA Fort Defiance Agency serving the Navajo Nation shredded approximately one cubic foot (*i.e.*, one box) of

------

June 21, 2007. (Dkt. #19)).  In essence, the situation involved the attempted discarding by a single NARA employee of hard-copy folders and records from the Department of Veteran's Affairs, the Department of the Interior, the United States Army, the War Department, and the Navy Department.  Documents were found in various unauthorized locations at NARA, including a waste basket, dumpster and trash compactor at the Main Archives building at 9th Street and Constitution Avenue.  The initial identification of these discarded records began on September 1, 2005.  NARA's Office of the Inspector General conducted an investigation in September and October of that year.  As noted in Mr. Baron's September 28, 2005 correspondence, the NARA staff determined that approximately 250 of the actual files that corresponded to the approximately 275 Consolidated Chippewa non-record file covers and jackets recovered in various trash areas in September 2005 were intact and in NARA's permanent holdings.  NARA staff thereafter conducted a search for the remaining 25 files.  See December 9, 2005 letter from Jason R. Baron to Dennis Gingold, *See* Ex. 27 to Defendant's Opposition to Plaintiff's Motion for Entry of Record Retention Order, filed in *Navajo Nation v. United States*, Case No. 06-945L in the Court of Federal Claims on June 21, 2007. (Dkt. #19)).

The foregoing events do not support or the entry of a document preservation order in this case or the other tribal trust cases before this Court, especially as the facts indicate the actions involved were attributable to a single disgruntled employee, who has resigned.  Indeed, the *Jicarilla* and *Laguna* record retention orders were in effect at the time of the incidents but did not prevent these  incidents.  The incidents should be recognized as aberrational actions of one individual who no longer has access to the documents at issue.  As such, they have little, if any, relevance to the question whether a document preservation order is necessary here.

documents. Those documents included duplicate documents that were not considered "records" as well as some incomplete sand and gravel permits, which are considered trust records. Pl.'s Mem. at 23. Defendants notified the court and opposing counsel of the incident (*see, e.g.,* 25th Interior Report, at 22-23), and reinforced records management protocols and duties with the agency staff. *Id*. The incident has been addressed and does not constitute a repeated loss or destruction of "irreplaceable Indian trust records," which is what Plaintiff claims has occurred and will be prevented by the document preservation order it seeks. Indeed, there is no evidence that the documents in the box, including archaeological clearances, had or will have any effect on the Navajo Nation's claims in its pending suit against the United States, much less any effect on Plaintiff here.

Plaintiff cites also to what it characterizes as "long-standing, substantial, and widespread email backup problems." Pl.'s Mem. at 23. Plaintiff specifically references DOI's efforts to forensically recover data from 268 email backup tapes containing data from February 2005 through September 2005. *Id*. Plaintiff's characterization of the problem is erroneous. Specifically, had Plaintiff performed even a cursory review of the 23rd Interior Report, Ex. 25 to Pl.'s Mem. at 8-9, it would have noted reference to the particular problem as a ZStage issue. Specifically, the Report explains as follows:

> ZStage refers to a ZANTAZ software indicator which shows whether an email message has been properly processed . . . (i.e., sent to the Zantaz email receptacle for processing.). During this reporting period, OST discovered a limited processing problem identified by reviewing ZStage data and took steps to mitigate it.

*Id*. As the 23rd Report explains, affected agencies such as the Office of the Special Trustee (OST), the National Business Center (NBC), the Solicitor's Office (SOL), and BIA forwarded backup tapes to Zantaz in order to retrieve undelivered email messages. That process is discussed in detail in the Report. *See id*. at 8-9. In addition, the 25th Interior Report, Ex. 24 to Pl.'s Mem. at 5-6, details the

upgrading of servers at the aforenoted agencies to correct the ZStage problems which had caused a failure to process email to Zantaz. The e-mail problems of OST, SOL, and NBC were resolved by July 27, 2006, and all emails were properly re-processed. *See* 26th Interior Report, Ex. 16 to Pl.'s Mem. at 5-6.[15]/

Plaintiff characterizes as "one of the most glaring" examples of Defendants' allegedly "inadequate document retention" an incident of the destruction of fifteen boxes of documents by a contractor to Bank of America, a Department of Treasury financial agent. Pl.'s Mem. at 24-25. Most importantly, as Plaintiff itself notes, the information contained in destroyed boxes can be recreated from electronic data stored in the Treasury CA$HLINK system. Pl.'s Mem. at 24-25. *See also* Ex 67, Defendant's Notice of Filing of Update Concerning Inadvertent Document Destruction. In that September 2007 filing Treasury reported to the Court of Federal Claims in the *Navajo v. United States* case (No. 06-945L), that "contrary to [Treasury's] initial understanding, data from [the inadvertently destroyed] materials would have also been captured in Treasury's CA$HLINK II system." (Ex. 67, attachment A at ¶ 1) Plaintiff offers no support for its claim that that will be inadequate because "hard copies almost always contain more information." (Pl.'s. Mem. at 26.)

In addition, "not every record in the fifteen boxes involved pertained to Indian trust-related records." Instead, the materials in the boxes encompassed "government-wide deposit ticket and debit voucher activity." (*See* Ex. 67, Defendant's Notice of Filing of Update Concerning Inadvertent Document Destruction, attachment A, ¶ 3).

Furthermore, Defendants responded quickly and appropriately to address the event,

---

[15]/In addition, it is DOI policy to require employees to print and save hard copies of any substantive e-mails. Thus, between the backup tapes and the "print and save" policy, chances of lost email seem remote. *See* Ex. 3, July 2004 Memorandum regarding Interior Email Policies.

minimizing any risk of its recurrence.  For example, Treasury reported that the incident was the result of an employee of a contractor of Bank of America overriding a "Hold" placed on the Bank records in the contractor's system.  (Ex. 67, attachment A at ¶ 2.).  Treasury further reported that "the [contractor's] system has since been modified so that only one [contractor] employee [the account manager] ... has permission within [the contractor's] system(s) to override any 'Hold' condition placed on Bank of America records."  *Id.*

In short, further investigation between the time of the Government's initial report to the Court of Federal Claims and September 2007 revealed that this incident had fewer consequences for records maintained by Treasury than was originally feared; and steps appropriate and tailored to the circumstances have been taken to minimize any risk of such incidents in the future.  Plaintiff failed to show how, as it claims, having a document preservation order in place would make Treasury or its agents more "proactive" in protecting  records.  Treasury's financial agent had placed a "Hold" on the documents, but the "Hold" was overridden, in error.  (Ex. 67, attachment A at ¶ 2.)  While it is arguable that Bank of America or its contractor should have, from the start, implemented a policy whereby only one employee of the contractor had the ability to override the "Hold," it is far from clear that the existence of yet another document preservation order relating to Indian trust litigation would have prevented the incident or caused the current policy to be implemented from the beginning.

Defendants are acutely aware of the potential consequences of the loss or destruction of relevant discoverable evidence.  They do not need any greater incentive to take appropriate steps to preserve trust records.

**D.     Plaintiff's Proposed Order Is Unduly Burdensome and Ineffective**

In addition to failing the first requirement the *Laguna* test, Plaintiff's proposed Order does not meet the additional requirement that it be "effective but not overbroad," that is, "not unduly burdensome." *See Treppel, supra*, 233 F.R.D. at 372 ("such a blanket preservation order may be prohibitively expensive and unduly burdensome"); *Laguna, supra,* 60 Fed. Cl. at 140 (limiting scope of proposed preservation order because "benefits associated with plaintiff's proposal are outweighed by the costs and burdens those steps would impose"). To the contrary, Plaintiff's proposed Order would impose undue burdens on Defendants' operations (including services to the Tribes) and would hamper Defendants' efforts to preserve records, instead of promoting that goal. For example, the proposed order fails to distinguish between active and inactive records, and relies on overly broad definitions, which could impose preservation requirements regarding documents that are neither trust records nor material reasonably calculated to lead to the discovery of admissible evidence. Moreover, the procedural hurdles Plaintiff wishes to interpose, such as conference requirements, certification, and restrictions on document movement, would needlessly increase costs and impose administrative and other burdens on the agencies and on litigation counsel, while failing effectively to protect relevant trust records or evidence. These matters are explained more fully below, with reference to the attached declarations from the United States government agencies whose records and operations would be most directly and severely affected by the proposed order (namely, NARA, Interior and its sub-agencies, and Treasury)

> ### 1. *Plaintiff's failure to distinguish between active and inactive records will impair Interior's ability to carry out its trust responsibilities.*

Plaintiff's proposed Order would create a general obligation to preserve Plaintiff's "Trust Records," which Plaintiff defines as "all documents, data, or tangible things, including any duplicates . . . that embody, refer to, or relate to the accounts, or assets held in trust by Defendants or their

agents." Pl.'s Order at ¶ 1(a). All of the other provisions of the order rely on this expansive definition of Trust Records. By failing to distinguish between active and inactive records, however, Plaintiff's order multiplies the burdens that will be imposed by the other provisions of the order. Active records are those records that are currently in use by Interior personnel to carry out their trust responsibilities to the tribes. Fielitz Decl., Ex. 22, ¶¶ 2-4. By subjecting these active records to Plaintiff's onerous preservation regime, the proposed order creates unnecessary burdens on the operations of agency staff, and would inhibit or prevent the agency from carrying out its mission. *See generally, e.g.,* Ex. 17 (Salt River Agency), ¶ 9; Ex. 34, ¶ 7 (Mescalero Agency); Ex. 49, ¶ 9 (Rocky Mountain Region); Ex. 44, ¶ 8 (Rocky Boy's Agency); *see also*, Exs. 14, 21, 39, and 48.

In addition, DOI already has a definition of "trust record" that is used regularly by employees handling those records. *See* Ex. 17 ¶¶ 2-4. Imposing a new definition for purposes of this TRPO would only serve to add an unnecessary additional layer of confusion and increase rather than mitigate the risk such materials will not be handled properly.

### 2. Movement restrictions

Plaintiff seeks a blanket order requiring twenty days' advance written notice of *any* movement of "Trust Records from their present location to another location." Pl.'s Proposed Order at ¶ 4. In *Laguna*, the Court declined to impose the broad inspection and transfer restrictions proposed by plaintiff, *see id.*, because, as the Court noted, such provisions would unduly burden the operations of various agencies in two ways: (1) by affecting the daily and routine movement of records; and (2) by "injecting plaintiff into agency processes that are designed to avoid the loss or destruction of records." *See id.* The requirement of twenty-day advance notice for movement of records that Plaintiff here proposes would, just as the proposal in *Laguna*, affect (and inhibit) the daily and routine

movement of records and "inject plaintiff into agency processes that are designed to avoid the loss or destruction of records."  *See* Ex. 58, Decl. John Swales ¶¶ 5,7 (discussing burden imposed by a potential 20-day notification requirement and explaining that such a requirement could "jeopardize [the Bureau of Public Debt's] routine business operations"); *see also* Ex. 59, Decl. Tilley ¶¶ 18-20; Ex. 51, Decl. Pomicter ¶ 20.

Moreover, inhibiting the movement of active records will impede the normal and often vital operations of the agencies concerned.  *See, e.g.,* Ex. 21, ¶ 12 (Project drawings and other documents must routinely be moved from Bureau of Reclamation offices to project sites.  The free movement of these documents is particularly important at times of natural disasters that may require decisive and immediate action related to the projects.); Ex. 17, ¶ 9(interfering with negotiation of lease and business deals on behalf of tribe); Ex. 34, ¶ 7 (slowing provision of contracting and review services to the tribes); Ex. 43, ¶ 6 (hindering lease approvals); Ex. 46, ¶ 11 (intereference with forestry and fire contracts); *see also* Ex. 49, ¶ 9 (Rocky Mountain Region); Ex. 44, ¶ 8 (Rocky Boy's Agency); *see also*, Exs. 14, 21, 39, and 48.  Delays in accessing or moving records because of notice, meet and confer, or inventory requirements (as just some examples) will severely disrupt the agency's ability to provide services.  *See id.*

Thee twenty-days' notice provision would actually prevent Defendants from relocating documents in the event of a weather emergency or for any other urgent reason.  It would inhibit and obstruct Interior's ongoing efforts to preserve records by moving them to the secure facilities designed for their protection, such as the AIRR.

Furthermore, the proposed notice requirement and restriction of movement of records is so vague that it is both ineffective and overly broad (and therefore fails the second prong of the *Laguna*

38

test.)  Plaintiff's provision might be read to require twenty days' advance written notice when boxes were moved from one shelf to another or from one office to another down the hall, as well as from one State to another.  In fact, as written, it would apply to and interfere with routine correspondence between agency and Regional offices about active matters.  For an office that routinely moves tribal records in the ordinary course of its business, Plaintiff's order would bring its operations to a standstill.  *See, e.g.*, Declaration of Scott MacPherson of the Bureau of Land Management ("BLM"), Ex. 39, ¶ 9 (noting that BLM employees frequently need to transport the records it has and to use them at project sites.).  *See also* Decl. of Charles Breece, Ex. 14, ¶ 5 (delays in the probate process carried out by the Office of Hearings and Appeals); Decl. of Delores Springer (Midwest Region, BIA), Ex. 57, ¶ 7 (delays in submitting funding requests of tribal members to the Central Office in Washington, D.C.); Decl. of Barbara Fix (Truxton Canon Agency) Ex. 23, ¶ 9 (delaying and inhibiting meetings with tribal representatives or outside agencies, where trust records are used or transported).

Notably (given Plaintiff's reliance on the *Jicarilla/Laguna* standard for entry of a document preservation order), the *Jicarilla* court recognized the inherent burden that an advance notice requirement would impose on Defendants, and provided instead in its final order that "DOI may, at any time, move boxes that have not been designated for inspection, according to normal procedures and protocols for the movement of Indian trust records."  Def.'s Ex. 7, ¶ 2.  This Court, likewise, should refrain from any order that imposes an advance notice requirement on movement of records.

In addition to written notice twenty days in advance of any movement of records, Plaintiff demands that Defendants generate inventories and descriptions of the records to be moved.  This provision illustrates the overbreadth and unduly burdensome nature of Plaintiff's proposal.  The

39

existence of an inventory for a move would not save documents from loss any more than would the inexplicable demand for a twenty-day advance notice period.  In addition, it is a huge potential expense, and not supported by the pertinent caselaw.  *See Treppel, supra,* 233 F.R.D. at 372 ("such a blanket preservation order may be prohibitively expensive and unduly burdensome"); *Laguna, supra,* 60 Fed. at 140 (limiting scope of proposed preservation order because "benefits associated with plaintiff's proposal are outweighed by the costs and burdens those steps would impose").  Not only would it hamper Defendants' efforts to preserve documents, it would impose unnecessary costs that will impair the day-to-day functioning of the affected agencies and offices.  *See* Ex. 59, Decl. Tilley ¶¶ 14, 15; Ex. 51 Decl. Pomicter ¶¶ 16, 17.  *See also,* Ex. 14, ¶ 5 (delays in probate process); Ex. 21, ¶ 12 (describing expected impacts to Bureau of Reclamation's operations); Ex. 22 ¶ 18 (a-d) (describing impacts to OST's operations); Ex. 50, ¶ 4 (describing burdens on Office of Inspector General's activities); *see generally* Exs. 13-66 (describing burdens expected to be endured by BIA agency and regional operations as a result of Plaintiff's proposed Order).

Moreover, the term "move" is not defined.  Pl.'s Order at ¶ 4.  It is unclear from the order whether Defendants must file a move plan only when a box is permanently moved from one location to another (such as transporting records from an agency office to the AIRR), or whether the order would apply also to temporary or short-term situations, such as when box is charged out from a local agency office, or documents are moved interoffice or to a project site (as just two examples), in the course of daily business.  In addition, as drafted, TRPO Paragraph Four would apply to all movements of electronic records, including transferring files from one folder to another or from one server to another.  Requiring twenty days' notice and a detailed move plan with chain of custody on routine short term record movements would severely impede Defendants' ability to perform their

daily functions.  Ex. 35, ¶ 5 (burdens expected at the Northern Idaho); Ex. 37, ¶ 9 (expected impacts

on the Pawnee agency operations); Ex. 46, ¶ 11 (a-g) (describing impacts to Southwest Region

operations); *see generally*, Exs. 13-66 (describing burdens expected to be endured by BIA agency

and regional operations as a result of Plaintiff's proposed Order).  Likewise, those of other federal

agencies.  *See e.g.,* Decl. Tilley ¶¶ 19-20; Decl. Pomicter ¶ 20 (discussing interference with NARA

operations).

    Similarly, the move notification requirement proposed by Plaintiff will have negative effects

on the Financial Management Service's ("FMS") Information Services Directorate (part of the

Department of the Treasury), and thereby compromise its ability to carry out at least two of its

fundamental missions. Ex. 62, Decl. Tamara Whitaker ¶ 13.  In addition, Plaintiffs' proposed move

requirement will interfere with CA$HLINK II, interfering with FMS functions.  *Id.* ¶¶ 2-14.

Delaying the movement of back-up data would create a risk of catastrophic loss of data.  Decl.

Whitaker ¶ 11.  Thus, Plaintiff's proposal actually increases the potential risk of loss of information,

rather than serving to facilitate its retention.  *See id*.

### 3.      *Plaintiff's proposed conference requirement is burdensome and ineffective*

    Plaintiff's proposal that Defendants confer with Plaintiff regarding whether any particular

action would "constitute a failure to preserve" a Trust Record is also unjustified because it would be

wholly ineffective.  *See* Pl.'s Order at ¶ 1(b).  In rejecting a similar provision in *Pueblo of Laguna*,

the Court of Federal Claims stated "the court sees little purpose in requiring defendant to obtain

plaintiff's concurrence before destroying relevant documents."  60 Fed. Cl. at 140 (Fed. Cl. 2004).

As that court noted, such a request would never materialize:  "such would be the case whether agency

personnel comply with the existing policies precluding the destruction of documents or inadvertently

41

destroy records in contravention of those policies." *Id.* That is precisely the situation here - Defendants are already under an obligation to preserve relevant discoverable evidence for this litigation and have not intentionally destroyed (or "failed to preserve") those records. *See, e.g.,* Ex. 22 ¶¶ 12-16; Ex. 34, ¶ 5; Ex. 41, ¶¶ 6-7; *see also, generally*, Exs. 13-66 (describing BIA regional and agency office staff training on and awareness of DOI document preservation obligations). Accordingly, Plaintiff has not demonstrated that such an order would be effective, and the provision should not be implemented. *See Laguna,* 60 Fed. Cl. at 138 ("the proponent must show that the particular steps to be adopted will be effective, but not overbroad-the court will neither lightly exercise its inherent power to protect evidence nor indulge in an exercise in futility").

### 4. Plaintiff's "indisputable" test for identification of Trust Records is both overbroad and ineffective

Plaintiff's proposal that a record must be preserved unless it is "indisputable" that the record is not a "Trust Record," is similarly defective. Pl.'s Order at ¶ 1(a). Like the proposed conference requirement, this provision has no practical effect. This provision would have Defendants employees, agents, and contractors save every shred of paper or electronic information that "embodies, refers to or relates to the accounts and assets held in trust" unless it is "indisputable" that the record is not a "Trust Record." Such a draconian preservation order would have the effect of bringing daily business at affected offices to a near standstill. *See, e.g.,* Decl. Tilley ¶ 10 (explaining that it is "simply impossible for NARA to ever be in the position to represent that a given subcollection of Indian or tribal-related records 'indisputably' does not contain records related to the 34 Tribes"); Decl. Pomicter ¶¶ 12-13 (explaining the burden on NARA and noting that Plaintiffs' proposed order will interfere with NARA's ability to "go about its daily nationwide business and pursuing preservation of records and providing services to the public"); *see also* Exs. 13-66 (as noted

42

above, describing the burdens that would be imposed as a result of Plaintiff's proposed Order).

For example, if Bureau of Indian Affairs agency staff sent an email that said "turn left on X Rd. just after the Big Sky farm" to tell someone how to get to the agency office, that email would be a "Trust Record" according to plaintiff's definition, if Big Sky farm happened to be located on land leased from the tribe. On its face, such an email "refers to" an asset held in trust, so the email would be subject to the proposed preservation order. Again, Defendants are already under document preservation obligations in this litigation subject to the Federal Rules of Civil Procedure, and Plaintiff's proposed definition of "Trust Record" goes far beyond any reading of the permissible scope of discovery under those rules. *See* FED. R. CIV. P. 26 ("parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense...relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.").

Moreover, none of Plaintiff's examples of document mismanagement turned on a dispute between Plaintiff and Defendants as to whether a particular record was in fact a trust record. Rather, all of Plaintiff's examples involved issues of inadvertence, with one example of intentional vandalism. Therefore, the scope of Plaintiff's proposed preservation order paragraph 1(b) violates all requirements of *Laguna*: it is overbroad and it is ineffective, as well as being unnecessary. 60 Fed. Cl. at 138 ("the proponent must show that the particular steps to be adopted will be effective, but not overbroad"). Accordingly, since Plaintiff has failed show that an order is necessary, and because its Proposed Order is ineffective and overbroad, Plaintiff's motion should be denied.

### 5.    *The certification requirement*

Plaintiff also seeks to require "each employee or agent of Defendants, their departments,

agencies, offices, divisions, and contractors" who "has custody" of Trust Records to sign a

certification that he or she has read the preservation order and agrees to be bound by its terms.  Pl.'s

Order at ¶ 2(b).   This requirement could apply to vast numbers of employees, contractors and agents.

Moreover, the definition of "has custody" is not clear from the proposed order.  There is nothing to

indicate whether the order would apply to the IT technician who performs one-time maintenance on

servers housing trust record information, or to an office clerk who helps move boxes from one shelf

to another.  Collecting and managing the certifications and maintaining records for employees will

add expenses and require extra hours of labor for agencies already subject to budgetary pressures;

and will result in a significant administrative and paper-keeping burden, slowing  *See, e.g,* Ex. 34,

¶ 7.  In addition, such a requirement would be detrimental to the agencies' ability to deploy and move

personnel to perform tasks as needed.   *See, e.g.,* Ex. 51, Decl. Pomicter ¶¶ 17-18; Ex. 59, Decl.

Tilley ¶¶ 15-16.

     **E.**       **If The Court Deems A Preservation Order Necessary, Defendants Request An Opportunity To Present An Order That Better Protects Potentially Relevant Documents And Is Equally Binding On Both Parties.**

Finally, should the Court determine that Plaintiff has met its burden to demonstrate that an

order is necessary, effective, and not unduly burdensome, Defendants respectfully request an

opportunity to submit a proposed document retention order that is more narrowly tailored to preserve

relevant discoverable evidence.  In addition, any preservation order entered by this Court should be

binding on all parties to the litigation.  *See United States v. Magnesium Corp. of Am.*, 2006 WL

2350155 (D. Utah 2006) ("in fairness, the order should be mutual as requested by the non-USM

defendants").  This is especially true because Plaintiff has possession of numerous records that were

"made or received by a tribe or tribal organization in the conduct of a federal trust function" under

BIA regulations.  *See* 25 C.F.R. §§ 115.1000 - 115.1001.  Such records that "[e]vidence the organization, functions, policies, decisions, procedures, operations, or other activities undertaken in the performance of a federal trust function" are considered property of the United States, and are subject to Bureau of Indian Affairs retention regulations.  *See id.*  On the other hand, "records made or received by a tribe or tribal organization in the conduct of business with the Department of the Interior [but which do not evidence organization, function, policies, decisions etc.] under this part are the property of the tribe."  25 C.F.R. § 115.1000 (b).  As a result, Plaintiff has in its possession many relevant discoverable records which must be retained pursuant to Plaintiff's obligation to preserve evidence for this litigation.  Defendants therefore respectfully request that any preservation order entered in this case be made binding on Plaintiff as well as Defendants.

## IV.  **CONCLUSION**

For all of these reasons, Plaintiff's motion should be denied.


RONALD J. TENPAS
Assistant Attorney General

/s/      ***Brian Collins***
JOHN H. MARTIN
BRIAN M. COLLINS
ANTHONY P. HOANG
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C.  20044-0663
Tel: (202) 305-3022
Tel: (202) 305-0428
Fax: (202) 353-2021

Attorneys for Defendants

45

OF COUNSEL:

PAUL SMYTH
ELISABETH BRANDON
THOMAS BARTMAN

Office of the Solicitor
United States Department of the Interior
Washington, D.C. 20240

TERESA DAWSON
Office of Chief Counsel
Financial Management Service
United States Department of the Treasury
Washington, D.C. 20227