IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Yankton Sioux Tribe v. | ) | Civil Action No. 03-1603 (JR) |
| Kempthorne, *et al.*, | ) | |
| | ) | |
| Pechanga Band of Luiseno Mission Indians v. | ) | Civil Action No. 06-2206 (JR) |
| Kempthorne, *et al.*, | ) | |
| | ) | |
| Colorado River Indian Tribes v. | ) | Civil Action No. 06-2212 (JR) |
| Kempthorne, *et al.*, | ) | |
| | ) | |
| Tohono O'Odham Nation v. | ) | Civil Action No. 06-2236 (JR) |
| Kempthorne, *et al.*, | ) | |
| | ) | |
| Nez Perce Tribe v. | ) | Civil Action No. 06-2239 (JR) |
| Kempthorne, *et al.*, | ) | |
| | ) | |
| Passamaquoddy Tribe of Maine v. | ) | Civil Action No. 06-2240 (JR) |
| Kempthorne, *et al.*, | ) | |
| | ) | |
| Salt River Pima-Maricopa Indian Community v. | ) | Civil Action No. 06-2241 (JR) |
| Kempthorne, *et al.*, | ) | |
| | ) | |
| Ak-Chin Indian Community v. | ) | Civil Action No. 06-2245 (JR) |
| Kempthorne, *et al.*, | ) | |

---

**PLAINTIFFS' PRINCIPAL BRIEF IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ iv

INTRODUCTION ............................................................................................................. 1

SUMMARY OF ARGUMENT ......................................................................................... 2

STATEMENT OF FACTS ................................................................................................ 5

I.      THE TRUST OBLIGATIONS OF THE UNITED STATES AND TRUSTEE-DELEGATES. ......................................................................................................... 5

        A.      Trustee-Delegates Hold Assets in Trust for Plaintiff-Tribes. ............................ 5

        B.      Trustee-Delegates Owe Plaintiff-Tribes Fiduciary Duties, Including the Duty to Provide a Complete, Accurate, and Adequate Accounting. ......................... 6

        C.      Trustee-Delegates' History of Trust Mismanagement, Delay and Failure to Account ...................................................................................................... 7

II.     PLAINTIFF-TRIBES' CLAIMS. .......................................................................... 9

III.    TRUSTEE-DELEGATES' CONTINUED DELAY AND INTRANSIGENCE. ....... 10

ARGUMENT ................................................................................................................... 12

I.      PLAINTIFF-TRIBES HAVE STATED JURISDICTIONALLY VALID CLAIMS. 12

        A.      Plaintiff-Tribes Have Stated Jurisdictionally Valid Non-APA Claims for Enforcement of Trustee-Delegates' Statutory Trust Responsibilities. ............ 12

                1.      Plaintiff-Tribes Have Stated a Valid Statutory Claim for Equitable Judicial Enforcement of Trustee-Delegates' Statutory Trust Duties. .. 13

                2.      Trustee-Delegates' Arguments Misconstrue Both the Nature of Plaintiff-Tribes' Claims and the State of the Law. .............................. 19

                3.      Plaintiff-Tribes have Stated a Valid Claim for Non-Statutory Review. ...................................................................................................... 22

        B.      Plaintiff-Tribes Also Present Jurisdictionally Valid Claims under the APA. . 24

1.       Plaintiff-Tribes Have Stated Valid Claims under § 706(1) of the APA to Compel Agency Action Unlawfully Withheld and Unreasonably Delayed by Trustee-Delegates. ........................................................... 25

       a.      The 1994 Act Is Neither the Source Nor a Complete Statement of Trustee-Delegates' Trust Duties, and Trustee-Delegates Have Not Satisfied the Obligations Stated Therein. .......................... 25

       b.      The Supreme Court's *SUWA* Opinion Did Not Deprive This Court of Its Authority to Enforce Trustee-Delegates' Duty to Account. ................................................................................... 28

2.       Plaintiff-Tribes Also Have Stated Valid Claims under § 706(2) of the APA. ................................................................................................. 33

C.     This Court Has Authority to Grant the Relief Sought by Plaintiff-Tribes. ..... 35

1.       Section 702's Waiver of Sovereign Immunity Extends to Specific Equitable Remedies, Including An Order Requiring Trustee-Delegates to Perform An Accounting and, If Appropriate Thereafter, Certain Monetary Relief, That Are Distinct From Money Damages. ........... 37

2.       The Equitable Relief Sought by Plaintiff-Tribes Is Not Money Damages. ............................................................................................ 40

3.       The Cases Relied upon by Trustee-Delegates are Inapposite. ............. 42

4.       The Equitable Relief Sought by Plaintiff-Tribes Is Not Barred by the Tucker Act. .......................................................................................... 44

II.     PLAINTIFF-TRIBES' PRE-1946 CLAIMS ARE NOT TIME BARRED. ............... 47

A.     Congress Deferred the Accrual of Plaintiff-Tribes' Pre-1946 Claims. ........... 48

B.     The Court of Federal Claims Twice Has Determined that the Tribal Trust Fund Accounting Statutes Preserve Pre-1946 Claims. ............................................. 51

C.     Trustee-Delegates' Arguments that Plaintiff-Tribes' pre-1946 Claims Are Barred Are Without Merit. .......................................................................... 53

III.    PLAINTIFF-TRIBES ARE ENTITLED TO AN ACCOUNTING OF THEIR NON-MONETARY ASSETS. .......................................................................................... 55

A.     It Is Well-Established that an Adequate Accounting Must Include Non-Monetary Assets. ........................................................................................ 55

B.     Plaintiff-Tribes Were Not Required to Exhaust Administrative Remedies. ... 57

CONCLUSION...................................................................................................... 61

## **TABLE OF AUTHORITIES**

**Cases**

*Aetna Cas. & Sur. Co. v. United States*,
    71 F.3d 475 (2d Cir. 1995) ........................................................................... 40

*Am. School of Magnetic Healing v. McAnnulty*,
    187 U.S. 94 (1902) ...................................................................................... 24

*America's Cmty. Bankers v. Fed. Deposit Ins. Corp.*,
    200 F.3d 822 (D.C. Cir. 2000) ............................................................... 39, 42

*Anselmo v. King*,
    902 F. Supp. 273 (D.D.C. 1995) ................................................................. 39

*Assiniboine & Sioux Tribes of Fort Peck Indian Reservation v. Bd. of Oil & Gas Conservation*,
    792 F.2d 782 (9th Cir. 1986) ...................................................................... 14

*Assininboine Sioux Tribes et. al v. Norton*,
    527 F. Supp.2d 130 (D.D.C. 2007) .......................................................... 2, 11

Avocados Plus Inc. v. Veneman,
    370 F.3d 1243 (D.C. Cir. 2004) .................................................................. 61

*Beckett v. Air Line Pilots Ass'n*,
    995 F.2d 280 (D.C. Cir. 1993) .................................................................... 18

*Bell Atl. Corp. v. Twombly,*
    127 S. Ct. 1955 (2007) ............................................................................... 33

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988) ................................................................ 39, 40, 41, 46

*Browning v. Clinton*,
    292 F.3d 235 (D.C. Cir. 2002) .................................................................... 28

*Bryan v. Itasca County*,
    426 U.S. 373 (1976) .................................................................................... 51

*Cartwright Int'l Van Lines, Inc. v. Doan*,
    525 F. Supp.2d 187 (D.D.C. 2007) ............................................................. 46

*Chamber of Commerce of the U.S. v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) .............................................................. 13, 24

*Chippewa Cree Tribe. v. United States*,
    69 Fed. Cl. 639 (Fed. Cl. 2006) .................................................................. 51

*City of Houston v. Dep't of Hous. & Urban Dev.*,
    24 F.3d 1421 (D.C. Cir. 1994) .............................................................. 42, 43

*City of Los Angeles v. Adams,*
    556 F.2d 40 (D.C. Cir. 1977) ...................................................................... 54

*City of Rochester v. Bond,*
603 F.2d 927 (D.C. Cir. 1979) ........................................................................ 23

*Clark v. Library of Congress,*
750 F.2d 89 (D.C. Cir. 1984) .......................................................................... 14

*Clifford v. United States,*
136 F.3d 144 (D.C. Cir. 1998) .................................................................... 56, 57

*Cobell v. Babbit,*
91 F. Supp.2d (D.D.C. 1999) ............................................................ 8, 20, 24, 30

*Cobell v. Babbitt,*
30 F. Supp.2d 24 (D.D.C. 1998) ................................................................. 14, 28

*Cobell v. Kempthorne,*
455 F.3d 301 (D.C. Cir. 2006),
*cert. denied,* 127 S. Ct. 1875 (2007) ............................................................ 4, 31

*Cobell v. Kempthorne,*
532 F. Supp.2d 37 (D.D.C. 2008) ................................................................... 35

*Cobell v. Norton,*
240 F.3d 1081 (D.C. Cir. 2001) ............................................................... passim

*Cobell v. Norton,*
260 F. Supp.2d 98 (D.D.C. 2003) .................................................................. 39

*Cobell v. Norton,*
391 F.3d 251 (D.C. Cir. 2004) ....................................................................... 30

*Cobell v. Norton,*
392 F.3d 461 (D.C. Cir. 2004) .................................................................. 31, 33

*Coit Independence Joint Venture v. Fed. Sav. & Loan Ins. Corp.,*
489 U.S. 561 (1989) ....................................................................................... 58

*Conley v. Gibson,*
355 U.S. 41 (1957) ......................................................................................... 34

*Coosewoon v. Meridian Oil Co.,*
25 F.3d 920 (10th Cir. 1994) ......................................................................... 60

*Crocker v. Piedmont Aviation, Inc.,*
49 F.3d 735 (D.C. Cir. 1995) ......................................................................... 41

*Crowley Caribbean Transp., Inc. v. United States,*
865 F. 2d 1281 (D.C. Cir. 1989) .................................................................... 50

*Davis v. United States,*
199 F. Supp.2d 1164 (W.D. Okla. 2002),
*aff'd* 343 F.3d 1282 (10th Cir. 2003) ............................................................. 61

*Energy Transp. Group, Inc. v. Skinner,*
752 F. Supp. 1 (D. D.C. 1990),
*aff'd on other grounds,* 956 F.2d 1206 (D.C. Cir. 1992) ................................. 50

*Esch v. Yeutter,*
  876 F.2d 976 (D.C. Cir. 1989) ........................................................................ 39

*Fisher v. United States,*
  402 F.3d 1167 (Fed. Cir. 2005) ...................................................................... 21

*Five Flags Pipeline Co. v. Dep't of Transp.,*
  854 F.2d 1438 (D.C. Cir. 1988) ...................................................................... 23

*Flying Food Group, Inc. v. NLRB,*
  471 F.3d 178 (D.C. Cir. 2006) ........................................................................ 35

*Great-West Life & Annuity Ins. Co. v. Knudson,*
  534 U.S. 204 (2002) ......................................................................................... 41

*Greene v. United States,*
  376 U.S. 149 (1964) ......................................................................................... 59

*Griffith v. Fed. Labor Relations Auth.,*
  842 F.2d 487 (D.C. Cir. 1988) ........................................................................ 23

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.,*
  527 U.S. 308 (1999) ......................................................................................... 36

*Harrison v. Emerald Outdoor Adver., LLC (In re Emerald Outdoor Adver., LLC),*
  444 F.3d 1077 (9th Cir. 2006) ........................................................................ 59

*Hecht Co. v. Bowles,*
  321 U.S. 321 (1944) ......................................................................................... 36

*Hill v. Republic of Iraq,*
  No. Civ. 4.1:99CV03346TP, 2003 WL 21057173 (D. D.C. Mar. 11, 2003),
  *rev'd on other grounds,* 328 F.3d 680 (D.C. Cir. 2003) .............................. 50

Hoptowit v. Ray,
  682 F.2d 1237 (9th Cir. 1982) ........................................................................ 10

*Ibrahim v. District of Columbia,*
  539 F. Supp.2d 143 (D.D.C. 2008) ........................................................... 27, 34

*ITT World Commc'ns Inc. v. Fed. Commc'ns Comm'n,*
  725 F.2d 732 (D.C. Cir. 1984) ........................................................................ 50

*Jicarilla Apache Tribe v. Supron Energy Corp.,*
  728 F.2d 1555 (10th Cir. 1984),
  *adopted as majority opinion and modified en banc,* 782 F.2d 855 (10th Cir. 1986)................ 33

*Joint Tribal Council of Passamaquoddy Tribe v. Morton,*
  388 F. Supp. 649 (D.C. Me. 1975),
  *aff'd,* 528 F.2d 370 (1st Cir. 1975) .............................................................. 46

*Jordan v. United Ins. Co. of Am.,*
  289 F.2d 778 (D.C. Cir. 1961) ........................................................................ 24

*Klamath & Modoc Tribes v. United States,* 1
  74 Ct. Cl. 483 (1966) ............................................................................... 20, 37

*Larson v. Domestic & Foreign Commerce Corp.*,
  337 U.S. 682 (1949) ................................................................................ 39

*Leatherman v Tarrant County Narcotics Intelligence & Coordination Unit*,
  507 U.S. 163 (1993) ................................................................................ 27

*Lujan v. National Wildlife Federation*,
  497 U.S. 871 (1990) ................................................................................ 30

*M.K. v. Tenet*,
  99 F. Supp.2d 12 (D.D.C. 2000) ............................................................. 39

*Manchester Band of Pomo Indians, Inc. v. United States*,
  363 F. Supp. 1238 (N.D. Cal. 1973) ....................................................... 15

*Megapulse, Inc. v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982) ........................................................... 46, 47

*Minn. Chippewa Tribe v. United States*,
  11 Cl. Ct. 534 (Cl. Ct. 1987) .................................................................. 54

*Montana v. Blackfeet Tribe of Indians*,
  471 U.S. 759 (1985) ................................................................................ 50

*Murphy Exploration & Prod. Co. v. U.S. Dep't of the Interior*,
  252 F.3d 473 (D.C. Cir. 2001) ................................................................ 54

*Nat'l Ass'n of Postal Supervisors v. United States Postal Serv.*,
  602 F.2d 420 (D.C. Cir. 1979) ................................................................ 23

*Nat'l Labor Relations Bd.  v. Pueblo of San Juan*,
  276 F.3d 1186 (10th Cir. 2002) .............................................................. 51

*Nat'l Labor Relations Bd. v. Amax Coal Co., Div. of Amax, Inc.*,
  453 U.S. 322 (1981) .................................................................................. 7

*Navajo Tribe of Indians v. New Mexico*,
  809 F.2d 1455 (10th Cir. 1987) ......................................................... 49, 54

*Nevada v. United States*,
  463 U.S. 110 (1983) ................................................................................ 19

*NLRB v. Amax Coal Co.*,
  452 U.S. 322 (1981) ................................................................................ 19

*Norton v. Southern Utah Wilderness Alliance*,
  542 U.S. 55 (2004) ............................................................... 25, 29, 30, 32

*Oregon Natural Desert Ass'n v. Taylor*,
  2005 WL 106599  (D. Or. 2005) ............................................................ 35

*Osage Nation v. United States*,
  57 Fed. Cl. 392 (Fed. Cl. 2003) .............................................................. 52

*Presidential Gardens Assocs. v. United States*,
  175 F.3d 132 (2d Cir. 1999) ................................................................... 13

*Rainbolt v. Johnson*,
   669 F.2d 767 (D.C. Cir. 1981) .................................................................. 40

*Randolph-Sheppard Vendors of Am. v. Weinberger*,
   795 F.2d 90 (D.C. Cir. 1986) ............................................................... 59, 61

*Red Lake Band of Chippewa Indians v. Barlow*,
   834 F.2d 1393 (8th Cir. 1987) ................................................................ 18

*Riverkeeper, Inc. v. U.S. Environmental Protection Agency*,
   514 F. Supp.2d 265 (S.D.N.Y. 2007) ....................................................... 34

*Robertson v. Seattle Audubon Soc'y*,
   503 U.S. 429 (1992) ............................................................................... 54

*Rosenak v. Poller*,
   290 F.2d 748 (D.C. Cir. 1961) ................................................................ 37

*San Carlos Irrigation & Drainage Dist. v. United States*,
   No. CV-05-937-PAX-DGC, 2005 WL 3434704 (D. Ariz. Dec. 14, 2005) ............ 46

*Schnapper v. Foley*,
   667 F.2d 102 (D.C. Cir. 1981) ................................................................ 13

*Sea-Land Serv., Inc. v. Alaska R.R.*,
   659 F.2d 243 (D.C. Cir. 1981) ................................................................ 14

*Sea-Land Serv., Inc. v. Dep't of Transp.*,
   137 F.3d 640 (D.C. Cir. 1998) ................................................................ 50

*Seminole Nation v. U.S.*,
   316 U.S. 268 (1942) ............................................................................... 46

*Shoshone Indian Tribe v. United States*,
   364 F.3d 1339 (Fed. Cir. 2004),
   *cert. denied*, 544 U.S. 973 (2005) ..................................................... 51, 52

*Shoshone Indian Tribe v. United States*,
   71 Fed. Cl. 172 (Fed. Cl. 2006) ............................................................. 51

*Sioux Tribe v. United States*,
   500 F.2d 458 (Ct. Cl. 1974) ................................................................... 54

*Smith v. Ill. Bell Tel. Co.*,
   270 U.S. 587 (1926) ............................................................................... 59

*South Carolina v. Catawba Indian Tribe, Inc.*,
   476 U.S. 498 (1986) ............................................................................... 50

*Southern Utah Wilderness Alliance*,
   542 U.S. 55 (2004) ................................................................................. 3

*Sparrow v. United Air Lines, Inc.*,
   216 F.3d 1111 (D.C. Cir. 2000) .............................................................. 27

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*,
   402 U.S. 1 (1971) ................................................................................... 36

*Taylor v. FDIC,*
  132 F.3d 753 (D.C. Cir. 1997) ............................................................. 27

*Te-Moak Bands of W. Shoshone Indians v. United States,*
  948 F.2d 1258 (Fed. Cir. 1991) ........................................................... 54

*Tenn. ex rel Leech v. Dole,*
  749 F.2d 331 (6th Cir. 1984) ............................................................... 45

*Transohio Sav. Bank v. Director, Office of Thrift Supervision,*
  967 F.2d 598 (D.C. Cir. 1992) ................................................... 45, 46, 47

*Trudeau v. Fed. Trade Comm'n,*
  456 F.3d 178 (D.C. Cir. 2006) ............................................................. 14

*U.S. v. Salerno,*
  937 F.2d 797 (2d Cir. 1991),
  rev'd on other grounds, 505 U.S. 317 (1992) ...................................... 10

*U.S. v. Yildiz,*
  355 F.3d 80 (2d Cir. 2004) .................................................................. 10

*United Am., Inc. v. N.B.C.-U.S.A. Hous., Inc. Twenty Seven,*
  400 F. Supp.2d 59 (D.D.C. 2005) ........................................................ 13

*United States v. Mitchell,*
  463 U.S. 206 (1983) .................................................................... passim

*United States v. Reich,*
  74 F.3d 1322 (D.C. Cir. 1996) ............................................................. 23

*United States v. Smith,*
  811 F. Supp. 646 (S.D. Ala. 1992) ...................................................... 49

*United States v. Ward,*
  No. 92-1786, 1992 WL 373557 (E.D. La. Dec. 7, 1992) ....................... 49

*United States v. White Mountain Apache Tribe,*
  537 U.S. 465 (2003) .................................................................... passim

*United States v. Will,*
  449  U.S. 200 (1980) .......................................................................... 54

*Vill. of Brookfield v. Pentis,*
  101 F.2d 516 (7th Cir. 1939) ............................................................... 15

*White Mountain Apache Tribe of Ariz. v. United States,*
  26 Cl. Ct. 446 (1992),
  *aff'd* 5 F.3d 1506 (Fed. Cir. 1993) ....................................................... 32

*Wolfchild v. United States,*
  62 Fed. Cl. 521 (Fed. Cl. 2004) ................................................... 51, 53

**Statutes**

25 U.S.C. § 152 ..................................................................................... 6

25 U.S.C. § 155 ..................................................................................... 6

25 U.S.C. § 155b ................................................................................................. 6

25 U.S.C. § 177 ................................................................................................... 6

25 U.S.C. § 2101, *et seq.* .................................................................................. 6

25 U.S.C. § 311 ................................................................................................... 6

25 U.S.C. § 312 ................................................................................................... 6

25 U.S.C. § 318a ................................................................................................. 6

25 U.S.C. § 319 ................................................................................................... 6

25 U.S.C. § 321 ................................................................................................... 6

25 U.S.C. § 396 ................................................................................................... 6

25 U.S.C. § 397 ................................................................................................... 6

25 U.S.C. § 398, *et seq.* .................................................................................... 6

25 U.S.C. § 399 ................................................................................................... 6

25 U.S.C. § 4011(a) .......................................................................................... 27

25 U.S.C. § 4022 .............................................................................................. 38

25 U.S.C. § 4044 .............................................................................................. 25

25 U.S.C. §§ 323-28 ........................................................................................... 6

25 U.S.C. §§ 396a-396g ...................................................................................... 6

25 U.S.C. §§ 415-416j ........................................................................................ 6

28 U.S.C. § 1331 .......................................................................................... passim

28 U.S.C. § 1331(a) .......................................................................................... 45

28 U.S.C. § 1361 .............................................................................................. 12

28 U.S.C. § 1362 ......................................................................................... 12, 24

28 U.S.C. § 1491 .............................................................................................. 44

28 U.S.C. § 1491(a)(1) ..................................................................................... 45

28 U.S.C. § 1505 .............................................................................................. 44

28 U.S.C. § 2501 .............................................................................................. 49

30 U.S.C. § 1701, *et seq.* .................................................................................. 6

5 U.S.C. § 702 .................................................................................... 13, 21, 24, 38

5 U.S.C. § 706 ............................................................................................. 12, 24

5 U.S.C. § 706(1) ............................................................................................. 34

5 U.S.C. § 706(2) ............................................................................................. 35

**Other Authorities**

76 Am. Jur. 2d, *Trusts* § 506 ........................................................................... 40

76 Am. Jur.2d Trusts § 378 ............................................................................................. 56

*Bogert on Trusts* § 962 (1962) ...................................................................................... 40

Charles A Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 4101 (1988) ............................................................................................................. 47

Fed. R. Evid. 801(d)(2)(1) ............................................................................................. 10

George T. Bogert, *The Law of Trusts & Trustees* § 963 (2d ed. Rev. & 3d ed. 2007) ............... 37

*Restatement (Second) of Trusts* § 173 ........................................................................... 57

*Restatement (Second) of Trusts* § 198 ........................................................................... 20

*Restatement (Second) of Trusts* § 199 ........................................................................... 21

Scott on Trusts § 199 (4th ed. 1988) .......................................................................... 36, 57

Scott on Trusts § 199.1 (4th ed. 1988) ............................................................................. 41

William F. Fratcher, 3 *Scott on Trusts* § 199 (4th ed. 1988) .............................................. 15

**Rules**
Fed. R. Civ. P. 8(d) ...................................................................................................... 35

**Regulations**
25 C.F.R. § 150.1 .................................................................................................... 58, 59

25 C.F.R. § 150.2 ......................................................................................................... 59

25 C.F.R. § 150.8 .......................................................................................... 58, 59, 60, 61

25 C.F.R. § 162.619 ...................................................................................................... 38

25 C.F.R. § 2.6 ............................................................................................................. 60

25 C.F.R. § 2.8 ............................................................................................................. 60

25 C.F.R. pt. 162 ........................................................................................................... 6

25 C.F.R. pt. 166 ........................................................................................................... 6

25 C.F.R. pts. 150-51 ..................................................................................................... 6

## INTRODUCTION

Trustee-Delegates move this Court to dismiss the Complaints of Indian tribes ("Plaintiff-Tribes") seeking to enforce Trustee-Delegates' fiduciary duty to perform a complete historical accounting of Plaintiff-Tribes' trust assets.  Trustee-Delegates bring this motion, notwithstanding the fact that one year ago they confessed that they had not yet provided the accounting – which they admitted was legally required – and expressed a firm commitment to finally doing so.

As this Court is well-aware, in support of their request for a "remand" of Plaintiff-Tribes' actions last year, Trustee-Delegates claimed that they needed a "time out" from the litigation to develop a "first step" plan for accomplishing the accounting and that it was "the government's core position that the Interior department is committed to and *will* complete the accounting required by law." (Defendants' Motion for Remand, p. 22; *Salt River Pima-Maricopa Indian Community v. Kempthorne*, 06-2241, 6/6/07 Hearing Tr. at 39).  Trustee-Delegates' counsel pointed to the *Cobell* decisions, in particular, *Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir. 2001) ("*Cobell VI*"), as requiring that they complete the accounting, stating to this Court that as they "construe[] the *Cobell* decision and particularly [*Cobell VI*], the Interior Department sees the duty and acknowledges that it must commit to completing a final accounting for this tribe." (6/6/07 Hearing Tr. at 11-12).

A full year later, however, Trustee-Delegates have not created any such accounting or plan.  Trustee-Delegates instead prepared a 63-page brief in support of their Motion to Dismiss challenging Plaintiff-Tribes' rights to have initiated the lawsuits.  In an abrupt about-face, Trustee-Delegates now take the position that they already have produced the legally required accounting and make the absurd contention that *Cobell VI* is "no longer valid."  (Def. Mem. at 29).

These are but examples of the extraordinary lengths Trustee-Delegates will go to further their strategy of unrelenting delay. Plaintiff-Tribes filed these actions beginning five years ago and are no closer to obtaining the long overdue accounting than they were last year when Trustee-Delegates sought "remand" to complete the accounting plan. When denying the Remand Motion, the Court noted with optimism that "nothing is stopping the agency from considering those matters now [] or from moving forward with the development and implementation of an accounting plan." *Assiniboine Sioux Tribes et. al v. Norton*, 527 F. Supp.2d 130, 135 (D.D.C. 2007). Yet, Plaintiff-Tribes still have not received an accounting plan, let alone the actual accounting. And, as this Court recently observed, for most of these cases, "not a single thing has happened." (*Nez Perce Tribe v. Kempthorne*, No. 06-2239, 05/06/08, Hearing Tr. 1).

There is no legitimate reason that these actions should be delayed any further. As the examination below forcefully reveals, Trustee-Delegates' arguments that Plaintiff-Tribes' actions should be dismissed are utterly without merit. The Court should deny the motion and these trust actions should go forward.

## SUMMARY OF ARGUMENT

In their Motion to Dismiss, Trustee-Delegates present a myriad of attacks on this Court's jurisdiction. In complete disregard of extensive contrary authority, they argue that Plaintiff-Tribes cannot state a non-APA cause of action for an accounting of trust assets. In addition, contrary to their own prior claim that they need additional time to prepare an accounting plan, they argue that Plaintiff-Tribes do not have a claim under the APA because the government has complied with all of its fiduciary obligations. Trustee-Delegates further argue that the Indian Claims Commission Act prevents Plaintiff-Tribes from receiving an accounting for any trust

management activity prior to 1946. Finally, they argue that Plaintiff-Tribes are not entitled to an accounting for any of their extensive non-monetary trust assets. Each of these arguments is without merit.

First, Plaintiff-Tribes have stated a valid, non-APA claim for an accounting. In this case, subject matter jurisdiction comes from the general federal question statute, 28 U.S.C. § 1331, the waiver of sovereign immunity comes from § 702 of the APA, and the cause of action in equity for judicial enforcement of the government's fiduciary obligations "naturally follows" from the body of statutes and regulations giving rise to the trust relationship. This is neither a common law claim nor an APA claim, but a statutory-based claim to enforce long-established fiduciary obligations. In light of the existing trust relationship, Plaintiff-Tribes here no more need a statute that expressly specifies a right of action than the Indian beneficiaries bringing suit in *Mitchell II* did.

Second, Plaintiff-Tribes also state valid claims under the APA. It is well-settled that Trustee-Delegates have a duty to provide Plaintiff-Tribes with a full accounting of all funds and other assets held in trust and that this duty preexisted the American Indian Trust Fund Management Reform Act of 1994 (the "1994 Act"). Trustee-Delegates have not satisfied their longstanding fiduciary obligations; in fact, they have not even complied with the more limited, non-exhaustive list of duties delineated in the 1994 Act. They conceded as much in their previous motion for stay and remand as they have in open Court. It is also well-established that this Court has the authority and jurisdiction to enforce Trustee-Delegates' fiduciary duty to account. Trustee-Delegates' argument that *Cobell VI* has been overruled *sub silentio* by the Supreme Court's decision in *Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004) ("SUWA") is patently absurd. *SUWA* has been repeatedly considered in detail by this Court and on five

3

separate occasions by the D.C. Circuit.  In not one instance, did any Court so much as hint that *Cobell VI* was, as Trustee-Delegates put it, "no longer valid."  Indeed, the Court of Appeals has repeatedly confirmed the vitality of *Cobell VI*.  Furthermore, in *Cobell v. Kempthorne*, 455 F.3d 301, 304, 307 (D.C. Cir. 2006) *("Cobell XVIII")*, *cert. denied*, 127 S. Ct. 1875 (2007), the vast majority of the decision was an attempt by the Court of Appeals to demonstrate how *Cobell* decisions after *Cobell VI* (and post-*SUWA* for that matter) were consistent with *Cobell VI*.

Third, Plaintiff-Tribes' claims are not barred, even in part, by the Indian Claims Commission Act ("ICCA").  Plaintiff-Tribes seek declaratory and equitable relief regarding their tribal trust assets, and Congress, through the passage of a series of trust accrual statutes, has provided that such claims do not accrue including pre-1946 claims, until such time as Trustee-Delegates provide the required accountings.  Because Trustee-Delegates have yet to provide the accountings, Plaintiff-Tribes' claims have yet to accrue and are not barred by the ICCA.

Finally, Plaintiff-Tribes are entitled to an accounting of non-monetary trust assets as well as trust funds.  It is axiomatic that a trustee's fiduciary obligation to provide an accounting applies to every part of the trust *corpus*, including non-monetary assets.  Any accounting excluding non-monetary assets would be wholly inadequate, as it would not provide Plaintiff-Tribes with sufficient information to evaluate the government's performance of its fiduciary obligations.  Trustee-Delegates' contention that an accounting of non-monetary assets is unwarranted due to Plaintiff-Tribes' purported failure to exhaust administrative remedies is also wholly without merit.

## STATEMENT OF FACTS

I.   **THE TRUST OBLIGATIONS OF THE UNITED STATES AND TRUSTEE-DELEGATES.**

A.   **Trustee-Delegates Hold Assets in Trust for Plaintiff-Tribes.**

The United States has long held substantial assets, including funds and non-monetary assets, in trust for American Indian tribes. In 1820, the federal government adopted the policy of holding tribal funds in trust.[1] The trust funds are comprised principally of the proceeds from the sale and leasing of trust lands and other assets, as well as judgment funds. Judgment funds are derived from settlements and judgments entered by federal courts on various claims against the United States. (*See, e.g.*, Complaint ("Salt River Complaint"), *Salt River Pima-Maricopa Indian Cmty. v. Kempthorne*, No. 06-2241 [Dkt. 1] at ¶ 14.) Trust funds, which are proceeds from the leasing and sale of trust lands and resources on such lands, receive their trust character as proceeds of trust property (and not because they are placed in a trust account). (*Id.* ¶ 2.) The funds involved are substantial. By the government's own – almost assuredly undervalued – estimates, as provided by government contractor Arthur Andersen LLP, the United States handled substantially more than $100 billion in transactions for Indian tribes between fiscal years 1973 and 1992.[2] As trustee, the United States has undertaken to manage, invest, and distribute these funds for the benefit of Plaintiff-Tribes. (*Id.* ¶ 14.)

Trust assets are not limited to tribal trust funds; tribal lands and associated resources are also a key component of the tribal assets held in trust. Title to the land constituting Plaintiff-

---

[1] Letter to Treaty Commission, October 18, 1820, reprinted in "American State Papers, Indian Affairs," vol. 2 at 233, cited in Committee on Government Operations, "Misplaced Trust: The Bureau of Indian Affairs' Mismanagement of the Indian Trust Fund" at 6 (April 22, 1992) (hereinafter "Misplaced Trust") (Attached as Exhibit 1 to Plaintiffs' Joint Memorandum in Opposition to Defendants' Motion for Remand and Stay of Litigation ("Opposition to Remand"), *Salt River Pima-Maricopa Indian Cmty. v. Kempthorne*, No. 06-2241 [Dkt. 20]).

[2] *See* 1996 U.S. General Accounting Office, *Report to the Committee on Indian Affairs*, U.S. Senate "Financial Management: BIA's Tribal Trust Fund Account Reconciliation Results," GAO/AIMD 96-93 (May 1996) (Attached as Exhibit 16 to Opposition to Remand).

Tribes' reservations is held by the United States in trust for the tribes' benefit.  (*Id.* ¶ 13.)

Through numerous statutes and regulations, the United States maintains comprehensive control

over these trust lands and resources.[3]  Over the years, substantial portions of these lands have

been leased to third parties and to the government for rights-of-way, business uses, farming,

grazing, housing, and other purposes.  Other natural resources are also held in trust for Plaintiff-

Tribes and are managed for the tribes' benefit, including, among other resources, oil, natural gas,

timber, coal, and various minerals.

> **B.    Trustee-Delegates Owe Plaintiff-Tribes Fiduciary Duties, Including the Duty to Provide a Complete, Accurate, and Adequate Accounting.**

Because the United States holds Plaintiff-Tribes' tribal lands and other assets in trust, it

has assumed the fiduciary obligations of a trustee with respect to the management and

administration of those assets.  *See United States v. White Mountain Apache Tribe*, 537 U.S. 465,

475-76 (2003); *United States v. Mitchell*, 463 U.S. 206, 225 (1983) ("*Mitchell II*").  The

longstanding trust relationship between the United States and Plaintiff-Tribes, and the United

States' resulting fiduciary duties, are rooted in and derived from numerous statutes, treaties,

regulations, and executive orders.  *See*, *e.g.*, Salt River Complaint ¶ 9; *see also White Mountain

Apache*, 537 U.S. at 474; *Mitchell II*, 463 U.S. at 224-26; *Cobell VI*, 240 F.3d at 1098-99.  The

laws giving rise to the United States' fiduciary duties provide the "general contours" of those

duties, but the specific details are filled in through reference to general trust law and defined in

"traditional equitable terms."  *Cobell VI*, 240 F.3d at 1099.  Thus, the failure of statutes to

specify the precise nature of the fiduciary obligation or to enumerate the trustee's duties does not

---

[3] *See, e.g.*, Indian Nonintercourse Act, 25 U.S.C. § 177; Indian Long-Term Leasing Act, 25 U.S.C. § 396; Indian Mineral Leasing Act of 1938, 25 U.S.C. §§ 396a-396g; Federal Oil & Gas Royalty Management Act, 30 U.S.C. §§ 1701, *et seq.*; Indian Mineral Development Act of 1982, 25 U.S.C. §§ 2101, *et seq.*; 25 U.S.C. § 152; 25 U.S.C. §§ 155, 155b; 25 U.S.C. §§ 311, 312, 318a, 319, 321, 323-28; 25 U.S.C. § 397; 25 U.S.C. §§ 398, *et seq.*; 25 U.S.C. § 399; 25 U.S.C. §§ 415-416j; 25 C.F.R. pts. 150-51; 25 C.F.R. pt. 162; 25 C.F.R. pt. 166.

absolve the government of its responsibilities. *Id.* Rather, courts "must infer that Congress intended to impose on trustees traditional fiduciary duties unless Congress has unequivocally expressed an intent to the contrary." *Nat'l Labor Relations Bd. v. Amax Coal Co., Div. of Amax, Inc.,* 453 U.S. 322, 330 (1981) (*quoted in Cobell VI*, 240 F.3d at 1099 (adopting this generally applicable rule into the Indian trust context)).[4]

The government's fiduciary duties include, among many others, the duty to perform a complete, accurate, and adequate historical accounting of all trust property (including funds and non-monetary assets). Such an accounting must provide sufficient information to enable Plaintiff-Tribes "readily to ascertain whether the trust has been faithfully carried out." *Cobell VI*, 240 F.3d at 1103 (internal quotation omitted). Despite their longstanding fiduciary responsibilities, Trustee-Delegates have failed, from the inception of these trusts until the present, to provide Plaintiff-Tribes with the type of accounting to which they are entitled – a complete, accurate, and adequate accounting of all their trust assets.

## C.    Trustee-Delegates' History of Trust Mismanagement, Delay and Failure to Account

Few of the trust mismanagement problems that plague Trustee-Delegates to this day are new. Indeed in 1828 – just four years after BIA's creation – H.R. Schoolcraft described the Bureau's financial management as follows: "The derangements in the fiscal affairs of the Indian department are in the extreme. One would think that appropriations had been handled with a pitchfork …. There is a screw loose in the public machinery somewhere."[5] In 1915, in a commissioned study on the state of Indian trust fund management, Congress described the

---

[4] Defendants Dirk Kempthorne, the Secretary of the Interior, Ross O. Swimmer, the Special Trustee, Office of the Special Trustee for American Indians, and Henry Paulson, the Secretary of Treasury, are "the designated trustee-delegates" for tribal assets. Thus, "[e]ach Secretary, or his designates, has specific fiduciary responsibilities that must be fulfilled lest the United States breach its fiduciary obligations." *Cobell VI*, 240 F.3d at 1088.

[5] H.R. Schoolcraft, *Personal Memoirs*, quoted in Misplaced Trust at 9.

Bureau as fraught with "fraud, corruption, and institutional incompetence almost beyond the possibility of comprehension."[6]  In 1992, a three-year congressional investigation of BIA's trust fund mismanagement arrived at the same conclusion as Schoolcraft had reached 164 years earlier:

> Schoolcraft's assessment of the BIA's financial management still rings true. BIA's administration of the Indian trust fund continues to make the accounts look as though they had been handled with a pitchfork.  Undoubtedly, there is a screw loose in the public machinery at the Bureau.  *Indeed, while mismanagement of the Indian trust fund has been reported for more than a century, there is no evidence that either the Bureau or the Department of Interior has undertaken any sustained or comprehensive effort to resolve glaring deficiencies.*

Misplaced Trust at 9 (emphasis added).

Sixteen years later, very little has changed – despite countless promises of improvement, numerous plans for reform, and a congressionally imposed deadline for producing a partial accounting of tribal trust assets that Trustee-Delegates failed to meet more than twelve years ago. Indeed, as their remand motion of eleven months ago made all too clear, Trustee-Delegates have not even begun the process of developing a plan to accomplish what they were supposed to have completed by May 31, 1996 per congressional mandate.  Nor have they put in place plans for retaining vital trust records necessary for the accounting or for obtaining such missing records from third parties – obligations that Congress reaffirmed in 1994.[7]

Indeed, Trustee-Delegates have taken *no* meaningful steps to rectify the continuing breach of this most fundamental trust duty.  Even as to "known errors" described in the Arthur

---

[6] "Report to the Joint Commission of the Congress of the United States, 63rd Congress, Third Session to Investigate Indian Affairs Relative to Business and Accounting Methods Employed in the Administration of the Office of Indian Affairs" (1915) at 2 (Attached as Exhibit 2 to Opposition to Remand) (hereinafter "1915 Report").

[7] The statutorily imposed requirements for such plans are addressed in detail in the Court's opinion in *Cobell v. Babbit*, 91 F. Supp.2d (D.D.C. 1999) ("*Cobell V*").  *See* 91 F. Supp.2d at 5 *et seq.* ("The Secretary of the Interior's Duty to Establish Written Plans for Gathering of Missing Information; Document Retention; Business and Computer Systems Architecture; and Staffing of Trust Management Functions").

Anderson Report issued in January 1996, tribes have not yet been reimbursed – notwithstanding assurances given eleven years ago that the government was prepared to "credit Tribes' accounts in the amount of those known errors due to Tribes on a net basis … whether or not a Tribe accept[ed] the government's settlement offer for any other claims … ." *See* U.S. Dep't of the Interior, Office of the Assistant Secretary – Indian Affairs, News Release, *Fact Sheet on Indian Tribal Trust Funds*, at 3 (Nov. 18, 1997) (Attached as Exhibit 24 to Opposition to Remand). Nor have Trustee-Delegates committed to making the substantial adjustment of tribal balances clearly warranted in light of the $2.4 billion in unreconciled transactions which they readily concede – not to mention the literally tens of billions of dollars worth of other transactions with woefully insufficient documentation to verify them.

Rather, as their conduct to date in this litigation only serves to confirm, Trustee-Delegates' evident strategy appears to be – once again – to do or say whatever it takes to avoid accountability for their almost two centuries of mismanagement of Plaintiff-Tribes' trust funds and other assets.

## II.    PLAINTIFF-TRIBES' CLAIMS.

Despite its longstanding and well-established duty to do so, the government has never provided Plaintiff-Tribes with a full and complete accounting of their tribal assets.[8] As a result, beginning in 2003, Plaintiff-Tribes filed the instant actions against Trustee-Delegates. These are actions by trust beneficiaries against their trustee. Therefore, Plaintiff-Tribes have invoked the equitable jurisdiction of this Court to request a complete, accurate, and adequate accounting of *all* property held in trust by Trustee-Delegates for Plaintiff-Tribes' benefit, as well as to require

---

[8] A detailed history of the government's malfeasance and delay in this regard appears in Plaintiff-Tribes' Opposition to Remand. (Opposition to Remand pp. 7-35.)

compliance with Trustee-Delegates' other fiduciary duties as trustee of tribal funds, lands, and other assets. (*See*, *e.g.*, Salt River Complaint ¶ 1.)

At this stage of the litigation, Plaintiff-Tribes primarily seek (1) a declaration that Trustee-Delegates possess – and have breached – a fiduciary duty to provide a complete, accurate, and adequate accounting of all trust funds and assets and (2) injunctive relief directing Trustee-Delegates to provide the required accounting and to comply with their other fiduciary obligations as determined by the Court. (*See*, *e.g.*, *id.* ¶¶ 33-44 & Prayer for Relief ¶¶ 1-5.) In the event that the accounting indicates that Trustee-Delegates have not complied with their fiduciary obligations, other equitable relief may be appropriate and necessary to compel Trustee-Delegates to comply with their trust obligations in the present or in the future. (*See*, *e.g.*, *id.* at ¶¶ 43-44 & Prayer for Relief ¶¶ 5-6.)

## III.    TRUSTEE-DELEGATES' CONTINUED DELAY AND INTRANSIGENCE.

After Plaintiff-Tribes filed the instant actions, Trustee-Delegates confessed that they had not performed the accountings required by law and asked the Court to stay the litigation so that they could develop a plan for doing so. (*See* Motion for Remand), *Salt River*, No. 06-2241 [Dkt. 17] at 1.) They assured the Court of "the government's core position that the Interior Department is committed to and will complete the accounting required by law." (*See Salt River* 6/6/07 Hearing Tr. at 39.) [9]    As the Court noted, Trustee-Delegates' position was that, if their

---

[9] The representations made by Defendants' counsel to this Court are binding admissions as to Trustee-Delegates. They clearly constitute statements made by the party's "agent" concerning matters "within the scope of the agency or employment [and] made during the existence of the relationship." *See* Fed. R. Evid. 801(d)(2)(1) (admissions by a party opponent). Courts repeatedly have found such statements made by counsel to be party admissions, including in instances where a government attorney has spoken on behalf of a government agency. *See*, *e.g.*, *Hoptowit v. Ray*, 682 F.2d 1237, 1262 (9th Cir. 1982) (investigative report prepared by Attorney General's office for defendant government official was within scope of declarant's agency). The same rule also applies to in-court statements made by government counsel. *See*, *e.g.*, *U.S. v. Yildiz*, 355 F.3d 80, 81-82 (2d Cir. 2004) (citing *U.S. v. Salerno*, 937 F.2d 797, 810-12 (2d Cir. 1991), *rev'd on other grounds*, 505 U.S. 317 (1992)).

remand motion was granted, they would "define and complete the accounting[s] … [then] present the accountings, along with the supporting administrative records, to Plaintiffs for their review." *See Assiniboine Sioux*, 527 F. Supp.2d at 134 (internal quotation & citation omitted)). While the Court denied Trustee-Delegates' remand motion, it noted that the ongoing litigation and negotiation should not prevent Trustee-Delegates from developing an accounting plan "in accordance with statutory mandates." *Id.* at 136.

More than a year after their pledge to produce an historical accounting plan – and some seven months after this Court's December 19 Order – there is still no evidence that Trustee-Delegates have taken steps to rectify their long-standing failure to account for the funds and other assets that the government holds in trust for Plaintiff-Tribes. On the contrary, Trustee-Delegates have now filed a motion challenging Plaintiff-Tribes' right to initiate these equitable accounting actions.[10]

Where one year ago Trustee-Delegates confessed that they had not even prepared an accounting plan and needed at least six months to do so, today they contend that they completely satisfied their duty to account in 1996 by providing Plaintiff-Tribes with reports generated by the widely discredited Arthur Andersen Reconciliation Project. Even more remarkably, they now advance the argument that *Cobell VI* – the same D.C. Circuit decision which Trustee-Delegates represented to this Court a year ago that they had "construed" and understood as *requiring* that they "commit to completing a final accounting"[11] – is "no longer valid" and has not been so since *SUWA* was decided four years ago. Having failed in their efforts to have this Court

---

[10] Trustee-Delegates have selectively filed motions to dismiss *only* in those "cases in which the Plaintiff-Tribes have elected or announced that they intend to pursue active litigation." *See* Defs.' Motion for Two Week Enlargement of Time Within Which to File a Motion to Dismiss on Jurisdictional Issues, and Motion for Leave to Exceed Page Limitation for Memorandum of Points and Authorities for Motion to Dismiss, and [Proposed] Order, para. 2 [Dkt. # 40]. At least for the time being, those tribal plaintiffs willing to stay their actions have been "spared" from having to respond to such a motion.

[11] 6/6/07 Hearing Tr. at 11-12.

sanction their continued delay, Trustee-Delegates now seek to remove this Court from the picture entirely. As has long been the case, Trustee-Delegates' chief concern is indefinite delay of their statutory obligations, and this Court's proper exercise of its jurisdiction is the only hope for Plaintiff-Tribes to vindicate their rights.

## ARGUMENT

I.    **PLAINTIFF-TRIBES HAVE STATED JURISDICTIONALLY VALID CLAIMS.**

A.    **Plaintiff-Tribes Have Stated Jurisdictionally Valid Non-APA Claims for Enforcement of Trustee-Delegates' Statutory Trust Responsibilities.**

As Trustee-Delegates scarcely acknowledge in their Motion to Dismiss, the claim set forth by Plaintiff-Tribes does not principally rely on the APA for its cause of action, but rather states an independent, equitable cause of action by a trust beneficiary to enforce express and implied federal statutory trust responsibilities. As set forth in Plaintiff-Tribes' Complaints, this cause of action is rooted in the various statutes and treaties giving rise to a trust relationship between the United States and Plaintiff-Tribes and invokes this Court's inherent equitable authority to enforce the terms of that statutorily-created trust. (*See*, *e.g.*, Salt River Complaint ¶¶ 9, 16.)[12] This claim is not, nor does it need to be, in any way grounded in the APA.[13]

---

[12] Salt River Complaint ¶ 9 ("This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1362, as the Community is a federally recognized Indian tribe and its claims arise under the Constitution and laws of the United States, including, but not limited to, the numerous statutes and regulations giving rise to the trust relationship between the United States and the Community. This Court also has jurisdiction over this action under 28 U.S.C. § 1361 and 5 U.S.C. § 706, as this is an action to compel federal officials to perform a duty owed to the Community."); Salt River Complaint ¶ 16 ("The longstanding trust relationship between the United States and the Community and the United States' resulting fiduciary duties are rooted in and derived from numerous statutes and regulations." (citations omitted)).

[13] As explained in detail below, Plaintiff-Tribes do allege claims under § 706 of the APA as alternative causes of action. Plaintiff-Tribes' cause of action to enforce statutory trust terms and duties against a trustee relies upon the APA only for the requisite waiver of sovereign immunity provided by § 702.

### 1. Plaintiff-Tribes Have Stated a Valid Statutory Claim for Equitable Judicial Enforcement of Trustee-Delegates' Statutory Trust Duties.

It is well-established that when bringing an action against the United States or its officials, a plaintiff must satisfy only three requirements: there must be (1) subject matter jurisdiction; (2) a waiver of sovereign immunity; and (3) a cause of action. *See United Am., Inc. v. N.B.C.-U.S.A. Hous., Inc. Twenty Seven*, 400 F. Supp.2d 59, 61 (D.D.C. 2005) (citing *Presidential Gardens Assocs. v. United States*, 175 F.3d 132, 139 (2d Cir. 1999)). As set forth in detail below, Trustee-Delegates' contention that different criteria apply to this case is unavailing. These are the only requirements for maintaining a suit against the United States or its officials, and all are satisfied in the instant case.

First, this Court has subject matter jurisdiction over Plaintiff-Tribes' trust claim pursuant to the general federal question statute, 28 U.S.C. § 1331. This jurisdiction exists because Plaintiff-Tribes' claims – which are rooted in the numerous treaties, statutes, and regulations establishing the trust relationship between the United States and Plaintiff-Tribes – arise under the laws of the United States. (*See*, *e.g.*, Salt River Complaint ¶¶ 9, 16.) Trustee-Delegates do not dispute the existence of federal question jurisdiction.

Second, § 702 of the APA, 5 U.S.C. § 702, provides the requisite waiver of sovereign immunity. (*See*, *e.g.*, Salt River Complaint at ¶ 10.) Section 702 waives sovereign immunity for actions (such as this one) against a federal official seeking relief "other than money damages." *See* 5 U.S.C. § 702. Critically, although the waiver of immunity is housed in the APA, it is well-settled that that the waiver is ***not*** limited to APA claims. As the D.C. Circuit has made clear, the "APA's waiver of sovereign immunity ***applies to any suit whether under the APA or not***." *Chamber of Commerce of the U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (emphasis added); *see also Schnapper v. Foley*, 667 F.2d 102, 107 (D.C. Cir. 1981) ("The legislative

history of this provision could not be more lucid.  It states that this language was intended 'to eliminate the defense of sovereign immunity with respect to any action in a court of the United States seeking relief other than money damages and based on the assertion of unlawful official action by a Federal officer ....'" (citation and quotation marks omitted)); *Cobell VI*, 240 F.3d at 1094-95; *Clark v. Library of Congress*, 750 F.2d 89, 102 (D.C. Cir. 1984); *Sea-Land Serv., Inc. v. Alaska R.R.*, 659 F.2d 243, 244 (D.C. Cir. 1981); *Assiniboine & Sioux Tribes of Fort Peck Indian Reservation v. Bd. of Oil & Gas Conservation*, 792 F.2d 782, 793 (9th Cir. 1986); *Cobell v. Babbitt*, 30 F. Supp.2d 24, 31 (D.D.C. 1998) ("*Cobell I*").

The D.C. Circuit reaffirmed this principle without qualification as recently as 2006, noting that it had "previously, and repeatedly, rejected" the argument that § 702's waiver is restricted to actions arising under the APA.  *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 186 (D.C. Cir. 2006) (holding that § 702 waived sovereign immunity for the plaintiff's First Amendment claim against the Federal Trade Commission).  The *Trudeau* Court summarized at length the legislative history confirming its reading of § 702, explaining that "[t]he Judiciary Committees of both Houses, in their reports on the 1976 amendment, identified as the measure's clear purpose 'elimina(tion of) the sovereign immunity' defense in *all* equitable actions for specific relief against a Federal agency or officer acting in an official capacity."  *Id.* (citation omitted) (emphasis and alterations in the original).

Indeed, the government recently has conceded this point in the related *Cobell* litigation, which is also pending before this Court, by "acknowledg[ing] that the law in this Circuit is that the APA's waiver of sovereign immunity applies to any suit whether under the APA or not." (*See* Defendants' Response to Plaintiffs' Memorandum in Support of Equitable Restitution and

Disgorgement at p. 5 n.2 (Case No. 1:96CV01285, Dkt. # 3519) (quotation and citation omitted)).

Therefore, the fact that Plaintiff-Tribes invoke § 702's *waiver of sovereign immunity* for equitable claims against the Defendant federal officials in no way means that Plaintiff-Tribes' *cause of action* is provided by the APA or that Plaintiff-Tribes seek review of an agency action under the APA.  Rather, § 702 simply provides the requisite waiver of sovereign immunity.

Third, Plaintiff-Tribes have a cause of action in equity for judicial enforcement of fiduciary duties that arise from the statutorily created trust relationship between Plaintiff-Tribes and Trustee-Delegates.  (*See*, *e.g.*, Salt River Complaint at ¶¶ 9, 16.)  Contrary to Trustee-Delegates' argument in their Motion to Dismiss, the statutes and regulations giving rise to the trust relationship between Plaintiff-Tribes and Trustee-Delegates unquestionably give rise to trust duties that can be enforced outside of the APA.  It is axiomatic that a "court of equity, having jurisdiction over the administration of trusts, will give to the beneficiaries of a trust such remedies as are necessary for the protection of their interests …."  William F. Fratcher, 3 *Scott on Trusts* § 199, at 203-04 (4th ed. 1988).  Accordingly, this Court has the authority and responsibility to enforce trust duties using its inherent equitable power to ensure protection of the beneficiary.  *See*, *e.g.*, *Vill. of Brookfield v. Pentis*, 101 F.2d 516, 520-21 (7th Cir. 1939) ("Courts of equity have original inherent jurisdiction to decree and enforce trusts and to do whatever is necessary to preserve them from destruction."); *Manchester Band of Pomo Indians, Inc. v. United States*, 363 F. Supp. 1238, 1242 (N.D. Cal. 1973) (finding that district courts have "jurisdiction over actions to compel the responsible officers of the United States to perform [their trust] duties in the event [that] they have not done so.").

15

Plaintiff-Tribes' cause of action is derived from various statutes and regulations that establish the trust relationship between the United States and Plaintiff-Tribes.  In the seminal case of *Mitchell II*, the Supreme Court recognized a substantive right to enforce trust duties when federal statutes and regulations establish a trust relationship between the government and Indian trust beneficiaries.  463 U.S. 206.  The *Mitchell II* plaintiffs sought money damages for mismanagement of timber lands held in trust.  In determining whether the federal government could be liable, the *Mitchell II* Court held that certain statutes and regulations gave the federal government "full responsibility to manage Indian resources and land for the benefit of the Indians."  *Id.* at 224.  The Court concluded that a

> fiduciary relationship necessarily arises when the Government assumes such elaborate control over … property belonging to Indians.  All of the necessary elements of a common law trust are present: a trustee (the United States), a beneficiary (the [tribe or] Indian allottees), and a trust corpus (Indian timber, lands, and funds).

*Id.* at 225.  The Court further held that a cause of action to obtain traditionally available remedies for the violation of the rights of the beneficiaries – in that case, money damages – is inherent in and "naturally follows" from the creation of the trust.  *Id.* at 226.

The Supreme Court reaffirmed the result of *Mitchell II* in *United States v. White Mountain Apache Tribe*, 537 U.S. 465 (2003).  There, the plaintiff tribe sought to recover for the government's failure to maintain a number of reservation buildings that had fallen into disrepair while occupied by the government.  The government moved to dismiss, arguing that the relevant statute (the "1960 Act"), which placed the tribe's reservation land in trust and permitted the government to use the land and its improvements for certain purposes, did not impose upon the government a legal obligation to maintain or restore the property.  *White Mountain Apache*, 537 U.S. at 469-70.  To be sure, the government was quite correct that the 1960 Act was completely

silent as to the imposition of an *express* duty to preserve trust assets. Nonetheless, the Court flatly rejected the government's argument, finding the 1960 Act's failure to "expressly subject the Government to duties of management and conservation" to be immaterial. *Id.* at 475. Instead, the Court relied on *Mitchell II* in holding that where a statute gave rise to a trust relationship and the government exercised control over the trust property, it "naturally follow[ed]" that the government had a judicially enforceable fiduciary obligation to preserve the trust property. *Id.* at 475-76 (citing *Mitchell II*, 463 U.S. at 226). The Court explained that "[t]his is so because elementary trust law, after all, confirms the commonsense assumption that a fiduciary actually administering trust property may not allow it to fall into ruin …. One of the fundamental common-law trust duties … is to preserve and maintain trust assets." *White Mountain Apache*, 537 U.S. at 475 (internal citation and quotation omitted)).

Here, as in *Mitchell II* and *White Mountain Apache*, the United States holds in trust the tribal lands, funds, and other trust assets of Plaintiff-Tribes and has assumed the fiduciary obligations of a trustee. (*See*, *e.g.*, Salt River Complaint ¶ 15.) As set forth in the Complaints, the longstanding trust relationship between Plaintiff-Tribes and Trustee-Delegates is rooted in and derived from numerous treaties, statutes, and regulations. (*See*, *e.g.*, *id.* ¶ 16 (citing a long list of examples)). These treaties, statutes, and regulations give the United States control over and responsibility for tribal assets and resources, and therefore obligate the United States to the full range of fiduciary obligations. It "naturally follows" from the establishment of this trust relationship that an ordinary right of action seeking an accounting and other equitable relief is available to Plaintiff-Tribes. *See Cobell VI*, 240 F.3d at 1101 ("While *Mitchell II* involved a claim for damages, nothing in that decision or other Indian cases would imply that appellants are not entitled to declaratory or injunctive relief. Such remedies are the traditional ones for

violations of trust duties." (emphasis added)); *Beckett v. Air Line Pilots Ass'n*, 995 F.2d 280, 286 (D.C. Cir. 1993) ("Just as an intended third party beneficiary may sue to enforce a contract, it is equally fundamental that the beneficiary of a trust may maintain a suit to compel the trustee to perform his duties as trustee or to redress a breach of trust." (citing Restatement (Second) of Trusts § 199) (1959)).

Other courts are in accord.  In *Red Lake Band of Chippewa Indians v. Barlow*, 834 F.2d 1393 (8th Cir. 1987) ("*Red Lake Band I*"), for example, the Eighth Circuit approved a trust claim against a federal official based upon exactly the same right of action identified by Plaintiff-Tribes in this case.  There, in reliance upon *Mitchell II*, the Court "d[id] not hesitate in finding that a trust relationship exist[ed] between the federal government and the [Red Lake] Band" and held that the district court had equitable authority to order funds transferred from one account to another if necessary to comply with the federal government's trust obligations.  *Id.* at 1398-1400.  That the Red Lake Band was neither seeking monetary damages under the Tucker Act nor proceeding under the APA gave the Eighth Circuit no pause.  *See also Cobell VI*, 240 F.3d at 1101 (allowing plaintiffs to proceed with claims for declaratory and injunctive relief because "[s]uch remedies are the traditional ones for violations of trust duties").

Once a fiduciary relationship is established by statute, the government's fiduciary duties – and the beneficiary's right to enforce them – follow as a matter of law.  While rooted in and derived from various statutes, treaties, and regulations, these duties "are largely defined in traditional equitable terms" and may be filled in by reference to trust law.  *Cobell VI*, 240 F.3d at 1099.  Since the trust relationship is established by statute, courts "'must infer that Congress intended to impose on [the] trustees traditional fiduciary duties unless Congress has unequivocally expressed an intent to the contrary.'"  *Id.* at 1100 (quoting *Amax Coal Co.*, 452

18

U.S. at 330); *see also Nevada v. United States*, 463 U.S. 110, 142 (1983) ("[W]here only a relationship between the Government and the tribe is involved, the law respecting obligations between a trustee and a beneficiary in private litigation will in many, if not all, respects adequately describe the duty of the United States."); *White Mountain Apache*, 537 U.S. at 475; *Cobell VI*, 240 F.3d at 1098-99 ("It is no doubt true that the government's fiduciary responsibilities necessarily depend on the substantive laws creating those obligations. … This does not mean that the failure to specify the precise nature of the fiduciary obligation or to enumerate the trustee's duties absolves the government of its responsibilities." (internal quotation and citations omitted)).

In sum, Plaintiff-Tribes' cause of action is a trust claim – the cause of action arising "naturally" as in *Mitchell II* from the statutes that established the trust – expressly pleaded under 28 U.S.C. § 1331 and grounded in the Court's authority in equity to enforce Trustee-Delegates' statutory trust responsibilities. The APA provides the necessary waiver of sovereign immunity, but the Plaintiff-Tribes' cause of action is distinct from and in no way dependent upon the APA.

### 2. Trustee-Delegates' Arguments Misconstrue Both the Nature of Plaintiff-Tribes' Claims and the State of the Law.

Trustee-Delegates argue that Plaintiff-Tribes cannot assert a non-APA claim because (1) they cannot identify "any positive federal law that expressly or impliedly creates a private right or cause of action for judicial review of Defendants' conduct" and (2) courts do not recognize a common law breach of trust claim against the United States. (Def. Mem. at 16-17.) The first argument misconstrues the relevant law; the second misconstrues the nature of Plaintiff-Tribes' cause of action.

Trustee-Delegates' argument that this Court lacks jurisdiction because Plaintiff-Tribes have failed to identify a federal law creating a "private right or cause of action" cannot withstand

19

scrutiny in light of *Mitchell II* and its progeny.  As the Supreme Court has repeatedly stated, given the existence of a trust relationship between the government and an Indian tribe, it "naturally follows" that the tribe has the right to sue the government for breaching its trust duties.  *See*, *e.g.*, *Mitchell II*, 463 U.S. at 226; *see also White Mountain Apache*, 537 U.S. at 475-76.  Indeed, the D.C. Circuit echoed this well-settled point in *Cobell VI*, one of the opinions from which Trustee-Delegates seek support.  There, the Court noted that "[f]ederal courts have repeatedly recognized the right of Native Americans to seek relief for breaches of fiduciary obligations …. 'It is fundamental that an action for accounting is an equitable claim and that courts of equity have original jurisdiction to compel an accounting.'"  *Cobell VI*, 240 F.3d at 1104 (quoting *Klamath & Modoc Tribes v. United States*, 174 Ct. Cl. 483, 487 (1966)).

In this respect, *Cobell VI* affirmed *Cobell v. Babbitt*, 91 F. Supp.2d 1 (D.D.C. 1999) ("*Cobell V*"), wherein this Court expressly recognized both APA and non-APA alternative causes of action:

> Plaintiffs' actionable rights in this case stem from and are shaped by three bodies of law. … First, as a matter of litigating against the government, plaintiffs may enforce rights granted to them by statute under the provisions of the APA. … Second, to the extent that certain government actions cannot be reviewed under the APA, then plaintiffs may seek non-statutory review. … Third, plaintiffs may rely upon the rights effectively given to them by the Supreme Court in *Mitchell II*.

*Cobell V*, 91 F. Supp.2d at 29-30.  Like the Supreme Court in *Mitchell II*, this Court in *Cobell V* recognized the existence of a trust relationship and that it "naturally follows" that the right of action to seek equitable relief commonly available to trust beneficiaries is also available to Indian trust beneficiaries.  Here, Plaintiff-Tribes' claim is for an accounting and, if appropriate, other equitable relief.  These are remedies that are available in equity to an aggrieved beneficiary.  *See Cobell VI*, 240 F.3d at 1104 (quoting *Klamath & Modoc Tribes*, 174 Ct. Cl. at 487); *see also Restatement (Second) of Trusts* § 198 (cmt. a (1959)) ("Although the beneficiary

can maintain an action at law against the trustee … he has also equitable remedies against the trustee.") and § 199 cmt. a ("The beneficiary of a trust can maintain a suit to compel the trustee to perform his duties as trustee.  It is immaterial that there be an adequate remedy at law.").

Trustee-Delegates' claim that the Tucker Act and Indian Tucker Act supplied the necessary right of action for damages in *Mitchell II*, thereby rendering that opinion inapposite to the instant litigation, is without merit.  The Court of Appeals disposed of this argument in *Cobell VI*, holding that "[w]hile *Mitchell II* involved a claim for damages, nothing in that decision or other Indian cases would imply that appellants are not entitled to declaratory or injunctive relief."  *Cobell VI*, 240 F.3d at 1101.  The Court further explained that "[s]uch remedies are the traditional ones for violations of trust duties."  *Id.*

Moreover, it is hornbook law that "[t]he Tucker Act does not create a substantive cause of action."  *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005); *see also Mitchell II*, 463 U.S. at 216 ("[T]he Tucker Act does not create any substantive right enforceable against the United States." (quotation and citations omitted)).  Instead, the Tucker Act and Indian Tucker Act merely supply subject matter jurisdiction and the requisite waiver of immunity for certain suits against the sovereign – functions that are served by 28 U.S.C. § 1331 and § 702 of the APA in the present cases.  In *Mitchell II*, as here, the actual cause of action was derived from "the statutes and regulations … establish[ing the] fiduciary obligations of the Government."  *Mitchell II*, 463 U.S. at 226.  The instant cases present precisely the same situation.  Trustee-Delegates' discussion of *Mitchell II* delineates a distinction without difference.

Trustee-Delegates' claim that no right of action exists because none was expressly provided for in the 1994 Act is equally unavailing.  It is settled law that the 1994 Act simply "recognized the federal government's preexisting trust responsibilities."  *See*, *e.g.*, *Cobell VI*, 240

21

F.3d at 1090, 1102-03. Trustee-Delegates' statutory trust responsibilities existed prior to and independently of the 1994 Act; so too did Plaintiff-Tribes' right to bring suit for the judicial enforcement of those responsibilities, as evidenced by *Mitchell II*. Thus, the fact that the 1994 Act did not expressly provide for a private right of action against the United States or Trustee-Delegates for breaches of their fiduciary duties is wholly immaterial.

Trustee-Delegates make another misstep to the extent that they mislabel Plaintiff-Tribes' statutory claim as an impermissible common law claim. That the details of the government's statutory trust duties are filled in by reference to general trust law in no way converts Plaintiff-Tribes' cause of action into a common law claim. As explained above, Plaintiff-Tribes are pursuing a statutory claim for breach of statutorily-created trust duties, and the Supreme Court has repeatedly recognized the viability of such a claim. *See, e.g.*, *White Mountain Apache*, 537 U.S. at 472, 475-76; *Mitchell II*, 463 U.S. at 225-26; *see also Cobell VI*, 240 F.3d at 1100-01. While some of these duties are not expressly stated but are instead implied in the statutes that create the trust, they are nonetheless statutory duties, and an action to enforce an implied statutory duty does not present a common law claim.[14] *See White Mountain Apache*, 537 U.S. at 475-76 (rejecting the government's contrary argument and mandating the enforcement of an implied statutory trust duty). A common law trust claim arises where there is no statute creating the trust. The trusts at issue here – and the concomitant fiduciary duties, both express and implied – are unquestionably statutory.

### 3. Plaintiff-Tribes have Stated a Valid Claim for Non-Statutory Review.

To support their argument that Plaintiff-Tribes have failed to plead non-statutory review, Trustee-Delegates contend that this judicially created exception is extremely limited and only

---

[14] Even if this were not the case, Plaintiff-Tribes note that the principal duties that they seek to enforce are expressly stated in the 1994 Act and other statutes.

available in the presence of an unambiguous statutory mandate that has been violated by *ultra vires* agency action. (Def. Mem. at 20-21.) Trustee-Delegates ignore the fundamental precept that, absent a statute prescribing review in a particular court, non-statutory review is available "under any applicable jurisdictional grant." *City of Rochester v. Bond*, 603 F.2d 927, 931 (D.C. Cir. 1979).

Non-statutory review of administrative action is in fact a broad concept that encompasses both judicial review in the absence of a specific review provision and cases where judicial review has been proscribed by Congress. *See, e.g., United States v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) ("If a plaintiff is unable to bring his case predicated on either a specific or a general statutory review provision, he may still be able to institute a non-statutory review action"); *Griffith v. Fed. Labor Relations Auth.*, 842 F.2d 487, 490 (D.C. Cir. 1988) (denying non-statutory review by district court of unfair labor practice determination made by agency when statute at issue limited judicial review to court of appeals and congressional intent supported such review). When applying the doctrine of non-statutory review, the D.C. Circuit Court of Appeals recognizes a "well-established presumption favoring judicial oversight of administrative activities." *Nat'l Ass'n of Postal Supervisors v. United States Postal Serv.*, 602 F.2d 420, 429 (D.C. Cir. 1979) (upholding the district court's assertion of jurisdiction based on non-statutory review to examine the Postal Service's compensation decisions). It also has made clear that, "[i]f Congress makes no specific choice of [the court in which judicial review is to occur] in the statute pursuant to which the agency action is taken, or in another statute applicable to it, then an aggrieved person may get 'nonstatutory review' . . . in federal district court pursuant to the general 'federal question' jurisdiction of that court." *Five Flags Pipeline Co. v. Dep't of Transp.*, 854 F.2d 1438, 1439 (D.C. Cir. 1988). *See Jordan v. United Ins. Co. of Am.*,

289 F.2d 778, 782 (D.C. Cir. 1961) ("Silence . . . as to judicial review is not necessarily to be construed as a denial of the power of the federal courts to grant relief in the exercise of the general jurisdiction which Congress has conferred upon them") (quoting *Estep v. U.S.*, 327 U.S. 114, 120 (1945)).

The cases relied upon by Trustee-Delegates to support their argument that non-statutory review is narrow involve plaintiffs seeking review when judicial review had been statutorily proscribed. Trustee-Delegates do not point to any statutes relied on by Plaintiff-Tribes in their cause of action that similarly proscribe judicial review. These cases, and the standards articulated therein, do not apply here. *See*, *e.g.*, Salt River Complaint ¶ 16.

And as demonstrated *supra*, Plaintiff-Tribes further and properly allege that the APA provides the waiver of sovereign immunity necessary to sustain this Court's jurisdiction. *See id.* ¶ 10; *Reich*, 74 F.3d at 1328 ("The APA's waiver of sovereign immunity applies to any suit whether under the APA or not"); *see also Cobell V*, 91 F. Supp.2d at 30 (noting that "to the extent that certain governmental actions cannot be reviewed under the APA, then plaintiffs may seek non-statutory review") (citing *Am. School of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902)). Accordingly, non-statutory review is available to Plaintiff-Tribes as an alternative basis of jurisdiction because they have properly alleged jurisdiction under 28 U.S.C. §§ 1331 & 1362, and waiver of sovereign immunity under § 702 of the APA. (*See*, *e.g.*, Salt River Complaint ¶¶ 9, 10.)

**B.    Plaintiff-Tribes Also Present Jurisdictionally Valid Claims under the APA.**

Plaintiff-Tribes also have alleged a right of action under § 706 of the APA, 5 U.S.C. § 706, to compel Trustee-Delegates to provide the accounting that has to date been unduly delayed and unlawfully withheld.

1. **Plaintiff-Tribes Have Stated Valid Claims under § 706(1) of the APA to Compel Agency Action Unlawfully Withheld and Unreasonably Delayed by Trustee-Delegates.**

Trustee-Delegates set forth two equally erroneous arguments to support their contention that Plaintiff-Tribes have failed to state claims under § 706(1) of the APA. First, they argue that they fully satisfied their trust responsibilities by complying with the obligations set forth in Section 304 of the 1994 Act, 25 U.S.C. § 4044. Second, they contend that the Supreme Court's decision in *SUWA*, 542 U.S. 55 (2004), overturned *Cobell VI* and other opinions of this Court and the Court of Appeals, thereby depriving this Court of jurisdiction under § 706(1) to enforce the government's trust responsibilities. Both of these arguments are meritless.

a. **The 1994 Act Is Neither the Source Nor a Complete Statement of Trustee-Delegates' Trust Duties, and Trustee-Delegates Have Not Satisfied the Obligations Stated Therein.**

Trustee-Delegates' argument that the 1994 Act exhaustively defines their trust responsibilities – and the concomitant claim that compliance with the duties enumerated therein necessarily establishes compliance with all trust duties enforceable in this Court – has been emphatically rejected by this Court and the Court of Appeals. Trustee-Delegates made the same argument in *Cobell VI*, and the Court of Appeals rejected it:

> The fundamental problem with appellants' claims is the premise that their duties are solely defined by the 1994 Act. The Indian Trust Fund Management Reform Act *reaffirmed and clarified preexisting duties; it did not create them*. It further sought to remedy the government's long-standing failure to discharge its trust obligations; *it did not define and limit the extent of appellants' obligations*.

*Cobell VI*, 240 F.3d at 1100 (emphasis added). The Court of Appeals further explained that:

> Enactment of the [1994 Act] *did not alter* the nature or scope of the fiduciary duties owed by the government to [Indian] trust beneficiaries. Rather, by its very terms the 1994 Act identified a portion of the government's specific obligations and created additional means to ensure that the obligations would be carried out.

*Id.* (emphasis added); *see also id.* at 1090 n.2 ("That the [1994 Act] recognized, rather than created, the government's [Indian] trust duties is clear from the Act's text and structure. Indeed, Title I of the Act is titled "'Recognition of Trust Responsibility.'"); *Chippewa Cree Tribe of the Rocky Boy's Reservation v. Norton*, Case No. 02-276 (RCL), Memorandum and Order of July 23, 2002 at 2 (D.D.C. 2002) ("The 1994 Act codifies certain preexisting duties that the Secretary of the Interior, as a trustee-delegate of the United States, owes both to individual Indian and tribal trust beneficiaries."). Accordingly, the Court of Appeals held that "the 1994 Act plainly reaffirm[ed] the government's *preexisting duty to provide an accounting*" and that "such an obligation inheres in the trust relationship itself." *Cobell VI*, 240 F.3d at 1103 (emphasis added); *see also id.* at 1102 (holding that the 1994 Act "reaffirms the government's preexisting fiduciary duty to perform a complete historical accounting"). Simply stated, "[n]othing in the 1994 Act, nor any other federal statute, limits or alters this right [to a complete accounting]." *Id.* at 1104. Trustee-Delegates never explain how a statute that does not "create," "limit," or "alter" the "preexisting" right to an accounting can be read as the sole basis for and narrow definition of the accounting obligation.

Section 304 of the 1994 Act – which requires the Department of Interior to report to Congress certain information regarding its efforts to reconcile the balances in tribal trust accounts – certainly does not fully delineate the government's fiduciary obligations, nor does it in any way supersede, eliminate, or limit the preexisting duty to provide Plaintiff-Tribes with a full accounting. *Cobell VI*, 240 F.3d at 1104 ("*Nothing* in the 1994 Act, nor any other federal statute, acts to limit or alter this right." (emphasis added)); *see also id.* at 1100 ("[T]he government has other trust responsibilities not enumerated in the 1994 Act."). In seizing on § 304, Trustee-Delegates ignore not only the government's preexisting duties, but also other,

broader provisions of the 1994 Act. These include, *inter alia*, § 102, which reaffirms Plaintiff-Tribes' right a full accounting that includes, but is not limited to, "all funds held in trust by the United States for the benefit of an Indian tribe … which are deposited or invested pursuant to the Act of June 24, 1938." 25 U.S.C. § 4011(a). The argument that the 1994 Act as a whole – much less § 304 by itself – replaced or limited the government's preexisting duty to account simply cannot withstand scrutiny.

Moreover, whether Trustee-Delegates have complied with the 1994 Act is not a question properly before the Court at this time. At this juncture, the Court must treat all factual allegations in Plaintiff-Tribes' Complaints as true and draw all reasonable inferences in Plaintiff-Tribes' favor. *See Leatherman v Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993); *Sparrow v. United Air Lines, Inc.,* 216 F.3d 1111, 1113 (D.C. Cir. 2000); *Ibrahim v. District of Columbia*, 539 F. Supp.2d 143, 147 (D.D.C. 2008) ("On a motion to dismiss, I must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff.") (*citing Taylor v. FDIC*, 132 F.3d 753, 761 (D.C. Cir. 1997)). Plaintiff-Tribes have alleged in their Complaints that the Arthur Andersen reports – which Trustee-Delegates have attempted to rechristen as "TRP Reports" – do not satisfy the government's duty to provide an accounting. (*See*, *e.g.*, Salt River Complaint at ¶ 30) ("The reports … fall far short of satisfying the defendants' duty to provide a complete, accurate, and adequate accounting."). Trustee-Delegates have not denied these allegations in their Answers.[15] To determine that the government has satisfied its obligations under the 1994 Act, therefore, the Court would need to resolve in *Trustee-Delegates'* favor unrebutted factual allegations made by

---

[15] Instead, their Answers aver that the term "full and complete accounting" as used by Plaintiff-Tribes is "vague and ambiguous," and hence that "Defendants are unable to formulate a response thereto." (*See, e.g.*, Defendants' Answer to Plaintiff's Complaint in *Salt River* at ¶ 30). This same form of response is repeated time and again in Trustee-Delegates' Answers. (*See, e.g.,* Defendants' Answer in *Salt River* at ¶ 37 (averring that the Plaintiff-Tribe's use of the term "accounting" is "vague and ambiguous").

Plaintiff-Tribes regarding the reliability and content of the Arthur Andersen reports.  As such, whether the Arthur Andersen reports satisfy the government's obligations under § 304 is not a question properly before the Court at this time.  *See, e.g., Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) (motion to dismiss tests the "legal sufficiency" of the complaint); *Cobell I,* 30 F. Supp.2d at 44-45  (declining to rule on legal issue in a motion for judgment on the pleadings for want of discovery on a question of fact).

The fact is that the government has not even come close to complying with the 1994 Act's requirements.  The shortcomings of Trustee-Delegates' efforts – including the Arthur Andersen reports – are addressed at length in previous briefing and, as the issue is not properly before the Court at this time, need not be recounted here.  (*See* Opposition to Remand at 22-28.)[16]

> **b.**    **The Supreme Court's *SUWA* Opinion Did Not Deprive This Court of Its Authority to Enforce Trustee-Delegates' Duty to Account.**

At the heart of Trustee-Delegates' Motion to Dismiss is the remarkable contention that Plaintiff-Tribes' claim for an accounting cannot be the proper subject of an action under § 706(1) on the additional ground that *Cobell VI* – which found to the contrary – is "no longer valid" in

---

[16] The woeful inadequacies of the Arthur Andersen reports have been discussed in many venues.  *See, e.g., Cobell v. Kempthorne,* 532 F. Supp.2d 37, 52 (D.D.C. 2008) ("*Cobell XX*") ("The tribal reconciliation project was not an audit, but a contract governed by 'agreed-upon procedures' – in other words, a contract in which the client defines the scope and nature of the project"); U.S. General Accounting Office, *Report to the Committee on Indian Affairs*, U.S. Senate "Financial Management: BIA's Tribal Trust Account Reconciliation Results," GAO/AMD 96-93 (May 1996) ("May 1996 Report") (Exhibit 16 to Opposition to Remand);  Testimony of Paul Homan, Special Trustee, U.S. House of Representatives, Committee on Resources, Hearing Before the Task Force on Indian Trust Fund Management at 7 (June 18, 1996) (Exhibit 17 to Opposition to Remand) (conceding many of the deficiencies identified by the GAO and concluding that "the undeniably poor quality of the trust management systems and the condition of the historical records effectively prevent the Federal Government from providing an accurate and timely accounting to the American Indian trust beneficiaries"); U.S. Dep't of the Interior, Office of the Assistant Secretary – Indian Affairs, News Release, *Fact Sheet on Indian Tribal Trust Funds*, at 2 (Nov. 18, 1997) (Exhibit 24 to Opposition to Remand) ("[T]he poor condition of the records and systems did not allow the federal government to conduct a complete audit or provide the level of assurance to account holders that was expected").

light of the Supreme Court's opinion in *SUWA*. The government's entire argument thus hinges on the patently incorrect premise that *SUWA* overruled *Cobell VI*.

In *SUWA*, the plaintiff (SUWA) sued the Bureau of Land Management ("BLM") seeking to compel agency action to forbid the use of off-road vehicles in federally designated Wilderness Study Areas ("WSAs"). As the statutory basis for its claim, SUWA cited the Federal Land Policy and Management Act of 1974, 43 U.S.C. § 1701 *et seq.*, which, *inter alia*, directed BLM to "'continue to manage [WSAs] … in a manner so as not to impair the suitability of such areas for preservation as wilderness.'" *SUWA*, 542 U.S. at 65 (quoting 43 U.S.C. § 1782(c) (alterations in *SUWA*)). SUWA claimed that BLM violated § 1782(c) by allowing the use of off-road vehicles in certain WSAs, and sought declaratory and injunctive relief forcing BLM to comply with its non-impairment mandate by banning the use of off-road vehicles in certain WSAs.

In considering SUWA's claim, the Court noted that § 1782(c) was "mandatory to the object to be achieved [i.e., non-impairment], but it le[ft] BLM a great deal of discretion in deciding how to achieve it." *SUWA*, 542 U.S. at 66. Section 1782(c) thus did not mandate a total exclusion of the use of off-road vehicles, at least not "with the clarity necessary to support judicial action under § 706(1) [of the APA]," which allows a claim to proceed "only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *SUWA*, 542 U.S. at 64, 66 (emphasis in original). Because barring the use of off-road vehicles in WSAs was not a discrete action that BLM was required to take under § 1782(c), § 706(1) of the APA did not allow judicial action compelling BLM's performance.

*SUWA* thus stands for the unremarkable proposition that, under § 706(1) of the APA, courts can compel an agency to comply with its statutorily mandated duties – at least when

29

acting as a regulator or administrator of a program – but cannot dictate the precise details of how the agency goes about doing so. This essentially restates the rule already laid down in *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990), albeit in the context of agency inaction rather than agency action. *See id.* at 891 ("Under the terms of the APA, respondent must direct its attack against some particular 'agency action' that causes it harm."). More importantly, it is not at all inconsistent with *Cobell VI*, where the Court of Appeals held that this Court had not exceeded its authority in ordering the defendants to perform an accounting "'of all money … held in trust for the benefit of plaintiffs, without regard to when the funds were deposited.'" *Cobell VI*, 240 F.3d at 1103-04 (quoting *Cobell V*, 91 F. Supp.2d at 58). As in *Cobell*, this Court enjoys the authority to order Trustee-Delegates to comply with their duty to account – a duty that is both discrete and statutorily required – even if this were a typical agency case, which it is not, and the Court was thus unable to dictate all of the details of how the accounting is performed.

Trustee-Delegates' entire argument hinges on the novel – and absurd – claim that *SUWA* tacitly overruled *Cobell VI*. (*See* Defendants' Memorandum, pp. 29-30.) This would no doubt come as a great surprise to the D.C. Circuit, which has decided five appeals in *Cobell* since *SUWA* and considered *SUWA* at length while still recognizing the vitality of *Cobell VI* in each case.

For example, in *Cobell v. Norton*, 391 F.3d 251 (D.C. Cir. 2004) ("*Cobell XII*"), which was decided nearly seven months after *SUWA*, the Court of Appeals discussed *Cobell VI* at length, quoting with approval its determination that the defendants breached their statutory trust duties by failing to take "'reasonable steps toward the discharge of the federal government's fiduciary obligations ….'" *Cobell XII*, 391 F.3d at 258 (quoting *Cobell VI*, 240 F.3d at 1106).

Similarly, in *Cobell v. Norton*, 392 F.3d 461, 473 (D.C. Cir. 2004) ("*Cobell XIII*"), the D.C. Circuit explicitly recognized *Cobell VI* as consistent with "the limits placed by the APA and the Court's *Lujan* and *Southern Utah* [*SUWA*] decisions," which the Court understood as "limiting APA review to attacks on specific 'agency action[s]' … and precluding its use for claims of broad programmatic failure." *Cobell XIII*, 392 F.3d at 469, 473.

Two years later, while evaluating an injunction issued by this Court, the Court of Appeals again recognized the continuing validity of *Cobell VI* while attempting to provide a definitive reconciliation of its prior *Cobell* opinions. *See Cobell XVIII*, 455 F.3d at 304, 307. This reconciliation was necessitated by the plaintiffs' argument that the "first in time" rule mandated the abandonment of any language in subsequent opinions that was inconsistent with *Cobell VI*. (*See* Appellees' Brief Filed on Feb. 10, 2006 ("*Cobell XVIII* Appellees' Brief") at 19-26 [Dkt. No. 05-5388]). While the government's reply brief cited *SUWA*, it never contended that *SUWA* had vitiated *Cobell VI*; instead, it argued at length that *Cobell VI* could be reconciled with the Court of Appeals' subsequent decisions. (*See* Appellants' Reply Brief Filed on March 3, 2006 ("*Cobell XVIII* Reply Brief") at 8, 15-21 [Dkt. No. 05-5388].) This was a peculiar approach if, as Trustee-Delegates now contend, *SUWA* overruled *Cobell VI*.

Like the government's brief, the Court of Appeals in *Cobell XVIII* went to great lengths to explain how decisions subsequent to *Cobell VI* could be reconciled with *Cobell VI*. *See Cobell XVIII*, 455 F.3d at 303-307. A significant portion of the decision is an explication of how the various Court rulings in *Cobell XIII* and *XVII* were in line with *Cobell VI*. Trustee-Delegates' argument here necessarily implies that the bulk of the Court's analysis in *Cobell XVIII* was an exercise in irrelevance. If *Cobell VI* was no longer good law, as Trustee-Delegates now contend, then the Court of Appeals would have simply noted as much and proceeded to

analyze the issue at hand in light of its subsequent decisions instead of attempting to reconcile those decisions with *Cobell VI*. Clearly, the Court of Appeals does not share Trustee-Delegates' view that *Cobell VI* is no longer good law.

In reality, *SUWA* and *Cobell VI* can and do comfortably coexist. *SUWA* holds that "the only agency action that can be compelled under the APA is action legally *required*," 542 U.S. at 63 (emphasis in original); *Cobell VI* upholds this Court's determination in *Cobell V* that an accounting *is* legally required. *Cobell VI*, 240 F.3d at 1102-04 (holding, *inter alia*, that "the 1994 Act reaffirms the government's preexisting fiduciary duty to perform a complete historical accounting of trust fund assets"). *SUWA* requires that the agency action that a plaintiff seeks to compel be discrete, 542 U.S. at 64; *Cobell VI* identifies a discrete duty to perform an "adequate" accounting – *i.e.*, one "sufficient to serve the purposes for which a trust accounting is typically conducted." 240 F.3d at 1103 ("It is black letter trust law that an accounting necessarily requires a full disclosure and description of each item of property constituting the corpus of the trust at its inception." (internal quotation and citation omitted)); *see also id.* ("Under traditional equitable trust principles, '[t]he trustee's report must contain sufficient information for the beneficiary readily to ascertain whether the trust has been faithfully carried out.'" (quoting *White Mountain Apache Tribe of Ariz. v. United States*, 26 Cl. Ct. 446, 449 (1992)), *aff'd* 5 F.3d 1506 (Fed. Cir. 1993)).

Perhaps recognizing that *SUWA* is wholly consistent with *Cobell VI*'s declaration that this Court has the authority to enforce their preexisting, statutory duty to account, Trustee-Delegates seek refuge in their repeatedly discredited contention that that 1994 Act is the sole source of their trust duties. Because the 1994 Act does not define the contours of their accounting obligations with the clarity required by *SUWA*, they argue, this Court cannot compel their compliance under

32

§ 706(1).[17]  This argument has been addressed and rejected sufficiently elsewhere, both *supra*

and in the opinions of this Court and the D.C. Circuit.  *See*, *e.g.*, *Cobell VI*, 240 F.3d at 1100-03.

What is more, as *Cobell VI* makes clear, the nature and scope of the trustee's obligations are

informed by the common law.  Accordingly, "'the Secretary cannot escape his role as trustee by

donning the mantle of administrator ….'"  *Id.* at 1099 (internal quotations and citations omitted);

*see also id.* ("[T]he Secretary is obligated to act as a fiduciary … his actions must not merely

meet the minimal requirements of administrative law, but must also pass scrutiny under the more

stringent standards demanded of a fiduciary.'" (quoting *Jicarilla Apache Tribe v. Supron Energy

Corp.*, 728 F.2d 1555, 1563 (10th Cir. 1984) (Seymour, J., concurring in part and dissenting in

part), *adopted as majority opinion and modified en banc*, 782 F.2d 855 (10th Cir. 1986)).

> In short, Trustee-Delegates' argument rises and falls on the untenable premise that *SUWA*
vitiated *Cobell VI sub silentio*.  That premise has not been accepted by this Court or the Court of
Appeals, nor is it compelled by *SUWA*.  Trustee-Delegates' claim that *SUWA* prevents this Court
from ordering them to comply with their preexisting, statutory trust obligations, including the
duty to account, is thus wholly without merit.

### 2.  Plaintiff-Tribes Also Have Stated Valid Claims under § 706(2) of the APA.

> Trustee-Delegates' argument that jurisdiction is not proper under § 706(2) also fails.

> All that the Federal Rules of Civil Procedure require of a complaint is that it contain "'a
short and plain statement of the claim showing that the pleader is entitled to relief,' in order to
'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'"  *Bell
Atl. Corp. v. Twombly,* 127 S. Ct. 1955, 1964 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47

---

[17] Trustee-Delegates' argument glosses over the fact that *SUWA* is a traditional administrative law case, while the instant cases are trust cases.  In the trust context, the Court of Appeals has made it clear that trust rules limit the deference that would ordinarily be accorded to an administrative agency.  *Cobell XII*, 392 F.3d at 473.

(1957)).  In these cases, Plaintiff-Tribes allege that Trustee-Delegates have failed to provide the accounting to which they are legally entitled.  This claim necessarily includes the proposition that nothing the Government thus far has provided to Plaintiff-Tribes – including Arthur Andersen reports – constitutes the requisite accounting.  Indeed, Plaintiff-Tribes further allege in their Complaints that the Arthur Andersen reports do not satisfy Trustee-Delegates' duty to provide an accounting.  (*See*, *e.g.*, Salt River Complaint at ¶ 30) ("The reports … fall far short of satisfying the defendants' duty to provide a complete, accurate, and adequate accounting."). [18]

As discussed *supra*, at the motion to dismiss stage, the Court only is testing the legal sufficiency of the Complaints.  In doing so, the Court must treat all factual allegations in Plaintiff-Tribes' Complaints as true and draw all reasonable inferences in Plaintiff-Tribes' favor.  *See, e.g., Ibrahim*, 539 F. Supp.2d at 147.  Because Plaintiff-Tribes have alleged jurisdiction under § 706(2) and identified the Arthur Andersen Reports as failing to satisfy Trustee-Delegates' legal duty to provide an adequate accounting, in other words, action that is "contrary to law", the Court is authorized to assert jurisdiction pursuant to § 706(2).  *See Riverkeeper, Inc. v. U.S. Environmental Protection Agency*, 514 F. Supp.2d 265 (S.D.N.Y. 2007)  (holding that District Court had jurisdiction under § 706(2) where plaintiff alleged that "the EPA defendants' failure to promulgate regulations was arbitrary, capricious, and abuse of discretion or contrary to law.")

The Court ultimately can resolve the issue of whether the Arthur Andersen reports suffice as the requisite accounting either pursuant to 5 U.S.C. § 706(1) or pursuant to 5 U.S.C. §

---

[18] Trustee-Delegates cannot possibly contend that they have not received "fair notice" of Plaintiff-Tribes' contention given that, in their Motion, Trustee-Delegates concede that the "obvious" final agency action is Trustee-Delegates' production of the Arthur Andersen Reports.  (Def. Mem. at 38.)

706(2).[19]  It is entirely permissible for Plaintiff-Tribes to invoke both § 706(1) and (2) in setting

forth their claim.  *See* Fed. R. Civ. P. 8(d); *Oregon Natural Desert Ass'n v. Taylor*, 2005 WL

106599 at *7 (D. Or. 2005) (plaintiffs pleaded claim in the alternative under § 706(1) and (2);

court concluded that the appropriate evaluation on facts presented there was pursuant to § 706(2)

rather than under the umbrella of agency inaction).  The potential applicability of both § 706(1)

and (2) in these cases is not a novel concept.  For example, in *Cobell v. Kempthorne,* 532 F.

Supp.2d 37 (D.D.C. 2008) ("*Cobell XX*"), this Court noted that the October 2007 trial was

designed to assess whether agency action "has been unlawfully withheld or unreasonably

delayed" *and* to review whether Interior's accounting plan is "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law."  *Id.* at 88. [20]

## C.    This Court Has Authority to Grant the Relief Sought by Plaintiff-Tribes.

Trustee-Delegates also contend that this Court lacks jurisdiction over Plaintiff-Tribes'

claims because those claims do not fall under the waiver of immunity provided by § 702 of the

APA.  They make two arguments to support their contention.  First, they argue that Plaintiff-

Tribes' claim seeks relief "other than money damages."  Second, they contend that the Tucker

Act deprives this Court of jurisdiction because § 702 does not apply "if any other statute that

---

[19] The contention that the Arthur Andersen reports constitute the requisite accounting owed to the Plaintiff-Tribes is not part of Plaintiff-Tribes' claim but is instead a *defense* advanced by Trustee-Delegates.  Plaintiff-Tribes are not required to anticipate and negate that defense in their complaints.  *See Flying Food Group, Inc. v. NLRB*, 471 F.3d 178, 183 (D.C. Cir. 2006).

[20] Trustee-Delegates' reliance on the Joint Status Reports filed in the *Salt River Pima-Maricopa Indian Community*, the *Ak-Chin Indian Community*, the *Tohono O'odham Nation*, and the *Passamaquoddy Tribe of Maine* actions to support their contention that Plaintiff-Tribes have failed to plead jurisdiction under § 706(2) is misplaced.  (Defs.' Mem. at 37.)  Trustee-Delegates assert that the proposed discovery plans requested that the government "specify the final agency action for review."  (*Id.*)  This is simply not the case.  The Plaintiff-Tribes sought, through "Phase One" of their proposed discovery plans, to compile a complete record to ascertain what the government claims constitutes an accounting.  Trustee-Delegates' reading is out of context and plainly misguided.

grants consent to suit explicitly or impliedly forbids the relief that is sought."  Neither of these arguments has merit.

Plaintiff-Tribes are well aware of the jurisdictional constraints regarding the recovery of money damages from the United States and its officers in this Court.  Plaintiff-Tribes are equally well aware, however, of the broad and inherent equitable authority conferred on this Court by the Constitution and Congress.  *See*, *e.g.*, *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971) ("[T]he scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."), *quoted in Cobell VI*, 240 F.3d at 1108; *see also Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944) ("The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case.  Flexibility rather than rigidity has distinguished it.").  This Court's powers are available to fashion equitable remedies and to decide on the merits all matters that are presently before it, including, but not limited to, Plaintiff-Tribes' requests for an accounting.  *See*, *e.g.*, *Scott on Trusts* § 199, at 203-04 (4th ed. 1988) ("A court of equity, having jurisdiction over the administration of trusts, will give to the beneficiaries of a trust such remedies as are necessary for the protection of their interests.").  As the Supreme Court held in *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), "the equity jurisdiction of the federal courts" is identical to that of "jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act, 1789 (1 Stat. 73)."  *Id.* at 319.

1. **Section 702's Waiver of Sovereign Immunity Extends to Specific Equitable Remedies, Including An Order Requiring Trustee-Delegates to Perform An Accounting and, If Appropriate Thereafter, Certain Monetary Relief, That Are Distinct From Money Damages.**

First and foremost, it is important to be clear about exactly what remedy Plaintiff-Tribes seek. At this time, Plaintiff-Tribes seek an accounting. (*See e.g.*, Salt River Complaint ¶ 42.) As explained by the D.C. Circuit:

> An accounting is a species of compulsory disclosure, predicated upon the assumption that the party seeking relief does not have the means to determine how much – or, in fact, whether – any money properly his is being held by another. The appropriate remedy, particularly where the determinations may be detailed and complex, is an order to account in a proceeding in which the burden of establishing the non-existence of money due to the plaintiff rests upon the defendant.

*Rosenak v. Poller*, 290 F.2d 748, 750 (D.C. Cir. 1961).

It is beyond dispute that Trustee-Delegates have a fiduciary duty to provide an accounting and that this Court has the authority to compel them to do so. *See*, *e.g.*, *Cobell VI*, 240 F.3d at 1104 ("'It is fundamental that an action for accounting is an equitable claim and that courts of equity have original jurisdiction to compel an accounting.'" (quoting *Klamath & Modoc Tribes*, 174 Cl. Ct. at 487)); George T. Bogert, *The Law of Trusts & Trustees* § 963 (2d ed. Rev. & 3d ed. 2007) ("In order to obtain an accounting it is not necessary for the beneficiary to allege that there is any payment immediately due him under the trust or that the trustee in some way is in default.")). Should the accounting reveal that the government has not faithfully carried out its statutory trust obligations, Plaintiff-Tribes may also seek such additional equitable relief as may be appropriate to redress those breaches. (*See* Salt River Complaint ¶ 43.) Those issues, however, are for a later day.

Moreover, the historical accounting sought by Plaintiff-Tribes has its own intrinsic value. As declared by the Court of Appeals, the accounting must "contain sufficient information for the

beneficiar[ies] readily to ascertain whether the trust has been faithfully carried out." *Cobell VI*, 240 F.3d at 1103 (citation omitted). The accounting thus will provide Plaintiff-Tribes with important information that will enable them to make informed judgments about their assets.

Many of the potential uses of the information gleaned from the accounting have nothing whatsoever to do with requests for monetary relief from the United States. For example, regulations governing the lease of trust property for business purposes provide the right to cancel a lease under certain circumstances. *See* 25 C.F.R. § 162.619. The accounting might alert Plaintiff-Tribes to the need to take such an action. Another example is that, under the 1994 Act, a tribe may choose to withdraw some or all of its funds held in trust by the United States and to manage those funds itself. *See* 25 U.S.C. § 4022. The accounting will provide Plaintiff-Tribes with critical information about the current state of their trust assets that will enable them to determine whether it is prudent to exercise this right. These few examples are merely illustrative of the breadth and usefulness of the information that a full accounting will provide to Plaintiff-Tribes.

Of course, it is also possible that the accounting will reveal that the government has breached its fiduciary duties in ways that justify additional equitable relief from this Court. Since the need for such relief is not yet established, the Court need not rule on its availability. Because Trustee-Delegates' brief goes to great lengths to conflate such relief with money damages not available in this Court under Section 702, however, Plaintiff-Tribes are compelled to briefly respond.

Section 702 of the APA waives sovereign immunity of the United States and its officers in cases where the relief requested is "other than money damages." 5 U.S.C. § 702. It is settled law that "money damages" is not synonymous with "monetary relief." *Bowen v. Massachusetts*,

487 U.S. 879, 896 (1988). Indeed, the phrase "money damages" was included in a 1976 amendment to § 702 and was intended to broaden – not restrict – the district courts' jurisdiction. *Esch v. Yeutter*, 876 F.2d 976, 981 (D.C. Cir. 1989). The distinction between money damages and other monetary relief is clear. An action at law for "money damages" is "intended to provide a victim with monetary compensation for an injury to his person, property or reputation." *Id.* at 893. In contrast, where an equitable action seeks specific relief,[21] including "'the recovery of specific property or monies,'" said relief is not damages because it does not compensate for loss. *Id.* (quoting *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 688 (1949)); *see also Cobell v. Norton*, 260 F. Supp.2d 98, 107 (D.D.C. 2003) (citing *Bowen* and noting the distinction between an action for "money damages" and an action in equity for recovery of "specific monies"). "The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen*, 487 U.S. at 893; *see also Anselmo v. King*, 902 F. Supp. 273, 275 (D.D.C. 1995). Indeed, in using the phrase "money damages" in § 702, Congress intentionally "authorize[d] equitable suits for specific monetary relief." *Bowen*, 487 U.S. at 899-900; *see also M.K. v. Tenet*, 99 F. Supp.2d 12, 24 (D.D.C. 2000) ("[T]he exclusion of damage claims from the APA's waiver of sovereign immunity does not exclude equitable claims for specific monetary relief." (emphasis added)).

Trustee-Delegates make a feeble attempt to artificially narrow the overwhelming authority supporting the possible claim of Plaintiff-Tribes by arguing that § 702 allows for an award of monetary relief only in cases where specific relief is sought pursuant to an express statutory mandate. It is well-established, however, that the right to recover specific relief in the form of a monetary award under § 702 applies to governmental obligations – such as those at

---

[21] "Specific relief" is defined as the "restor[ation] to the plaintiff [of] that to which it was entitled from the beginning." *See America's Cmty. Bankers v. Fed. Deposit Ins. Corp.*, 200 F.3d 822, 829 (D.C. Cir. 2000).

issue in the instant cases – created by statute and informed by common law. *Aetna Cas. & Sur. Co. v. United States*, 71 F.3d 475, 477 (2d Cir. 1995) (finding *Bowen* applicable to duties "prescribed by statute" as well as those "arising under some other rule of law"); *see also Cobell VI*, 240 F.3d at 1094 (holding that "plaintiffs['] rel[iance] upon common law trust principles in pursuit of their claim is immaterial" to the question of jurisdiction under § 702). The Second Circuit's discussion is illustrative:

> The government also argues that the *Bowen* rule applies only in those cases where the duty to make the payment is statutory. … In our view, the [*Bowen*] … opinion rests not on the fact that the federal government's duty was statutory, but rather on the distinction between money damages, which seek to compensate for governmental failure to perform a legal duty, and injunctive relief requiring that the duty be performed. We can see no reason why the *Bowen* holding should be limited to duties prescribed by statute, as opposed to those arising under some other rule of law, any more than it should be limited to claims brought by Massachusetts.

*Aetna Cas. & Sur. Co.*, 71 F.3d at 479 (internal citations omitted). In arguing that *Bowen* bars the specific equitable relief sought by Plaintiff-Tribes, Trustee-Delegates misconstrue *Bowen* and its progeny. As those cases demonstrate, so long as Plaintiff-Tribes seek equitable relief other than money damages – as they do here – § 702's waiver of immunity allows their claims to proceed in this Court.

### 2. The Equitable Relief Sought by Plaintiff-Tribes Is Not Money Damages.

To the extent the accounting uncovers that the balances of a Plaintiff-Tribe's trust fund account is misstated, then a correction of that balance would be in order and routine. *See*, *e.g.*, *Rainbolt v. Johnson*, 669 F.2d 767, 769 (D.C. Cir. 1981) ("Once the accounting is completed, the District Court shall provide such additional relief for plaintiff-appellant as may be appropriate." (citing *Bogert on Trusts* § 962 (1962)); 76 Am. Jur. 2d, *Trusts* § 506, at 726 ("[T]he trustee may be required in a suit for an accounting to show that he or she faithfully performed his or her duties, and is subject to appropriate remedies if he or she was unfaithful to the trust."); Scott on

40

Trusts § 199.1 (4th ed. 1988) ("As has been stated, the trustees is under a duty to the beneficiaries to make an accounting with respect to his administration of the trust. The court will specifically enforce this duty, and compel the trustee to render a proper accounting to the court, and thereupon such relief, if any, as the beneficiaries may be entitled to receive."). Such a balance correction is a correction of a bookkeeping error, and thus is not compensation for a loss. It is plainly the very thing to which plaintiff is entitled.

To the extent that a restitutionary remedy may be appropriate, it is likewise settled that equitable restitution is available. As this Circuit made clear in *Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735 (D.C. Cir. 1995), "[a]n action in restitution *can* result in the defendant's payment of money …. In such a case the payment of money from defendant to plaintiff represents a kind of specific relief rather than compensatory damages. Whatever restitution may encompass … we clearly may not collapse it into the broader notion of 'compensation.'" *Id.* at 747 (internal citations omitted) (emphasis in original).

Unlike restitution, damages – which are of course not available in this Court – are substitutionary. *Id.* Damages compensate plaintiffs for the loss that they have suffered as a consequence of a defendant's breaches of trust. *See*, *e.g.*, *Bowen*, 487 U.S. at 895 ("Damages are given to the plaintiff to *substitute* for a suffered loss, whereas specific remedies are … [an] attempt to give the plaintiff the very thing to which he [is] entitled." (internal citations and quotations omitted) (emphasis in original)). Equitable restitution, in contrast, simply restores to a plaintiff the very funds to which it is entitled but that have been wrongfully withheld. *See Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 214 (2002) (describing "restitution … in equity" as seeking to "restore to the plaintiff particular funds or property in the defendant's possession").

41

For these reasons, Plaintiff-Tribes seek relief other than money damages and plead claims falling comfortably within the scope of Section 702's broad waiver.

### 3.  The Cases Relied upon by Trustee-Delegates are Inapposite.

Trustee-Delegates cite several opinions in support of their claim that Plaintiff-Tribes seek impermissible money damages.  Given that Plaintiff-Tribes seek an accounting at this stage of the litigation, Trustee-Delegates' argument is premature.  Even in the context of further equitable relief, however, the cases cited by Trustee-Delegates are wholly inapposite.

For example, *City of Houston v. Dep't of Hous. & Urban Dev.*, 24 F.3d 1421 (D.C. Cir. 1994), an opinion upon which Trustee-Delegates place substantial reliance, is consistent with Plaintiff-Tribes' position.  There, the Department of Housing and Urban Development ("HUD") awarded to Houston, Texas a $21.6 million Community Development Block Grant ("CDBG") for fiscal year 1986.  However, HUD subsequently reduced the CDBG by $2.6 million due to the City's failure to meet spending targets and disbursed those funds to other program participants. The appropriations covering the $21.6 million grant expired by Act of Congress on September 30, 1988.  On April 4, 1989, the City filed suit seeking "restoration" of the funds deducted from the grant.  *Id.* at 1424.  The Court of Appeals rejected the City's claim, concluding that there were no funds to restore because "the relevant appropriation ha[d] lapsed or been fully obligated."  *Id.* at 1428.  Thus, "the federal courts [we]re without authority to provide monetary relief."  *Id.*  In other words, there were no funds to disgorge or restore to the City.

Unlike in *City of Houston*, Plaintiff-Tribes in these cases are not seeking recovery of government funds under an ordinary Congressional appropriation.  Instead, they seek and accounting and, to the extent that that the accounting shows it to be necessary, the recovery of their own monies.  This case is therefore akin to *American Community Bankers*, the case discussed *supra* wherein a trade association of banks and savings institutions filed a declaratory

42

judgment action seeking to recover monies improperly assessed by the FDIC. In holding that the analytical framework of *City of Houston* did not bar recovery, this Circuit explained that the relief sought was a return of the association's members' own funds – much like the relief sought by Plaintiff-Tribes here. The Court was not faced with a lapsed or otherwise obligated Congressional appropriation. As it explained:

> Whereas *City of Houston* addressed whether a court could award to a claimant funds which otherwise belonged to the government, this case questions whether the government can *retain funds which originally belonged to Bankers's members.* Unlike Houston, Bankers is not seeking compensation for economic losses suffered by the government's alleged wrongdoing; Bankers wants the FDIC to *return that which rightfully belonged to Bankers's member institutions in the first place.*

*Am. Cmty. Bankers*, 200 F.3d at 830 (emphasis added).

Moreover, the Court in *American Community Bankers* specifically rejected Trustee-Delegates' current argument that there can be no recovery if the money withheld has been improperly disbursed or there is no identifiable *res*. *Compare* Trustee-Delegates' Brief at 44-45. with *Am. Cmty. Bankers*, 200 F.3d at 830 ("[t]he FDIC cannot eliminate the entitlement of [a plaintiff] to reimbursement by distributing the improperly collected funds elsewhere") and *Minor*, 228 F.3d at 355 ("[T]hat the government obviously cannot restore to [the plaintiff] the specific currency that was seized does not transform the motion into an action at law."). As in *American Community Bankers*, the present actions do not involve a request to obtain funds belonging to the government that were set forth in a lapsed or otherwise obligated Congressional appropriation. Plaintiff-Tribes primarily seek an accounting – a remedy upon which questions of appropriation and funding plainly have no bearing. Should the accounting prove it necessary, Plaintiff-Tribes may eventually seek recovery of their own funds that have been improperly withheld by the trustee, acting through Trustee-Delegates, and the unlawful benefit that the

trustee has obtained as a result of its actions.  This is not compensation for a loss, but specific relief.  Accordingly, neither § 702 nor the analysis set forth in *City of Houston* bars recovery.

Likewise, the CFC's opinions in *Tohono O'Odham Nation v. United States*, 79 Fed. Cl. 645 (Fed. Cl. 2007), and *Ak-Chin Indian Community v. United States*, 80 Fed. Cl. 305 (Fed. Cl. 2008), are not relevant to this Court's jurisdiction to grant the relief requested by Plaintiff-Tribes. Both of those opinions addressed questions raised by 28 U.S.C. § 1500, a CFC-specific jurisdictional statute.  In *Tohono O'Odham*, the CFC expressly recognized that this Court might have jurisdiction over Plaintiff-Tribes' claims, but held that the issue was immaterial to its analysis of whether § 1500 barred jurisdiction in the CFC.  *Tohono O'Odham.*, 79 Fed. Cl. at 654 n.4.  Similarly – and in reliance on *Tohono O'Odham* – the CFC in *Ak-Chin* recognized *Bowen*'s distinction between "monetary relief" and "money damages," but held the distinction to be "irrelevant" for the purposes of § 1500.  *Ak-Chin*, 80 Fed. Cl. at 321 (citing *Bowen* and *Tohono O'Odham*).  While the CFC may consider *Bowen* to be irrelevant for the purposes of evaluating CFC jurisdiction under § 1500, there is no question that *Bowen* is relevant to – and in fact establishes – this Court's jurisdiction over the claims raised by Plaintiff-Tribes.

### 4.  The Equitable Relief Sought by Plaintiff-Tribes Is Not Barred by the Tucker Act.

In a final, futile attempt to support their claim that this Court cannot grant the specific equitable relief that Plaintiff-Tribes seek, Trustee-Delegates revisit the long discredited argument that the Tucker Act and Indian Tucker Act, 28 U.S.C. §§ 1491 & 1505 (collectively referred to herein as the "Tucker Acts"), preclude this Court from exercising jurisdiction under § 702 of the APA because § 702 does not apply "if any other statute that grants consent to suit explicitly or implicitly forbids the relief that is sought."  This argument fails because Tucker Act jurisdiction

is not exclusive for claims – such as those at issue here – founded upon the Constitution or federal statutes or regulation.

The Tucker Acts waive sovereign immunity and provide jurisdiction in the Court of Federal Claims ("CFC") for certain causes of action, namely "any Claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1).  The Acts provide the CFC exclusive jurisdiction "over contract claims against the government" for amounts in excess of $10,000.  *Transohio Sav. Bank v. Director, Office of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992); *see also Tenn. ex rel Leech v. Dole*, 749 F.2d 331, 335 (6th Cir. 1984).  By contrast, Tucker Act jurisdiction is *not* exclusive for claims – such as those at issue here – founded upon the Constitution, federal laws, or regulations.  *Transohio*, 967 F.2d at 609; *see generally* 28 U.S.C. § 1331(a).

Accordingly, Trustee-Delegates' argument that the Tucker Act has been interpreted as encompassing breach of trust cases, including those involving Native Americans, misses the point.  (*See* Def. Mem. at 46-49.)  While it may be permissible to file certain breach of trust claims in the CFC, the Tucker Act does not confer upon that court exclusive jurisdiction over all such claims.  In particular, Trustee-Delegates' citation of language from *Mitchell II* stating that "the Tucker Act provides the United States' consent to suit for claims founded upon statutes or regulations that create substantive rights to money damages," 463 U.S. at 218, is wholly inapposite.  As explained *supra*, Plaintiff-Tribes do not seek money damages in the instant actions, so the fact that the Tucker Act may grant the CFC jurisdiction over certain trust claims that do seek such relief is immaterial.

45

Trustee-Delegates rely extensively on opinions and analysis involving contract actions – *i.e.*, actions in which Tucker Act jurisdiction is in fact exclusive – to support their flawed argument that the Tucker Acts preclude § 702 jurisdiction in this Court.  (Def. Mem. at 47-48). The instant actions, however, are not contract actions and do not arise under the Tucker Acts; instead, they seek the enforcement of the government's statutory trust responsibilities.  *Seminole Nation v. U.S.*, 316 U.S. 268, 296-297 (1942) ("In carrying out its treaty obligations with the Indian tribes the Government is something more than a mere contracting party."); *Joint Tribal Council of Passamaquoddy Tribe v. Morton*, 388 F. Supp. 649, 662 (D.C. Me. 1975), *aff'd*,  528 F.2d 370 (1st Cir. 1975) (*citing Seminole Nation*  and holding that the relationship between the tribe and the United States "was not that of a mere contracting party" and the NonIntercourse Act imposed fiduciary obligation on the United States to protect tribal land).  Whether an action is "founded" upon a contract for Tucker Act purposes depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982); *see also Cartwright Int'l Van Lines, Inc. v. Doan*, 525 F. Supp.2d 187, 194-95 (D.D.C. 2007).  "[T]he Court must determine whether Plaintiff's claims are contractually or statutorily based."  *San Carlos Irrigation & Drainage Dist. v. United States*, No. CV-05-937-PAX-DGC, 2005 WL 3434704, at *2 (D. Ariz. Dec. 14, 2005); *see also Transohio*, 967 F.2d at 609 (stating that the court must determine whether "plaintiffs' claims are founded only on a contract, or whether they stem from a statute or the Constitution.").  In contrast to the 1976 amendment to § 702 of the APA, which was "intended to broaden the avenues for judicial review of agency action by eliminating the defense of sovereign immunity in cases covered by the amendment," *Bowen*, 487 U.S. at 891-92, the Tucker Act's "limited and conditional waiver of sovereign immunity in contract actions" must

not be interpreted so broadly "as to deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government." *Megapulse*, 672 F.2d at 968. As the Court of Appeals has explained, federal courts should be "mindful of the warning that [they] not 'subvert the congressional objectives underlying the enactment of [§ 702 of the APA] by allowing the government to give an overly expansive scope to the notion of claims "founded upon" a contract.'" *Transohio*, 967 F.2d at 611 (quoting Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 4101 at 319 (1988)).

Trustee-Delegates' attempt to import the law applicable to contract cases under the Tucker Act into the instant litigation is unavailing. These cases are not, and have never been, grounded in any contract. Instead, as discussed *supra*, Plaintiff-Tribes' seek to enforce the government's statutory trust duties. Trustee-Delegates' reliance upon contract cases to argue that the CFC has exclusive jurisdiction over Plaintiff-Tribes' claims is thus misplaced, and their argument that the Tucker Acts impliedly prohibit this Court from granting the relief that Plaintiff-Tribes seek is without merit.[22]

## II.    PLAINTIFF-TRIBES' PRE-1946 CLAIMS ARE NOT TIME BARRED.

In arguing that Plaintiff-Tribes' claims are barred by the statute of limitations in the ICCA, Trustee-Delegates misconstrue almost two decades of recent acts of Congress overriding the ICCA's limitations statute and ignore a solid body of case law interpreting the precise point at issue here adversely to Defendant. In addition, Trustee-Delegates' broad position in this litigation regarding pre-ICCA claims is inconsistent with their position taken recently on the same issue in the CFC.

---

[22] Plaintiff-Tribes are mystified by Trustee-Delegates' claim that their Tucker Act argument is somehow strengthened by their purported compliance with § 304 of the 1994 Act. As discussed *supra*, Trustee-Delegates failed to comply with the limited duties enumerated in § 304. Even if Trustee-Delegates had complied with § 304, however, their compliance would not change the fact that the Tucker Act does not bar Plaintiff-Tribes from pursuing their claims for equitable relief in this Court.

**A.  Congress Deferred the Accrual of Plaintiff-Tribes' Pre-1946 Claims.**

Plaintiff-Tribes' claims are for declaratory and equitable relief regarding their tribal trust funds.  In 1990, Congress deferred the accrual of the statute of limitations on such claims pending receipt of trust fund accountings.  "[N]otwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim concerning losses to or mismanagement of trust funds, until the affected tribe or individual Indian has been furnished with the accounting of such funds."  Pub. L. No. 101-512, 104 Stat. 1915 (1990) ("Tribal Trust Fund Accounting Statute").  In seventeen successive Tribal Trust Fund Accounting Statutes Congress has repeated this claims accrual language.[23]  The most recent version of these statutes provides:

> notwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim, including any claim in litigation pending on the date of the enactment of this Act, concerning losses to or mismanagement of trust funds, until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss.

Pub. L. No. 110-161, 121 Stat. 1844 (2007).

No accountings from which tribal trust fund beneficiaries can determine losses have been provided.  Indeed, full and complete accountings are the threshold relief Plaintiff-Tribes seek in their actions such as the instant one.  Thus, under applicable acts of Congress, Plaintiff-Tribes' claims have not yet even accrued; let alone been barred.

---

[23] *See* Pub. L. No. 102-154, 105 Stat. 990 (1991); Pub. L. 102-381, 106 Stat. 1374 (1992); Pub. L. No. 103-138, 107 Stat. 1379 (1993); Pub. L. No. 103-332, 108 Stat. 2499 (1994); Pub. L. No. 104-134, 110 Stat. 1321 (1996); Pub. L. No. 104-208, 110 Stat. 3009 (1996); Pub. L. No. 105-83, 111 Stat. 1543 (1997); Pub. L. No. 105-277, 112 Stat. 2681 (1998); Pub. L. No. 106-113, 113 Stat. 1501 (1999); Pub. L. No. 106-291, 114 Stat. 922 (2000); Pub. L. No. 107-63, 115 Stat. 414 (2001); Pub. L. No. 108-7, 117 Stat. 11 (2003); Pub. L. No. 108-108, 117 Stat. 1241 (2003); Pub. L. No. 108-447, 118 Stat. 2809 (2004); Pub. L. No. 109-54, 119 Stat. 499 (2005).

Trustee-Delegates concede that the Tribal Trust Fund Accounting Statutes operate to defer the accrual of claims that might otherwise be barred by the general six year statute of limitations for claims against the federal government, 28 U.S.C. § 2501. (Def. Mem. at n. 33.)[24] Trustee-Delegates argue, however, that the statutes do not similarly operate with respect to claims otherwise barred by Section 12 of the ICCA (formerly codified at 25 U.S.C. § 70k). Under the Tribal Trust Fund Accounting Statutes themselves and as they have been construed consistently on this very point, Trustee-Delegates are incorrect.

The ICCA Section 12 provides that "[t]he Commission shall receive claims for a period of five years after the date of the approval of this Act and no claim existing before such date but not presented within such time period may thereafter be submitted to any court or administrative agency for consideration . . . . " Pub. L. No. 79-726, 60 Stat. 1049. Under cases cited by Trustee-Delegates such as *Navajo Tribe of Indians v. New Mexico,* 809 F.2d 1455, 1460-61 (10th Cir. 1987), courts have held that Section 12 generally bars claims accruing before August 13, 1946 but not filed with the ICC by August 13, 1951 from being submitted to courts or agencies for consideration. But none of those cases involved acts of Congress subsequent to the ICCA such as the Tribal Trust Fund Accounting Statutes are applicable here.

In short, the Tribal Trust Fund Accounting Statutes have altered the landscape. They make clear that the accrual of trust claims has been tolled pending receipt of accountings regardless of when those claims arose. "The most basic rule of statutory construction requires

---

[24] This concession underscores that Trustee-Delegates' argument appropriately is not that Congress lacks the power to override or amend a previously enacted statute of limitations, but that in Trustee-Delegates' view, Congress has not done so in this instance with respect to the limitations period in the ICCA. *See United States v. Ward,* No. 92-1786, 1992 WL 373557, at *3 n.1 (E.D. La. Dec. 7, 1992) ("Defendant does not allege that Congress lacks the power to extend or revoke the limitation period within which to enforce a claim – even though, as in this case, the result is to resuscitate a claim that was hitherto thought time barred."). "This resuscitative legislation is not an unusual action, and the courts have clearly recognized that Congress has the power to revive a time-barred claim . . . ." *United States v. Smith,* 811 F. Supp. 646, 648 (S.D. Ala. 1992).

that courts attribute to the words of a statue their plain meaning." *ITT World Commc'ns Inc. v. Fed. Commc'ns Comm'n,* 725 F.2d 732, 743 (D.C. Cir. 1984). "The plain meaning of a statute is (at least for starters) the one produced by reading its words to have the meaning they do in most contexts . . . ." *Sea-Land Serv., Inc. v. Dep't of Transp.,* 137 F.3d 640, 645 (D.C. Cir. 1998).

Significantly, each and every Tribal Trust Fund Accounting Statute provides expressly that "notwithstanding any other provision of law, the statute of limitations shall not commence to run on any [trust fund] claim . . . ." It is well-established that "the phrase 'notwithstanding any other provision of law,' or a variation thereof, means exactly that; it is unambiguous and effectively supersedes all previous laws." *Energy Transp. Group, Inc. v. Skinner,* 752 F. Supp. 1, 10 (D. D.C. 1990), *aff'd on other grounds,* 956 F.2d 1206 (D.C. Cir. 1992). "A clearer statement than 'notwithstanding any other provision of law' is difficult to imagine." *Hill v. Republic of Iraq,* No. Civ. 4.1:99CV03346TP, 2003 WL 21057173, at *2 (D. D.C. Mar. 11, 2003), *rev'd on other grounds,* 328 F.3d 680 (D.C. Cir. 2003), *citing Crowley Caribbean Transp., Inc. v. United States,* 865 F. 2d 1281, 1283 (D.C. Cir. 1989). Accordingly, by their plain meaning, the trust claims accrual statutes supersede any other laws, including the ICCA.

There is no ambiguity on the face of the Tribal Trust Fund Accounting Statutes. Even if the statutes were ambiguous, the Court must resolve the ambiguity in light of the Indian canons of construction. It is a well-settled rule that "statutes are to be construed liberally in favor of Indians, with ambiguous provisions interpreted to their benefit." *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985); *see also South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 506 (1986) ("[D]oubtful expressions of legislative intent must be resolved in favor of the Indians"). The canon further provides "for a broad construction when the issue is whether Indian rights are reserved or established, and for a narrow construction when Indian rights are to

be abrogated or limited." *Nat'l Labor Relations Bd. v. Pueblo of San Juan¸* 276 F.3d 1186, 1194 (10th Cir. 2002) (citing *Bryan v. Itasca County*, 426 U.S. 373 (1976)). Accordingly, insofar as the statutory language relating to commencement of Plaintiff-Tribes' claims is ambiguous, the Tribal Trust Fund Accounting Statutes should be read broadly, with any ambiguity relating to commencement of an action against Trustee-Delegates resolved in favor of Plaintiff-Tribes.

**B.     The Court of Federal Claims Twice Has Determined that the Tribal Trust Fund Accounting Statutes Preserve Pre-1946 Claims.**

The Court of Federal Claims has found that the trust claims accrual statutes superseded the ICCA, in a tribal trust claim action.  In construing the trust claims accrual statutes in *Shoshone Indian Tribe v. United States,* 364 F.3d 1339, 1346 (Fed. Cir. 2004), *cert. denied,* 544 U.S. 973 (2005), the Court of Appeals held that "[t]he introductory phrase 'notwithstanding any other provision of law' connotes a legislative intent to displace any other provision of law that is contrary to the Act[s] . . . ."  Congress' "clear intent" is that statutes of limitations "will not begin to run on a tribe's claims until an accounting is completed."  *Id.* at 1347.  "This is simple logic – how can a beneficiary be aware of any claims unless and until an accounting has been rendered?" *Id.*

Following this appellate decision, which addressed the effect of the Tribal Trust Fund Accounting Statutes on the general six-year statute of limitations for claims against the federal government,[25] the tribes in *Shoshone* moved to amend their complaint to encompass claims dating back to 1868.  *Shoshone Indian Tribe v. United States,* 71 Fed. Cl. 172 (Fed. Cl. 2006).

---

[25]  Conclusions that the Tribal Trust Fund Accounting Statutes have deferred the accrual of claims that might otherwise be barred under 28 U.S.C. § 2501 also have been reached in *Wolfchild v. United States,* 62 Fed. Cl. 521, 547-548 (Fed. Cl. 2004); *Wolfchild v. United States,* 72 Fed. Cl. 511, 525-26 (Fed. Cl. 2006) (these statutes "resuscitate[] and preserve[] plaintiffs' claims of breach of trust, displacing 28 U.S.C. Sec. 2501 in the process."); and, *Chippewa Cree Tribe. v. United States,* 69 Fed. Cl. 639, 663-664 (Fed. Cl. 2006).

The government argued that this was impermissible under Section 12 of the ICCA and the trust claims accrual statutes as construed by the court of appeals with respect to claims for mismanagement of the assets underlying the tribes' trust funds. 71 Fed. Cl. at 176-77. The appeals court had distinguished between asset mismanagement claims, the accrual of which the appeals court found was not deferred by the trust claims accrual statutes, and other types of mismanagement claims, such as claims that the government failed to collect funds, or that it mismanaged funds after they were collected, which the appeals court found were deferred by the trust claims accrual statutes. *Shoshone,* 364 F.3d at 1348-51.

Finding that the tribes had properly alleged the types of claims affected by the Tribal Trust Fund Accounting Statutes, the Court of Federal Claims granted the tribes' motion. "The Tribes' proposed amendments are not precluded by the statute of limitations applicable here." *Shoshone,* 71 Fed. Cl. at 177. "Although some of the specific asset-related issues raised by the Tribes may be found to be outside the scope of the Appropriations Acts under the Federal Circuit's holding in *Shoshone* and therefore subsequently dismissed, the chief effect of the proposed changes to the petitions would be simply to reflect the possibility of additional damages for claims found to be valid for periods prior to 1946." *Id.* at 178-79.

As Trustee-Delegates note, a similar result has been reached in the *Osage* CFC trust litigation. *Osage Nation v. United States,* 57 Fed. Cl. 392, 396 (Fed. Cl. 2003) (Defendant's motion to dismiss contends, *inter alia,* that notwithstanding trust claims accrual statutes, tribe's "claims accruing before August 13, 1946 are time-barred by Section 12" of the ICCA; and Plaintiff argues that the statutes address "all trust claims," and thus even those predating "1946 do not accrue until plaintiff receives an accounting from defendant."). The court there found that the trust claims accrual statutes effectively prevented the accrual of pre-1946 claims,

notwithstanding the ICCA.   57 Fed. Cl. at 396.   "As in *Shoshone,* the court finds that the language "notwithstanding any other provision of law" is a sufficient signal to indicate congressional awareness of an existing statutory framework and is also a determination to preserve claims "notwithstanding" that framework." *Id.* at 392, 398 (citations omitted).   Hence, Congress intended "Indian tribes to file tribal trust mismanagement claims within six years after an accounting of the trust fund is furnished to the Tribe no matter when the mismanagement may have occurred." *Id.* at 392.[26]

### C.   Trustee-Delegates' Arguments that Plaintiff-Tribes' pre-1946 Claims Are Barred Are Without Merit.

Trustee-Delegate' arguments otherwise are unpersuasive.   First, Trustee-Delegates make the feeble contention that reliance on the trust claims accrual statutes "is misplaced, because Section 12 of the ICCA is not a "statute of limitations,"' but is "a statute of repose." (Def. Mem. at 55.)   That argument ignores that Congress expressly entitled Section 12 as "Limitations."   A statute section's title can be used to resolve any doubt about the meaning of a statute. *Murphy*

---

[26]   Trustee-Delegates' complaint that Plaintiff-Tribes are unable to specify the dates on which their trust accounts began simply highlights Trustee-Delegates' failure ever to provide Plaintiff-Tribes with accountings.   Many federal agency reports have documented this failure as well as Trustee-Delegates' inability to confirm the historical and present balances of Plaintiff-Tribes' accounts. *See, e.g.,* U.S. Government Accountability Office, Office of the Special Trustee for American Indians*,* Financial Statement Audit Recommendations and the Audit Follow-up Process, at 2 and 8-17, GAO-07-295R (Jan. 2007), http://www.gao.gov/new.items/d07295r.pdf.

In any event, the fact that "Plaintiffs appear to seek accountings extending back to the early 19th Century . . . ." should come as no surprise to Trustee-Delegates, whose own reports confirm that they have been holding funds in trust for tribes since 1820. *See, e.g.,* U.S. Department of the Interior, Office of the Inspector General, Statement of Assets and Trust Fund Balances at September, 30, 1995, of the Trust Funds Managed by the Office of Trust Funds Management, Bureau of Indian Affairs, Audit Rep. No. 97-I-196, at 1 (Dec. 1996).   Of course, Congress has mandated that Trustee-Delegates provide full and complete accountings "to the earliest possible date." *See, e.g.,* 25 U.S.C. Sec. 4044 (1994); Pub. L. No. 100-202, 101 Stat. 1329 (1987).   Thus, decisions such as that in *Wolfchild v. United States,* 72 Fed. Cl. at 525, and in *Shoshone, supra*, where no trust accountings have been provided, allow claims to go back to the inception of the trust, which in *Wolfchild,* happens to be 1888 and in *Shoshone* happens to be 1868.

*Exploration & Prod. Co. v. U.S. Dep't of the Interior,* 252 F.3d 473, 481 (D.C. Cir. 2001). Moreover, in the many decades that Section 12 has been construed, various courts consistently have recognized it for what it is – a statute of limitations. *See, e.g., Te-Moak Bands of W. Shoshone Indians v. United States,* 948 F.2d 1258, 1259 (Fed. Cir. 1991) ("The limitations provision of the [ICC] Act . . . ."); *Minn. Chippewa Tribe v. United States*, 11 Cl. Ct. 534, 536 (Cl. Ct. 1987) (the ICCA's "statute of limitations"); *Sioux Tribe v. United States*, 500 F.2d 458, 476-79 (Ct. Cl. 1974) (the ICCA's "limitation period"); *Navajo Tribe v. New Mexico,* 809 F.2d at 1470 (the ICCA's "statute of limitations").

Second, Trustee-Delegates rely on *United States v. Will,* 449 U.S. 200 (1980), for their version of the rule that "repeals by implications are disfavored, particularly when the provision advanced as the repealing measure was enacted in an appropriations bill." (Def. Mem. at 55). A more recent case more accurately states the rule as being that "although repeals by implication are especially disfavored in the appropriations context, . . . Congress nonetheless may amend substantive law in an appropriations statute, as long as it does so clearly." *Robertson v. Seattle Audubon Soc'y,* 503 U.S. 429, 440 (1992), *citing United States v. Will,* 449 U.S. 200, 222 (1980) (internal citation omitted). As every court that has reached this issue has found, such is a clear case here. "Where Congress chooses to do so, . . . we are bound to follow Congress' last word on the matter even in an appropriations law." *City of Los Angeles v. Adams,* 556 F.2d 40, 49 (D.C. Cir. 1977). "Courts have treated appropriations measures as amendments in a number of cases." *Id.* (footnote omitted).

Third, Trustee-Delegates' argue that the ICCA's jurisdictional limitations preclude relief sought under the APA. Plaintiff-Tribes' response that the APA is merely one basis on which they seek relief in these actions is discussed elsewhere in this brief. In this section, Plaintiff-

Tribes simply reiterate, as noted above, that this ICCA argument of Trustee-Delegates ignores the overriding impact of the Tribal Trust Fund Accounting Statutes on the ICCA.  Under the trust claims accrual statutes, Plaintiff-Tribes' claims regarding their trust fund accounts have been deferred unless and until they are provided with accountings, notwithstanding the ICCA. Nothing in the APA changes this state of the law.

Finally, two years ago, as noted by the CFC in *Shoshone,* the government acknowledged "that 'claims for mismanagement of certain trust fund monies . . .  may be allowable for periods pre-dating 1946."  71 Fed. Cl. at 177 (citing Defendant's Response to Tribes' Motion for Leave to Amend Petitions, at 6).[27]  The government's more tenable position in *Shoshone* is in stark contrast to its blanket position here that "any and all" pre-1946 claims are barred by Section 12 of the ICCA.  (Def. Mem. at 51-54.)[28]

## III.    PLAINTIFF-TRIBES ARE ENTITLED TO AN ACCOUNTING OF THEIR NON-MONETARY ASSETS.

### A.    It Is Well-Established that an Adequate Accounting Must Include Non-Monetary Assets.

Trustee-Delegates contend that Plaintiff-Tribes cannot obtain an accounting of non-monetary assets under Section 706(1).  This argument fails on two principal grounds.  First, Plaintiff-Tribes' claim is an equitable cause of action by a trust beneficiary to enforce express and implied federal statutory trust responsibilities.  The obligation of a trustee to provide an accounting – which includes non-monetary assets – is fundamental.  Second, Plaintiff-Tribes' alternative claim based on 706(1) to compel an accounting of non-monetary assets falls squarely

---

[27] For this Court's convenience, copies of the briefs for both sides on the Tribes' Motion for Leave to Amend in *Shoshone* are appended hereto collectively as Exhibit A.

[28]  Regarding Trustee-Delegates' arguments that Plaintiffs' claims are barred by the ICCA under theories of relitigation / *res judicata,* Plaintiffs already have argued that the law is clear that the ICCA did not produce the requisite accountings and other relief sought in these actions.  *See, e.g.,* Plaintiffs' Memorandum in Opposition to Defendants' Motion to Remand and for Stay of Litigation, at 10-11, *Ak-Chin Indian Comm. v. Kempthorne,* No. 06-2245 (D.D.C. Doc. # 22 filed Oct. 1, 2007).

within the scope of judicial authority set forth in *SUWA* and *Cobell VI*, especially since this is a trust case. *Cobell XII*, 391 F.3d at 258-58 ("The district Court, then, retains substantial latitude, much more so than in a typical agency case, to fashion an equitable remedy because the underlying lawsuit is both an Indian case and a trust case in which the trustees have egregiously breached their fiduciary duties.")

It is axiomatic that a trust beneficiary is entitled to "information . . . reasonably necessary to enable [it] to enforce [its] rights under the trust . . . ." Restatement (Second) of Trusts § 173, cmt. c ("Duty to Furnish Information") (1959); *Cobell VI*, 240 F.3d at 1103 ("Under traditional equitable trust principles, '[t]he trustee's report must contain sufficient information for the beneficiary readily to ascertain whether the trust has been faithfully carried out.'") (citation omitted); *Clifford v. United States*, 136 F.3d 144, 152 (D.C. Cir. 1998) (same). As such, an adequate accounting is not limited to funds, but also must include non-monetary assets. *See* 76 Am. Jur.2d Trusts § 378 (as a general rule, trustee must account for property or funds); 1A C.J.S. Accounting §§ ("An accounting is essentially an equitable remedy, which arises from an obligation to account for the plaintiff's money *or property*") (emphasis added), 16 ("Equity has jurisdiction of an accounting where a fiduciary relation exists creating a duty to account for money *or property*") (emphasis added); Black's Law Dictionary (8th ed. 2004) (defining accounting as "'the report of all items of property, income and expenses' prepared by the trustee for the beneficiary").[29]

In addition, this Court is authorized to compel an accounting of all of Plaintiff-Tribes' assets, including non-monetary assets, under Section 706(1). *See* Section B.1.(b). It is

---

[29] Even in the *Cobell* case which involved only an accounting of funds, the Court of Appeals held that a listing of the non-monetary assets held in trust was necessary. *See Cobell VI*, 240 F.3d at 1103 ("an accounting necessarily requires a full disclosure and description of each item of property constituting the corpus of the trust at its inception" and further defining accounting "as the report of *all items of property*, income, and expenses prepared by the trustee for the beneficiary.") (citations omitted) (emphasis added).

fundamental that an adequate accounting necessarily includes an accounting of non-monetary assets. Thus, under *SUWA* and *Cobell VI*, this Court is authorized to, indeed required to, compel an accounting of Plaintiff-Tribes' non-monetary assets.

**B.      Plaintiff-Tribes Were Not Required to Exhaust Administrative Remedies.**

Trustee-Delegates next contend that Plaintiff-Tribes' claim for an accounting of non-monetary assets is barred by the failure to exhaust administrative remedies. This argument is unavailing for two reasons. First, Plaintiff-Tribes are trust beneficiaries and thus have access to Courts of equity to enforce trust obligations owed to them. Scott on Trusts § 199, at 203-04 (4th ed. 1988). Second, the information subject to the regulations cited by Trustee-Delegates is wholly different in scope and nature from the information Plaintiff-Tribes seek through an accounting of non-monetary assets. In other words, there are no applicable administrative procedures that Plaintiff-Tribes could have exhausted prior to filing the instant action.

The information that is the subject of Plaintiff-Tribes' accounting claim is all-encompassing. As discussed, *supra*, a trust beneficiary is entitled to obtain from its trustee a broad array of information, which includes information reasonably necessary to enable it to enforce its rights under the trust. *See Restatement (Second) of Trusts* § 173 ("Duty to Furnish Information") (1959); *Clifford*, 136 F.3d at 152; *Cobell VI*, 240 F.3d at 1103. Trustee-Delegates owe this strict duty to Plaintiff-Tribes, as beneficiaries, *even in the absence of a request*. Restatement (Second) of Trusts § 173 cmt. d (emphasis added).

The Court is well-acquainted with the contours of Trustee-Delegates' obligations under its trust relationship with Indian tribes. It is therefore not necessary here to repeat the manifold contentions that have been made in this and earlier filings. *See, e.g., Ak-Chin Indian Community v. Kempthorne*, No. 06-2245, Ak-Chin Status Report, *filed on* January 18, 2008, at pp. 7-10

[Docket No. 27], attached hereto as Exhibit B.  It is enough that counsel for Trustee-Delegates has not attempted to dispute Plaintiff-Tribes' entitlement to detailed information about non-monetary assets.  *See* Tr. of Feb. 25, 2008 Status Conf., in *Ak-Chin*.

Quite apart from Trustee-Delegates' obligation under trust law to furnish information about trust assets to Plaintiff-Tribes, a set of regulations requires the BIA to maintain information and provide title status reports regarding tribal land.  *See generally* 25 C.F.R. § 150.1-150.11.    Trustee-Delegates take the untenable position that these run-of-the-mill regulations setting forth procedures for BIA merely to provide "title status reports" to "those persons authorized by law to receive such information" establishes an administrative mechanism for Plaintiff-Tribes to obtain an accounting of non-monetary assets requested by Plaintiff-Tribes in this action.  25 C.F.R. § 150.8.

This argument is patently incorrect.  The disclosure obligation of these regulations is not a means for obtaining a comprehensive accounting of non-monetary assets in a trust.  Rather, the regulation only would obligate BIA to provide a title status report containing the most rudimentary summary level information not at all equal to the comprehensive accounting of non-monetary assets Plaintiff-Tribes seek here.  What Plaintiff-Tribes seek is far different than a title status report.  The regulations do not provide a means, for example, for a Plaintiff-Tribe to obtain background records on leases or easements which would enable Plaintiff-Tribes to determine whether certain encumbrances remain in force and effect.  The comprehensive accounting of non-monetary assets is the lifeblood of the trust.  This is what Plaintiff-Tribes are entitled.  Thus, requiring Plaintiff-Tribes to exhaust these so-called "administrative remedies" would be pointless and provide them with wholly inadequate relief.  *Coit Independence Joint Venture v. Fed. Sav. & Loan Ins. Corp.*, 489 U.S. 561, 587 (1989) ("Administrative remedies that are

inadequate need not be exhausted.") (citing *Greene v. United States*, 376 U.S. 149, 163 (1964); *Smith v. Ill. Bell Tel. Co.*, 270 U.S. 587, 591-92 (1926)); *Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 107 (D.C. Cir. 1986) ( "The administrative process is inadequate where … the relief [the agency] will provide through its action will not be sufficient to right the wrong ...").

Moreover, the stated purpose and scope of the regulations cited by Trustee-Delegates is merely to "set forth authorities, policy and procedures governing the recording, custody, maintenance, use and certification of title documents, and the issuance of title status reports for Indian land."  25 C.F.R. § 150.1; *see also Harrison v. Emerald Outdoor Adver., LLC (In re Emerald Outdoor Adver., LLC)*, 444 F.3d 1077, 1082-83 (9th Cir. 2006) (emphasizing the public notice aspect of the regulations).  It is not to provide an administrative mechanism for the tribal beneficiaries to obtain information about their own assets.

The regulation pointed to by the BIA simply states that the BIA:

> [M]ay conduct a title examination of a tract of Indian land [and] provide a title status report upon request to those persons authorized by law to receive such information.  Requests for title status reports shall be submitted by or through the Bureau office that has administrative jurisdiction over the Indian land.

25 C.F.R. § 150.8.  Under 25 C.F.R. § 150.2, a "Title status report" is defined as:

> [A] report issued after a title examination which shows the proper legal description of a tract of Indian land; current ownership, including any applicable conditions, exceptions, restrictions or encumbrances on record; and whether the land is in unrestricted, restricted, trust, or other status as indicated by the records in a Land Titles and Records Office.

Trustee-Delegates point to no other regulation requiring the BIA to provide information regarding non-monetary trust assets.

Trustee-Delegates contend that the failure of Plaintiff-Tribes to seek a title status report under these regulations and then appeal the BIA's failure to provide such a report, *see* 25 C.F.R. §§ 2.6 & 2.8, means that the claims are barred for failure to exhaust administrative remedies. The absurdity of this argument can be understood merely by envisioning Trustee-Delegates' version of events.   Trustee-Delegates contend that Plaintiff-Tribes should have made an administrative request for the information they seek.   Under the regulation, Plaintiff-Tribe would be entitled only to a title status report, a document with little to no utility.   Providing this report would not discharge Trustee-Delegates' broad and well-established obligations under the trust relationship to provide all information reasonably necessary to enable Plaintiff-Tribes to enforce their rights under the trust.   But Trustee-Delegates would have discharged their obligations under the regulation, meaning the Plaintiff-Tribe would be left with wholly inadequate relief.   An administrative appeal from a failure to provide information under 25 C.F.R. § 150.8 *could not possibly* satisfy Plaintiffs-Tribes' claims, as a matter of law.   Put another way, a reviewing court could not enforce the trust obligations by enforcing the regulation because the regulation does not address the full complement of information to which Plaintiff-Tribes are entitled.

The cases cited by Trustee-Delegates in support of their argument scarcely merit discussion.   Nearly all involve mechanical application of the exhaustion of administrative remedies doctrine in cases where plaintiffs plainly failed to seek available remedies at the administrative level.   In *Coosewoon v. Meridian Oil Co.*, 25 F.3d 920 (10th Cir. 1994), for example, the plaintiffs sought cancellation of an oil and gas lease under a particular DOI regulation which provided a specific mechanism for the cancellation of such leases.   *Id.* at 924-25.   Thus, in stark contrast to the case at hand, in *Coosewoon*, there was a perfect correlation between the relief sought and the remedy available under the regulation.   *Id.*; *see also Davis v.*

*United States*, 199 F. Supp.2d 1164, 1179 (W.D. Okla. 2002), *aff'd* 343 F.3d 1282 (10th Cir. 2003) (cited by Trustee-Delegates and dismissing plaintiffs' claims seeking to obtain Certificates of Degree of Indian Blood because of their failure to follow the prescribed procedure for obtaining such certificates).

The obligation to provide sufficient information for a trust beneficiary to determine whether the trustee has discharged its duties exists independently of, and is not coextensive with, the obligations created by the regulations cited by Trustee-Delegates. As such, the administrative procedure for obtaining information under 25 C.F.R. § 150.8 is both wholly inapplicable and inadequate to meet Plaintiff-Tribes' needs. For these reasons, Plaintiff-Tribes were not required to exhaust administrative remedies and this Court should exercise jurisdiction over their claims for an accounting of non-monetary assets. *Randolph-Sheppard Vendors of Am.*, 795 F.2d at 107 (holding that exhaustion may be excused where administrative remedies are inadequate)*; Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1247 (D.C. Cir. 2004) (same).

## <u>CONCLUSION</u>

For all of the foregoing reasons, Plaintiff-Tribes respectfully request that Trustee-Delegates' Motion to Dismiss be summarily denied.

This 16th day of July, 2008.

Respectfully submitted,

/s/ Keith Harper
KEITH HARPER
D.C. Bar No. 451956
E-mail: kharper@kilpatrickstockton.com
G. WILLIAM AUSTIN
D.C. Bar No. 478417
E-mail: baustin@kilpatrickstockton.com
CATHERINE F. MUNSON
Georgia Bar No. 529621
Email: cmunson@kilpatrickstockton.com

61

KILPATRICK STOCKTON LLP
607 14th Street, N.W.
Washington, D.C. 20005
Phone: (202) 508-5800

*Attorneys for the Ak-Chin Indian Community, Salt River Pima-Maricopa Indian Community, Passamaquoddy Tribe of Maine and Tohono O'Odham Nation*

## CERTIFICATE OF SERVICE

I hereby certify that PLAINTIFF'S PRINCIPAL BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS was electronically filed using the Court's ECF system and that the below-listed counsel are ECF users and will be served via the ECF System:

> John H. Martin, Esq.
> United States Department of Justice
> Environmental and Natural Resources Division
> 1961 Stout Street, Eighth Floor
> Denver, CO 80294
>
> Kevin E. Regan, Esq.
> United States Department of Justice
> Environmental and Natural Resources Division
> P.O. Box 663
> Washington, D.C. 20044-0663

This 16th day of July, 2008.

> /s/ Keith Harper
> KEITH HARPER
> D.C. Bar No. 451956
> E-mail: kharper@kilpatrickstockton.com
> G. WILLIAM AUSTIN
> D.C. Bar No. 478417
> E-mail: baustin@kilpatrickstockton.com
> CATHERINE F. MUNSON
> Georgia Bar No. 529621, Admitted *Pro Hac Vice*
> Email: cmunson@kilpatrickstockton.com
> KILPATRICK STOCKTON LLP
> 607 14th Street, N.W.
> Washington, D.C. 20005
> Phone: (202) 508-5800
> *Attorneys for Plaintiffs*
> *Ak-Chin Indian Community*
> *Salt River Pima-Maricopa Indian Community*
> *Tohono O'Odham Nation*
> *Passamaquoddy Tribe of Maine*

# EXHIBIT A

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| THE SHOSHONE INDIAN TRIBE OF THE WIND RIVER RESERVATION, WYOMING, | |
| *Plaintiff,* | No. 4582-79 L, 4583-79 L |
| v. | Judge Hewitt |
| THE UNITED STATES, | |
| *Defendant.* | |
| THE ARAPAHO INDIAN TRIBE OF THE WIND RIVER RESERVATION, WYOMING, | |
| *Plaintiff,* | No. 4592-79 L, 4593-79 L |
| v. | Judge Hewitt |
| THE UNITED STATES, | |
| *Defendant.* | |

**TRIBES' MOTION FOR LEAVE TO AMEND PETITIONS**

Pursuant to RCFC 15(a), Plaintiffs Eastern Shoshone and Northern Arapaho Tribes (collectively "Tribes") respectfully request leave to amend their Petitions to encompass damages suffered by the Tribes prior to August 14, 1946. Proposed Amended Petitions are attached hereto as Exhibits A and B. The only substantive amendments are to Paragraphs 9 and 10 of the Shoshone petition and paragraphs 10 and 11 of the Arapaho petition to remove August 14, 1946, as the earliest date for the claims and substitute an earlier date. In the Shoshone petition, July 3, 1868 is substituted, which is the date the Wind River Reservation was established. In the

**TRIBES' MOTION TO AMEND
PETITIONS -- 1**

Arapaho petition, 1878 is substituted, which is when the Arapaho Tribe became a beneficial owner of an undivided one-half interest in the Wind River Reservation. In addition, the spelling and designation of the Tribes' names have been modernized in limited instances for clarity.

The Tribes have viable claims for earlier time periods under the recent, final ruling of the Court of Appeals for the Federal Circuit in this case regarding limitations. *Shoshone Indian Tribe v. United States*, 364 F.3d 1339 (Fed. Cir. 2004), *cert. denied* 125 S.Ct. 1824, 1826 (April 18, 2005). The Federal Circuit affirmed this Court's ruling (*Shoshone Indian Tribe v. United States*, 51 Fed. Cl. 60 (2001)) that the Tribes were not barred by the statute of limitations (28 U.S.C. § 2501) from seeking damages for "losses to or mismanagement of trust funds" which may have occurred more than six years before the Tribes filed their Petitions. This Court denied the Tribes' prior motion to amend their Petitions on July 27, 2004, as unripe, because the Federal Circuit's decision had not yet become final. The motion is now ripe.

The limitations issue has also been addressed in several recent decisions of this Court in other cases, relying on its own and the Federal Circuit's decisions in *Shoshone*, including one issued within the past few weeks. *See Osage Nation v. United States*, 57 Fed. Cl. 392 (2003); *Wolfchild v. United States*, 62 Fed. Cl. 521 (2004); *Osage Tribe v. United States*, ___ Fed. Cl. ___, 2005 WL 2807671 (October 27, 2005). Justice requires that the Tribes be granted leave to amend their Petitions to cover breaches of fiduciary and statutory duties occurring before August 14, 1946.

## I.    BACKGROUND

On October 10, 1979, the Tribes filed their Petitions in this case, seeking damages for alleged breaches of fiduciary and statutory duties occurring since August 14, 1946. *See* 28 U.S.C. § 1505 (limiting the jurisdiction of the Court of Federal Claims with respect to Indian

claims against the United States to claims that accrued after August 13, 1946). The United States

answered the Petitions on January 18, 1980.

Beginning in 1990, Congress enacted a series of statutes (the "Appropriations Acts")

which provide that the statute of limitations shall not commence to run on a broad range of

claims affecting Indian trust funds – including claims at issue here – until a proper accounting is

furnished to the beneficiary.[1] The full text of the most recent version provides:

> [N]otwithstanding any other provision of law, the statute of
> limitations shall not commence to run on any claim, including any
> claim in litigation pending on the date of the enactment of this Act,
> concerning losses to or mismanagement of trust funds, until the
> affected tribe or individual Indian has been furnished with an
> accounting of such funds from which the beneficiary can
> determine whether there has been a loss.

Department of the Interior and Related Agencies Appropriations Act of November 10, 2003,

Pub. L. No. 108-108, 117 Stat. 1263. It is undisputed that the accounting contemplated by the

Appropriations Acts has never been provided to the Tribes.

Relying on the Appropriations Acts, this Court issued an opinion on November 30, 2001,

rejecting the Government's contention that breaches occurring more than six years prior to the

1979 filing of the Petitions was barred by 28 U.S.C. § 2501's six-year statute of limitations.

Noting that "Congress has not shown itself at all unwilling to address and provide remedies for

tribes even when the grievances to be redressed arose in the earliest days of this country," the

Court ruled that Tribal claims "concerning losses to or mismanagement of trust funds" do not

---

[1] The Appropriations Acts, with minimal variations, are as follows: Act of November 5, 1990, Pub. L. No. 101-512, 104 Stat. 1915; Act of November 13, 1991, Pub. L. No. 102-154, 105 Stat. 990; Act of October 5, 1992, Pub. L. No. 102-381, 106 Stat. 1374; Act of November 11, 1993, Pub. L. No. 103-138, 107 Stat. 1379; Act of September 30, 1994, Pub. L. No. 103-332, 108 Stat. 2499; Act of April 26, 1996, Pub. L. No. 104-134, 110 Stat. 1321; Act of September 30, 1996, Pub. L. No. 104-208, 110 Stat. 3009; Act of November 14, 1997, Pub. L. No. 105-83, 111 Stat. 1543; Act of November 29, 1999, Pub. L. No. 106-113, 113 Stat. 1501; Act of October 11, 2000, Pub. L. No. 106-291, 114 Stat. 922; Act of November 5, 2001, Pub. L. No. 107-63, 115 Stat. 414; Act of February 20, 2003, Pub. L. No. 108-7, 117 Stat. 11; Act of November 10, 2003, Pub. L. No. 108-108, 117 Stat. 1263.

**TRIBES' MOTION TO AMEND**
**PETITIONS -- 3**

accrue until the federal government furnishes an accounting concerning such losses or mismanagement. *Shoshone Indian Tribe v. United States*, 51 Fed. Cl. 60, 67, 69 (2001).

The Federal Circuit affirmed this ruling in part on April 7, 2004, holding that the "Act provides that claims falling within its ambit shall not accrue, *i.e.* 'shall not commence to run,' until the claimant is provided with a meaningful accounting." *Shoshone Indian Tribe v. United States*, 364 F.3d 1339, 1347, *reh. and reh. en banc denied* (Fed. Cir. 2004). The Federal Circuit ruled that the Act delays the accrual of claims relating not only to the Government's mismanagement of funds actually deposited into tribal trust accounts, but also to the Government's failure or delay in collecting payments under mineral leasing contracts, depositing those monies into interest bearing trust accounts, and assessing penalties for late payments. 364 F.3d at 1349-50. On April 18, 2005, the United States Supreme Court denied certiorari. 125 S.Ct. 1824, 1826 (2005).

While the appeal in *Shoshone* was pending, this Court, in *Osage Nation v. United States*, 57 Fed. Cl. 392 (2003), addressed claims regarding mismanagement of tribal trust funds from 1873 to the present. The Government argued that the Osage Tribe's claims accruing before August 13, 1946, were time-barred by Section 12 of the Indian Claims Commission Act ("ICC Act"), 60 Stat. 1052, and that the Court lacked subject matter jurisdiction over such claims. Applying its holding in *Shoshone*, this Court ruled that a claim within the scope of the Appropriations Acts does not accrue until the requisite accounting is provided to the tribe. *Id.* at 397. Because the only arguable accounting "concerning losses to or mismanagement of trust funds" had been provided to the Osage tribe on December 31, 1999, the tribe's claims accrued for limitations purposes on that date. The Court concluded that the congressional intent underlying the Appropriations Acts was "to allow Indian tribes to file tribal trust fund

**TRIBES' MOTION TO AMEND**
**PETITIONS — 4**

mismanagement claims within six years after an accounting of the trust fund is furnished to the Tribe *no matter when the mismanagement may have occurred.*" *Id.* at 398 (emphasis added).

The Wind River Tribes have not yet received the accounting to which they are entitled by the Appropriations Acts, and thus may pursue claims for losses to or mismanagement of their trust funds no matter when the breach of duty may have occurred.

## II.    ARGUMENT

RCFC 15(a) provides that after a responsive pleading has been filed, a complaint may be amended "only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." The Supreme Court has emphasized that the standard of Rule 15(a) is a liberal one. "If the underlying facts and circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. [Unless there is a] reason — such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.— the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis,* 371 U.S. 178, 182 (1962). Applying these considerations in this case, the Tribes should be permitted to amend their Petitions.

First, the Federal Circuit's decision in *Shoshone* and this Court's 2003 decision in *Osage* demonstrate that the Tribes' amended claims "may be a proper subject of relief." The amended Petitions are the Tribes' prompt, good faith response to these decisions. When the original Petitions were filed in 1979, the Tribes limited their claims to breaches that occurred on and after August 14, 1946, because that was the apparent jurisdictional cutoff date established by 28 U.S.C. § 1505, and there was no precedent for the Tribes to seek recovery for earlier breaches.

**TRIBES' MOTION TO AMEND**
**PETITIONS — 5**

The Appropriations Acts had not yet been enacted; indeed, they would not be enacted for more than a decade after these actions were filed. Furthermore, the impact of the Appropriations Acts on tribal claims for mismanagement occurring more than six years prior to filing was not passed upon by any court until this Court's decision in the instant case (51 Fed. Cl. 60 (2001)). Appellate review of that decision has only recently become final on denial of petitions of certiorari by the U.S. Supreme Court on April 18, 2005. 125 S.Ct. 1824, 1826. In the interim, this Court applied its own ruling in *Shoshone* to hold, for the first time, that covered claims accruing prior to August 14, 1946, were not barred by the ICC Act either. *Osage Nation v. United States*, 57 Fed. Cl. 392 (2003).

Second, there has been no undue delay or dilatory motive by the Tribes in seeking this amendment. The Government appealed this Court's decision regarding limitations. After the Federal Circuit issued its ruling in 2004, the Tribes promptly filed a motion to amend. The Federal Circuit's ruling remained subject to the appellate process, as rehearing, rehearing *en banc,* and certiorari were sought. This Court held on July 27, 2004, that the Tribes' motion to amend was premature due to the pendency of the appeal. The appellate process is now complete, and this motion is timely.

Third, the Government will not be prejudiced if the Petitions are amended. The proposed amendment does not change the nature of the claims against the Government; it simply extends them back in time to encompass periods prior to August 14, 1946.[2] Despite ruling that the prior motion to amend was unripe, the Court, in an Order issued August 27, 2004, allowed the Tribes to seek through discovery documents relating to claims of alleged mismanagement occurring both before and after 1946. *Id.* at 3 n. 2. Many such documents from both periods have already

---

[2] The Tribes' claims for such earlier periods would of course be subject to the Federal Circuit's ruling regarding the scope of preserved claims. *See, e.g., Shoshone*, 364 F.3d at 1349-50.

**TRIBES' MOTION TO AMEND
PETITIONS -- 6**

been produced. The proposed amendment will not require the Government to revisit or duplicate discovery efforts that it already has completed.

Furthermore, the alternative to amending the Petitions would be for the Tribes to file new actions addressing the period before August 14, 1946. Under the Federal Circuit's ruling in *Shoshone,* and this Court's rulings in *Shoshone* and *Osage,* such actions would be timely. It makes little sense, however, to bifurcate the Tribes' claims in such a manner. Judicial economy requires that the Tribes' pre-1946 claims should be consolidated with their identical post-1946 claims.

## III.    CONCLUSION

For the reasons stated above, the Tribes respectfully request leave to amend their Petitions to expand the time period covered by their claims to encompass the periods both before and after August 14, 1946.

DATED:   November 18, 2005.

Respectfully submitted,

s/Harry R. Sachse
by Richard M. Berley w/auth'n
HARRY R. SACHSE
Sonosky, Chambers, Sachse
  Enderson & Perry, LLP
1425 K Street, NW, Suite 600
Washington, DC 20005
(202) 682-0240 (Telephone)
(202) 682-0249 (Facsimile)
hsachse@sonosky.com
*Counsel of Record for Eastern Shoshone Tribe*

s/Richard M. Berley
RICHARD M. BERLEY
Ziontz, Chestnut, Varnell,
  Berley & Slonim
2101 4th Avenue, Suite 1230
Seattle, WA 98121
(206) 448-1230 (Telephone)
(206) 448-0962 (Facsimile)
rberley@zcvbs.com
*Counsel of Record for Northern Arapaho Tribe*

**TRIBES' MOTION TO AMEND
PETITIONS -- 7**

## CERTIFICATE OF SERVICE

I certify that the foregoing pleading, including Exhibits, is to be served on Terry Petrie, counsel of record for the United States, contemporaneously with this filing via the Court's electronic filing system.

s/Richard M. Berley
*Counsel of Record for Northern Arapaho Tribe*

**TRIBES' MOTION TO AMEND
PETITIONS -- 8**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

THE SHOSHONE INDIAN TRIBE OF
THE WIND RIVER RESERVATION,
WYOMING,

      *Plaintiff,*

    v.

THE UNITED STATES,

      *Defendant.*

No. 4582-79 L, 4583-79 L
Judge Hewitt

THE ARAPAHO INDIAN TRIBE OF THE
WIND RIVER RESERVATION,
WYOMING,

      *Plaintiff,*

    v.

THE UNITED STATES,

      *Defendant.*

No. 4592-79 L, 4593-79 L
Judge Hewitt

## FIRST AMENDED PETITION – EASTERN SHOSHONE INDIAN TRIBE
## [PROPOSED]

The Eastern Shoshone Indian Tribe (the Tribe) for its petition alleges:

<u>ALLEGATIONS APPLICABLE TO ALL CLAIMS</u>

1. This petition is filed pursuant to 28 U.S.C. 1491 and 1505.

2 This petition does not assert any claim, or seek to recover any damages with respect to any claim, which is now pending before this Court or any other court.

**[PROPOSED] FIRST AMENDED PETITION
EASTERN SHOSHONE TRIBE – EXHIBIT A, PAGE 1**

3.    The Tribe is a federally recognized Indian tribe, residing on the Wind River Indian Reservation in Wyoming.  The Tribe originally occupied some 44,672,000 acres in Wyoming, Colorado, Idaho and Utah (Treaty of July 2, 1863, 18 Stat. 685).  In 1868, the Government induced the Tribe to give up its vast territory and move to a reservation of some 3,054,182 acres in Wyoming (Treaty of July 3, 1868, 15 Stat. 673).  In 1872, the United States persuaded the Tribe to sell 710,642 acres of the southern portion of the Reservation for $27,500 (Agreement of September 26, 1872, 18 Stat. 291, 292) – a sum since judicially declared to be unconscionable (Shoshone Tribe of Indians of the Wind River Reservation, Wyoming v. United States, 3 Ind. Cl. Comm. 313, 343 (1954)).  In 1896, a smaller tract of land in the northeast corner of the Reservation was also removed (Agreement of April 21, 1896, 30 Stat. 93, 94).  The Reservation currently consists of the land reserved by the Treaty of 1868, less the land removed in 1872 and 1896, plus a small tract of land at the northern border of the 1868 reservation, extending outside the 1868 boundaries.

4.    In 1870, a band of the Northern Arapahoes were permitted by the Tribe to stay at the Reservation for a short time.  After a few months they moved away.  In 1878, a band of Northern Arapahoes was brought to the Reservation under military escort.  Other Arapahoes came in increasing number and were maintained on the Reservation by the United States.  There was no judicial redress since by law the courts were closed to the Tribe.  Act of March 3, 1863, 12 Stat. 767.  Sixty years later, when Congress granted the Tribe special permission to have this particular grievance heard, the Supreme Court held that the 1878 action of the United States constituted a taking under the Fifth Amendment of an undivided one-half of the Shoshone Reservation for the benefit of the Arapaho Tribe.  Shoshone Tribe v. United States, 299. U.S. 476 (1937).  Since 1878, the Shoshone Tribe and the Arapaho Tribe, accordingly, have been

**[PROPOSED] FIRST AMENDED PETITION**
**EASTERN SHOSHONE TRIBE – EXHIBIT A, PAGE 2**

owners in common of the Reservation – now referred to as the Wind River Reservation.

5. By Act of March 3, 1905, 33 Stat. 1016, 1019, the United States through a "cession in trust" opened the northern two-thirds of the Reservation to non-Indian settlement. Under the Act the United States paid nothing for the cession, but agreed to dispose of surplus land to settlers with the proceeds to go to the Tribes. The Tribes remained the equitable owners of the land, including all mineral resources, until actually disposed of by the United States. United States v. Shoshone Tribe, 304 U.S. 111, 114 (1938), Ash Sheep Company v. United States, 252 U.S. 159 (1920). There were known oil and gas resources within the "opened" part of the Reservation. By the Act of August 21, 1916, 39 Stat. 519, Congress empowered the Secretary of the Interior to lease the "opened" land for oil and gas "under such terms and conditions as shall be by him prescribed" with the proceeds of royalties from the leases to be "applied to the use and benefit of said Tribe***".

6. Little of the land opened for non-Indian settlement by the 1905 Act was actually settled by non-Indians. By Act of July 27, 1939 (25 U.S.C. 575), all undisposed of lands in the opened portion of the Reservation, not within a reclamation project, were restored to the Tribes. In the meantime, however, in 1920, Congress authorized the Riverton Reclamation Project. It embraced about 332,000 acres. Acts of June 5, 1920, 41 Stat. 874, 915 and March 4, 1921, 41 Stat. 1367, 1404. The project was constructed and through the years about 100,000 acres of the 332,000 acres were sold and the proceeds credited to the Tribes. An additional 70,500 acres, not required for the project, ultimately were restored to the Tribes under Section 4 of the Act of August 15, 1953, 67 Stat. 592, 613. Under that Act, the remaining 161,520 acres was ceded to the Government subject to a 90% interest of the Tribes to the proceeds of mineral leases to be administered under the "mining and mineral leasing laws of the United States." By Act of

**[PROPOSED] FIRST AMENDED PETITION**
**EASTERN SHOSHONE TRIBE – EXHIBIT A, PAGE 3**

August 27, 1958, 72 Stat. 935, the entirety of the mineral interests under those lands were "declared to be held by the United States in trust for the Shoshone and Arapahoe Tribes" and were required to be administered under the Indian Leasing Act of May 11, 1938, 52 Stat. 347, the general statute governing tribal oil and gas.

7.  By Act of May 19, 1947, 61 Stat. 102, 25 U.S.C. 611 et seq., the Secretary of the Interior was directed to divide the trust funds on deposit in the Treasury of the United States to the joint credit of the Shoshone and Arapahoe Tribes of the Wind River Reservation into separate accounts.  Since the effective date of that Act, all income derived from tribal property held in common by the two Tribes has been divided evenly.  From each Tribe's one-half, 85% is paid in a monthly per capita to the respective members of the Tribe.  The remaining 15%, referred to as the "15% fund" is maintained in the Treasury of the United States or under the control of the Secretary of the Interior.

8.  Under the Treaty of July 3, 1868, supra, the Trade and Intercourse Acts as amended, 25 U.S.C. 177, and the Commerce, War and Treaty powers of the Constitution, the Act of August 21, 1916, supra, the Act of May 11, 1938, supra, and decisions of this Court and the United States Supreme Court, the United States has a fiduciary duty to the Tribe requiring that it exercise "the most exacting fiduciary standards" in managing the Tribe's land and mineral estate and trust funds, Navajo Tribe of Indians v. United States, 176 Ct. Cl. 502, 507 (1966).

9.  The Tribe at all times since July 3, 1868, has been the beneficial owner of funds, real property and mineral interests held in trust and managed by the United States for the Tribe.

10.  In breach of its fiduciary and statutory duties to the Tribe, the defendant, for the entire period, has failed to manage plaintiff's trust funds as a prudent administrator and has failed to manage or administer the Tribes' mineral and other income producing property at least

**[PROPOSED] FIRST AMENDED PETITION**
**EASTERN SHOSHONE TRIBE – EXHIBIT A, PAGE 4**

as well as an informed owner of such property.

## CLAIM I:
### (FAILURE OR DELAY IN COLLECTING FUNDS DUE TO THE TRIBE)

11.  Defendant, at all times relevant, has been under fiduciary and statutory obligations to collect funds owing to the Tribe arising from the use or lease by defendant or third parties of the Tribe's mineral estate including but not limited to oil, gas, uranium, and gravel under the management and control of the defendant.

12.  In breach of its fiduciary duty to the Tribe and to the Tribe's detriment, defendant has delayed unreasonably, or failed to collect, such funds.

## CLAIM II:
### (DELAY IN DEPOSITING)

13.  On information and belief, the Tribe alleges that defendant, in breach of its fiduciary duty to the Tribe and to the Tribe's detriment, delayed for unreasonable periods of time depositing the Tribe's funds in interest bearing accounts.

## CLAIM III:
### (HOLDING TRUST FUNDS IN THE TREASURY
### AT INADEQUATE INTEREST)

14.  During a major part of the period in suit, defendant has held plaintiff's trust funds in its Treasury at a rate of 4 percent per annum simple interest.  Interest earned in the Treasury is segregated into separate accounts and no interest is paid by the United States on these accounts.

15.  During relevant times, there were readily available for acquisition with such funds, pursuant to 25 U.S.C. 162a, various obligations of the defendant and its agencies, as well as bank certificates or obligations guaranteed or secured as required by 25 U.S.C. 162a carrying interest rates higher than 4 percent.

**[PROPOSED] FIRST AMENDED PETITION**
**EASTERN SHOSHONE TRIBE – EXHIBIT A, PAGE 5**

16.  The defendant breached its fiduciary duty to the Tribe to the Tribe's detriment by, in effect, borrowing tribal trust funds for its own purposes and benefit and by failing to invest such funds and the interest on such funds to earn maximum income for the Tribe.

## CLAIM IV:
### (INVESTMENT AT INADEQUATE RATES)

17.  Defendant invested certain of the Tribe's trust funds in various governmental and private securities guaranteed or secured as required by 25 U.S.C. 162a.  On information and belief, the Tribe alleges that defendant did so in breach of its fiduciary duty to the Tribe and to the Tribe's detriment in that at the time the investments were made other securities or obligations of the same or similar type, guaranteed or secured as required by 25 U.S.C. 162a, were readily available for investment at higher interest rates.

## CLAIM V:
### (IMPROPER EXPENDITURES FROM INTEREST BEARING ACCOUNTS)

18.  Plaintiff alleges and believes that defendant has consistently made expenditures from plaintiff's interest bearing funds or investments returning a higher yield when lower yield funds or funds bearing no interest were available, all in violation of defendant's statutory and fiduciaries duties to plaintiff.

## CLAIM VI:
### (MISUSE OF MISCELLANEOUS REVENUES)

19.  In breach of its fiduciary duty to the Tribe and to the Tribe's detriment, defendant had failed to deposit tribal funds in the United States Treasury and has used such funds derived from the Tribe's trust property for purposes not for the exclusive benefit of the Tribe.

CLAIM VII:
(MISMANAGEMENT OF CREDIT PROGRAM)

20.  The defendant, through the Secretary of the Interior, manages a tribal credit program. The Tribe alleges on information and belief that the defendant in breach of its fiduciary duty to the Tribes, and to the Tribe's detriment, has mismanaged the program by, among other things, keeping large sums of tribal money in non-interest bearing checking accounts when proper management would require such funds to be placed at interest.

CLAIM VIII:
(MISMANAGEMENT OF PLAINTIFF'S OIL AND GAS ESTATE)

21.  At all times relevant, the Tribe has been the beneficial owner of an undivided one-half interest in substantial oil, gas and mineral deposits on the Reservation.  Under the Treaty of July 3, 1868, 15 Stat. 673, the Trade and Intercourse Acts as amended, 25 U.S.C. 177, the statutes regulating oil and gas leasing on Indian lands including but not limited to 25 U.S.C. 396-398 and the Act of August 2, 1916, 39 Stat. 519, as well as the regulations under such acts (including 25 CFR Parts 171 and 184 and 30 CFR Part 221), the United States has the obligation to manage the tribal oil and gas resource in a manner consistent with defendant's superior skill and knowledge in the area of oil and gas development and management and in all instances at least equal to the management of oil and gas lands by an informed owner of such lands. Defendant, in breach of its statutory and trust responsibility to the Tribe, and to the Tribe's detriment has mismanaged plaintiff's oil and gas estate as set out in the following paragraphs:

22.  The defendant, through its Bureau of Reclamation, inconsistent with its fiduciary and statutory duties to the Tribe has burdened the Tribe's oil and gas estate and interfered with its development by inappropriately and unnecessarily applying regulations and restrictions employed on public lands of the United States to tribal lands in particular to tribal oil and gas

**[PROPOSED] FIRST AMENDED PETITION**
**EASTERN SHOSHONE TRIBE – EXHIBIT A, PAGE 7**

lands within reclamation areas.

23.  The defendant has excluded from oil and gas leases river bottoms and lake bottoms owned by the Tribe.

24.  The defendant has held large sums of money received as deposits for bids for the right to lease the Tribe's oil and gas without placing the same at interest for the benefit of the Tribe.

25.  The defendant has failed to require oil and gas lessees to comply with the terms of their leases on tribal lands and has failed to oversee, monitor and administer said oil and gas leases on a basis at least equal to the management of oil and gas lands by the informed owner of oil and gas lands in, among others, the following respects:

a)  The defendant has not required that royalties paid under the Tribe's oil and gas leases be the stated percentage of the fair market value of the oil and gas produced, but in violation of defendant's own regulations has consistently accepted the lessees' report of price received for the gas or oil as the value thereof with the result that the Tribe lost significant revenues to which it is entitled under its leases and defendant's own regulations.

b)  Where natural gas has been produced, the defendant has consistently accepted the interstate controlled price of natural gas or prices lower than the controlled price as the value of the gas rather than the intrastate price which during a substantial portion of the time at issue has been substantially higher.  As a result, the Tribe has received its royalty percentage based upon a small fraction of the actual value of the gas produced.

c)  The defendant has not required that lessees account for and pay royalties on the value of liquid hydrocarbon substances produced and saved on the leased premises as

**[PROPOSED] FIRST AMENDED PETITION**
**EASTERN SHOSHONE TRIBE – EXHIBIT A, PAGE 8**

required by the regulations and the provisions of the leases and has thereby failed to obtain for the Tribe the highest price permitted under the lease.

d)  The defendant has not required prompt payment of royalties on a monthly basis as required by the terms of the leases, but has permitted lessees to pay royalties and rentals long after their due dates.

e)  The defendant has failed to terminate leases in accordance with its own lease terms and regulations, although lessees have committed serious breaches for which an informed owner would have required cancellation; nor has the defendant required payment of penalties as required by 30 CFR 221.54 incorporated into the leases under provision 3(g).

f)  The defendant has failed to require lessees to exercise reasonable diligence in drilling and operating wells for oil and gas on tribal land as provided in paragraph 3(f) of the leases and as required by federal regulations.  As a result of this failure and refusal, the defendant has permitted lessees to hold leases on tribal land without development for years.

g)  The defendant has failed either to require drilling and production of wells to offset and protect tribal leases from drainage, or to require the lessees to pay compensatory royalties.

CLAIMS FOR RELIEF

Wherefore the Tribe prays:

1.  For a determination that the defendant is liable to the plaintiff in damages for the injuries and losses caused through violations of the defendant's fiduciary and statutory responsibilities to the Tribe.

2.  That defendant be ordered to render such accountings of its management and handling

**[PROPOSED] FIRST AMENDED PETITION**
**EASTERN SHOSHONE TRIBE – EXHIBIT A, PAGE 9**

of the Tribe's funds and mineral estate as are appropriate in aid of the Court's determination of

the specific amount of money damages.

    3. For a determination of the amount of damages due the plaintiff.

    4. For such further relief as the Court may deem just.

Dated: _____, 2005.


                    Respectfully submitted,


                    _____
                    HARRY R. SACHSE
                    Sonosky, Chambers, Sachse
                      Enderson & Perry, LLP
                    1425 K Street, NW, Suite 600
                    Washington, DC 20005
                    (202) 682-0240 (Telephone)
                    (202) 682-0249 (Facsimile)
                    hsachse@sonosky.com
                    *Counsel of Record for Eastern Shoshone Tribe*

**[PROPOSED] FIRST AMENDED PETITION**
**EASTERN SHOSHONE TRIBE – EXHIBIT A, PAGE 10**

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

THE SHOSHONE INDIAN TRIBE OF
THE WIND RIVER RESERVATION,
WYOMING,

      *Plaintiff,*

    v.

THE UNITED STATES,

      *Defendant.*

No. 4582-79 L, 4583-79 L
Judge Hewitt

THE ARAPAHO INDIAN TRIBE OF THE
WIND RIVER RESERVATION,
WYOMING,

      *Plaintiff,*

    v.

THE UNITED STATES,

      *Defendant.*

No. 4592-79 L, 4593-79 L
Judge Hewitt

---

## FIRST AMENDED PETITION – NORTHERN ARAPAHO INDIAN TRIBE
### [PROPOSED]

The Northern Arapaho Indian Tribe (the Tribe) alleges as follows:

### ALLEGATIONS APPLICABLE TO ALL CLAIMS

1. This petition is filed pursuant to 28 U.S.C. § 1491 (1976) and 28 U.S.C. § 1505 (1976).

**[PROPOSED] FIRST AMENDED PETITION**
**NORTHERN ARAPAHO TRIBE – EXHIBIT B, PAGE 1**

2.  This petition does not assert any claim, or seek to recover any damages with respect to any claim now pending before this Court or any other Court.

3.  The Tribe is a federally recognized Indian Tribe, residing on the Wind River Indian Reservation in Wyoming.

4.  In 1851, by the Treaty of Fort Laramie, 11 Stat. 749, the United States recognized the title of the Tribe to large tracts of land on the Platte River.  On May 10, 1868, the Tribe signed a treaty with the United States by which the tribe relinquished title to these lands in return for a "permanent home."  Treaty of May 10, 1868, ratified July 25, 1868, Art. II, Stat. 655, 657.

5.  Since 1878, the Tribe has been the beneficial owner of an undivided one-half interest in the Wind River Reservation.

6.  By Act of March 3, 1905, Ch. 1452, 33 Stat. 1016, the United States through a "cession in trust" opened the northern two-thirds of the Reservation to non-Indian settlement. Under the Act the United States paid nothing for the cession, but agreed to dispose of surplus land to settlers with the proceeds to go to the Tribes.  The Tribes remained the equitable owners of the land, including all mineral resources, until actually disposed of by the United States. United States v. Shoshone Tribe, 304 U.S. 111, 114 (1938).  See Ash Sheep Company v. United States, 252 U.S. 159 (1920).  There were known oil and gas resources within the "opened" part of the Reservation.  By the Act of August 21, 1916, Ch. 363, § 1, 39 Stat. 519, Congress empowered the Secretary of the Interior to lease the "opened" land for oil and gas "under such terms and conditions as shall be by him prescribed" with the proceeds of royalties from the leases to be "applied to the use and benefit of said Tribe . . .".

**[PROPOSED] FIRST AMENDED PETITION**
**NORTHERN ARAPAHO TRIBE – EXHIBIT B, PAGE 2**

7. Little of the land opened for non-Indian settlement by the 1905 Act was actually settled by non-Indians. By Act of July 27, 1939, Ch. 387, § 4, 53 Stat. 1129, (codified at 25 U.S.C. § 575, (1976)), all undisposed of lands in the opened portion of the Reservation, not within a reclamation project, were restored to the Tribes. In the meantime, however, in 1920, Congress authorized the Riverton Reclamation Project. It embraced about 332,000 acres. Act of June 5, 1920, Ch. 320, 41 Stat. 874, 915, and Act of March 4, 1921, Ch. 161, 41 Stat. 1367, 1404. The Project was constructed and through the years about 100,000 acres of the 332,000 acres were sold and the proceeds credited to the Tribes. An additional 70,500 acres, not required for the project, ultimately were restored to the Tribes under Section 4 of the Act of August 15, 1953, Ch. 509, 67 Stat. 592, 613. Under Section 5 of that Act, the remaining 161,520 acres were ceded to the Government subject to a 90% interest of the Tribes to the proceeds of mineral leases to be administered under the "mining and mineral leasing laws of the United States." By Act of August 27, 1958, § 1, 72 Stat. 935, the entirety of the mineral interests under those lands were "declared to be held by the United States in trust for the Shoshone and Arapahoe Tribes" and were required to be administered under the Indian Leasing Act of May 11, 1938, Ch. 198, 52 Stat. 347, (codified at 25 U.S.C. §§ 396a-396g (1976)), the general statute governing tribal oil and gas.

8. By Act of May 19, 1947, Ch. 80, 61 Stat. 102, (codified at 25 U.S.C. § 611 et seq. (1976)), the Secretary of the Interior was directed to divide the trust funds on deposit in the Treasury of the United States to the joint credit of the Shoshone and Arapahoe Tribes of the Wind River Reservation into separate accounts. Since the effective date of that Act, all income derived from tribal property held in common by the two Tribes has been divided evenly. From each Tribe's one-half, 85% is paid in a monthly per capita to the respective members of the

**[PROPOSED] FIRST AMENDED PETITION**
**NORTHERN ARAPAHO TRIBE – EXHIBIT B, PAGE 3**

Tribe. The remaining 15%, referred to as the "15% fund" is maintained in the Treasury of the United States or under the control of the Secretary of the Interior.

9.    Under the Treaty of May 10, 1868, 15 Stat. 655, the Trade and Intercourse Act as amended, 25 U.S.C., § 177, (1976), the Commerce, War and Treaty powers of the Constitution, the Act of August 21, 1916, 39 Stat. 519, 25 U.S.C. §§ 396a-396g (1976), and the decisions of the United States Supreme Court and this Court, the United States has a fiduciary duty to the Tribe requiring that it exercise "the most exacting fiduciary standards" in managing the Tribes' land and mineral estate and trust funds, <u>Navajo Tribe of Indians v. United States</u>, 176 Ct. Cl. 502, 507 (1966).

10.    The Tribe at all times since 1878, has been the beneficial owner of funds, real property and mineral interests held in trust and managed by the United States for the Tribe.

11.    In breach of its fiduciary and statutory duties to the Tribe, the defendant, for the entire period, has failed to manage plaintiff's trust funds as a prudent administrator and has failed to manage or administer the Tribes' mineral and other income producing property in a manner consistent with its superior skill and knowledge or even at least as well as an informed owner of such property.

## CLAIM I

### (FAILURE OR DELAY IN COLLECTING FUNDS DUE TO THE TRIBE)

12.    Defendant, at all times relevant, has been under fiduciary and statutory obligations to collect funds owing to the Tribe arising from the use or lease by Defendant or third parties of the Tribe's mineral estate, including but not limited to oil, gas, uranium, and gravel.

13.  In breach of its fiduciary duty to the Tribe and to the Tribe's detriment, Defendant has delayed unreasonably, or failed to collect, such funds.

## CLAIM II

### (DELAY IN DEPOSITING)

14.  On information and belief, the Tribe alleges that Defendant, in breach of its fiduciary duty to the Tribe and to the Tribe's detriment, delayed for unreasonable periods of time depositing the Tribe's funds in interest-bearing accounts.

## CLAIM III

### (HOLDING TRUST FUNDS IN THE TREASURY
### AT INADEQUATE INTEREST)

15.  During a major part of the period in suit, Defendant has held Plaintiff's trust funds in its treasury at a rate of four percent per annum simple interest.  Interest earned in the Treasury is segregated into separate accounts and no interest is paid by the United States on the accounts.

16.  During relevant times, there were readily available for acquisition with the Tribe's trust funds, pursuant to 25 U.S.C., § 162a (1976), various obligations of the Defendant and its agencies, as well as bank certificates or obligations guaranteed or secured as required by 25 U.S.C., § 162a carrying interest rates higher than the four percent.

17.  Defendant breached its fiduciary duty to the Tribe's detriment by, in effect, borrowing tribal trust funds for its own purposes and benefit and by failing to invest such funds and the interest on such funds to earn maximum income for the Tribe.

**[PROPOSED] FIRST AMENDED PETITION
NORTHERN ARAPAHO TRIBE – EXHIBIT B, PAGE 5**

## CLAIM IV

### (INVESTMENT AT INADEQUATE RATES)

18.  Defendant invested certain of the Tribe's trust funds in various governmental and private securities guaranteed or secured as required by 25 U.S.C., § 162a.  On information and belief, the Tribe alleges that Defendant did so in breach of its fiduciary duty to the Tribe and to the Tribe's detriment in that at the time the investments were made other securities or obligations of the same or similar type, guaranteed or secured as required by 25 U.S.C., § 162a, were readily available for investment at higher interest rates.

## CLAIM V

### (REVERSE SPENDING)

19.  The Tribe alleges and believes that Defendant has consistently made expenditures from the Tribe's interest-bearing funds or investments returning a higher yield when lower yield funds or funds bearing no interest were available.

## CLAIM VI

### (MISUSE OF MISCELLANEOUS REVENUES)

20.  In breach of its fiduciary duty to the Tribe and to the Tribe's detriment, Defendant had failed to deposit tribal funds in the United States Treasury and has used such funds derived from the Tribe's trust property for purposes not for the exclusive benefit of the Tribe.

21.  Defendant, through the Secretary of the Interior, manages a tribal credit program. The Tribe alleges on information and belief that Defendant, in breach of its fiduciary duty, and to the Tribe's detriment, has mismanaged the program by, among other things, keeping large

**[PROPOSED] FIRST AMENDED PETITION**
**NORTHERN ARAPAHO TRIBE – EXHIBIT B, PAGE 6**

sums of tribal money in non-interest-bearing checking accounts when proper management would require such funds to be placed at interest.

CLAIM VII

(MISMANAGEMENT OF PLAINTIFF'S OIL AND GAS ESTATE)

22.  At all relevant times, the Tribe has been the beneficial owner of an undivided one-half interest in substantial oil, gas and mineral deposits on the Reservation.  Under the Treaty of May 10, 1868, 15 Stat. 655, the Trade and Intercourse Act as amended, 25 U.S.C. § 177 (1976), the statutes regulating oil and gas leasing on Indian lands including but not limited to 25 U.S.C. §§ 396a-396g, and the Act of August 2, 1916, 39 Stat. 519, as well as the regulations under such acts (including 25 C.F.R. Parts 171 and 184 (1979) and 30 C.F.R. Part 221 (1978)), the United States has the obligation to manage the tribal oil and gas resource in a manner consistent with defendant's superior skill and knowledge in the area of oil and gas management and in all instances at least equal to the management of oil and gas lands by an informed owner of such lands.  Defendant, in breach of its statutory and trust responsibility to the Tribe, and to the Tribe's detriment, has mismanaged plaintiff's oil and gas estate as set out in the following subparagraphs:

(a)  Defendant, through its Bureau of Reclamation, has burdened the Tribe's oil and gas estate and interfered with its development; inconsistent with its fiduciary and statutory obligations and the interests of the Tribe, Defendant has applied regulations and restrictions employed on public lands of the United States to tribal lands, in particular, to tribal oil and gas lands within reclamation areas;

(b)  Defendant has excluded from oil and gas leases river bottoms and lake bottoms owned by the Tribe;

(c)  Defendant has held large sums of money received as deposits for bids for the right to lease the Tribe's oil and gas without placing the same at interest for the benefit of the Tribe;

(d)  Defendant has failed to require oil and gas lessees to comply with the terms of their leases on tribal lands and has failed to oversee, monitor and administer said oil and gas leases on a basis at least equal to the management of oil and gas lands by the informed owner of oil and gas lands in, among others, the following respects:

(i)  Defendant has not required that royalties paid under the Tribe's oil and gas leases be the stated percentage of the fair market value of the oil and gas produced, but in violation of defendant's own regulations has consistently accepted the lessees' reports of price received for the gas or oil as the value thereof with the result that the Tribe lost significant revenues to which it is entitled under its leases and defendant's own regulation;

(ii)  Where natural gas has been produced, Defendant has consistently accepted the interstate controlled price of natural gas or prices lower than the controlled price as the value of the gas rather than the intrastate price which during a substantial portion of the time at issue has been substantially higher.  As a result, the Tribe has received its royalty percentage based upon a small fraction of the actual value of the gas produced;

(iii)  Defendant has not required that lessees account for and pay royalties on the value of liquid hydrocarbon substances produced and saved on the leased premises as

**[PROPOSED] FIRST AMENDED PETITION**
**NORTHERN ARAPAHO TRIBE – EXHIBIT B, PAGE 8**

required by the regulations and the provisions of the leases and has thereby failed to obtain for the Tribe the highest price permitted under the lease;

(iv)  Defendant has not required prompt payment of royalties on a monthly basis as required by the terms of the leases, but has permitted lessees to pay royalties and rentals long after their due dates;

(v)  Defendant has failed to terminate leases in accordance with its own lease terms and regulations, although lessees have committed serious breaches for which an informed owner would have required cancellation; nor has Defendant required payment of penalties as required by 30 CFR § 221.54 (1978), incorporated into provision 3(g) of the leases;

(vi)  Defendant has failed to require lessees to exercise reasonable diligence in drilling and operating wells for oil and gas on tribal land as provided in paragraph 3(f) of the leases and as required by Federal regulation.  25 C.F.R. § 184.22 (1979). As a result of this failure and refusal, the Defendant has permitted lessees to hold leases on tribal land without development for years;

(vii)  Defendant has failed either to require drilling and production of wells to offset and protect tribal leases from drainage, or to require the lessees to pay compensatory royalties.

CLAIMS FOR RELIEF

The Tribe Prays this Court:

**[PROPOSED] FIRST AMENDED PETITION**
**NORTHERN ARAPAHO TRIBE – EXHIBIT B, PAGE 9**

1.    For a determination that Defendant is liable to the Tribe in damages for the injuries and losses caused through violations of Defendant's fiduciary and statutory responsibilities to the Tribe set out above.

2.    That Defendant be ordered to render such accountings of its management and handling of the Tribe's funds and mineral estate as are appropriate in aid of the Court's determination of the specific amount of money damages.

3.    For a determination of the amount of damages due the Tribe.

4.    For such further relief as the Court may deem just.

Dated: _____, 2005

Respectfully submitted,

_____
RICHARD M. BERLEY
Ziontz, Chestnut, Varnell,
  Berley & Slonim
2101 4th Avenue, Suite 1230
Seattle, WA 98121
(206) 448-1230 (Telephone)
(206) 448-0962 (Facsimile)
rberley@zcvbs.com
*Counsel of Record for Northern Arapaho Tribe*

**[PROPOSED] FIRST AMENDED PETITION**
**NORTHERN ARAPAHO TRIBE – EXHIBIT B, PAGE 10**

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

THE SHOSHONE INDIAN TRIBE OF  )
THE WIND RIVER RESERVATION,  )
WYOMING,  )
                                          )
        *Plaintiff,*  )
                                            )
          v.  )     No. 4582-79L, 4583-79L
                                           )     Judge Hewitt
THE UNITED STATES,  )
                                           )
        *Defendant.*  )
                                           )

THE ARAPAHO INDIAN TRIBE OF  )
THE WIND RIVER RESERVATION,  )
WYOMING,  )
                                           )
        *Plaintiff,*  )
                                            )
          v.  )     No. 4592-79L, 4593-79L
                                           )     Judge Hewitt
THE UNITED STATES,  )
                                           )
        *Defendant.*  )
                                           )

## DEFENDANT'S RESPONSE TO
## TRIBES' MOTION FOR LEAVE TO AMEND PETITIONS

       Plaintiffs, Eastern Shoshone and Northern Arapaho Tribes (collectively "Tribes"), seek

leave to amend petitions filed in 1979, to add damages allegedly incurred by the Tribes prior to

August 14, 1946.  Defendant, United States, opposes the "Tribes' Motion For Leave To Amend

Petitions" (hereinafter "Tribes' Motion" or "Motion") because their proposed amended petitions

are futile pursuant to RCFC 15(a).  Presently, the Tribes' proposed amended petitions include

claims involving the mismanagement of trust assets accruing prior to August 14, 1946.  These claims are time-barred pursuant to the decision by the United States Court of Appeals for the Federal Circuit in <u>Shoshone Indian Tribe v. United States</u>, 364 F.3d 1339 (Fed. Cir. 2004), <u>cert. denied</u>, 125 S.Ct. 1824 (2005) and <u>cert. denied</u>, 125 S.Ct. 1826 (2005).

## I.    BACKGROUND

The Tribes filed petitions in this case 26 years ago before the United States Court of Claims.[1]  The Tribes' original petitions declared August 14, 1946 as the earliest date for their claims.  <u>See</u> Shoshone original petition at paragraphs 9 and 10 and Arapaho petition at paragraphs 10 and 11.  (Case No. 79-4582, Docket No. 17).  This date corresponds to the enactment of the 1946 Indian Claims Commission Act.  60 Stat. 1052.  <u>See</u> <u>Shoshone Indian Tribe</u>, 364 F.3d at 1343.

In recent years, this Court divided the claims into four main stages.  <u>See</u> <u>Shoshone Indian Tribe v. United States</u>, 51 Fed. Cl. 60, 62 (2001).  Claims currently before the Court include those alleging "mineral resource mismanagement."  <u>See</u> Court Order filed August 27, 2004.  (Case No. 79-458, Docket No. 419).  <u>See</u> also the Eastern Shoshone and Northern Arapaho Tribes' Legal Bases for the Tribes' Theories of Recovery for Breach of Trust filed August 30, 2000.  ("Tribes'

---

[1] The Federal Courts Improvement Act of 1982, Pub. L. No. 97-164, 96 Stat. 25, established the United States Court of Appeals for the Federal Circuit (by merging the appellate functions of the United States Court of Claims and the United States Court of Customs and Patent Appeals) and created the United States Claims Court out of the trial division of the Court of Claims.  In 1992, the United States Claims Court was renamed the United States Court of Federal Claims, effective October 29, 1992.  <u>See</u> Federal Court Administration Act of 1992, Pub. L. No. 102-572, § 902, 106 Stat. 4506, 4516 (1992).

Theories of Recovery") (Case No. 79-458, Docket No. 149).[2]  Due to a lack of specificity in

these claims, this Court directed the Tribes to identify the actual issues to be resolved at trial by

January 13, 2006 including:

> "any discrete claims from the pre-1973 time period falling outside
> conventional Oil and Gas Phase Two claims for improper collection
> of royalties or improper accounting, including but not limited to any
> so-called drainage claims as discussed by way of example in the
> June 1, 2005 teleconference (discrete claims)."

Court Order filed June 6, 2005 (Case No. 79-4582, Docket No. 12).  Importantly, the Court

ordered that the Tribes' statement "shall include the types of damages claimed, the legal theories

supporting recovery, and the time frames for which discovery is sought." Id.  The Tribes'

proposed amended petitions now seek to recoup damages for asset mismanagement claims

accruing as of the original settlement date by each tribe on the Reservation, 1868 and 1878,

respectively.  See Motion at 1-2 and Exhibit A at paragraphs 3, 8-10 and Exhibit B at paragraphs

5, 10-11.

Statute of limitations issues have played prominently throughout this litigation.  The

Federal Circuit's decision exposes the futility of the Tribes' collective positions with regard to

their requests to amend. See Shoshone Indian Tribe v. United States, 364 F.3d 1339 (Fed. Cir.

---

[2] See Tribes' Theories of Recovery (Case No. 79-458, Docket No. 149) at pages 15-23 in which
the Tribes list claims for reasonable diligence, drainage, improper approval of agreements,
agreement violations, prevention of waste, excessive surface burdens, and so forth.  See also the
"Response of the Eastern Shoshone and Northern Arapaho Tribes to United States' Motion Re
Statute of Limitations Issues" filed August 21, 2001 at 3 ("The third phase of the case relates to
the remaining oil and gas operations issues, including pre-1973 issues"), which is cited by this
Court in Shoshone Indian Tribe v. United States, 51 Fed. Cl. 60, 62 (2001) ("The third phase
involves residual issues relating to oil and gas extraction such as the failure to monitor leases").

2004).  In affirming, in part, an opinion issued by this Court on the issue of statute of limitations,[3]/

the Federal Circuit held that the Department of the Interior and Related Agencies Appropriations

Act, Public Law No. 108-7 (including both an earlier version and ones subsequently adopted

thereafter) (collectively referred to as "Act") precluded the statute of limitations from running on

a tribe's claims falling within the ambit of the Act until the tribe receives a meaningful accounting.

See Shoshone, 364 F.3d at 1344, 1347.  The Court expressly held that claims involving trust

assets do not fall within the ambit of the Act.  Thus, there is no tolling of the statute of limitations

as to claims involving trust assets.  Id. at 1348, 1350.

     The Tribes' proposed amendments do not make substantive changes to their original

claims.  Both the original and proposed amended petitions allege the Defendant's breach of duties

to include the mismanagement of Tribal trust funds and other income-producing property.  Cf.

Exhibit A to Tribes' Motion, Shoshone proposed petition at paragraph 10, with Shoshone original

petition at paragraph 10 (Case No. 79-4582, Docket No. 17); Cf. Exhibit B to Tribes' Motion,

Arapaho proposed petition at paragraph 11, with Arapaho original petition at paragraph 11 (Case

No. 79-4582, Docket No. 17).  Specifically, both Tribes' petitions include allegations of oil and

gas asset mismanagement.  Cf. Exhibit A to Tribes' Motion, Shoshone proposed petition at

paragraphs 21-25, with Shoshone original petition at paragraphs 21-25 (Case No. 79-4582,

Docket No. 17); Cf. Exhibit B to Tribes' Motion, Arapaho proposed petition at paragraph 22,

with Exhibit 2, Arapaho original petition at paragraph 22 (Case No. 79-4582, Docket No. 17).

Because the Federal Circuit declined to toll statutes of limitations as to trust asset claims,

however, these claims do not fall within the exception created by the Federal Circuit and are

---

[3]/ See Shoshone Indian Tribe v. United States, 51 Fed. Cl. 60 (2001).

limited to periods of time from 1946 on.  Any pre-1946 asset management claims had to have

been brought by August 13, 1951.[4/]  Id.

## II.    ARGUMENT

The Federal Circuit Court of Appeals has already determined as a matter of law that trust

asset mismanagement claims alleged for periods prior to August 14, 1946, are time-barred.

Shoshone, 364 F.3d at 1349-1350.  No interpretation of the Shoshone decision by the Tribes can

lead to a result where these claims may be permitted.  As such, it would be a futile endeavor for

the Tribes to amend their petitions pertaining to asset mismanagement claims.

Although RCFC 15(a) favors grants of leave to amend when "justice so requires," the

United States Supreme Court has expressly recognized that a proposed amendment may be denied

where doing so would avoid a futile result.  Foman v. Davis, 371 U.S. 178 (1962).  The Federal

Circuit, as well as this Court, have also found futility to be an appropriate basis for denying leave

to amend.  E.g., Cultor Corp. v. A.E. Staley Mfg. Co., 224 F.3d 1328, 1333 (Fed. Cir. 2000)

(futility was apparent); Mitsui Foods, Inc. v. United States, 867 F.2d 1401, 1404 (Fed. Cir. 1989)

(apparent futility); see also Johnson v. United States, 41 Fed. Cl. 341, 347 (1998) (request denied

to amend dismissed complaint for lack of jurisdiction, because proposed amendment did not

include a jurisdictionally-required monetary claim); Black v. United States, 24 Cl. Ct. 471, 476

(1991) (request to amend complaint to add a tort claim denied for lack of jurisdiction).

Additionally, the Foman standard does not require the Court to "reach the legal merits of the

cause of action being added."  Effingham County Bd. of Educ. v. United States, 9 Cl. Ct. 177,

---

[4/] Prior to passage of the Indian Claims Commission Act, tribes could not litigate claims against
the United States without specific authority from Congress.  Id.

181 (1985).

A motion to amend is deemed "futile" where the proposed claim is "frivolous and insufficient on its face," Croskey v. United States, 24 Cl.Ct. 420, 423 (1991), or where the proposed claim would not withstand a motion to dismiss. See Slovacek v. United States, 40 Fed. Cl. 828, 834 (1998). See also Hickman v. United States, 43 Fed. Cl. 424, 438 (1999) (denied, in part, because two proposed new counts did not state claims upon which relief could be granted); Herndon v. United States, 36 Fed. Cl. 198, 202-203 (1996) (request to amend complaint to add a third party to takings action futile because the third party lacked a compensatory interest in the property). Proposed motions to amend have been denied in at least one other instance where the statute of limitations would preclude the amended claim. See Jablonski v. Pan Am. World Airways, Inc., 863 F.2d 289, 292 (3d Cir.1988) (affirming district court's denial of motion to amend where proposed amendment would have alleged a claim that was barred by the applicable statute of limitations).

The Tribes' proposed amended petitions are futile on their face and could not withstand a motion to dismiss, because they seek damages as to trust asset mismanagement for periods prior to August 14, 1946. Shoshone, 364 F.3d at 1349-1350. As mentioned above, these claims are time-barred pursuant to the Federal Circuit decision in Shoshone. Id. The Tribes' Motion fails to distinguish between claims for mismanagement of certain trust fund monies, which may be allowable for periods pre-dating 1946, and claims for mismanagement of trust assets, which are not allowed.[5] Because the Tribes did not bring their pre-1946 asset mismanagement claims by

---

[5] In fact, the Tribes gloss almost entirely over this problem speaking in their Motion only to the claims seeking damages for "losses to or mismanagement of trust funds." Motion at 2-5. They overstate their case when they broadly contend they "have viable claims for earlier time periods."

August 13, 1951, and these do not fall within the limited exception thereto created by the Federal

Circuit, they are forever barred from asserting claims for mismanagement of trust assets for

periods prior to August 14, 1946.

## III.    CONCLUSION

For the reasons stated above, Defendant respectfully requests the Court deny the Tribes'

request to amend their petitions to expand their claims of trust asset mismanagement to include

periods of time prior to August 14, 1946.

Dated: December 5, 2005

Respectfully submitted,

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environment and Natural Resources Division


*s/Terry M. Petrie*
TERRY M. PETRIE
Environment and Natural Resources Division
U.S. Department of Justice
999 18th Street, Suite 945
Denver, CO 80202
(303) 312-7327 (telephone)
(303) 312-7379 (facsimile)
Terry.Petrie@usdoj.gov
Counsel of Record for Defendant

---

Motion at 2. At most, the Tribes give some evidence in a footnote of having an awareness of an issue with the reach of their proposed amendments. At footnote 2 on page 6 of their Motion, the Tribes acknowledge that their "claims for such earlier periods [prior to August 14, 1946] would of course be subject to the Federal Circuit's ruling regarding the scope of preserved claims." That acknowledgment, without establishing why their proposed asset mismanagement claims fall within the ambit of the Appropriation Acts, implicitly serves to concede the overreach of their Motion.

OF COUNSEL
THOMAS KEARNS
Office of the Solicitor
United States Department of the Interior
Washington, DC 20240

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| THE SHOSHONE INDIAN TRIBE OF THE WIND RIVER RESERVATION, WYOMING, | |
| *Plaintiff,* | No. 4582-79 L, 4583-79 L |
| v. | Judge Hewitt |
| THE UNITED STATES, | |
| *Defendant.* | |
| THE ARAPAHO INDIAN TRIBE OF THE WIND RIVER RESERVATION, WYOMING, | |
| *Plaintiff,* | |
| v. | No. 4592-79 L, 4593-79 L |
| | Judge Hewitt |
| THE UNITED STATES, | |
| *Defendant.* | |

**TRIBES' REPLY MEMORANDUM RE MOTION TO AMEND PETITIONS**

Plaintiffs Eastern Shoshone and Northern Arapaho Tribes (Tribes) filed a motion to amend their Petitions on November 18, 2005, to encompass damages suffered by the Tribes prior to August 14, 1946. The United States filed its response opposing the motion on December 5, 2005. This is the Tribes' reply.

The Tribes' motion should be granted. It is undisputed that recent holdings of this Court and the Court of Appeals for the Federal Circuit interpreting a series of Appropriations Acts

**TRIBES' REPLY MEMORANDUM RE MOTION TO AMEND PETITIONS -- 1**

passed since 1990[1] have broadened the ability of tribes to pursue claims for damages suffered during periods which might have otherwise been barred by the statute of limitations when the original Petitions were filed in 1979. The Federal Circuit's ruling in *Shoshone Indian Tribe v. United States*, 364 F.3d 1339 (Fed. Cir. 2004), *cert. denied* 125 S.Ct. 1824, 1826 (April 18, 2005) affirmed this Court's ruling (51 Fed. Cl. 60 (2001)) that the Tribes were not barred from seeking damages for "losses to or mismanagement of trust funds" which may have occurred more than six years before the Tribes filed their Petitions. This Court also held in *Osage Nation v. United States*, 57 Fed. Cl. 392 (2003), relying on its ruling herein, that the Appropriations Acts permitted tribes to pursue eligible claims for mismanagement occurring prior to August 13, 1946, the effective date of the Indian Claims Commission Act, 60 Stat. 1052.

Under these recent rulings, which acknowledge Congress's intent to defer the commencement of the statute of limitations for covered claims, the Tribes should be permitted to amend their Petitions. This Court has acknowledged the probable propriety of such an amendment when it explicitly permitted the Tribes to pursue documentary discovery relating to claims of alleged mismanagement occurring both before and after 1946. *See* Order (August 27, 2004) at 3 n. 2.

The Government's position is based on the Federal Circuit's holding regarding the scope of the Appropriations Acts, which was narrower regarding the distinction between "trust funds" and "trust assets" than the ruling of this Court. *See* 364 F.3d at 1350. The Tribes are not trying

---

[1] Act of November 5, 1990, Pub. L. No. 101-512, 104 Stat. 1915; Act of November 13, 1991, Pub. L. No. 102-154, 105 Stat. 990; Act of October 5, 1992, Pub. L. No. 102-381, 106 Stat. 1374; Act of November 11, 1993, Pub. L. No. 103-138, 107 Stat. 1379; Act of September 30, 1994, Pub. L. No. 103-332, 108 Stat. 2499; Act of April 26, 1996, Pub. L. No. 104-134, 110 Stat. 1321; Act of September 30, 1996, Pub. L. No. 104-208, 110 Stat. 3009; Act of November 14, 1997, Pub. L. No. 105-83, 111 Stat. 1543; Act of November 29, 1999, Pub. L. No. 106-113, 113 Stat. 1501; Act of October 11, 2000, Pub. L. No. 106-291, 114 Stat. 922; Act of November 5, 2001, Pub. L. No. 107-63, 115 Stat. 414; Act of February 20, 2003, Pub. L. No. 108-7, 117 Stat. 11; Act of November 10, 2003, Pub. L. No. 108-108, 117 Stat. 1263.

to relitigate the Federal Circuit's decision, and their motion to amend explicitly acknowledges that claims for mismanagement occurring prior to 1973 are subject to the Federal Circuit's holding. Tribes' Motion to Amend at 6 n. 2. The Tribes in their motion to amend did not propose major redrafts of their original petitions. They simply removed references to 1946 as the earliest potential date of claimed mismanagement, because it is now inconsistent with the governing law.

Because of the complexity of the case, which covers a broad range of alleged mismanagement over long periods, and because of the lengthy period since the original petitions were filed in 1979, the parties and the Court have managed this litigation not by close recourse to the original Petitions but through Orders which have divided the case into phases, and, for each phase, require the plaintiff Tribes to submit a statement identifying the issues they seek to have resolved in that phase, including "types of damages claimed, the legal theories supporting recovery, and the time frames for which recovery is sought." *See, e.g.,* the Court's current scheduling Order (June 6, 2005), which governs the next phase to be tried in this matter, Oil and Gas Phase Two:

> 1. Identification of Issues. The plaintiffs shall file a statement identifying the issues to be resolved at trial by Friday, January 13, 2006. This statement shall include the types of damages claimed, the legal theories supporting recovery, and the time frames for which recovery is sought. Plaintiffs' claims in this subdocket regard royalty accounting and related oil and gas valuation and collection issues for the period prior to October 10, 1973 (Oil and Gas Phase Two). . . . This statement shall also identify any discrete claims from the pre-1973 time period falling outside conventional Oil and Gas Phase Two claims for improper collection of royalties or improper accounting, including but not limited to any so-called drainage claims as discussed by way of example in the June 1, 2005 teleconference (discrete claims). Until the close of non-expert discovery as set forth below, plaintiffs shall reasonably cooperate with defendant to provide access to discovery documents concerning discrete claims identified in plaintiffs' January 13, 2006 filing. Plaintiffs shall also file updates of their statement identifying issues with reasonable promptness with respect to discrete claims identified after their January 13, 2006 filing.

**TRIBES' REPLY MEMORANDUM RE**
**MOTION TO AMEND PETITIONS – 3**

The Tribes' issues statement due January 13, 2006, rather than the original Petitions, is to govern the next phase of the litigation. ¶ 1 of the current scheduling Order accords the Tribes an opportunity to "update" their statement with reasonable promptness. ¶¶ 2 through 8 of the Order provide that the issues statement is to be followed by expert reports and associated data disclosure, and expert and non-expert discovery. The Government will then have ample opportunity to file dispositive motions keyed to the Tribes' issues statement (*i.e.,* relating to "types of damages claimed, the legal theories supporting recovery, and *the time frames for which recovery is sought*") until a deadline following the close of discovery:

> 9. <u>Dispositive Motions</u>. The parties shall file a notice of intent to file any dispositive motions concerning types of damages claimed, the legal theories supporting recovery, and the time frames for which recovery is sought on or before Friday, October 27, 2006. The parties shall file any dispositive motions by Friday, November 10, 2006.

This approach has been successful in helping the parties resolve the prior phases of this case, and has been further refined in the scheduling Order for the current phase. The Government's concern that the Tribes' amended petitions may be overbroad is premature.

The Tribes' motion to amend should be granted.

DATED: December 12, 2005.

Respectfully submitted,

<table>
<tr><td>

s/Harry R. Sachse by R. Berley w/auth'n<br>
HARRY R. SACHSE<br>
ANNE D. NOTO<br>
Sonosky, Chambers, Sachse<br>
  Enderson & Perry, LLP<br>
1425 K Street, NW, Suite 600<br>
Washington, DC 20005<br>
(202) 682-0240 (Telephone)<br>
(202) 682-0249 (Facsimile)<br>
hsachse@sonosky.com<br>
*Counsel of Record for Eastern Shoshone Tribe*

</td><td>

s/Richard M. Berley<br>
RICHARD M. BERLEY<br>
BRIAN W. CHESTNUT<br>
Ziontz, Chestnut, Varnell, Berley & Slonim<br>
2101 4th Avenue, Suite 1230<br>
Seattle, WA 98121<br>
(206) 448-1230 (Telephone)<br>
(206) 448-0962 (Facsimile)<br>
rberley@zcvbs.com<br>
*Counsel of Record for Northern Arapaho Tribe*

</td></tr>
</table>

**TRIBES' REPLY MEMORANDUM RE
MOTION TO AMEND PETITIONS -- 4**

SUSAN M. WILLIAMS
LISA K. CONDON
Williams & Works, P.A.
P.O. Box 1483
Corrales, New Mexico 87048
(505) 899-7994 (Telephone)
(505) 899-7972 (Facsimile)
swilliams@williamsandworks.net
*Counsel for Eastern Shoshone Tribe*

## CERTIFICATE OF SERVICE

I certify that the foregoing pleading is to be served on Terry Petrie, counsel of record for

the United States, contemporaneously with this filing via the Court's electronic filing system.


s/Richard M. Berley
Counsel of Record for Northern Arapaho Tribe


**TRIBES' REPLY MEMORANDUM RE
MOTION TO AMEND PETITIONS – 5**

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE AK-CHIN INDIAN
COMMUNITY,                          )
                                    )
                                    )
            Plaintiff,              )
                                    )
v.                                  )        Case No. 06-CV-02245-JR
                                    )        Judge James Robertson
DIRK KEMPTHORNE, ROSS O.            )        **(Electronically filed on January 18, 2008)**
SWIMMER and HENRY M.               )
PAULSON,                            )
                                    )
                                    )
            Defendants.             )

## PLAINTIFF'S STATUS REPORT

### I.  INTRODUCTION

The Plaintiff-Beneficiary, the Ak-Chin Indian Community ("Ak-Chin"), submits its Status Report pursuant to this Court's order of December 19, 2007 denying Trustee-Delegates' Motion to Remand brought by defendants Dirk Kempthorne, Ross O. Swimmer and Henry Paulson ("Trustee-Delegates").

The remand issue alone has delayed progress in this case for nearly six months, thereby prejudicing Ak-Chin by delaying enforcement of its right to obtain information from its trustee related its  trust lands including information relevant to rights-of-way, easements, leases and other encumbrances on trust land and cadastral surveys.  Without this critical information, Ak-Chin sits vulnerable  in its dealings with third parties and is unable to effectively manage development of its Reservation lands.  Now that this Court has properly rejected Trustee-Delegates' theory of the case, and refused to remand the action, it should proceed to direct the production of the trust information that Ak-Chin so desperately needs to

protect its interests. *See* Ak-Chin's Updated Case Management Plan and Phase I Scheduling Order (hereinafter "the Updated CMO", a copy of which is attached hereto as Exhibit "1") at ¶ 6.

This Court's immediate intervention is desperately needed. Ak-Chin is located in an area experiencing unprecedented growth and, as a consequence, obtaining the records regarding its trust lands and other assets is absolutely critical to protect its interests. Without such records and information, which are within the custody and control of Trustee-Delegates, Ak-Chin is unable to protect its rights in connection with ongoing negotiations and other dealings with developers, local governments, the State of Arizona ("State") and other third parties regarding the expansion of roads, infrastructure development, use of rights-of-way and innumerable other matters. As a result, Ak-Chin is vulnerable, at a significant disadvantage and unable to fully protect its interests in outside dealings.

The information in question is basic information - *e.g.,* all documents related to rights-of-way, easements, leases and other encumbrances on trust land, and cadastral surveys. When, for example, the State or local government adjacent to the Reservation asserts an interest in a road, Ak-Chin needs the supporting documentation kept by its trustee to effectively respond to these third party other government. The demand for such information is unremarkable, and any other trustee would provide it as a matter of course. Ak-Chin has repeatedly requested this information from Trustee-Delegates, but to no avail. The refusal or inability of Ak-Chin's trustee to supply this critical trust information has, in short, placed Ak-Chin in the most precarious of positions rendering it unable to protect its vital interests. Time is of the essence. Growth continues unabated. Every day issues arise. Every day Ak-Chin is more vulnerable. The Court's involvement in making long-overdue

2

information regarding Ak-Chin's trust assets available to the Plaintiff-Beneficiary is thus absolutely necessary.

## II. TRUSTEE DELEGATES HAVE UTTERLY FAILED TO COMPLY WITH THEIR DUTY TO FURNISH INFORMATION TO AK-CHIN THAT IS ESSENTIAL FOR AK-CHIN TO PROTECT ITS INTEREST.

To fully appreciate the necessity for immediate action, it is important to have a sense of Ak-Chin's history, as well as its current situation.

### A. Ak-Chin Is Currently Experiencing a Period of Hyper-growth and Requires Critical Information from its Trustee-Delegates

Ak-Chin is located approximately 35 miles south of Phoenix, Arizona adjacent to the town of Maricopa, Arizona, one of the fastest growing suburbs of Phoenix. (Declaration of Delia Carlyle ("Carlyle Decl."), at ¶ 3, attached hereto as Exhibit 2).[1] Ak-Chin, a small tribe with 767 enrolled members, once inhabited a small, rural farming village. (*Id.*) Today, like many Phoenix suburbs, Ak-Chin is being significantly impacted by unprecedented hyper-growth in its area. (*Id.* at ¶ 4.) By way of example, in the year 2000, there were approximately 1,000 people in the adjacent town of Maricopa. (*Id.*) In 2004, the town had grown to over 5,000 people and one year later, the population swelled to approximately 18,000. (*Id.*) The town of Maricopa projects that in a just a few years its population will exceed 100,000 people – a 100 fold increase in less than a decade. (*Id.*) This explosive growth has brought "big-city" problems to Ak-Chin, such as an increase in traffic, congestion and other effects of rapid urban expansion. (*Id.* at ¶ 5.) Because of the hyper-

---

[1] Ms. Caryle's declaration was originally filed as an exhibit to Plaintiff-Beneficiary's Supplemental Mem. in Opp'n to Defs.' Mot. for Remand and Stay of Litigation, filed on October 22, 2007 [Dkt. No. 23].

US2000 10572540.1

growth in the area, roadway infrastructure, in particular, is a major problem for Ak-Chin and

its neighbors. (*Id.*)

Trustee-Delegates hold all relevant information regarding roadways, rights-of-way,

easements, leases and the encumbrances crossing Ak-Chin's reservation (not to mention

cadastral surveys and other related information) which has been directly impacted by hyper-

growth. (*Id.* at ¶6.) Ak-Chin has made many good faith attempts to retrieve documentation

from Trustee-Delegates regarding information of this nature, but to no avail. (*Id.* at ¶7.)

Trustee-Delegates' failure to produce critical documents to Ak-Chin makes it impossible for

Ak-Chin to effectively protect its rights or negotiate with local developers, the State or local

governments regarding road expansion and other developments affecting its reservation. (*Id.*

at ¶8.) While Trustee-Delegates' failure to produce information to Ak-Chin regarding its

trust assets is not a new problem for Ak-Chin – indeed, for decades, Ak-Chin has had

difficulty obtaining trust records from Trustee-Delegates – because of the recent hyper-

growth in its area, obtaining this information is now a top priority. (*Id.* at ¶9.)

### B.      Trustee-Delegates Have Failed to Produce Critical Information Regarding Ak-Chin's Assets Through Informal Discovery.

On December 29, 2006, Ak-Chin initiated this action for an accounting of its trust

funds *and*, importantly, to enforce the duty that Trustee-Delegates provide all information

regarding the management and administration of Ak-Chin's trust assets, such as rights-of-

way and easements affecting Ak-Chin's reservation. (*Id.* at ¶10.) During the first meeting of

the parties' counsel in this action, on April 11, 2007, Trustee-Delegates took the position that

Ak-Chin was not entitled to discovery in this case, contending that Ak-Chin's case involves

nothing more than the Court's "review on an administrative record." *See* Fed. R. Civ. P.

4

26(a)(1)(E)(i) and Local Rule 16.3(b)(1); Joint Report Pursuant to Fed. R. Civ. P. 26(f) and Local Rule 16.3, at p. 3-5. Trustee-Delegates also withheld Initial Disclosures on those same grounds.[2]

During this same meeting, Ak-Chin's counsel informed Trustee-Delegates' counsel of the critical nature of Ak-Chin's request for information regarding Ak-Chin's assets in light of the impact of hyper-growth in its area. Trustee-Delegates' counsel agreed to produce information to Ak-Chin on an "informal" basis.

At a subsequent meeting on April 27, 2007, the Trustee-Delegates' counsel represented that they had already begun to collect for Ak-Chin the type of information identified by Ak-Chin's counsel during the April 11th meeting, and also represented that such information would be provided in June or July, 2007. On June 14, 2007, after not having received any responsive information despite Trustee-Delegates' counsel's representation to Ak-Chin and this Court that they were "in the process of copying and imaging and reviewing" responsive documents to Ak-Chin's request (see Tr. of June 6, 2007 Status Conference, 44:22-45:01; 47:14-18), Ak-Chin provided Trustee-Delegates' counsel with a listing of four roads, a pipeline and identified three narrow categories of supporting documentation that it required as a top-priority. (Carlyle Decl. at ¶11 and Ex. A thereto.) Nevertheless, citing privilege and confidentiality concerns, counsel for Trustee-Delegates refused to provide the requested information until a protective order was in place in the Ak-

---

[2] The United States served Initial Disclosures in Ak-Chin's Court of Federal Claims action, but only provided very limited information and promised to produce documents at a later date, most of which has not yet been provided, despite Ak-Chin's counsel's request for this promised documentation. See Exhibit 3 (Email correspondence between Bill Austin and Laura Maroldy dated July 26, 27, 30 and August 6, 2007). The United States also moved to dismiss Ak-Chin's Court of Federal Claims action pursuant to 28 U.S.C. § 1500. This motion is currently pending.

Chin proceeding before Judge Hewitt in the Court of Federal Claims – even though the requested information was not confidential and Ak-Chin requested the information as part of this proceeding. Nevertheless, Ak-Chin attempted to accommodate defendants' request and, in fact, on July 19, 2007, Judge Hewitt issued such an order, whereupon Trustee-Delegates had no impediment for producing the requested information contained in Ak-Chin's June 14th request. *Ak-Chin Indian Community v. United States,* No. 06-932L (Fed. Cl.) (Protective Order issued July 19, 2007).

After the protective order was issued, Ak-Chin still did not receive any of the information requested in its June 14th request. Plaintiff-Beneficiary's counsel repeatedly attempted to follow up with Trustee-Delegates' counsel requesting further information pursuant to Ak-Chin's June 14th request. (*See* Exhibit 3.) It was not until August 14, 2007, that Trustee-Delegates provided Ak-Chin with a redacted Title Status Report – the most basic of basic information – accompanied by a solemn promise to provide more documents relating to the June 14th request at a later date. (Carlyle Decl. at ¶12 and Ex. B thereto.) Trustee-Delegates' counsel specifically promised an "additional increment of documents" responsive to Ak-Chin's June 14th request – those that represent the most pressing need for purposes of ongoing development in and around Ak-Chin's reservation – and explained that they were simply being "imaged" and would be submitted pending confidentiality review. (*Id.* at ¶12 and Ex. B thereto.)

Despite the clear admission by Trustee-Delegates' counsel that responsive documents were not only available for distribution but also forthcoming, *Ak-Chin has yet to receive any information requested in its June 14th request or correspondence from Trustee-Delegates'*

6

counsel explaining the reason for the undue delay to date. (*See* Ex. B and Transcript of June 6, 2007 Status Conference, 44:22-45:01; 47:14-18.)

### C. The Clear Need for this Court's Intervention.

What the foregoing record indicates is that "informal" discovery is a farce. Trustee-Delegates have merely used it as a tool to string along Ak-Chin in the hopes that it will believe the Trustee-Delegates' next promise which ultimately, invariably, will be broken. What is equally clear is that until this Court orders production of information, it will not happen. In the meantime, Ak-Chin will continue to suffer and to be rendered vulnerable by Trustee-Delegates.

In light of this history, Ak Chin asks that this Court immediately enforce its right and the Trustee-Delegates' fiduciary duty to provide "information ... reasonably necessary to enable [Ak Chin] to enforce [its] rights under the trust ...." RESTATEMENT (SECOND) OF TRUSTS, § 173 ("Duty to furnish Information") (1959). *See also Clifford v. United States*, F.3d 144, 152 (D.C. Cir. 1998) (A trust beneficiary is entitled to receive "all information necessary to protect his rights under the trust."). What Ak-Chin needs, among other things, is information and documentation to protect its interest vis-à-vis third parties (*e.g.*, states, local municipalities, local businesses, developers). And it is beyond peradventure that where a beneficiary requests information about its trust *corpus*, the trustee (or in this case, the Trustee-Delegate) is under a strict duty to provide the requested information and, even without a request, to ensure the beneficiary has whatever "material facts affecting the interest of the beneficiary which [the Trustee-Delegate] knows the beneficiary does not know and which the beneficiary needs to know for his protection in dealing with a third person with respect to his interest." RESTATEMENT (SECOND) OF TRUSTS, comment d, ¶ 173.

7

As documented *supra* and in Ak-Chin's supplemental brief in opposition to the motion to remand filed October 22, 2007, the need for such information and related documentation here could not be more apparent. The vital interests of Ak-Chin hang in the balance. And the information needed is a textbook example of the precise type of information that a trustee must provide to a beneficiary for the beneficiary's "protection in dealing with third . . . person[s]" with or without request. Here, the trustee has failed this basic obligation and Ak-Chin needs immediate relief to prevent further irreparable harm.

This Court has inherent equitable authority to provide the relief requested and to order Trustee-Delegates to comply with their fiduciary obligation to furnish this critical information. *See, e.g., Village of Brookfield v. Pentis*, 101 F.2d 516, 520-21 (7th Cir. 1939) ("Courts of equity have original inherent jurisdiction to decree and enforce trusts").[3] It is this Court's obligation to protect the interest of the beneficiary of this trust from such harmful breaches. *See, e.g, Crawford v. La Boucherie Bernard Ltd.*, 815 F.2d 117, 120 (D.C. Cir. 1987), *cert. denied*, 484 U.S. 943 (1987) ("Trust law contemplates the use of broad and flexible equitable remedies as means for dealing with breaches of fiduciary duty, and it imposes the obligation upon the courts to use the remedy that is most advantageous to the participants and that will most closely effectuate the purposes of the trust.") (citation omitted). To be sure, much of the information Ak-Chin seeks is obtainable through discovery. The right of beneficiaries to obtain their trust information, however, is quite apart from any discovery rules and is enforceable as a matter of trust law applicable in this case. *See Cobell v. Norton*, 240 F.3d 1081, 1093 (D.C. Cir. 2001) ("As trustee delegates these

---

[3] The Court also clearly has case management authority to direct and supervise Trustee-Delegates' long-overdue production. *See, e.g.,* Fed. R. Civ. P. 16(c)(6) (specifically authorizing the Court's entry of "orders affecting disclosures and discovery . . . .").

officials ha[ve] a clear obligation to maintain trust records and furnish such records to

beneficiaries upon request." (emphasis added)); *Clifford v. United States,* 136 F.3d 144, 152

(D.C. Cir. 1998) (The beneficiary of a trust is entitled to receive "information necessary to

protect his rights under the trust.")[4]; *Eddy v. Colonial Life Ins. Co. of Am.,* 919 F.2d 747,

750 (D.C. Cir. 1990) ("The duty to disclose material information is the core of a fiduciary's

responsibility, animating the common law of trusts ...."); RESTATEMENT (SECOND) OF

TRUSTS, comment c, § 173 (1959) ("[T]he beneficiary is always entitled to such information

as is necessary to enable him to enforce his rights under the trust or to prevent or redress a

breach of trust.").[5]  *See also Beckett v. Air Line Pilots Ass'n,* 995 F.2d 280, 286-87 (D.C. Cir.

1993) ("the beneficiary of a trust may maintain a suit to compel the trustee to perform his

duties as trustee or to redress a breach of trust").

    To ensure that Ak-Chin will obtain the requisite information in the near term, Ak-

Chin respectfully suggests the following schedule (as provided in the attached Case

Management Order) be established:

    Plaintiff-Beneficiary will serve on Trustee-Delegates and file with the Court by no

later than March 1, 2008, a listing of information that is to be furnished by Trustee-

Delegates.  Trustee-Delegates will have 30 days from service to provide such material.  If

Trustee-Delegates object to production of such material or need clarification, they must file

---

[4] The UNIFORM TRUST CODE ("Code") provides that a trustee shall ensure beneficiaries are aware "of the material facts necessary for them to protect their interests" and "shall promptly respond to a beneficiary's request for information related to the administration of the trust."  Code § 813 (2005).
[5] Accordingly, a beneficiary has a right to demand from a trustee all information concerning the trust "for which he has reasonable use," and the trustee's failure to provide that information is a breach of trust.  G. BOGERT & G. BOGERT, THE LAW OF TRUSTS AND TRUSTEES § 961 (Rev. 2d ed. 2005).  Where a trustee refuses to provide such information, the court may order its production and the trustee must bear the expense of such a proceeding.  *Id.*

9

an appropriate motion for protective order by no later than 15 days after service of the Ak-Chin's request. If the Trustee-Delegates fail to object timely or seek enlargement of time, they will thereafter waive their right to object and shall provide the requested information. (*See* Ak-Chin's Updated CMO at ¶ 6.)

This is a matter of utmost importance for Ak-Chin. For this Plaintiff-Beneficiary, its prompt resolution takes precedence over the other case management issues addressed in this Status Report.

## III.   OTHER DEVELOPMENTS IN THE LITIGATION PRIOR TO THE TEMPORARY STAY ISSUED ON JULY 2, 2007.

### A.   Ak-Chin's Claim for an Equitable Accounting.

As noted above, Ak-Chin also has initiated this action for an equitable accounting of its trust funds and other assets held by Trustee-Delegates. Ak-Chin seeks, *inter alia*, a declaration that Trustee-Delegates owe a trust duty to provide a complete and accurate accounting of all such funds and assets and that they are in violation of this duty. Further, to the extent that the accounting demonstrates errors in the account balance, whether positive or negative, Ak-Chin seeks a decree directing the restatement and correction of its trust account balances reflecting the results of the accounting. Finally, the accounting may reveal other breaches of trust that will require further equitable relief which may be appropriate under the circumstances (*e.g.*, an order mandating the Trustee to bring an action against a third party, *see, e.g.*, RESTATEMENT (SECOND) OF TRUSTS § 177 ("Duty to Enforce Claims")) or reveal other actions that Ak-Chin may have to commence in other tribunals.

Contrary to what Trustee-Delegates contend, this is no ordinary APA review case, as this Court has now recognized. (*See* 12/19/07 Memo Order at 8-9.) As set forth in the

10

US2000 10572540.1

Complaint, Ak-Chin's claim is an action to enforce trust obligations – both express and implied – arising under the laws of the United States.  As such, this case is expressly pleaded as an action under 28 U.S.C. § 1331.

This action thus involves the inherent equitable powers of this Court to enforce the trust created by federal statutes – and not the mere review of an administrative record as Trustee-Delegates have contended.  Indeed, it is Trustee-Delegates' failure to fulfill their accounting obligations owed Ak-Chin for decades that necessitates this suit in the first place.  As a result, "[t]he narrower judicial powers appropriate under the APA do not apply [in this suit] . . . because the underlying lawsuit is both an Indian case and a trust case in which trustees have egregiously breached their fiduciary duties."  *Cobell v. Norton*, 391 F.3d 246, 257-58 (D.C. Cir. 2004) ("*Cobell XII*").

Trustee-Delegates therefore cannot evade accountability – as they have sought to do thus far in this litigation – by claiming that Ak-Chin has no right to engage in pre-trial discovery until after an "administrative record" has first been completed and reviewed.  This identical contention has been flatly rejected by the Court as "ill-founded" and "unsound" in the *Cobell* trust litigation, in which individual Indian trust beneficiaries have similarly sought to enforce Trustee-Delegates' accounting obligations in the face of decades of mismanagement and neglect.  *See Cobell v. Norton*, 226 F.R.D. 64, 92 (D.D.C. 2005).

Moreover, as this Court has now determined in denying Trustee-Delegates' remand-and-stay-request, "[t]hese cases, like *Cobell*, sound in traditional equity as well as in administrative law. . . ."  (12/19/07 Mem. Order at 7.)  Consequently, "it is the Court's obligation to define the trustee's legal duties and resolve the various charges raised in plaintiffs' complaints."  *Id.* at 8-9.  And, pre-trial discovery is absolutely critical as a

11

litigation tool that will "aid in the court's determination of such threshold questions of duty and breach." *Id.*

Ak-Chin submits that the case management order it proposed in this case eight months ago provides the proper foundation for further proceedings consistent with the Court's December 19 Memorandum Order. The elements of Ak-Chin's plan and Trustee-Delegates' APA-based opposition (a dispute which this Court has now effectively resolved in Ak-Chin's favor) are examined in the Sections below.

**B.     The Case Management and Discovery Plan Initially Proposed by Ak-Chin.**

During the meeting of counsel for the parties on April 11, 2007 (per Fed. R. Civ. P. 26(f) and Local Rule 16.3(c)), Ak-Chin presented a plan for the conduct of this litigation intended to resolve its equitable accounting claim in an orderly and timely fashion. This same case management plan – with minor modifications to accommodate government counsel's concerns – was later included in the Joint Report filed in this case on May 3, 2007. It was also outlined by counsel during the Status Conference on June 6, 2007. [Hearing Tr. at 12-15].

Ak-Chin's request for entry of such a Case Management Order ("CMO") was pending as of the Court's entry of the July 2 stay. With the lifting of that stay on December 19, this case management issue is now ripe for decision.

Pursuant to Ak-Chin's proposed CMO, along with the simultaneous and paramount proceedings outlined *supra* to obtain critical trust records, there is no reason not to also proceed on resolving the accounting claim. To accomplish this end, the litigation would be divided into two phases: (1) Declaratory Relief; and (2) Accounting Trial & Remedies.

12

Phase I ("Declaratory Relief") -- The initial phase is intended to address and resolve

Ak-Chin's requests for declaratory relief set forth in Count One of the Complaint. (*See*

Complaint at ¶¶ 32-39.)   The issues to be addressed in Phase I are to include:   (1)

identification of the fiduciary duties applicable to this trust; (2) the nature and scope of

Trustee-Delegates fiduciary duty to account;[6] and (3) whether they are in breach of this trust

duty as claimed by Ak-Chin.   These are precisely the types of "threshold questions" the

Court has now confirmed are to be addressed in this litigation. (*See* 12/19/07 Memo Order at

9.)

The six-month period proposed for Phase I discovery (both factual and expert) under

Ak-Chin's CMO would focus on such threshold issues of duty and breach.   And as a starting

point, Trustee-Delegates would be required to produce all of the financial data and records

referenced in their Answer and to identify any such materials that Trustee-Delegates contend

satisfy their accounting obligation.

No later than 45 days after the conclusion of Phase I discovery, Ak-Chin would move

for summary judgment.[7]   This motion would seek, among other things, a declaration setting

forth certain duties applicable to this trust – including the fiduciary duty to account for all

trust assets and that Trustee-Delegates had breached that duty.   In the event this Court

---

[6] As noted in Section IV below, since the CMO was initially prepared eight months ago, Trustee-Delegates have admitted that they owe such an accounting duty.  However, further questions remain for the Court to decide, including key determination with respect to the nature and scope of that fiduciary obligation.

[7] Per the proposed CMO, however, Ak-Chin would not be precluded from moving for relief regarding certain threshold issues (*e.g.*, the nature and scope of the accounting obligation owed by Trustee-Delegates) in advance of the completion of Phase I discovery.  Indeed, the resolution of such legal questions at an earlier stage could facilitate further Phase I proceedings by helping to frame other questions of law and fact and to identify the need for further discovery.

13

determined that issues of material fact remained regarding any Phase I issue, this Court would specially set a trial to resolve those factual issues.[8]

Phase II ("Accounting Trial & Remedies") -- Within 30 days of the Court's ruling on Phase I issues in favor of Ak-Chin, a further scheduling order would then issue governing Phase II proceedings. Although Ak-Chin submits that the details of this further order will not need to be determined until after Phase I, it is anticipated that the "Accounting Trial & Remedies" Phase would require an additional 12-month period to be completed (including additional factual and expert discovery). The Phase II "Accounting" trial would be scheduled at the end of this period, thereby allowing Trustee-Delegates ample time "for further agency consideration in harmony with the court's holding." (See 12/19/07 Memo Order at 9.) Phase II discovery in turn would be necessary to permit Ak-Chin to evaluate and test Trustee-Delegates' accounting methodology and the data on which it is premised, and to determine whether certain exceptions and objections to Trustee-Delegates' work product might be warranted.

At the Phase II trial, Trustee-Delegates would present their accounting of trust assets belonging to Ak-Chin in conformity with this Court's determination regarding the nature and scope of the accounting duty, and the Court then would hear Ak-Chin's exceptions and objections to the accounting. Following the Accounting Trial, the Court would determine whether Trustee-Delegates have complied with their declared trust duties. The propriety of any additional equitable relief would also be addressed at that time.

---

[8] The CMO that Ak-Chin initially submitted suggested May 2008 as the date for any Phase I trial that might be needed. Eight months have now passed, so that a change in the Phase I trial date and other changes are now necessary. Accordingly, Ak-Chin has substituted a "January 2009" date for any such specially set Phase I trial. See Updated CMO at ¶ 1(a). Additional modifications in the Updated CMO are addressed in Section IV below.

14

## C.    Defendants' APA-Based Objections.

Without proposing any Case Management Plan of their own (aside from their request for the remand and stay the Court has now denied), Trustee-Delegates opposed key elements of Ak-Chin's CMO as unnecessary in an APA-review case [*see* 5/3/07 Joint Report at 11-13 and 18-20]. Most notably, Trustee-Delegates took issue with Ak-Chin's proposal that the Court address the threshold issues of trust duty and breach, urging instead that the litigation be stayed (or dismissed altogether) so as to allow Interior to "exercise its primary responsibility and discretion to define and complete the accounting for the Tribe, as Interior deems required . . . ." Joint Report at 11-12. Trustee-Delegates further objected across-the-board to the allowance of any of the pre-trial discovery called for under Ak-Chin's CMO, and requested that the Court "prohibit formal discovery in this case." Joint Report at 18.

Under Trustee-Delegates' contrary approach, Ak-Chin would effectively be put in the position of continuing to wait indefinitely for Interior to produce some version of a purported "accounting" without Ak-Chin's being allowed any meaningful opportunity to test the accuracy or reliability of Trustee-Delegates' accounting work product through discovery and appropriate review of Ak-Chin's own trust information – and without the benefit of the Court's review as to the sufficiency of Trustee-Delegates' efforts. This is a far cry from the type of accounting Ak-Chin is clearly entitled to receive under traditional equitable principles. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 112 (1989) ("The extent of the duties . . . of a trustee is determined by the rules of law that are applicable to the situation; and not the rules that the trustee or his attorney believes to be applicable, and by the terms of the trust as the court may interpret them, and not as they may be interpreted by the trustee himself or by his attorney"); *Cobell VI*, 240 F.3d at 1103 (recognizing that "[t]he

15

trustee's report must contain sufficient information for the beneficiary readily to ascertain whether the trust has been faithfully carried out").

## IV.   FURTHER PROCEEDINGS NOW THAT THE JULY 2 STAY HAS BEEN LIFTED AND DEFENDANTS' THEORY THAT THIS IS MERELY AN AGENCY REVIEW CASE HAS BEEN REJECTED.

In denying Trustee-Delegates' remand-and-stay request on December 19, 2007, the Court laid to rest Trustee-Delegates' principal argument in opposition to Ak-Chin's CMO – *i.e.*, that this accounting action is nothing more than a typical APA review case.  As the Court has now made clear, "[t]hese cases, like *Cobell*,  sound in equity as well as in administrative law. . . ."  12/19/07 Mem. Order at 7.  And as such, the following principles govern further proceedings in these matters:

- First and foremost, "it is the court's obligation to define the trustee's legal duties and resolve the various charges raised in plaintiffs' complaints."  (12/19/07 Memo Order at 8-9.)  Indeed, the resolution of plaintiffs' claims for declaratory and injunctive relief "require analysis of trust and administrative law principles" that the Court (rather than agency officials) is particularly competent to provide.  (*See id.* at 9.)

- There is *no* legitimate reason to delay the Court's determination of "threshold questions of duty and breach" – particularly when the accounting plan Trustee-Delegates now claim to be committed to developing is "its response to trust-related concerns the department has been aware of for at least twenty years."  (*Id.* at 10.)  Indeed, in light of the recent admission by Trustee-Delegates that they have not even begun the accounting required by law (*see* 8/10/07 Remand Mo. at 22), it is appropriate to proceed forthwith in the manner outlined in the Updated CMO.

16

- Further, once Trustee-Delegates have been found by the Court to be in breach of their declared fiduciary duties, it may be "proper" to allow for "further agency consideration in harmony with the court's holding" before the litigation is concluded. (*Id.* at 9.) But in the end, it is for the Court to determine whether Trustee-Delegates have fulfilled their fiduciary duties in accordance with the law, and whether appropriate steps have been taken to rectify any declared breaches of their trust duties. (*See id.* at 8-9.)

With the lifting of the July 2 stay, the Court can now proceed to address and decide "threshold questions" of Trustee-Delegates' duties and their breach. The adoption of Ak-Chin's Updated CMO would allow this "next step" to be accomplished by the end of this calendar year. Pursuant to the same CMO, Phase II "Accounting & Remedies" issues could then be presented and resolved by the end of 2009. Ak-Chin therefore urges the Court to adopt the Updated CMO without further delay, and to address the other case management issues set forth below.

## A.   Plaintiff's Updated Case Management and Phase I Scheduling Order.

The provisions of the Updated CMO (*see* Exhibit "1") are virtually unchanged from what Ak-Chin presented in the Joint Report filed with the Court eight months ago.

As before, the Updated CMO calls for bifurcated proceedings, thus permitting the Court to decide the threshold questions of trust duty and breach during the initial "Declaratory Relief" phase. Deciding these key issues in this fashion will permit Trustee-Delegates the opportunity to take the Court's holdings into account as they proceed with

17

accounting-related activities during Phase II of the litigation.[9]  This in turn would be entirely consistent with the Court's December 19 articulation of principles governing further proceedings in the tribal trust cases. (*See* 12/19/07 Memo Order at 7-10.)

As before, the Updated CMO also would require that as a first step in Phase I discovery, Trustee-Delegates produce all of the materials referenced in the Answer they filed in this case in March 2007.  This is made critically necessary because the current lack of clarity regarding Trustee-Delegates' position.  In response to allegations in the Complaint that Trustee-Delegates have breached their trust duty to account for Ak-Chin's trust funds and assets, Trustee-Delegates repeatedly made reference to "financial and accounting data and documentation," "statements of account" and other "trust account information" they claim to have furnished to Ak-Chin. (*See* Answer at ¶¶ 2, 3, 5, 21, 30, 34, 36, 37 and 38.)  It is unclear from Trustee-Delegates' responsive pleadings, however, whether they actually intend to rely on any such materials as claimed satisfaction of the fiduciary duty that they allegedly owe.

Accordingly, the Updated CMO would require that Trustee-Delegates produce any and all such referenced materials within 30 days of the issuance of the Court's Order.  At the same time, Trustee-Delegates also would produce all work papers and other background source documents related thereto, and they would be required to specify at that same time which of the produced items (if any) they contend constitute a complete (or even partial),

---

[9] This is not to say that Trustee-Delegates should not commence their accounting effort *immediately* (if they have not already done so), as there is plenty they can begin doing without the Court's guidance.  But as the December 19 Memorandum Order recognizes, the Court's guidance will also be essential to ensure that Trustee-Delegates fully comprehend the nature and scope of their fiduciary duties.

18

accurate and adequate accounting of all trust assets belonging to Ak-Chin as required by law. (*See* Updated CMO at ¶ 2(a). )

Requiring such disclosures at the outset will facilitate Phase I discovery and help to frame the issues to be presented to the Court during the "Declaratory Relief" Phase. Among the relief requested by Ak-Chin in Count One of its Complaint is a determination that the Arthur Andersen reports prepared by Defendants' contractors more than a decade ago do not constitute in any respect the complete, accurate and adequate accounting required under law. (*See* Complaint at ¶ 37.) Depending on the position taken by Trustee-Delegates in complying with Paragraph 2(a) of the Updated CMO, it then may be possible to determine whether the Arthur Andersen reports (and other reports) present a Phase I issue necessitating further discovery and summary adjudication during Phase I. Similarly, Trustee-Delegates' other responses per Paragraph 2(a) may help to significantly narrow and focus further Phase I proceedings.

In the Joint Report filed with this Court in May 2007, Trustee-Delegates took issue with this particular CMO provision – not on grounds that the information to be elicited was of no relevance but because in Trustee-Delegates' view such a disclosure could only properly be required vis-à-vis the service of written discovery requests for production and admissions pursuant to Federal Rules 34 and 36, respectively. *See* Joint Report at 19.[10]

This is incorrect. The Court clearly has the authority to direct that such disclosures be made pursuant to its broad case management authority. *See, e.g.*, Fed. R. Civ. P. 16(c)(1) (empowering the Court to "take appropriate action with respect to the formulation and

---

[10] Trustee-Delegates effectively sought to avoid making any such disclosures whatsoever, inasmuch as the position taken elsewhere in the same Joint Report was that "the Court should prohibit formal discovery in this case." (*See id.* at 18.)

US2000 10572540.1

simplification of the issues"); Rule 16(c)(6) and (c)(12) (authorizing "the control and scheduling discovery, including orders affecting disclosures . . .; as well as the adoption of "special procedures for managing potentially difficult or protracted actions"); *and* Fed. R. Civ. P. 16(c)(16) (recognizing the broad authority of the Court to address "such other matters as may facilitate the just, speedy and inexpensive disposition of the action"). Moreover, imposing such a disclosure requirement on Trustee-Delegates at the onset of Phase I discovery would serve to reduce the delay that will otherwise result if Ak-Chin is required to seek the very same information by means of written discovery. Given the extensive delay already created by the temporary stay Trustee-Delegates were granted on July 2 for the purpose of presenting their failed remand request, the Court should utilize its Rule 16 authority in this instance to move the case forward without needlessly compounding such delay.

With respect to the other provisions of the Updated CMO, there is one change of particular significance for the Phase I proceedings. The CMO submitted eight months ago indicated that among the questions to be addressed and resolved in Phase I would be whether Trustee-Delegates had a duty to account for Ak-Chin's trust assets. (*See* 5/3/07 proposed CMO at paragraph 1(a).) During the June 6 Status Conference, however, government counsel conceded that there was indeed such a duty (Hearing Tr. at 39).[11] And the motion for remand that Trustee-Delegates thereafter filed in this and the 36 other tribal trust cases tacitly acknowledged the existence of such a trust duty in requesting a six-month "time out" to allow Interior to develop a plan to satisfy such an obligation. (*See* 8/10/07 Remand Mo. at

---

[11] Indeed, Defendants' counsel described it as "the government's core position that *the Interior Department is committed to and will complete the accounting required by law.*" (6/6/07 Hearing Tr. at 39 (emphasis added).)

22 (referring to the historical accounting plan Trustee-Delegates proposed to formulate as "[t]he first step in providing a full and complete accounting . . . .").)

Accordingly, Paragraph 1(a) of the Updated CMO has been amended to reflect that Defendants have now admitted that an accounting duty is owed. Of course, while this threshold issue has been resolved, other key legal questions remain to be decided by the Court in the first phase of the litigation. Among these are issues relating to the nature and scope of Trustee-Delegates' accounting obligation; and whether Defendants are in breach of the declared trust duties. As the Court's December 19 decision recognizes, it is for the Court to address and resolve such "threshold questions" without further delay. (*See* 12/19/07 Memo Order at 9.)

### B.   Trustee-Delegates' Refusal to Make the Initial Disclosure Required Per Rule 26(a)(1).

As noted above, Trustee-Delegates have objected to serving any initial disclosures in this action on the ground that this action purportedly involves nothing more than the Court's "review on an administrative record." *See* Fed. R. Civ. P. 26(a)(1)(E)(i) and Local Rule 16.3(b)(1). Trustee-Delegates made this objection at the parties' Rule 26(f) conference and in the Joint Report filed with the Court eight months ago, thereby relieving both parties from the obligation of serving initial disclosures. *See* Fed. R. Civ. P. 26(a)(1). Under Fed. R. Civ. P. 26, it is now for the Court to "rul[e] on the objection and determine what disclosures, if any, are to be made, and set the time for disclosure." *Id.*

The Court should overrule Trustee-Delegates' objection and direct the parties to serve initial disclosures within 30 days. As the Advisory Committee note to Fed. R. Civ. P. 26(a)(1)(E)(i) exempting actions for review of an administration record explain, the

21

exemption of an action for review of an administrative record . . . is intended to reach a proceeding that is *framed as an 'appeal'* based solely on an administrative record." Fed. R. Civ. P. Rule 26(a)(1) Advisory Committees' Note (2000) (emphasis added); 6 JAMES WM. MOORE, ET AL., MOORE'S FEDERAL PRACTICE ¶ 26.26[2] (3d ed. 1999).

It is for the plaintiff tribes, not Trustee-Delegates, to state the cause of action for which they seek relief. Ak-Chin's claim is not framed as an appeal but is *expressly pleaded* as an action under 28 U.S.C. § 1331 to enforce federal statutory trust responsibilities, both express and implied against Trustee-Delegates who owe substantial fiduciary duties to Ak-Chin. *See* Complaint at ¶ 9. As such, Ak-Chin's action for an equitable accounting of its trust assets including trust funds presents a federal question over which the Court clearly has subject-matter jurisdiction under Section 1331 – quite apart from the APA.

Nevertheless, Trustee-Delegates have ignored the contents of Ak-Chin's pleadings in this matter in attempting to characterize this case as an APA matter in which this Court's jurisdiction has been "invok[ed] . . . under the Administrative Procedure Act (APA), 5 U.S.C. §§ 500-706 . . . among other statutes." (*See* Joint Report at Section B.2._ This is not correct. The APA provision invoked by Ak-Chin as support for the breach of trust claim asserted under 28 U.S.C. § 1331 is Section 702 – which waives federal officials' sovereign immunity for actions (like this one) "seeking relief other than money damages" against federal officials' unlawful acts or omissions. 5 U.S.C. § 702. *See Schnapper v. Foley*, 667 F.2d 102, 108 (D.C. Cir. 1981) (holding that § 702 "was intended to eliminate the defense of sovereign immunity with respect to any action in a Court of the United States seeking relief other than money damages"). It is well settled that an APA waiver of sovereign immunity is *not* limited to APA claims, as "[t]he APA's waiver of sovereign immunity *applies to any suit*

22

*whether under the APA or not.*"  *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (emphasis added).  *See also Cobell VI*, 240 F.3d at 1094 ("Insofar as plaintiffs seek specific injunctive relief and declaratory relief – and, in particular, seek the accounting to which they are entitled – the government has waived its sovereign immunity under the provisions").

As such, Federal Rule 26(a)(1)(E)(i) does not apply as this is not an APA administrative review case.  The Parties should be ordered to serve all of the initial disclosures in this case that are required under Rule 26(a)(1).  *See* Updated CMO at Paragraph 2(b).

## C.    Additional Case Management Issues.

For the Updated CMO proposed by Ak-Chin to work effectively and without encountering further delay, the following issues also should be addressed and decided at this stage:

### 1.    *Lifting The Presumptive Limitations On Pre-Trial Discovery (Interrogatories And Deposition Limits).*

It is Trustee-Delegates that have the information relating to trust management to which tribal plaintiffs have far too long been denied access.  They also have a duty to furnish trust data that exceeds the parameters of discovery per the Federal Rules of Civil Procedure.  All such limits were removed in 1996 in the *Cobell* litigation.  The same should happen here.

### 2.    *Addressing the Issue of Document Preservation.*

Quite apart from Trustee-Delegates' obligation to preserve information and documents relevant to the pending litigation, there is an even broader duty under trust law principles for Trustee-Delegates to preserve records relating to trust administration.  *See,*

23

*e.g., Pueblo of San Ildenfonso v. United States*, 35 Fed. Cl. 777, 788 (1996) ("It is well settled that a trustee such as defendant is under a duty to keep and render clear and accurate accounts with respect to administration of the trust").

Nevertheless, there are numerous examples of the government's mishandling of Indian trust records in cases pending before this Court and the Court of Federal Claims. This has included repeated and widespread destruction of documents in the *Cobell* litigation. *See, e.g., Cobell v. Norton*, 224 F.R.D. 1, 4 (D.D.C. 2004) (nothing the then-Special Master's filing of "dozens of reports documenting a myriad of disturbing (and undisputed) findings with respect to the lack of care with which trust information was being safeguarded"); *Cobell VI*, 240 F.3d at 1093 (nothing the "egregious" nature of destruction of documents and the government's failure to report that destruction to the Court in a timely manner); *Cobell v. Babbitt* ("*Cobell V*"), 91 F. Supp.2d 1, 60 (D.D.C. 1999) (acknowledging the Special Master's report regarding destruction and late notification to the court regarding 162 boxes of potentially relevant Treasury Department filings). *See also Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 138 (2004) (concluding that "the failures evidenced in *Cobell* appear to be so pervasive and systematic as to provide ample support for the issuance of a document preservation order in this case").

The preservation of such trust materials is an absolute essential prerequisite for this Court to ensure the integrity of these proceedings. Trust documents that Defendants appear to have had a penchant for destroying are the essential lifeblood of the trust – without which there is no accountability. Accordingly, now that the July 2 stay has been lifted, Ak-Chin anticipates moving for the entry of a document preservation order. (*See* Paragraph 5 of the Updated CMO directing that such a motion be filed within 30 days).

24

Ak-Chin further proposes that the Court consider whether such a preservation order should be entered in all 37 of the tribal trust cases currently pending before this Court. As this Court's recent consolidation of these cases for purposes of consideration of Defendants' remand request reflects, this Court clearly has the discretion under Fed. R. Civ. P. 42 to proceed in such a fashion. And adopting a single form of preservation order for all 37 cases would not only mitigate the risk of further loss of irreplaceable trust records in these matters, but also reduce the burden imposed on Trustee-Delegates with respect to compliance and enforcement of the order's terms.

The Updated CMO thus directs the parties to address the consolidation issue when briefing the document preservation issue in connection with Ak-Chin's to-be-filed motion. (*See* ¶ 5.)

> **3.      *Entering A Protective Order To Prevent Trustee-Delegates' Delays In The Production Of Trust Data*.**

To ensure that disclosures required per the CMO and Phase I discovery are not delayed over purported "confidentiality" concerns, Ak-Chin proposes that the parties be directed to confer immediately regarding the provisions of a proposed Protective Order to be entered in this case pursuant to Fed R. Civ. P. 26(c). Per Paragraph 5 of the Updated CMO, counsel would be required within 15 days of the entry of the CMO to advise the Court whether they have reached agreement with respect to the terms of such a Protective Order. With respect to any provisions where differences then remain, counsel are to submit memoranda addressing any such differences and proposing how they might be appropriately resolved without delaying the disclosures required under Paragraphs 2(a) and 2(b) of the Updated CMO.

25

In the action for money damages filed by Ak-Chin in the Court of Federal Claims (*Ak-Chin Indian Community v. United States*, No. 06-932L (Fed. Cl.), Judge Emily Hewitt imposed similar requirements and deadlines on counsel for the parties with respect to the negotiation of the form of protective order to be entered in that CFC case. The approach was successful – counsel for the parties reported that they had reached an agreement with respect to all but two provisions of the form of protective order thereafter presented for the Court's consideration and entry. And following a telephone conference on July 18, 2007, in which counsel addressed their differences and how to resolve them, a protective order was entered by the Court the very next day.

The Protective Order issued in the Ak-Chin CFC case is attached as Exhibit "4." To facilitate discovery in this case, Ak-Chin is prepared to accept a similar form of protective order for use here.

## V.   **CONCLUSION**

For all of the foregoing reasons, Plaintiff-Beneficiary, The Ak-Chin Indian Community, respectfully requests the Court's adoption of the Revised Case Management and Phase I Scheduling Order submitted together with this Status Report.

Respectfully submitted,

/s/ Keith Harper
KEITH HARPER
D.C. Bar No. 451956
E-mail: kharper@kilpatrickstockton.com
G. WILLIAM AUSTIN
D.C. Bar No. 478417
E-mail: baustin@kilpatrickstockton.com
KILPATRICK STOCKTON LLP
607 14th Street, N.W.
Washington, D.C. 20005

26

Phone: (202) 508-5800

*Attorneys for Plaintiff*
The Ak-Chin Indian Community

January 18, 2008

27

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE AK-CHIN INDIAN
COMMUNITY,

        Plaintiff,

v.

DIRK KEMPTHORNE, ROSS O.
SWIMMER and HENRY M.
PAULSON,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

Case No. 06-CV-02245-JR
Judge James Robertson
**(Electronically filed on January 18, 2008)**

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing PLAINTIFF'S STATUS REPORT was electronically filed using the Court's ECF system and that the below-listed counsel are ECF users and will be served via the ECF System:

        Laura M.L. Maroldy, Esq.
        Martin J. LaLonde, Esq.
        United States Department of Justice
        Environmental and Natural Resources Division
        Natural Resources Section
        P.O. Box 663
        Washington, D.C.  20044-0663

This 18th day of January, 2008.

US2000 10572540.1

/s/ Keith Harper
KEITH HARPER
D.C. Bar No. 451956
E-mail: kharper@kilpatrickstockton.com
G. WILLIAM AUSTIN
D.C. Bar No. 478417
E-mail: baustin@kilpatrickstockton.com

KILPATRICK STOCKTON LLP
607 14th Street, N.W.
Washington, D.C. 20005
Phone: (202) 508-5800

*Attorneys for Plaintiff*
The Ak-Chin Indian Community

-29-

US2000 10572540.1